**EXHIBIT 1**

**JOINT COMBINED DISCLOSURE STATEMENT AND CHAPTER 11 PLANS OF LIQUIDATION**

50

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
---------------------------------------------------------------- x
                                             :
In re:                                       :  Chapter 11
                                             :
       APPVION, INC., et al.,¹               :  Case No. 17-12082 (KJC)
                                             :
              Debtors.                       :  (Jointly Administered)
                                             :
                                             :
---------------------------------------------------------------- x
```

## SECOND AMENDED JOINT COMBINED DISCLOSURE STATEMENT
## AND CHAPTER 11 PLANS OF LIQUIDATION

Dated: June 20, 2018
       Wilmington, Delaware

**DLA PIPER LLP (US)**
Stuart M. Brown (DE 4050)
Kaitlin Mackenzie Edelman (DE 5924)
1201 N. Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
       kaitlin.edelman@dlapiper.com

Richard A. Chesley (admitted *pro hac vice*)
444 West Lake Street, Suite 900
Chicago, Illinois 60606
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com

Jamila Justine Willis (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
Email: jamila.willis@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**LOWENSTEIN SANDLER LLP**
Kenneth A. Rosen, Esq. (admitted *pro hac vice*)
Wojciech F. Jung, Esq. (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 262-6700
Facsimile: (212) 262-7402
Email: krosen@lowenstein.com
       wjung@lowenstein.com

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Michael W. Yurkewicz (DE 4165)
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone: (302) 552-5519
Facsimile: (302) 426-9193
Email: myurkewicz@klehr.com

*Co-Counsel to the Official Committee of Unsecured Creditors*

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Appvion, Inc. (6469), Paperweight Development Corp. (4992), PDC Capital Corporation (1197), Appvion Receivables Funding I LLC (9218) and APVN Holdings LLC (8543). The corporate headquarters and the mailing address for the Debtors listed above is 825 East Wisconsin Avenue, P.O. Box 359, Appleton, Wisconsin 54912.

I.      INTRODUCTION .................................................................................................. 1

II.     DEFINITIONS AND CONSTRUCTION OF TERMS...................................................... 1

        A.      Definitions.................................................................................................. 1

        B.      Interpretation; Application of Definitions and Rules of Construction................. 19

III.    BACKGROUND .................................................................................................... 19

        A.      Overview of the Debtors' Business .............................................................. 19

        B.      The Debtors' Prepetition Capital Structure.................................................... 24

        C.      Events Precipitating the Chapter 11 Filing .................................................... 28

        D.      The Chapter 11 Cases ................................................................................ 30

IV.     CONFIRMATION AND VOTING.............................................................................. 38

        A.      Confirmation Procedures ............................................................................ 38

V.      TREATMENT OF UNCLASSIFIED CLAIMS............................................................... 44

        A.      General Administrative Expense Claims ........................................................ 44

        B.      Priority Tax Claims..................................................................................... 46

        C.      Statutory Fees........................................................................................... 46

        D.      ESOP........................................................................................................ 46

VI.     CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED
        RECOVERIES....................................................................................................... 46

VII.    TREATMENT OF CLAIMS AND INTERESTS ............................................................ 47

        A.      Treatment of Claims and Interests .............................................................. 47

        B.      Modification of Treatment of Claims and Interests......................................... 52

VIII.   PROVISIONS REGARDING THE LIQUIDATING TRUST............................................. 52

        A.      Appointment of the Liquidating Trustee........................................................ 52

        B.      Creation of Liquidating Trust ...................................................................... 52

        C.      Beneficiaries of Liquidating Trust ................................................................ 53

        D.      Vesting and Transfer of Assets to the Liquidating Trust................................. 53

        E.      Funding of the Liquidating Trust.................................................................. 53

| | | |
|---|---|---|
| F. | Distributions from the Liquidating Trust | 54 |
| G. | Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee | 54 |
| H. | Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets | 56 |
| I. | Term of Liquidating Trust | 56 |
| J. | Limitation of Liability of the Liquidating Trustee | 57 |

**IX.    ADDITIONAL MEANS FOR IMPLEMENTATION** ... 57

| | | |
|---|---|---|
| A. | Substantive Consolidation | 57 |
| B. | Preservation of Right to Conduct Investigations | 60 |
| C. | Prosecution and Resolution of Litigation Claims | 60 |
| D. | Effectuating Documents and Further Transactions | 61 |
| E. | Authority to Act | 61 |
| F. | Real Property | 61 |
| G. | Cancellation of Documents | 62 |
| H. | Termination of Debtors' Plans | 62 |
| I. | Corporate Action; Effectuating Documents; Further Transactions | 62 |
| J. | Release of Liens | 63 |
| K. | Exemption from Securities Laws | 63 |
| L. | Exemption from Certain Taxes and Fees | 63 |
| M. | Privileges as to Certain Causes of Action | 64 |
| N. | Preservation of Causes of Action | 64 |
| O. | Insurance Policies | 65 |
| P. | Filing of Monthly and Quarterly Reports and Payment of Statutory Fees | 65 |
| Q. | Closing of the Chapter 11 Cases | 65 |

**X.    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED PLAN AND DISCLOSURE STATEMENT** ... 65

| | | |
|---|---|---|
| A. | Distribution Record Date; Transferability | 65 |
| B. | Method of Payment | 66 |
| C. | Claims Objection Deadline | 66 |
| D. | No Distribution Pending Allowance | 66 |
| E. | Reserve of Cash Distributions | 66 |

EAST\152399891.23

| | | |
|---|---|---|
| F. | Distribution After Allowance | 66 |
| G. | Delivery of Distributions | 67 |
| H. | Unclaimed Distributions | 67 |
| I. | Set-Off | 67 |
| J. | Postpetition Interest | 68 |
| K. | Distributions After Effective Date | 68 |
| L. | Distributions Free and Clear | 68 |
| M. | Allocation of Distributions Between Principal and Interest | 68 |
| N. | De-Minimis Distribution and Donation | 68 |
| O. | Prepayment | 68 |
| XI. | EXECUTORY CONTRACTS | 68 |
| A. | Rejection of Executory Contracts | 68 |
| B. | Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement | 69 |
| XII. | INJUNCTION, EXCULPATION AND RELEASES | 69 |
| A. | Injunction to Protect Estate Assets | 69 |
| B. | Term of Injunctions or Stays | 70 |
| C. | Injunction Against Interference with Plan | 70 |
| D. | Exculpation | 70 |
| E. | Releases | 71 |
| F. | Necessity and Approval of Releases and Injunctions | 73 |
| G. | Releases, Exculpations, Waivers and Injunctions under Plan and Related Documents Shall Not Affect Fifth Third Bank and KeyBank Suits for Damages under DIP Credit Agreement | 74 |
| XIII. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 74 |
| A. | General | 74 |
| B. | Consequences to the Debtors | 75 |
| C. | Consequences to Holders of Claims and Equity Interests | 76 |
| D. | Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests | 77 |
| E. | Tax Treatments of Holders of Warrants | 79 |
| F. | Withholding on Distributions, and Information Reporting | 80 |

EAST\152399891.23

XIV.  CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION
      AND THE EFFECTIVE DATE ..................................................................... 81

      A.  Conditions Precedent to Confirmation ............................................... 81

      B.  Conditions Precedent to the Effective Date ....................................... 81

      C.  Establishing the Effective Date .......................................................... 82

      D.  Effect of Failure of Conditions ......................................................... 82

      E.  Waiver of Conditions to Confirmation and Effective Date ................ 82

XV.   RETENTION OF JURISDICTION ............................................................... 83

XVI.  MISCELLANEOUS PROVISIONS ............................................................... 85

      A.  Amendment or Modification of this Combined Plan and Disclosure
          Statement ............................................................................................ 85

      B.  Severability ........................................................................................ 85

      C.  Revocation or Withdrawal of this Combined Plan and Disclosure
          Statement ............................................................................................ 85

      D.  Binding Effect .................................................................................... 86

      E.  Notices ................................................................................................ 86

      F.  Governing Law ................................................................................... 87

      G.  Withholding and Reporting Requirements ......................................... 87

      H.  Headings ............................................................................................. 87

      I.  Exhibits/Schedules ............................................................................. 87

      J.  Filing of Additional Documents ........................................................ 88

      K.  No Admissions .................................................................................... 88

      L.  Successors and Assigns ...................................................................... 88

      M.  Reservation of Rights ......................................................................... 88

      N.  Inconsistency ...................................................................................... 88

      O.  Dissolution of the Debtors ................................................................. 88

      P.  Dissolution of the Creditors' Committee ........................................... 89

XVII. RISKS AND OTHER CONSIDERATIONS .................................................. 89

      A.  Bankruptcy Considerations ................................................................ 89

      B.  No Duty to Update Disclosures .......................................................... 90

      C.  Alternatives to Confirmation and Consummation of the Plan ........... 90

      D.  Certain Federal Tax Consequences .................................................... 90

EAST\152399891.23

XVIII. RECOMMENDATION AND CONCLUSION................................................................ 96

Each Holder of a Claim against the Debtors entitled to vote to accept or reject the Plan should read this Combined Plan and Disclosure Statement in its entirety before voting. No solicitation of votes to accept or reject this Combined Plan and Disclosure Statement may be made except under the terms hereof and section 1125 of the Bankruptcy Code. If you are entitled to vote to approve the Plan, you are receiving a Ballot with your notice of this Combined Plan and Disclosure Statement. The Debtors and the Creditors' Committee urge you to vote to accept the Plan.

This Combined Plan and Disclosure Statement has been prepared in accordance with sections 1125 and 1129 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3017, and Local Rule 3017-2, and not in accordance with federal or state securities law or other applicable non-bankruptcy law. Persons or Entities trading in or otherwise purchasing, selling, or transferring Claims against, or Interests in, the Debtors should evaluate this Combined Plan and Disclosure Statement in light of the purpose for which it was prepared. This Combined Plan and Disclosure Statement shall not be construed to be advice on the tax, securities, or other legal effects of this Combined Plan and Disclosure Statement as to Holders of Claims against or Interests in the Debtors.

There has been no independent audit of the financial information contained in this Combined Plan and Disclosure Statement except as expressly indicated herein. This Combined Plan and Disclosure Statement was compiled from information obtained from numerous sources believed to be accurate to the best of the Debtors' knowledge, information, and belief. This Combined Plan and Disclosure Statement was not filed with the Securities and Exchange Commission or any state authority and neither the Securities and Exchange Commission nor any state authority has passed upon the accuracy, adequacy, or merits of this Combined Plan and Disclosure Statement. Neither this Combined Plan and Disclosure Statement nor the solicitation of votes to accept or reject the Plan constitutes an offer to sell, or the solicitation of an offer to buy, securities in any state or jurisdiction in which such offer or solicitation is not authorized.

This Combined Plan and Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements.

Any projected recoveries to Creditors set forth in this Combined Plan and Disclosure Statement are based upon the analyses performed by the Debtors and their advisors. Although the Debtors and their advisors have made every effort to verify the accuracy of the information presented herein, the Debtors and their advisors cannot make any representations or warranties regarding the accuracy of the information.

Nothing herein shall be deemed or construed as an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party. The statements contained herein are made as of the date hereof, unless another time is specified. The delivery of this Combined Plan and Disclosure Statement shall not be deemed or construed to create any implication that the information contained herein is correct at any time after the date hereof.

It is the opinion of the Debtors and the Creditors' Committee that the treatment of Creditors under the Plan contemplates a greater recovery than that which is likely to be achieved under other alternatives for the Debtors. Accordingly, the Debtors and the Creditors' Committee believe that confirmation of the Plan is in the best interests of Creditors, and the Debtors and the Creditors' Committee recommend that Creditors support and vote to accept the Plan.

# I.  INTRODUCTION

Appvion, Inc. ("Appvion"), together with its affiliated debtors and debtors in possession (collectively, the "Debtors"), and the Creditors' Committee propose this Combined Plan and Disclosure Statement under sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.  While the Debtors and the Creditors' Committee are the proponents of this Combined Plan and Disclosure Statement within the meaning of section 1129 of the Bankruptcy Code, this Combined Plan and Disclosure Statement, as may be amended from time to time, is the culmination of extensive negotiations between the Debtors, certain of its lenders, the Creditors' Committee, and other key constituents of the Debtors' Estates, resulting in these consensual liquidating chapter 11 plans for the Debtors and the remaining Assets of the Estates. The Debtors and the Creditors' Committee support this Combined Plan and Disclosure Statement and encourage the Holders of impaired Claims entitled to vote hereunder to vote to accept this Combined Plan and Disclosure Statement.

This Combined Plan and Disclosure Statement contemplates the creation of a Liquidating Trust from which, under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, Distributions shall be made for the benefit of Holders of various Allowed Claims.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, and those restrictions on modifications set forth in Section XVI.A of this Combined Plan and Disclosure Statement, the Debtors expressly reserve the right, in accordance with Section XVI.A, to alter, amend, or modify this Combined Plan and Disclosure Statement, including the Plan Supplements, one or more times before substantial Consummation thereof.

# II.  DEFINITIONS AND CONSTRUCTION OF TERMS

## A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**2L/Committee Settlement**" means that certain Settlement Agreement effective as of May 9, 2018 entered into by and among the Majority DIP Lender, the Debtors, the Second Lien Noteholders, the Creditors' Committee and the Purchaser, approved by the *Order Approving Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 753] granting the *Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 734].

2.    "**363 Sale**" means the sale of substantially all of the Debtors' Assets as set forth in, and in accordance with, the 363 Sale Documents, which was consummated on the 363 Sale Effective Date.

3.    "**363 Sale Agreement**" means that certain Asset Purchase Agreement, dated as of March 13, 2018, by and among Appvion Holding Corp., as Purchaser, and Debtors Appvion, PDC, PDC Capital, Appvion Receivables, and APVN, as sellers, approved by the Bankruptcy Court on May 14, 2018, as amended, modified or supplemented from time to time.

4.    "**363 Sale Documents**" means the 363 Sale Agreement, the 363 Sale Order, and all documents, instruments, and agreements executed and delivered in connection with the consummation of the transactions contemplated by the 363 Sale Agreement.

5.    "**363 Sale Effective Date**" or "**Closing Date**" means June 13, 2018, the effective date of the 363 Sale.

6.    "**363 Sale Motion**" means *the Motion of the Debtors For Entry of Orders (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets; (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to Assumption and Assignment of Certain Executory Contracts and Unexpired Leases;(D) Approving the Form and Manner of Notice Thereof, and (II)(A) Approving and Authorizing the Sale of Substantially All Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 425].

7.    "**363 Sale Order**" means the *Order (A) Approving and Authorizing the Sale of Substantially All of the Debtors' Assets Pursuant to Successful Bidder's Asset Purchase Agreement, Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 751].

8.    "**401(k) Fund**" means the 401(k) retirement savings feature of the KSOP.

9.    "**Acquired Assets**" means all Assets transferred, conveyed, sold, and assigned to the Purchaser under and in connection with the consummation of the 363 Sale under the 363 Sale Documents, which are set forth in more detail in the 363 Sale Agreement.

10.    "**Accounts Receivable Securitization Facility**" means the accounts receivable securitization program whereby transactions under the accounts receivable facility were accounted for as sales of trade receivables, pursuant to that certain Receivables Purchase Agreement dated as of June 4, 2014 among Appvion Receivables, as seller, Appvion, as servicer, various purchasers from time to time party thereto, and Fifth Third Bank, as purchaser and administrative agent and that certain Purchase and Sale Agreement dated as of June 4, 2014 between Appvion and Appvion Canada Ltd., as originators, and Appvion Receivables.

11.    "**Ad Hoc Group of Second Lien Noteholders**" means that group of certain beneficial holders, or investment advisors or managers of beneficial holders, of the Second Lien Notes issued under the Second Lien Indenture identified in the *Second Supplemental Verified Statement of Stroock & Stroock & Lavan LLP and Young Conaway Stargatt & Taylor LLP Pursuant to Bankruptcy Rule 2019* [D.I. 763], as may be amended or updated from time to time.

- 2 -

12. "**Administrative Expense Claim**" means any Claim constituting an actual, necessary cost or expense of administering the Chapter 11 Cases under sections 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estates, (b) any fees or charges assessed against the Estates under section 1930 of chapter 123 of title 28 of the United States Code, and (c) all Claims arising under section 503(b)(9) of the Bankruptcy Code.

13. "**Administrative Expense Claim Bar Date**" means the deadline, which is thirty (30) days from the Effective Date, for Holders of Administrative Expense Claims accruing for the period from the Petition Date through the Effective Date to file a request with the Bankruptcy Court for payment of such Administrative Expense Claim in the manner indicated in Section V herein.

14. "**Allowed**" means, with respect to Claims: (a) any Claim, proof of which was timely Filed (or for which Claim, under this Combined Plan and Disclosure Statement, the Bankruptcy Code, or a Final Order of the Bankruptcy Court, a proof of Claim is not or shall not be required to be Filed); (b) any Claim which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent and for which no proof of Claim has been Filed; or (c) any Claim expressly allowed under this Combined Plan and Disclosure Statement or a Final Order of the Bankruptcy Court; *provided* that any Claim described in clauses (a) and (b) shall be considered Allowed only if and to the extent that with respect to such Claim, no objection to the allowance thereof has been interposed within the applicable period fixed by this Combined Plan and Disclosure Statement, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such objection is interposed and the Claim or any portion thereof is subsequently Allowed by a Final Order; *provided, further*, that Claims Allowed solely for purposes of voting on this Combined Plan and Disclosure Statement under an Order of the Bankruptcy Court shall not be considered "Allowed" Claims hereunder. An Allowed Claim shall be net of any valid setoff exercised with respect to such Claim under the provisions of the Bankruptcy Code and applicable law. Moreover, any portion of a Claim that is satisfied, released, or waived during the Chapter 11 Cases is not an Allowed Claim. Unless otherwise specified in this Combined Plan and Disclosure Statement, in section 506(b) of the Bankruptcy Code, or by Final Order of the Bankruptcy Court, "Allowed" Claims shall not, for purposes of Distributions under this Combined Plan and Disclosure Statement, include interest on such Claim accruing from and after the Petition Date.

15. "**Appvion**" means Appvion, Inc.

16. "**Appvion Canada**" means Appvion Canada, Ltd.

17. "**Appvion Netherlands**" means Appvion Global Netherlands Cooperatief UA.

18. "**Appvion Receivables**" means Appvion Receivables Funding I LLC.

19. "**APVN**" means APVN Holdings, LLC.

20. "**Arjo Wiggins**" means Arjo Wiggins Appleton p.l.c.

- 3 -

21.    "**Assets**" means all tangible and intangible assets of every kind and nature of the Debtors and the Estates within the meaning of section 541 of the Bankruptcy Code.

22.    "**Avoidance Actions**" means all rights to avoid transfers or distributions and recover any such avoided transfers or distributions for the benefit of the Estates under chapter 5 of the Bankruptcy Code or otherwise, including, but not limited to, Bankruptcy Code sections 502(d), 510, 541, 542, 544, 545, 547, 548, 550, 551, and 553, or otherwise under the Bankruptcy Code or under similar or related state or federal statutes and common law, including, without limitation, all preference, fraudulent conveyance, fraudulent transfer, and/or other similar avoidance claims, rights, and causes of action, whether or not demand has been made or litigation has been commenced as of the Effective Date.

23.    "**Ballot**" means the ballot on which each Holder of a Claim entitled to vote on the acceptance or rejection of this Combined Plan and Disclosure Statement casts such vote.

24.    "**Balloting Agent**" means Prime Clerk.

25.    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*

26.    "**Bankruptcy Court**" or "**Court**" means the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases, or if such Court ceases to exercise jurisdiction over the Chapter 11 Cases, such court or adjunct thereof that exercises jurisdiction over the Chapter 11 Cases in lieu of the United States Bankruptcy Court for the District of Delaware.

27.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time.

28.    "**Beneficiary**" means any Holder of an Allowed Second Lien Secured Note Claim in Class 3 and any Holder of an Allowed General Unsecured Claim in Class 5 that may, or that is entitled to, receive a Distribution from the Liquidating Trust under the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

29.    "**Bid Procedures Motion**" means the *Motion of Debtors for Entry of Orders (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All Assets, (B) Approving Stalking Horse Protections, (C) Approving Procedures Related to Assumption of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof, and (II)(A) Approving and Authorizing Sale of Substantially All Debtor Assets to Successful Bidder Free and Clear of All Liens, Claims, Encumbrances and Other Interests, (B) Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [D.I. 425].

30.    "**Bid Procedures Order**" means the *Order (I)(A) Approving and Authorizing Bidding Procedures in Connection With the Sale of Substantially All Assets, (B) Approving the Expense Reimbursement, (C) Approving Procedures Related to the Assumption and Assignment*

- 4 -

*of Certain Executory Contracts and Unexpired Leases, (D) Approving the Form and Manner of Notice Thereof*, entered by the Bankruptcy Court on March 12, 2018 [D.I. 565].

31.    "**Board**" means the boards of directors of Appvion and PDC.

32.    "**Business Day**" means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

33.    "**Cash**" means legal tender of the United States of America and equivalents thereof.

34.    "**Causes of Action**" means all claims, actions (including the Avoidance Actions), causes of action, choses in action, suits, refunds, turnovers, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims of any Debtor and/or any of the Estates against any Person, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, and any and all commercial tort claims against any Person, arising from or relating to any act or omission or other event occurring at any time prior to (and including) the Effective Date; and *subject, however,* to any releases provided in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the 363 Sale Order, 2L/Committee Settlement, or any other Final Order of the Bankruptcy Court. For the avoidance of doubt, the Causes of Action shall not include any Causes of Action against the Released Parties.

35.    "**CBAs**" means the collective bargaining agreements entered into by and among Appvion and USW.

36.    "**Chapter 11 Cases**" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  17-12082 (KJC), 17-12083 (KJC), 17-12084 (KJC), 17-12085 (KJC) and 17-12086 (KJC), which Chapter 11 Cases are jointly administered under case number 17-12082 (KJC).

37.    "**Chief Restructuring Officer**" means Alan D. Holtz of AP Services LLC.

38.    "**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

39.    "**Claims Agent**" means Prime Clerk.

40.    "**Claims Objection Deadline**" means the date that is one hundred and eighty (180) days after the Effective Date or such later date as may be approved by the Bankruptcy Court.

- 5 -

41. "**Class**" means any group of substantially similar Claims or Interests classified by this Combined Plan and Disclosure Statement under sections 1122 and 1123(a)(1) of the Bankruptcy Code.

42. "**Combined Plan and Disclosure Statement**" or "**Plan**" means this combined disclosure statement and chapter 11 plan of liquidation including, without limitation, all exhibits, supplements, appendices, and schedules hereto, either in their present form or as the same may be altered, amended, or modified from time to time through and including the Effective Date; *provided that* any such modifications are reasonably acceptable to the Majority DIP Lender, the Creditors' Committee, and the Ad Hoc Group of Second Lien Noteholders.

43. "**Company**" means Appvion and its subsidiaries and affiliates.

44. "**Consummation**" or "**Consummate**" means the occurrence of or to achieve the Effective Date.

45. "**Creditor**" means any Person that is the Holder of a Claim against any of the Debtors.

46. "**Creditors' Committee**" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in the Chapter 11 Cases on October 11, 2017 [D.I. 97], as may be amended from time to time.

47. "**Cure Notices**" means all notices to counterparties to Executory Contracts, including the *Notice to Counterparties to Executory Contracts and Unexpired Leases that May be Assumed and Assigned* filed by the Debtors on March 13, 2018 [D.I. 576] and including all amendments and supplements thereto and any additional such notices that may be Filed and served from time to time.

48. "**D&O Insurance**" means all primary and excess Insurance Policies that provide coverage for liability related to the Litigation Claims and the Released D&O Claims, and, if applicable, "tail" or "runoff" coverage for such policies.

49. "**Debtors**" means Appvion, PDC, PDC Capital, Appvion Receivables, and APVN.

50. "**Debtors in Possession**" means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases under sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

51. "**DIP Agent**" means Wilmington Trust, National Association, in its capacity as administrative and collateral agent in connection with the DIP Financing.

52. "**DIP Credit Agreement**" means that certain Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of October 2, 2017, as amended from time to time, or that certain Senior Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of March 16, 2018, as amended from time to time, as applicable.

EAST\152399891.23

53.    "**DIP Facility Claims**" means Claims arising under the DIP Financing.

54.    "**DIP Financing**" means the initial postpetition, senior superpriority debtor-in-possession financing; the Senior DIP Facility; and the letter of credit facility provided to the Debtors by the DIP Lenders and the L/C Issuer, respectively, pursuant to and under the respective DIP Credit Agreement and DIP Order.

55.    "**DIP Lenders**" means the lenders party to the DIP Financing.

56.    "**DIP Motion**" means, collectively, the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Secured Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [D.I. 17]; and the Senior DIP Motion.

57.    "**DIP Order**" means any of, or collectively, (i) the *Interim Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 75]; (ii) the *Interim Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (III) Modifying Final Existing DIP Financing Order; (IV) Scheduling A Final Hearing; and (V) Granting Related Relief* [D.I. 564]; and (iii) the Final DIP Orders, each as modified, amended and/or supplemented from time to time.

58.    "**Direct ESOP Claims**" means solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

59.    "**Directors and Officers**" means the current and former directors and officers of the Debtors.

60.    "**Disputed**" means, with respect to any Claim or any portion thereof, (A) any Claim that (i) is, or hereafter may be listed on the Schedules as disputed, contingent, or unliquidated; (ii) is evidenced by a proof of Claim that, on its face, is contingent or unliquidated; (iii) is evidenced by a proof of Claim which amends a Claim scheduled by the Debtors as contingent, unliquidated or disputed; or (iv) is objected to in whole or in part or subject to a request for estimation prior to the Claims Objection Deadline, which objection or request for estimation has not been withdrawn or resolved; and (B) any Claim that is not an Allowed Claim or a disallowed Claim in whole or in part by settlement or Final Order.

61.    "**Distribution**" means Cash, property, interests in property or other value distributed to Holders of Allowed Claims, or their designated agents, or Beneficiaries, as

- 7 -

applicable, under this Combined Plan and Disclosure Statement and/or the Liquidating Trust Agreement.

62.    "**Distribution Date**" means the date or dates determined by the Liquidating Trustee in accordance with the terms of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement upon which the Liquidating Trustee shall make Distributions to holders of Allowed Claims entitled to receive Distributions under the Plan.

63.    "**Distribution Record Date**" means the record date for purposes of making Distributions under the Plan and the Liquidating Trust Agreement on account of Allowed Claims, which date or dates shall be set forth in the Liquidating Trust Agreement.

64.    "**Domtar**" means Domtar Paper Company, LLC, Domtar A.W., LLC and its affiliates.

65.    "**Domtar Motion**" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Performing Under the Consignment Agreement Nunc Pro Tunc to the Petition Date (II) Authorizing the Debtors to Obtain Postpetition Credit Under the Domtar Facility; (III) Authorizing the Use of Cash Collateral; (IV) Granting Adequate Protection to Domtar; (V) Approving Setoff; (VI) Modifying the Automatic Stay; and (VII) Waiving Bankruptcy Rule 6004(h)* [D.I. 98].

66.    "**Domtar Supply Agreement**" means that certain Supply Agreement entered into by and between Domtar Paper Company, LLC, Domtar A.W., LLC and Appvion, together with all related ancillary agreements, undertakings, understandings, terms and condition.

67.    "**Effective Date**" means the date on which the conditions specified in Section XIV.B of this Combined Plan and Disclosure Statement have been satisfied or waived and the transactions contemplated hereunder have been substantially consummated.

68.    "**Employee Benefit Programs**" means, collectively, (a) medical and dental, and prescription drug insurance plans and health savings plans; (b) life, disability, and AD&D insurance; (c) retiree medical, dental, and life insurance and related benefits; (d) holidays and other paid time off; (e) reimbursement and allowance programs; (f) an onsite clinic; (g) a health facility; (h) an employee assistance program; (i) a scholarship program; and (j) miscellaneous other benefit plans and policies of Appvion.

69.    "**Employee Benefit Plans**" means the Appvion, Inc. Retirement Plan, amended and restated effective January 1, 2015; Pace Industry Union-Management Pension Plan; the Appleton Papers Inc. Supplemental Executive Retirement Plan, as amended through March 28, 2001, the Amendment to the Appleton Papers Inc. Supplemental Executive Retirement Plan, effective January 1, 2009, and the Amendment to the Appvion, Inc. Supplemental Executive Retirement Plan, dated August 27, 2014; the Nonqualified Excess Plan; the Appvion, Inc. Flexible Benefits Plan for Bargaining Unit Employees, amended and restated effective January 1, 2017; Appvion, Inc. Flexible Benefits Plan for Non-Bargaining Unit Employees, amended and restated effective January 1, 2017; Appvion, Inc. Long Term Restricted Stock Unit Plan, as amended and restated effective January 1, 2017; the Appvion, Inc. Long Term Stock Appreciation Rights Plan, as amended and restated effective January 1, 2017; the Appvion, Inc.

- 8 -

Group Medical Plan, restated effective January 1, 2016; the Employee Referral Award Policy, effective January 1, 2008 and revised on January 1, 2014; the Appvion, Inc. Short Term Disability for Non-Union Employees, effective July 1, 2011 and revised on June 1, 2016; the Appvion, Inc. Disability Plan For Non-Bargaining Unit Employees, effective July 1, 2015; the Appvion, Inc. Cafeteria Plan; the Appvion, Inc. Group Life Insurance Plan, including AD&D; the Appvion, Inc. Dental Plan; the Appvion, Inc. Severance Plan For Salaried Employees; the HCC Life Insurance Company Stop Loss Policy, effective July 1, 2017; the Travel Insurance Policy; the Code Section 105(h) Plan Reserve Fund; the Charles Boyd Scholarship Program; the Work Disruption Pay Policy, effective July 14, 2008 and revised on January 1, 2015; the Appvion, Inc. Accident & Sickness for Bargaining Unit Hourly Employees, effective January 1, 1993 and revised on March 1, 2014; the 2017 Annual Incentive Plan for Union Hourly Employees, effective January 2017; the Overtime and Miscellaneous Pay – Non-Union Employees Policy, effective July 14, 2018 and revised on January 1, 2017; and all other benefit plans made available to the employees of Appvion.

70.     "**Encapsys Business**" means the business of developing and manufacturing microencapsulation solutions formerly owned by Appvion and sold to an affiliate of Sherman Capital Holdings LLC on August 4, 2015.

71.     "**Entity**" means an entity as defined in section 101(15) of the Bankruptcy Code.

72.     "**Equity Interest**" means any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock or limited company interests.

73.     "**Equity Security**" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

74.     "**ESOP**" means the Paperweight Development Corporation employee stock ownership plan component of the KSOP, invested in the stock of PDC.

75.     "**ESOP Committee**" means the members of the ESOP administrative committee established to perform all administrative functions with respect to the operation of the ESOP and to direct the ESOP Trustee.

76.     "**ESOP Trustee**" means Argent Trust Company.

77.     "**Estates**" means the estates of the Debtors created upon the commencement of the Chapter 11 Cases, including all of the Debtors' Assets.

78.     "**Exculpated Parties**" means, as of the Petition Date through the date of Consummation of the Plan, the Debtors, the Creditors' Committee and members of the Creditors' Committee (solely in their capacity as members of the Creditors' Committee), Alan D. Holtz (current Chief Restructuring Officer), AP Services, LLC, the Debtors' Professionals, the Foreign Subsidiaries, the Senior DIP Lenders and DIP Lenders, the Senior DIP Agent and DIP Agent and each of their respective Related Persons, in their capacity as such, to the extent such Related Persons serve as fiduciaries of the Estates, as well as the Debtors' current directors and officers as of the Petition Date through the date of the Consummation of the Plan.

- 9 -

79.    "**Executory Contract**" means any executory contract or unexpired lease as of the Petition Date between any Debtor and any other Person or Persons.

80.    "**File**", "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases or any other related proceedings.

81.    "**Final DIP Order**" means any of, or collectively, (i) the *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) Granting Adequate Protection to Postpetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364; and (III) Granting Related Relief* [D.I. 234]; (ii) the *Final Order (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Modifying Final Existing DIP Financing Order; and (III) Granting Related Relief* [D.I. 625]; and (iii) the Senior DIP Order, each as modified, amended and/or supplemented from time to time.

82.    "**Final Order**" means an Order of the Bankruptcy Court or a Court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified, or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; *provided, however,* that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be Filed with respect to such order shall not cause such order not to be a Final Order.

83.    "**First Day Motions**" has the meaning set forth in Section III.D.1 of this Combined Plan and Disclosure Statement.

84.    "**Foreign Subsidiaries**" means Appvion Canada, Ltd., Arjo Wiggins and Appvion Netherlands.

85.    "**General Administrative Expense Claim**" means any Administrative Expense Claim and any Professional Fee Administrative Claim.

86.    "**General Bar Date**" means February 14, 2018, as established in the General Bar Date Order.

87.    "**General Bar Date Order**" means that certain order of the Bankruptcy Court dated as of December 19, 2017 [D.I. 337], establishing, among other things, (a) February 14, 2018 as the general bar date for filing proofs of Claim in the Chapter 11 Cases, and (b) March 30, 2018 as the deadline for all Governmental Units (as such term is defined in section 101(27) of the Bankruptcy Code) for filing proofs of Claim in the Chapter 11 Cases, subject in each case to only those exceptions permitted thereby.

88.    "**General Unsecured Claim**" means any Claim against the Debtors that arose or is deemed or determined by the Bankruptcy Code or Bankruptcy Court, as the case may be, to

- 10 -

have arisen before the Petition Date and that is not: (i) a Secured Claim, (ii) an Administrative Expense Claim, (iii) a Professional Fee Administrative Claim, (iv) a Statutory Fee Claim, (v) a Priority Tax Claim, (vi) an Other Priority Claim or any other Claim entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, or (vii) any Claim that constitutes an Interest. For the avoidance of doubt, General Unsecured Claims (a) shall include Rejection Damages Claims and (b) shall not include any deficiency claims, including any deficiency claim related to the Second Lien Notes.

89.    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

90.    "**Governmental Unit Bar Date**" means March 30, 2018 at 4:00 p.m. (prevailing Eastern Time), the deadline for Governmental Units to file a proof of Claim against any of the Debtors for a Claim that arose prior to the Petition Date.

91.    "**GUC Cash Pool**" means Cash in the amount of $600,000 paid by the Purchaser into an escrow account held by Debtors' counsel for Distribution to Holders of Allowed General Unsecured Claims against the Debtors, other than Second Lien Noteholders in their capacity as Second Lien Noteholders, in accordance with the terms of the 2L/Committee Settlement.

92.    "**Guggenheim Securities**" means Guggenheim Securities, LLC.

93.    "**Holder**" means the legal or beneficial holder of any Claim or Interest.

94.    "**Indenture Trustee**" means U.S. Bank National Association, as indenture trustee and collateral agent for the Second Lien Notes pursuant to the Second Lien Indenture.

95.    "**Industrial Development Bonds**" means the Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 Company issued in the aggregate principal amount $6 million pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027.

96.    "**Insurance Policies**" means all insurance policies of the Debtors, including any D&O Insurance.

97.    "**Intercompany Claims**" means (i) any account reflecting intercompany book entries by one Debtor with respect to another Debtor or any Foreign Subsidiary, or (ii) any Claim that is not reflected in such book entries and is held by a Debtor against another Debtor or any Foreign Subsidiary, in each case accruing before or after the Petition Date through the Effective Date, including, but not limited to, any Claim for reimbursement, payment as guarantor or surety, or any Claim for contribution or expenses that was allocable between the Debtors.

98.    "**Interest**" means any equity or membership interest in any Debtor.

99.    "**IRC**" means the Internal Revenue Code of 1986, as amended.

100.    "**IRS**" means the Internal Revenue Service.

101.    "**Jefferies**" means Jefferies Finance LLC.

102.    "**Key Employee Retention Plan**" means the key employee retention plan authorized by the *Order Approving Debtors' Key Employee Retention Plan* [D.I. 261].

103.    "**KSOP**" means the Appvion Retirement Savings and Employee Stock Ownership Plan.

104.    "**L/C**" means letter of credit.

105.    "**L/C Issuer**" means Citizens Bank, N.A.

106.    "**Letter of Credit Agreement**" means that certain Letter of Credit Agreement, dated as of February 2, 2018, by and between the Debtors and Citizens Bank, N.A.

107.    "**Lien**" means any mortgage, pledge, deed of trust, assessment, security interest, lease, lien, adverse claim, levy, charge, right of first refusal or surrender right, or other encumbrance of any kind, including any "lien" as defined in section 101(37) of the Bankruptcy Code.

108.    "**Liquidating Trust**" means the trust established on the Effective Date as described in Section VIII of this Combined Plan and Disclosure Statement and in accordance with the Liquidating Trust Agreement and the 2L/Committee Settlement.

109.    "**Liquidating Trust Advisors**" means any firm(s) or individual(s) retained by the Liquidating Trustee in accordance with the terms of the Liquidating Trust Agreement to serve as legal counsel for the Liquidating Trust or to provide other professional services for the Liquidating Trust in connection with the performance of the Liquidating Trustee's duties and responsibilities under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

110.    "**Liquidating Trust Agreement**" means the trust agreement, in form and substance reasonably acceptable to the Debtors, the Ad Hoc Group of Second Lien Noteholders, the Creditors' Committee and the Liquidating Trustee as of the Effective Date, establishing the Liquidating Trust described in Section VIII of this Combined Plan and Disclosure Statement, and which shall be filed in draft form as part of the Plan Supplement.

111.    "**Liquidating Trust Assets**" means (i) any and all Litigation Claims and Litigation Proceeds; (ii) the Plan Contribution Payment; (iii) the GUC Cash Pool; (iv) the benefits, rights, interests and proceeds of any Insurance Policies (including the D&O Insurance); and (v) any and all other Assets belonging to the Debtors' Estates, including any Cash and other Assets that are not Acquired Assets remaining in the Debtors' Estates on the Effective Date.

112.    "**Liquidating Trustee**" means the Person or Persons selected by the Debtors, the Creditors' Committee and the Second Lien Noteholders in accordance with the 2L/Committee Settlement and appointed to administer the Liquidating Trust, which shall be disclosed in the Plan Supplement, with such rights, duties, and obligations as set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement.

- 12 -

113. "**Liquidating Trust Operating Expenses**" means the overhead and other operational expenses of the Liquidating Trust including, but not limited to, (i) reasonable compensation for the Liquidating Trustee and members of the Trust Oversight Committee (which expenses shall not include professional fees of such members) in accordance with the Liquidating Trust Agreement, (ii) costs and expenses incurred by the Liquidating Trustee in administering the Liquidating Trust, (iii) Statutory Fees incurred after the Effective Date to the U.S. Trustee, and (iv) any fees and expenses payable to the Liquidating Trust Advisors.

114. "**Litigation Claims**" means any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

115. "**Litigation Proceeds**" means the net proceeds of the Litigation Claims.

116. "**Local Rules**" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as amended from time to time.

117. "**Majority DIP Lender**" means Franklin Advisors, Inc., as investment manager on behalf of certain funds and accounts.

118. "**MSCI**" means Marubeni Specialty Chemicals, Inc.

119. "**NM Term Loan Obligations**" shall have the meaning set forth in the DIP Credit Agreement.

120. "**Nonqualified Excess Plan**" means the Executive Nonqualified Excess Plan, dated March 14, 2013.

121. "**Order**" means an order, opinion, or judgment of the Bankruptcy Court as entered on the docket.

122. "**Other Priority Claim**" means any Claim accorded priority in right of payment under Bankruptcy Code section 507(a), that is not otherwise a Priority Tax Claim, a Statutory Fee Claim, an Administrative Expense Claim, or a Professional Fee Administrative Claim.

123. "**Owned Real Property**" means all real property and all of the Debtors' right, title and interest in real property owned, in whole or in part, directly or indirectly by the Debtors, together with all buildings, fixtures and improvements located thereon, and all easements, rights of way, servitudes, tenements, appurtenances, privileges and other rights with respect thereto.

124. "**PDC**" means Paperweight Development Corporation.

125. "**PDC Capital**" means PDC Capital Corporation.

- 13 -

126. "**Person**" means an individual, a corporation, a partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated association or organization, a governmental unit or any agency or subdivision thereof or any other entity.

127. "**Petition Date**" means October 1, 2017, the date on which the Debtors commenced these Chapter 11 Cases.

128. "**PIUMPF**" means the Pace Industry Union-Management Pension Plan.

129. "**Plan Confirmation Date**" means the date on which the Bankruptcy Court enters the Plan Confirmation Order.

130. "**Plan Confirmation Hearing**" means the hearing to be held by the Bankruptcy Court to consider approval and confirmation of this Combined Plan and Disclosure Statement, as such hearing may be adjourned or continued from time to time.

131. "**Plan Confirmation Order**" means an Order entered by the Bankruptcy Court approving and confirming this Combined Plan and Disclosure Statement on a final basis under sections 1125 and 1129 of the Bankruptcy Code and Local Rule 3017-2.

132. "**Plan Contribution Payment**" means the forgivable loan in the amount of $350,000 paid by the Purchaser into an escrow account held by the Debtors' counsel to be transferred to the Liquidating Trust on the Effective Date in accordance with the terms of the 2L/Committee Settlement, which forgivable loan shall be repaid only from the Litigation Proceeds, if any, net of Liquidating Trust Operating Expenses, prior to Distribution of any such Litigation Proceeds to the Liquidating Trust Beneficiaries.

133. "**Plan Documents**" means this Combined Plan and Disclosure Statement, the Plan Supplements, and all of the exhibits and schedules attached to any of the foregoing.

134. "**Plan Proponents**" means the Debtors and the Creditors' Committee as the proponents of the Combined Plan and Disclosure Statement.

135. "**Plan Supplement**" means the appendix of schedules and exhibits to be Filed at least seven (7) days before the Plan Confirmation Hearing containing, among other things, the Liquidating Trust Agreement and the Warrant Agreement, as may be amended, modified, and/or supplemented; each of which shall be in form and substance reasonably acceptable to the Majority DIP Lender, the Creditors' Committee, and the Ad Hoc Group of Second Lien Noteholders and otherwise in accordance with the terms of the 2L/Committee Settlement.

136. "**Preserved D&O Claims**" means any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; *provided*, *however*, that the Preserved D&O Claims shall not include the Released D&O Claims.

- 14 -

137.   "**Prime Clerk**" means Prime Clerk LLC.

138.   "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

139.   "**Privilege**" means the attorney client privilege, work product protections or other immunities (including without limitation those related to common interests or joint defenses with other parties), or protections from disclosure of any kind held by the Debtors or their Estates.

140.   "**Professional**" means any professional Person employed by the Debtors or the Creditors' Committee in the Chapter 11 Cases under section 327, 363, or 1103 of the Bankruptcy Code or otherwise under an Order of the Bankruptcy Court.

141.   "**Professional Fee Administrative Claim**" means a Claim for compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, including Claims of any Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date.

142.   "**Professional Fee Escrow**" means one or more accounts to be funded by the Debtors on or prior to the Effective Date in an amount equal to the aggregate amount of unpaid fees for all Professionals earned as of the Sale Effective Date and through the Plan Effective Date, as estimated in the Debtors' reasonable discretion.

143.   "**Pro Rata**" means the proportion that (i) an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class (for the avoidance of doubt, with respect to any Distributions of the GUC Cash Pool, "Pro Rata" means the proportion that an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 5); (ii) with respect to any Distributions of the Litigation Proceeds, an Allowed Second Lien Secured Note Claim in Class 3 or an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 3 and Class 5; (iii) with respect to any Distributions of the Liquidating Trust Assets (excluding the GUC Cash Pool, Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), an Allowed Second Lien Secured Note Claim in Class 3 or an Allowed General Unsecured Claim in Class 5 bears to the aggregate amount of all Allowed Claims in Class 3 and Class 5.

144.   "**Purchaser**" means Appvion Holding Corp., in its capacity as purchaser under the 363 Sale Agreement.

145.   "**QIP Motion**" means *Motion of the Debtors for Entry of an Order Approving the Debtors' Quarterly Incentive Plan* [D.I. 361].

- 15 -

146.    "**Qualified Bid**" means an offer, solicitation or proposal submitted in connection with the 363 Sale satisfying the conditions set forth in the Bid Procedures Order, as determined by the Debtors, in consultation with the Creditors' Committee.

147.    "**Rejection Damages Claim**" means a Claim for damages arising out of the rejection of an Executory Contract.

148.    "**Related Persons**" means, with respect to any Person, such Person's predecessors, successors, assigns and present and former shareholders, affiliates (whether by operation of law or otherwise), subsidiaries, principals, employees, agents, officers, directors, managers, trustees, partners, members, professionals, representatives, advisors, attorneys, financial advisors, accountants, investment bankers, and consultants, and any Person claiming by or through them, each in their capacities as such.

149.    "**Released D&O**" means any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

150.    "**Released D&O Claims**" means any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O.

151.    "**Released Parties**" means the Debtors, the Purchaser, the Ad Hoc Group of Second Lien Noteholders and the members of the Ad Hoc Group of Second Lien Noteholders (solely in their capacity as members of the Ad Hoc Group of Second Lien Noteholders), the Creditors' Committee, the Senior DIP Agent, the DIP Agent, and the DIP Lenders, in each case in their capacities as such, and each of their respective Related Persons; provided, however, that the Released Parties shall not include any of the Debtors' Directors and Officers other than the Released D&O.

152.    "**Releasing Parties**" means (i) the Released Parties, (ii) each Holder of a Claim who votes to accept the Plan, (iii) each Holder of a Claim who votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release, (iv) each Holder of a Claim who abstains from voting on the Plan (except for those Holders of Claims whose solicitation packages were returned to the Debtors or the Balloting Agent as undeliverable, which Holders of Claims shall be identified in the Debtors' voting certification or a notice to be filed by the Debtors or the Balloting Agent) and does not mark its ballot to indicate its refusal to grant the Third-Party Release, and (v) with respect to the foregoing clauses (i) though (iv), each of such Person's Related Persons, in each case in their capacity as such.

153.    "**Schedules**" mean the schedules of assets and liabilities, schedules of executory contracts, schedules of co-debtors and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

154.    "**Second Lien Indenture**" means that certain Indenture, dated as of November 19, 2013, by and among Appvion, the guarantors identified therein and U.S. Bank National

Association, as trustee and collateral agent, pursuant to which the Second Lien Notes were issued.

155.    "**Second Lien Notes**" means the 9.000% Second Lien Senior Secured Notes due June 1, 2020 issued in the aggregate principal amount of $250 million pursuant to the Second Lien Indenture.

156.    "**Second Lien Noteholders**" means Holders of the Second Lien Notes.

157.    "**Second Lien Secured Note Claims**" means the Claims held by Second Lien Noteholders.

158.    "**Secured Claim**" means a Claim that is secured (a) by a Lien that is valid, perfected, and enforceable under the Bankruptcy Code or applicable non-bankruptcy law or by reason of an Order, or (b) as a result of rights of setoff under section 553 of the Bankruptcy Code, but in any event only to the extent of the value determined in accordance with section 506(a) of the Bankruptcy Code, of the Holder's interest in the Estate's interest in such property (unless an election has been made under section 1111(b) of the Bankruptcy Code on or prior to the Plan Confirmation Date) or to the extent of an amount subject to such setoff, as applicable.

159.    "**Senior DIP Agent**" means Wilmington Trust, National Association, in its capacity as administrative and collateral agent in connection with the Senior DIP Facility.

160.    "**Senior DIP Credit Agreement**" means that certain Senior Superpriority Senior Debtor-in-Possession Credit Agreement, dated as of March 16, 2018, as amended from time to time.

161.    "**Senior DIP Facility**" means the postpetition, senior superpriority senior debtor-in-possession financing provided to the Debtors by the Senior DIP Lenders pursuant to and under the Senior DIP Order.

162.    "**Senior DIP Lenders**" means the lenders party to the Senior DIP Facility.

163.    "**Senior DIP Motion**" means the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), and (B) Grant Senior Liens and Superpriority Administrative Expense Status; (II) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (III) Modifying Final Existing DIP Financing Order; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [D.I. 520].

164.    "**Senior DIP Order**" means the *Amended Final Order (i) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Grant Senior Liens and Superpriority Administrative Expense Status; (ii) Modifying Final Existing DIP Financing Order; and (iii) Granting Related Relief* [D.I. 639].

165.    "**Statutory Fees**" means any and all fees payable to the U.S. Trustee under section 1930 of title 28 of the United States Code and any interest thereupon.

- 17 -

166.    "**Successful Bidder**" shall have the meaning set forth in the Bid Procedures Order.

167.    "**Third-Party Release**" means the releases set forth in Section XII of this Plan.

168.    "**Transition Services Agreement**" means that certain Transition Services Agreement effective as of June 13, 2018 by and between the Purchaser and the Debtors.

169.    "**Trust Oversight Committee**" means the committee formed on the Effective Date to be selected by the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders and reasonably acceptable to the Debtors and the Majority DIP Lender and identified in the Plan Supplement for the purposes set forth in the Liquidating Trust Agreement.

170.    "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

171.    "**Unclaimed Distribution Deadline**" means, in each instance, the date that is one hundred and twenty (120) days from the date the Liquidating Trustee makes a Distribution.

172.    "**USW**" means the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial Union.

173.    "**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

174.    "**Voting Deadline**" means August 6, 2018 at 5:00 p.m. (prevailing Eastern Time) as described in Section IV.A.9 of this Combined Plan and Disclosure Statement.

175.    "**Warrant Agent**" means, collectively, Computershare Inc., a Delaware corporation, and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, together with their respective successors and assigns.

176.    "**Warrant Agreement**" means the warrant agreement executed by and between the Purchaser and the Warrant Agent, pursuant to which (i) the Warrants were issued by the Purchaser to the Warrant Agent and delivered to the Debtors upon the 363 Sale Effective Date to be held in trust for benefit of the Holders of Allowed Second Lien Secured Note Claims, and (ii) the Warrants are to be distributed under this Plan to Holders of Allowed Second Lien Secured Note Claims on the Effective Date in exchange for the Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code.

177.    "**Warrants**" means the warrants issued by the Purchaser and delivered to the Debtors upon the 363 Sale Effective Date for the benefit of the Holders of Allowed Second Lien Secured Note Claims, as set forth in the 2L/Committee Settlement, for 5.0% of the common stock of the Purchaser on a fully diluted basis after giving effect to exercise in full of all of the Warrants in two tranches: (x) 5-year warrants for 2.5% of the common stock of the Purchaser, struck at the "make-whole" equity value as of the 363 Sale Effective Date resulting in a 100% recovery to Roll-Up DIP Lenders (as defined in the DIP Credit Agreement), including a 1.5% exit fee (the "Tranche A Warrants"), and (y) 5-year warrants for 2.5% of the common stock of

- 18 -

the Purchaser, with a strike price of 15% above the Tranche A Warrants (the "Tranche B Warrants"). The Warrants shall contain reasonable and customary anti-dilution, exemption, transferability and information rights, and in the event of a change of control (to be defined in the Warrant Agreement), the Purchaser shall be required to pay the holders of the Warrants an amount of Cash equal to the value of the Warrants based on the Black-Scholes pricing model using a volatility of 37%.

## B.    Interpretation; Application of Definitions and Rules of Construction

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in this Combined Plan and Disclosure Statement are to the respective section in, article of, Schedule to, or Exhibit to this Combined Plan and Disclosure Statement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Combined Plan and Disclosure Statement as a whole and not to any particular section, subsection or clause contained in this Combined Plan and Disclosure Statement. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Plan and Disclosure Statement. A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code. The headings in this Combined Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Plan and Disclosure Statement. Any reference to the "Liquidating Trustee" shall be deemed to include a reference to the "Liquidating Trust" and any reference to the "Liquidating Trust" shall be deemed to include a reference to the "Liquidating Trustee" unless the context otherwise requires. Bankruptcy Rule 9006 shall apply to all computations of time periods prescribed or allowed by this Combined Plan and Disclosure Statement unless otherwise set forth herein or provided by the Bankruptcy Court.

## III. BACKGROUND

On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code initiating these Chapter 11 Cases. Following the Petition Date, the Debtors remained in possession of their Assets and management of their businesses as Debtors in Possession under sections 1107 and 1108 of the Bankruptcy Code.

## A.    Overview of the Debtors' Business

### 1.    Description of the Debtors' Operations and History

Appvion and its subsidiaries and affiliates (the "Company"), headquartered in Appleton, Wisconsin, is a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. The Company was founded by Charles Boyd on May 13, 1907 as "The Appleton Coated Paper Company." Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013. Today, the Company creates

- 19 -

product solutions for customers and end users through its development and use of coating formulations and applications as well as security technologies. Appvion has a dedicated heritage of growing new markets and well-regarded technical assets.

On November 9, 2001, the Company's employees purchased Appvion from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan. In late 2001, approximately 90% of Appvion's employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the employee stock ownership plan component of the Appvion Retirement Savings and Employee Stock Ownership Plan purchased all of the common stock of PDC. PDC simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available Cash, to finance the purchase of Appvion from Arjo Wiggins.

2.    **The Debtors' Workforce, Compensation and Benefits**

As of the Petition Date, the Debtors employed approximately 1,350 employees across their headquarters in Appleton, Wisconsin, their fully-integrated pulp and paper mill located in Roaring Spring, Pennsylvania, which produces carbonless, security and specialty papers, and their thermal paper-producing plant located in West Carrollton, Ohio. Appvion was party to three CBAs with the USW, which expired on August 31, 2017, February 1, 2018 and March 31, 2018, respectively. The USW represents approximately 915 employees (collectively, the "Union Employees") at the Debtors' manufacturing facilities. Throughout these Chapter 11 Cases, the Debtors negotiated with the USW regarding revised CBAs, which negotiations the Purchaser continued following entry of the Bid Procedures Order.

As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees. The Debtors supplement their workforce from time to time with co-ops, interns and other temporary employees, to whom they pay wages but do not provide benefits. The Debtors also have an international sales team of sales contractors, who are critical to the Debtors' sales and marketing operations and play an important role in the Debtors' business operations.

As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans"). The purpose of the Long-Term Incentive Plans was to attract and retain key management employees, who were in a position to make a significant contribution to the growth and profitability of the Debtors' business. The compensation committee of the Board established the number of units granted each year under the Long-Term Incentive Plans. The Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Recipients were required to enter into a non-compete and non-solicitation agreement in order to receive units under the Long-Term Incentive Plans which, if violated following the receipt of units, resulted in forfeiture of any and all rights to receive payment relating to the units. Units received prior to January 1, 2017 were generally vested

- 20 -

three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

Further, in the ordinary course of business, the Debtors offered various bonus and incentive programs to recognize and reward certain key employees' superior achievements and contributions to the Debtors' business. Prior to the Petition Date, the Debtors maintained incentive plans for salaried employees, sales employees, and certain night-shift employees (the "Incentive Plans"). Each Incentive Plan was designed to compensate eligible employees for attaining various financial, sales, and performance metrics.

In the ordinary course of business, the Debtors maintained various Employment Benefit Programs and policies, including, without limitation: (a) medical and dental, and prescription drug insurance plans and health savings plans; (b) life, disability, and AD&D insurance; (c) retiree medical, dental, and life insurance and related benefits; (d) holidays and other paid time off; (e) reimbursement and allowance programs; (f) an onsite clinic; (g) a health facility; (h) an employee assistance program; (i) a scholarship program; and (j) miscellaneous other benefit plans and policies. The Employee Benefit Programs were, in each case, available to eligible full-time, part-time, terminated, and retired former employees under each respective plan or policy. The Debtors also provided certain retired former employees and their eligible dependents with medical, dental, and life insurance and maintained a retiree call center and open enrollment processing center (collectively, the "Retiree Benefit Obligations").

The KSOP is a tax-qualified retirement plan that contains (i) the 401(k) Fund, which provides participants with the ability to make pre-tax contributions to the KSOP by electing to defer a percentage of their compensation, and (ii) a separate tax-qualified ESOP designed to invest primarily in the common stock of PDC. Employees could defer, on a pre-tax basis, a percentage of their pay in an amount, subject to certain IRS limitations, to the 401(k) Fund, the ESOP, or a combination of both. Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next valuation date, June 30 or December 31. At that time, these deferrals and the interest earned on these amounts were used to purchase shares based upon the price of a share of PDC common stock on the valuation date preceding or following the date on which the participant made the deferrals, whichever is lower.

The Appvion, Inc. Retirement Plan (the "Pension Plan") is a single-employer defined benefit pension plan with approximately 3,200 participants. Under the Pension Plan, benefits were vested upon retirement at age 65 with 5 years of service and paid as annuities or a single lump sum following termination of employment. Pension Plan benefits for salaried employees were based on years of service and employee pay, and benefits for union employees are based on years of service. The Pension Plan was closed for all new salaried employees on and after January 1, 2008 and frozen for all salaried employees as of March 1, 2011. For all new USW employees, the Pension Plan was closed effective as of 2014 or 2015 depending on the applicable CBA. Salaried employees who no longer receive pension benefits received a contribution for future retirement benefits into the 401(k) Fund of the KSOP and new USW

- 21 -

employees and USW employees who elected to freeze their pension also receive a contribution for future retirement benefits into the 401(k) Fund of the KSOP.

Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017.

The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan. The SERP benefit, when added to the Pension Plan benefit, provided a combined benefit equal to the benefit under the Pension Plan as if certain tax-qualified plan limitations did not apply. Benefits under the SERP were paid as annuities only, except for benefits with a present value of less than $20,000, which were paid in lump sums.

The Debtors also maintained the Nonqualified Excess Plan for highly-compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. Participants in the Nonqualified Excess Plan chose to have deferrals deemed invested in selected mutual funds, and the Debtors invested funds equal to participants' deferred amounts in the mutual funds selected by participants. The Debtors pay administrative expenses of the Nonqualified Excess Plan and annually add funds to the Nonqualified Excess Plan to make up for any difference between the participants' deemed investments and the actual performance of the investments. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP. This benefit provided the same 1% to 5% contribution calculated on excluded pay. There is an additional "KSOP match" of 6% of excluded pay, which is calculated regardless of whether the employee participates in the KSOP.

3.    **The Debtors' Organizational Structure**

The Debtors in these Chapter 11 Cases are PDC, Appvion, and certain of their wholly-owned direct and indirect subsidiaries. A brief overview of each of the Debtors and non-debtors, including their business operations, follows:

- 22 -

- PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and is owned in its entirety by the ESOP. PDC does not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP and actions required to be taken under ancillary acquisition agreements.

- PDC Capital, a Wisconsin corporation is a wholly owned subsidiary of PDC and a parent company to Arjo Wiggins. PDC Capital does not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

- Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor, has no assets and no operations.

- Appvion, a Delaware corporation, is a wholly owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Appvion is the major operating company and manufacturer of the Company's products. Appvion also employs the majority of the Company's employees.

- Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and an operating entity based in Toronto, Ontario. Appvion Canada is not a Debtor.

- Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and has no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Company under its Account Receivable Securitization (as defined below).

- APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and 1% owner of the stock of Appvion Netherlands, which has no operations.

On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Despite the prior intentions of the Company to expand its business to the Netherlands and Germany, Appvion Netherlands never conducted any operations. In 2015, Appvion transferred approximately $25,000 to Appvion Netherlands as a capital contribution. The Debtors and Appvion Netherlands began efforts to wind down Appvion Netherlands. Shortly after the Petition Date, the Debtors determined that equitable distribution of Appvion Netherlands' limited assets would be better achieved through liquidation under Dutch law rather than through the administrative expenses incurred under chapter 11 or chapter 7 of the Bankruptcy Code. On October 27, 2017, Appvion Netherlands filed the *Motion of the Debtor to Dismiss the Chapter 11 Case of Appvion Global Netherlands Cooperatief U.A.* [D.I. 194] seeking entry of an order dismissing its Chapter 11 Case. On November 15, 2017, the Bankruptcy Court entered the *Order Dismissing the Chapter 11 Case of Appvion Global Netherlands Cooperatief U.A.* [D.I. 262]. As of April 26, 2018, the liquidation of Appvion Netherlands was complete and Appvion Netherlands was struck from the corporate rolls of the Netherlands.

**B.**        **The Debtors' Prepetition Capital Structure**

The Company reports its financial information on a consolidated basis.  As of August 31, 2017, the last reporting period prior to the Petition Date, the Company's books and records reflected total assets of approximately $381 million and current liabilities totaled approximately $75 million.  The Company's long-term liabilities, as of August 31, 2017, totaled $640.9 million, consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

Prior to the Petition Date, the Company's primary sources of liquidity and capital resources included Cash provided by operations and credit available under its $75 million revolving credit facility and $24 million Accounts Receivable Securitization Facility, both described in additional detail herein.  As of the Petition Date, a total of approximately $490 million was owed to the Company's pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

1.        **Senior Secured Credit Facility**

On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, Jefferies, as joint lead arranger, joint book runner and administrative agent, Fifth Third Bank, as joint lead arranger, joint book runner, revolver agent and swing line lender and L/C lender, KeyBank National Association, as joint lead arranger, joint book runner and documentation agent, and the other lenders party thereto (the "Prepetition Credit Agreement").  The Term Loan had an original term of six years, maturing on September 15, 2015, and the Revolving Credit Facility had an original term of five years, maturing on June 30, 2015.  The Revolving Credit Facility included a $25 million subfacility for standby letters of credit and a $5 million subfacility for swing line loans.

Appvion's obligations under the Prepetition Credit Agreement were guaranteed by PDC, Appvion Canada and, through a joinder agreement after its formation, APVN, each of which granted to Jefferies, for the benefit of the secured parties under the Prepetition Credit Agreement, a senior first priority security interest in substantially all of its assets in order to secure the prompt and complete payment and performance when due of its obligations under the Prepetition Credit Agreement and the related loan documents.

The Senior Secured Credit Facility was senior in right of payment to all existing and future subordinated indebtedness of Appvion and secured by security interests in substantially all property and assets of Appvion, PDC, Appvion Canada, and APVN.

On June 28, 2013, Appvion applied substantially all of the Term Loan proceeds to fund the purchase price, including principal, premium, consent fee, and accrued and unpaid interest, of $300.71 million aggregate principal amount of its 10.50% Senior Secured Notes due 2015 pursuant to its Cash tender offer and consent solicitation, and to pay related fees and expenses.

- 24 -

On November 11, 2013, Appvion, PDC, Jefferies, as administrative agent, and certain lenders entered into the first amendment to the Prepetition Credit Agreement (the "First Amendment"). The First Amendment, among other things, permitted the Company to issue $250 million aggregate principal amount of the Second Lien Notes to refinance its outstanding 9.750% Senior Subordinated Notes due 2014 and 11.25% Second Lien Notes due 2015 and allowed the Company to enter into an intercreditor agreement governing the relative priorities of the respective security interests in its assets securing the newly issued notes and the borrowings under its Senior Secured Credit Facility governed by the Prepetition Credit Agreement.

On August 3, 2015, Appvion, PDC and Jefferies, as administrative agent, and certain lenders under the Prepetition Credit Agreement entered into the third amendment to the Prepetition Credit Agreement (the "Third Amendment"). The Third Amendment became effective simultaneously with the closing of the sale of the Encapsys Business. Upon its effectiveness, the Third Amendment, among other things, (i) permitted the Company to consummate the sale of the Encapsys Business and provided for the corresponding release of liens on the Encapsys Business, (ii) required that not less than $165 million of the net proceeds be applied to prepay the revolving credit loans and the term loans under the Prepetition Credit Agreement and provided that the remainder of the net proceeds be reinvested or otherwise applied to further prepay indebtedness in accordance with the Prepetition Credit Agreement, (iii) provided for a permanent reduction of the revolving credit facility commitments from $100 million to $75 million, (iv) required the payment of a consent fee equal to 0.175% of the aggregate principal amount of loans and commitments, and (v) further conformed certain terms and covenants under the Prepetition Credit Agreement to account for the sale of the Encapsys Business and the transactions contemplated thereby.

On January 16, 2017, Appvion, PDC, Jefferies, as administrative agent, Fifth Third Bank, as revolver agent, swing line lender and L/C issuer, and the lenders party to the Prepetition Credit Agreement entered into a fifth amendment (the "Fifth Amendment") to the Prepetition Credit Agreement. The Fifth Amendment, among other things, (i) fixed the applicable interest rate on the Company's term and revolving loans at 5.5% per annum for base rate loans and 6.5% per annum for eurodollar loans, regardless of the Company's then current consolidated leverage ratio, (ii) increased the maximum consolidated first lien leverage ratios applicable to the Company pursuant to the maximum consolidated leverage covenant to require maintenance of a consolidated first lien leverage ratio, during the first fiscal quarter of 2017, of not more than 3.60 to 1.00, during the second fiscal quarter of 2017, of not more than 3.50 to 1.00, during the period beginning on the third fiscal quarter of 2017 though the second fiscal quarter of 2018, of not more than 3.25 to 1.00 and from and after July 1, 2018, of not more than 3.00 to 1.00, and (iii) required the payment of a 1.5% premium on any prepayments, payments in connection with a change in control or a refinancing, or payments at maturity of either term or revolving loans.

On February 16, 2017, Appvion, PDC, Jefferies, as administrative agent, Fifth Third Bank, as revolver agent, swing line lender and L/C issuer, and the lenders party to the Prepetition Credit Agreement entered into a sixth amendment (the "Sixth Amendment") to the Prepetition Credit Agreement. The Sixth Amendment amended the Prepetition Credit Agreement to provide for the availability of additional term loans in an aggregate principal amount not to exceed $20.0 million, on the same terms and subject to the same conditions as the

- 25 -

term loans already existing under the Prepetition Credit Agreement. Proceeds from the issuance of these term loans were reduced by $0.8 million for original issue discount, and the net proceeds were used to pay down the revolving line of credit. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

2.      **Second Lien Notes**

On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes accrue interest from the issue date at a rate of 9.000% per year, payable in Cash semi-annually in arrears on each June 1 and December 1, maturing on June 1, 2020. The Second Lien Notes were issued pursuant to that certain Indenture, dated as of November 19, 2013, by and among Appvion, the guarantors identified therein, and U.S. Bank National Association, as trustee and collateral agent. The obligations under the Second Lien Notes were guaranteed by PDC, Appvion Canada, APVN, and any existing or future domestic or foreign subsidiaries that become guarantors or borrowers under the Senior Secured Credit Facility. The Second Lien Notes rank equal in right of payment to the Senior Secured Credit Facility and are secured by a second priority security interest in substantially all of the property and assets of Appvion, PDC, Appvion Canada and APVN, junior in priority to the liens on the same collateral securing the outstanding debt obligations under the Senior Secured Credit Facility. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes. On November 19, 2013, the Debtors, the collateral agent for the Senior Secured Credit Facility, and the Indenture Trustee entered into that certain Intercreditor Agreement, thereby documenting their rights, responsibilities and remedies vis-à-vis the collateral and each other.

3.      **Accounts Receivable Securitization**

On June 4, 2014, the Company entered into the Accounts Receivable Securitization Facility, with a commitment size of $30.0 million, whereby transactions under the program were accounted for as sales of trade receivables, pursuant to that certain Receivables Purchase Agreement dated as of June 4, 2014 among Appvion Receivables, as seller, Appvion, as servicer, various purchasers from time to time party thereto, and Fifth Third Bank, as purchaser and administrative agent and that certain Purchase and Sale Agreement dated as of June 4, 2014 between Appvion and Appvion Canada, as originators, and Appvion Receivables. Trade receivables sold to third-party financial institutions, serviced by Appvion, totaled $46 million as of August 31, 2017. As of the Petition Date, approximately $24 million was owed under the securitization. The Accounts Receivable Securitization Facility was scheduled to mature on September 29, 2017. Appvion Receivables, Appvion, and Fifth Third Bank negotiated, but did not execute, a fifth amendment to the Accounts Receivable Securitization Facility to extend the maturity date to October 16, 2017. Appvion, however, paid a facility fee in the amount of $100,000, a condition for effectiveness of the fifth amendment to the Accounts Receivable Securitization Facility. As of the Petition Date, the trade receivables were reflected on Appvion's books and records. The Debtors paid off the Accounts Receivable Securitization Facility with the proceeds of the DIP Facility on October 5, 2017.

4.    **Other Indebtedness and Obligations**

Additionally, on August 8, 1997 the Company issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"), which had a 0.9% average interest rate as of July 2, 2017. As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Further, the Company is the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan.

There are also a number of workers' compensation claims pending against the Company. Many of these claims are proceeding through the litigation process, and the final outcome will not be known until the claim is adjudicated or a settlement is reached with the claimant. The ultimate cost of individual workers' compensation claims can vary based upon, among other factors, the nature of the injury, the duration of the disability period, if any, the length of the claim period, the jurisdiction of the claim and the nature of the final outcome. The Company has approximately $2.2 million in pending workers' compensation claims. These Claims for pending workers' compensation will continue as obligations of the Purchaser following Consummation of the Plan.

Each of the Debtors is a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan is covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), 29 U.S.C. §§ 1301-1461 (2012 & Supp. IV 2016). The Pension Benefit Guaranty Corporation (the "PGBC"), a United States Government corporation, guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. As of December 31, 2016, the total projected benefit obligation of the Company's defined benefit pension plans exceeded the fair value of the plan assets by $112.6 million. The Company was not required to make, nor did it make, any contributions to the Pension Plan in 2015 or 2016. The Company made a payment of $2.5 million on September 25, 2017. Following the Petition Date, the Company made no contributions to the Pension Plan.

On January 17, 2018, PBGC filed three proofs of claim, claim nos. 280-282, against each of the Debtors, asserting unfunded benefit liabilities under 29 U.S.C. § 1362(b), missed minimum funding contributions due to the Pension Plan under 26 U.S.C. §§ 412, 430; 29 U.S.C. §§ 1082, 1342(d), and pension termination premiums due under 29 U.S.C. § 1306. As of October 31, 2017, PBGC asserted that the Pension Plan's unfunded benefit liabilities were an estimated $148.9 million. *See* 29 U.S.C. § 1362(b). The PBGC is currently updating the amount of the Pension Plan's underfunding based on updated actuarial information.

On May 10, 2018, PBGC filed a motion for allowance of administrative expenses in the amount of $3,276,329 for asserted missed minimum funding contributions due to the Pension Plan during the post-petition period. PBGC also asserts a priority claim in the amount of $936,573 for missed contributions due to the Pension Plan arising from services rendered within 180 days before the Petition Date. While the Debtors dispute the PBGC's asserted

- 27 -

Claims, they and the PBGC are engaged in settlement negotiations and if a settlement is reached, it will be presented to the Court at or before the Confirmation Hearing and will become included into the Plan.

5.    **Trade Vendor Obligations**

The Debtors' business is dependent upon their ability to timely fulfill orders from and provide prompt shipment of products to their customers which, in turn, makes them dependent upon continuous access to the raw materials, including base stock and other chemicals, goods and services that are essential to the production of the Debtors' products from a number of trade vendors.

On February 22, 2012, Appvion, formerly Appleton Papers, Inc., entered into a long-term supply agreement with Domtar for the purchase of carbonless and thermal base stock for coating at the Debtors' converting facilities, and from time to time during the parties' performance under the Domtar Supply Agreement the parties entered formal and informal agreements, undertakings, understandings, terms and conditions that modify, amend, or supplement the Domtar Supply Agreement.  The Domtar Supply Agreement provides that Domtar will be the exclusive supplier of certain thermal and carbonless base stock used by the Debtors.  The term of the Domtar Supply Agreement is 15 years.

In 2016, the Debtors purchased approximately $226 million of base stock from various external suppliers.  Nearly 100% of the base stock purchased to produce carbonless paper and approximately 92% of the base stock purchased to produce thermal papers was purchased from Domtar.  As of the Petition Date, the Debtors ordered approximately $500,000 of base stock per day, 7 days per week, under the Domtar Supply Agreement.

On October 6, 2017, the Debtors paid Domtar a $4.1 million adequate assurance deposit, which deposit Domtar applied to amounts due from the Debtors for postpetition shipments.  Upon Domtar's demand for additional adequate protection of its interest in the purchased inventory as of the Petition Date and thereafter respecting postpetition sale of inventory to the Debtors, the Debtors filed the Domtar Motion seeking (i) authority to continue performing under the consignment agreement *nunc pro tunc* to the Petition Date; (ii) authority to obtain postpetition credit from Domtar under the Domtar Supply Agreement; (iii) authority to provide adequate protection to Domtar; and (iv) modification of the automatic stay and approval of setoff of the rebates owed to Domtar.  The Bankruptcy Court entered orders approving the Domtar Motion on an interim and final basis on October 16, 2017 and October 30, 2017, respectively [D.I. 124 and 219].

C.    **Events Precipitating the Chapter 11 Filing**

The need to file for chapter 11 was a result of the confluence of a number of factors including persistent negative industry trends, an unsustainable degree of balance sheet leverage, inability to adequately address near-term maturities, and rapidly deteriorating liquidity. The North American paper industry began to contract in the mid-2000s, resulting in closure of paper mills throughout the industry.  In particular, the coated paper industry faces a long-term, structural decline as dependency on digital technology has increased and demand has decreased.

- 28 -

As a result, over the last several years, the Company began to sell business lines and implement transformational savings projects to maintain or improve financial performance.

The Company experienced further challenges in 2015, driven primarily by a soft pricing environment in thermal paper point of sale products, such as merchandise receipts, ATM receipts, coupons and gas receipts. In the following year, the Company successfully executed its business plan, resulting in a 20% adjusted EBITDA improvement. The key drivers of this performance improvement were execution of cost and performance initiatives in manufacturing operations, targeted selling, general and administrative expense savings, and continued growth in the thermal tag, label and entertainment paper products, which include event tickets, retail tags and labels, baggage tags, package labeling, and lottery tickets.

The Company's revenues from sales to customers in the United States began to drop, from $568.6 million in 2014 to $526.0 million in 2015, and then rose slightly, to $529.7 million in 2016. Revenues from sales to customers in foreign countries also dropped, from $196.1 million in 2014 to $174.0 million in 2015, and then to $160.7 million in 2016. Sales revenues continued to decline during the 2017 year. Through this period of declining sales, the Company's debt load grew, and its liquidity became strained.

1.    **Attempted Refinancing**

Beginning in the spring of 2017, the Company began to explore a refinancing of its senior debt, with a focus on extending the maturity of its existing debt obligations and raising additional liquidity. On April 5, 2017, the Company engaged Guggenheim Securities as investment banker, to initially assist in the Company's exploration of ways to address its impending debt maturities, and subsequently the Company's exploration of an out-of-court refinancing transaction designed to extend its maturities and improve its liquidity. As part of this process, the Company, with the assistance of Guggenheim Securities, pursued a multi-track approach focusing on both the Company's existing senior lenders and almost twenty third-parties that had signed non-disclosure agreements. In the end, while the Company did receive four new-money proposals, it became apparent to the Company that a refinancing transaction on appropriate terms was not commercially feasible due to the nature of the Company's debt agreements, financial condition and near-term liquidity demands.

Accordingly, beginning in August 2017, the Board directed the Company's advisors to begin to explore a deleveraging transaction that could be accomplished through either an out-of-court process, or a chapter 11 proceeding. In order to further these discussions, both the participants to the Senior Secured Credit Facility and the Ad Hoc Group of Second Lien Noteholders retained legal and financial advisors and became restricted, thereby allowing open and arms-length negotiations toward a solution to both the Company's short-term liquidity needs and long-term leverage issues. During this same period, the Board retained AlixPartners as an advisor to evaluate near term liquidity and cash flow and to support the efforts of the Company's other advisors.

Due to the inability to consummate a refinancing transaction, and with near-term maturity of certain of the credit facilities, on August 16, 2017, the Company issued its Form 10-

Q for the quarter ending July 2, 2017, which stated, "there is substantial doubt about its ability to continue as a going concern."

Shortly thereafter, Standard & Poor's issued a credit rating downgrade on the Company. The combination of these two announcements led a number of the Company's vendors to begin to request disadvantageous trade terms, further restricting the Company's liquidity. Further, the Accounts Receivable Securitization Facility was scheduled to expire on September 29, 2017, which would have had a negative impact on liquidity that the Company could not have withstood. In light of these significant factors negatively impacting liquidity, it was determined that it would be necessary for the Company to effectuate the restructuring through an in-court process.

## D.    The Chapter 11 Cases

The following is a brief description of certain material events that have occurred during these Chapter 11 Cases.

### 1.    First Day Orders

On the Petition Date, in addition to the voluntary petitions for relief Filed by the Debtors, the Debtors Filed a number of motions and applications (collectively, the "First Day Motions") seeking certain "first day" relief. A summary of the relief sought and obtained under the First Day Motions is set forth below:

- **Joint Administration Motion.** Following consideration of the *Motion of the Debtors for an Order Directing the Joint Administration of Their Chapter 11 Cases* [D.I. 2], the Bankruptcy Court entered an Order [D.I. 52] authorizing the joint administration of the Chapter 11 Cases for procedural purposes only.

- **Consolidated Creditor List Motion.** Following consideration of the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor* [D.I. 3], the Bankruptcy Court entered an Order [D.I. 54], among other things, authorizing the Debtors to submit a consolidated list of creditors and File a consolidated list of the Debtors' twenty largest unsecured creditors.

- **Application to Retain Prime Clerk.** Following consideration of the *Application of the Debtors For Appointment of Prime Clerk LLC as Claims and Noticing Agent* [D.I. 5], the Bankruptcy Court entered an Order [D.I. 56] authorizing the Debtors to retain Prime Clerk as Claims Agent in the Chapter 11 Cases.

- **Cash Management Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Continued Use of the Debtors' Cash Management System, (B),Authorizing*

- 30 -

*Continued Transfers Among Debtors and Non-Debtor Affiliates and (C) Scheduling a Final Hearing on the Motion* [D.I. 8], the Bankruptcy Court entered interim and final Orders [D.I. 53 and 224] that, among other things, (i) authorized the Debtors to continue to use their current cash management system, existing bank accounts, and business forms, including authorizing the Debtors to open and close certain bank accounts; (ii) continue intercompany transfers and, to the extent applicable, grant administrative expense priority status to postpetition Intercompany Claims held by a Debtor against one or more of the other Debtors.

- **Employee Wages/Benefits Motion.**    Following consideration of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Wages and Compensation and Maintain and Continue Employee Benefits and Programs in the Ordinary Course; (II) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations; and (III) Granting Related Relief* [D.I. 11], the Bankruptcy Court entered interim and final Orders [D.I. 61 and 218] authorizing the Debtors to, among other things, pay and honor certain prepetition employee obligations, including prepetition payroll obligations, reimbursable expenses, and benefit plan obligations.

- **Utilities Motion.**    Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* [D.I. 7], the Bankruptcy Court entered interim and final Orders [D.I. 58 and 206] authorizing and approving the provision of adequate assurance of payment to the Debtors' utility service providers under section 366 of the Bankruptcy Code, while allowing the Debtors to avoid the threat of imminent termination of their utility services from those utility companies.

- **Insurance Motion.**    Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Continue Their Insurance Policies and Pay Prepetition and Postpetition Obligations in Respect Thereof* [D.I. 9], the Bankruptcy Court entered interim and final Orders [D.I. 59 and 207] authorizing the Debtors to, among other things, pay any outstanding obligations under the Debtors' existing Insurance Policies and renew, revise, extend, supplement, change, or enter into new Insurance Policies.

- **Customer Programs Motion.**    Following consideration of the *Motion of the Debtors for Interim and Final Orders Authorizing Debtors to (I) Honor Prepetition Obligations to Customers and (II) Continue Customer Programs in the Ordinary Course of Business* [D.I. 10], the Bankruptcy

EAST\152399891.23

Court entered an interim and final Orders [D.I. 60 and 208] authorizing the Debtors to continue to honor prepetition obligations owed to customers arising under customer-related programs, practices and maintain, renew, replace, implement, modify or terminate any such customer programs, as the Debtors deem appropriate in their business judgment and in the ordinary course of business.

- **Tax Motion.** Following consideration of the Motion of the *Debtors for Entry of Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes* [D.I. 6], the Bankruptcy Court entered interim and final Orders [D.I. 57 and 205] authorizing the Debtors to, among other things, pay prepetition taxes in the ordinary course of their business.

- **Critical Vendors Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Vendor Obligations* [D.I. 14], the Bankruptcy Court entered interim and final Orders [D.I. 64 and 210] authorizing the Debtors to, among other things, pay prepetition claims of certain critical domestic vendors in the ordinary course of their business.

- **Foreign Vendors Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders (A) Authorizing the Debtors to Pay or Honor Prepetition Obligations to Certain Critical Foreign Vendors and (B) Authorizing Banks to Honor and Process Checks and Transfers Related to Such Critical Foreign Vendors Obligations* [D.I. 15], the Bankruptcy court entered interim and final Orders [D.I. 65 and 225] authorizing the Debtors, to among other things, pay prepetition claims of certain critical foreign vendors in the ordinary course of their business.

- **Shippers and Warehousemen Motion.** Following consideration of the *Motion of the Debtors for Entry of Interim and Final Orders Authorizing the Debtors to (A) Pay Prepetition Claims of Shippers and Warehousemen and (B) Satisfy Customs Duties Imposed on Shipments and Foreign Suppliers* [D.I. 12], the Bankruptcy Court entered interim and final Orders [D.I. 62 and 209] authorizing the Debtors to, among other things, (a) pay prepetition claims of shippers and warehousemen, possessory lien claimants in the ordinary course of their business and (b) satisfy prepetition custom duties imposed on shipments of goods from foreign suppliers.

2.      **Appointment of Creditors' Committee**

The Office of the United States Trustee formed the Creditors' Committee on October 11, 2017 [D.I. 97].  On November 14, 2017 the Bankruptcy Court authorized the

retention of the following advisors to the Creditors' Committee: Lowenstein Sandler LLP [D.I. 255] and Klehr Harrison Harvey Branzburg LLP [D.I. 256] as co-counsel and FTI Consulting, Inc. as financial advisor [D.I. 276]. The members of the Creditors' Committee are: (i) Pension Benefit Guaranty Corporation; (ii) Pace Industry Union-Management Pension Fund; (iii) Yupo Corporation America; (iv) Marubeni America Specialty Chemicals, Inc.; (v) BASF Corporation; (vi) USW, and (vii) Granwell Products, Inc.

On February 8, 2018, the Debtors filed the *Motion of the Debtors for Entry of an Order Approving Settlement Agreement with Marubeni Specialty Chemicals Inc.* [D.I. 424] (the "Marubeni Settlement Motion"). The Marubeni Settlement Motion sought approval of a settlement agreement (the "Marubeni Settlement Agreement") among the Debtors and MSCI, by which the Debtors paid MSCI the full amount of its prepetition claim in exchange for favorable terms and trade credit. The Marubeni Settlement Agreement contemplates payment by the Debtors to MSCI in full and complete satisfaction of the Released Claims. On February 26, 2018, the Bankruptcy Court entered an order approving the Marubeni Settlement Motion and the Marubeni Settlement Agreement [D.I. 486]. Subsequently, MSCI resigned from the Creditors' Committee and became an *ex officio* member of the Creditors' Committee.

### 3.    Employment of Professionals and Advisors

On October 30, 2017 the Bankruptcy Court authorized the Debtors to (a) retain DLA Piper LLP (US) as their attorneys pursuant to sections 327(a) and 329(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 213], (b) retain and appoint Prime Clerk as claims and noticing agent for the Debtors pursuant to 28 U.S.C. § 156(c), *nunc pro tunc* to the Petition Date [D.I. 215], and (c) retain AP Services, LLC to provide the Debtors with a Chief Restructuring Officer (and certain additional personnel), and designate Alan D. Holtz of AP Services, LLC as the Chief Restructuring Officer [D.I. 216]. Moreover, on November 1, 2017, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Bankruptcy Court authorized the Debtors to retain Guggenheim Securities as investment banker [D.I. 235].

### 4.    Schedules, Section 341(a) Meeting of Creditors, and Bar Dates

On November 15 and 16, 2017, the Debtors Filed their Schedules. On December 20, 2018, the U.S. Trustee conducted the meeting of creditors in these Chapter 11 Cases under section 341(a) of the Bankruptcy Code.

On December 19, 2017, the Bankruptcy Court entered the General Bar Date Order [D.I. 337] establishing (a) February 14, 2018 at 4:00 p.m. (prevailing Eastern Time) as the General Bar Date, and (b) March 30, 2018 at 4:00 p.m. (prevailing Eastern Time) as the Governmental Unit Bar Date.

### 5.    Postpetition Financing

In order to have sufficient Cash to operate their businesses while in bankruptcy, the Debtors sought approval to obtain postpetition financing initially through the DIP Motion. The DIP Motion sought authorization to enter into a postpetition, superpriority debtor-in-possession financing facility between the Debtors and certain lenders party thereto. On October

3, 2017, the Bankruptcy Court entered an order authorizing entry into the DIP Facility on an interim basis.

On October 31, 2017, the Bankruptcy Court entered the Final DIP Order, authorizing and approving on a final basis, *inter alia*, the Debtors' entry into and performance under the DIP Facility and the granting of certain liens and adequate protection in connection therewith, all as more fully set forth in such Final DIP Order. Under the Final DIP Order, the Debtors were authorized to obtain $325.3 million of postpetition financing, and to secure this financing, the DIP Lenders were granted superpriority liens on substantially all of the Debtors' Assets. In connection with the final approval of the DIP Facility, the Debtors and the DIP Lenders agreed to amend the DIP Facility, which, among other things, extended certain of the milestones under which the Debtors must file a chapter 11 plan.

As of the Petition Date, the Debtors had caused an aggregate amount of approximately $13.1 million in letters of credit to be issued by Fifth Third Bank, which letters of credit were held by Domtar, Zurich American Insurance Company, the Ohio Bureau of Workers' Compensation, the Pennsylvania Department of Environmental Protection, amongst others. Postpetition, following entry of the final order approving the Domtar Motion, Domtar drew on a letter of credit in the amount of approximately $2.2 million and the Bank of New York Mellon Trust Company, N.A. drew on a letter of credit in the amount of approximately $6 million. A replacement letter of credit was not issued to either party.

Shortly after the commencement of these Chapter 11 Cases, Fifth Third Bank informed the Debtors that it did not intend to renew the then outstanding letters of credit upon expiration, despite being fully cash collateralized.

Aware that Fifth Third Bank would not renew the outstanding letters of credit after expiration, the Debtors sought approval of, and the Final DIP Order provided for, the issuance of new standby letters of credit in an amount not to exceed $8.1 million, in order to provide for the replacement of letters of credit and to provide for the capacity to issue additional letters of credit, pursuant to documentation to be entered into after the date of the entry of the Final DIP Order. *See* Final DIP Order [D.I. 234], at ¶ (ii)(c). The Final DIP Order further contemplated the cash collateralization of any such new letters of credit, and provided that such cash collateral could be funded with cash collateral released by Fifth Third Bank upon expiration of the letters of credit and, if necessary, no more than an additional $3 million from the proceeds of the DIP Financing. *See id.*

The Debtors approached a number of institutions with the intent of seeking replacement letters of credit, after which Citizens Bank, N.A. agreed to provide a letter of credit facility which the Debtors would use for replacement letters of credit and additional letters of credit in an aggregate amount not to exceed at any time outstanding $5 million on terms acceptable to the Debtors and Citizens Bank, N.A. On February 2, 2018, the Debtors filed the *Motion of the Debtors for Entry of a Supplemental Order Authorizing the Debtors to Incur Additional Post-Petition Secured Debt in Connection with Letter of Credit Facility* [D.I. 411], as of which date, the aggregate outstanding amount of the letters of credit was $4.6 million. On February 16, 2018, the Court entered an Order [D.I. 461] authorizing, *inter alia*, the Debtors to

- 34 -

enter that certain Letter of Credit Agreement and a corresponding amendment to the DIP Facility to authorize entry into the Letter of Credit Agreement.

On March 5, 2018, the Debtors filed a motion seeking authority to enter into a new Senior DIP Facility to address constraints on liquidity due to headwinds faced by the Debtors, and the need to manage developments in these Chapter 11 Cases, and authority to enter into a corresponding amendment to the DIP Facility authorizing entry into the Senior DIP Facility. On March 12, 2018, the Bankruptcy Court entered the *Interim Order (i) Authorizing the Debtors to (a) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (b) Grant Senior Liens and Superpriority Administrative Expense Status; (ii) Authorizing Entry into Fourth Amendment to Existing DIP Credit Agreement; (iii) Modifying Final Existing DIP Financing Order; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [D.I. 564], authorizing the Debtors to enter into the Senior DIP Facility on an interim basis. The Senior DIP Order approving the Senior DIP Facility was entered on March 29, 2018 [D.I. 625]. Through the approval of the Senior DIP Facility, the Debtors were authorized to obtain a total of $100 million of postpetition financing, through which the NM Term Loan Obligations under the initial DIP Financing were refinanced.

Prior to the Petition Date, Fifth Third Bank and KeyBank National Association were the prepetition first lien revolver agent and the first lien documentation agent under the Prepetition Credit Agreement, respectively. Upon approval of the DIP Facility, both Fifth Third Bank and KeyBank National Association became DIP Lenders under the DIP Credit Agreement as Roll-Up Lenders, and did not participate in the New Money Term Loans under the DIP Credit Agreement. Fifth Third Bank and KeyBank National Association filed objections to the Bid Procedures Motion, alleging disparate treatment among DIP Lenders. Fifth Third Bank and KeyBank National Association further objected to the Senior DIP Facility, alleging that the necessary approvals to refinance the DIP Facility were not obtained and the Senior DIP Facility sought to revise the Final DIP Order to correct flaws in the sale structure. Both the Bid Procedures Order and the Senior DIP Order were entered over the objections of Fifth Third Bank and KeyBank National Association. Subsequently, Fifth Third Bank and KeyBank National Association filed complaints against the Majority DIP Lender and others in the Supreme Court of the State of New York, County of New York (the "State Court Lender Dispute") alleging breach of contract claims relating to the Bankruptcy Court's approval of the Senior DIP Facility. On April 27, 2018, the defendants removed the State Court Lender Dispute to the United States District Court for the Southern District of New York. On May 14, 2018, the defendants moved to transfer venue of the State Court Lender Dispute to the United States District Court for the District of Delaware for referral to the Bankruptcy Court.

6.    **Key Employee Retention Plan and Quarterly Incentive Plan**

On November 15, 2017, the Bankruptcy Court approved the Debtors' Key Employee Retention Plan [D.I. 261], authorizing the Debtors to make retention payments, in the maximum aggregate amount of $1 million to certain non-executive employees of the Debtors, as follows: (a) one-third of the payments were payable (and paid) by the Debtors on December 31, 2017 and (b) two-thirds of the payments shall be payable on the later of the consummation of a Restructuring Transaction or June 1, 2018.

- 35 -

On December 27, 2017, the Debtors filed the QIP Motion seeking authority to pay certain bonus amounts in accordance with the Debtors' quarterly incentive plan. The Bankruptcy Court entered orders approving the QIP Motion for all non-executive employees on and for all executive employees on February 16, 2018 [D.I. 460].

7.    **Sale of Substantially All of the Debtors' Assets**

a.    Marketing Process and Bid Procedures Order

On February 8, 2018 the Debtors filed the Bid Procedures Motion, which set forth both a proposed schedule and process, including bidding procedures, for the marketing and sale of all or substantially all of the Debtors' Assets to the highest bidder at auction. Under the Bid Procedures Motion, the Purchaser was named as the "Stalking Horse Purchaser" of the Debtors' Assets. The procedural relief requested in the Bid Procedures Motion was granted by entry of the *Order (i)(a) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially all Assets, (b) Approving the Expense Reimbursement, (c) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (d) Approving the Form and Manner of Notice Thereof* [D.I. 565] on March 12, 2018.

The Debtors with the assistance of their investment banking professionals conducted an extensive marketing process for the sale of substantially all of the Debtors' Assets prior to filing the Chapter 11 Cases. This marketing continued after the filing of the Chapter 11 Cases and included establishing and maintaining a "data room" for prospective purchasers to conduct due diligence. In total, more than sixty (60) strategic and financial prospective purchasers of Appvion were contacted, NDA and teasers were provided to fifty-eight (58) parties, providing confidential information memoranda and data room access to twenty-two (22) parties, and management presentations were made to three (3) parties all over approximately three (3) months' time. The Debtors' professionals received five (5) expressions of interest, two (2) of which were from potential purchasers to the thermal side of the business. In the end, a total of three (3) bids were submitted to the Debtors and their advisors to purchase all or substantially all of the Debtors' Assets. Of the three (3) bids, the Debtors, in consultation with the Creditors' Committee, determined that none of the bids were Qualified Bids. No Qualified Bid, other than the bid of the Purchaser, was submitted to the Debtors. Accordingly, on April 30, 2018, the Debtors canceled the Auction and filed a notice that the Purchaser was the Successful Bidder. Consequently, the Purchaser agreed to acquire substantially all of the Debtors' Assets on terms negotiated between them and the Debtors pursuant to the 363 Sale Agreement.

b.    363 Sale Order and Sale of Assets to the Purchaser

On May 14, 2018, the Bankruptcy Court held a hearing on the approval of the 363 Sale Agreement and authorization to close the 363 Sale. The 363 Sale Agreement provided for, among other things, the assumption of certain trade payables including, among other things, payment of cure amounts associated with the assumption and assignment of several of the Debtors' executory contracts. The Purchaser credit bid the full amount of the Term Loan Claims, including the assumption of the DIP Financing. The order approving the 363 Sale and 363 Sale Agreement was entered on May 14, 2018 [D.I. 751].

The Debtors and the Purchaser entered into an amendment to the 363 Sale Agreement extending the date by which the 363 Sale must be consummated to June 18, 2018. The Debtors and the Purchaser consummated the Sale on the 363 Sale Effective Date. Having sold substantially all of their Assets, the Debtors seek to wind-down their remaining operations and liquidate their remaining Assets as set forth in this Plan.

8.    **Disputes and Settlements**

At the outset of the Chapter 11 Cases, the Creditors' Committee played an active role. When the Debtors began to engage in earnest to effect a sale of substantially all Assets with the Purchaser, the Creditors' Committee objected to the Debtors' sale-related motions, including the Bid Procedures Motion, and filed the *Motion of the Official Committee of Unsecured Creditors for Entry of an Order Granting the Committee Standing to Commence and Prosecute an Action on Behalf of the Debtors' Estates Against Administrative Agent for Prepetition First Lien Lenders, Trustee and Collateral Agent for the Prepetition Second Lien Noteholders, Administrative Agent for DIP Lenders, the Prepetition Lenders and the DIP Lenders* [D.I. 377] (the "Standing Motion"), seeking standing to sue the prepetition lenders, the DIP Lenders and the Second Lien Noteholders and challenge the DIP Lenders' and Second Lien Noteholders' liens on Assets.  At a hearing on the Bid Procedures Motion, the Creditors' Committee agreed to adjourn the Standing Motion to the hearing to approve the 363 Sale, and withdrew its objection to the Bid Procedures Motion after commitments from the DIP Lenders, the Purchaser, and the Debtors to engage good faith negotiations towards a consensual resolution of the Chapter 11 Cases. Following such negotiations, the Purchaser, the Majority DIP Lender, the Debtors, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders agreed to the 2L/Committee Settlement, pursuant to which the parties agreed, among other things, that (i) the Debtors would file a plan of liquidation and disclosure statement that is consistent with the 2L/Committee Settlement and otherwise reasonably acceptable to the Purchaser, the Majority DIP Lender, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders; (ii) the Purchaser will have no greater than $175 million of drawn debt as of the 363 Sale Effective Date, in a manner consistent with the terms agreed to between the Purchaser and the USW; (iii) the Purchaser will pay into an escrow account to be held by the Debtors' counsel the Plan Contribution Payment and the GUC Cash Pool, each of which will be transferred to the Liquidating Trust upon the Effective Date; (iv) any and all Litigation Claims will be transferred to the Liquidating Trust on the Effective Date; (v) the Liquidating Trust shall make Distributions of (a) the GUC Cash Pool on a Pro Rata basis to Holders of Allowed General Unsecured Claims in Class 5, and (b) the Litigation Proceeds, if any, net of Liquidating Trust Operating Expenses and repayments of the Plan Contribution Payment, on a Pro Rata basis to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5; (vi) the Purchaser will issue and deliver the Warrants to the Debtors upon the 363 Sale Effective Date for the benefit of the Holders of Allowed Second Lien Secured Note Claims, and the Debtors will distribute the Warrants under this Plan to Holders of Allowed Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code; (vii) the parties will fully support the Debtors' Plan, provided that the Plan is consistent with the 2L/Committee Settlement and otherwise reasonably acceptable to the Purchaser, the Majority DIP Lender, the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders; (viii) on or before the 363 Sale Effective Date, the Creditors' Committee will withdraw the Standing Motion with prejudice and the Debtors and the Creditors' Committee will

- 37 -

release all claims related thereto; and (ix) certain of the professional advisors of the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee will be subject to fee limitations. The Debtors sought approval of the 2L/Committee Settlement through the *Motion of the Debtors to Approve Settlement Agreement Among the Debtors, Official Committee of Unsecured Creditors, Ad Hoc Group of Second Lien Noteholders, Purchaser and Franklin* [D.I. 734]. The Bankruptcy Court approved the 2L/Committee Settlement on May 14, 2018 [D.I. 753].

## IV. CONFIRMATION AND VOTING

### A.    Confirmation Procedures

####    1.    Plan Confirmation Hearing

The Bankruptcy Code, Bankruptcy Rules, and Local Rules require the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of this Combined Plan and Disclosure Statement. On June 20, 2018, the Bankruptcy Court entered an order scheduling the Plan Confirmation Hearing for August 14, 2018 at 11:00 a.m. (prevailing Eastern Time), to consider, among other things, final approval of this Combined Plan and Disclosure Statement under section 1125 of the Bankruptcy Code and confirmation of this Combined Plan and Disclosure Statement under section 1129 of the Bankruptcy Code. Notice of the Plan Confirmation Hearing will be provided to all known Creditors, Holders of Equity Interests, and other parties in interest.

Any objection to confirmation of this Combined Plan and Disclosure Statement must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors, the basis for the objection and the specific grounds of the objection, and must be Filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon the following parties so as to be received no later than August 2, 2018 at 4:00 p.m. (prevailing Eastern Time): (i) counsel to the Debtors, DLA Piper LLP (US), 444 West Lake Street, Suite 900, Chicago, Illinois 60606 (Attn: Richard A. Chesley, Esq.), DLA Piper LLP (US), 1201 North Market Street, Suite 2100, Wilmington, Delaware 19801 (Attn: Stuart Brown, Esq. and Kaitlin Mackenzie Edelman, Esq.), and DLA Piper LLP (US) 1251 Avenue of the Americas, 27th Floor New York, New York 10020 (Attn: Jamila Justine Willis, Esq.); (ii) the Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801 (Attn: Mark S. Kenney, Esq.); (iii) counsel to the Majority DIP Lender and Purchaser, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, New York 10036 (Attn: Daniel S. Shamah, Esq. (dshamah@omm.com)) and Richards, Layton & Finger, P.A., One Rodney Square, Wilmington, Delaware 19801 (Attn: Michael J. Merchant, Esq. (merchant@rlf.com)); (iv) counsel to the DIP Agent, Covington & Burling LLP, 620 Eighth Avenue, New York, New York 10018 (Attn: Ronald Hewitt, Esq. (rhewitt@cov.com)) and Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 N. Market Street, Wilmington, Delaware 19899 (Attn: David Fournier, Esq. (fournierd@pepperlaw.com)); (v) counsel to the Committee, Klehr Harrison Harvey Branzburg LLP, 919 N. Market Street, Suite 1000, Wilmington, Delaware 19801 (Attn: Michael Yurkewicz, Esq. (myurkewicz@klehr.com)) and Lowenstein Sandler LLP, 1251 Avenue of the Americas,

New York, New York 10020 (Attn: Kenneth Rosen, Esq. (krosen@lowenstein.com) and Wojciech Jung, Esq. (wjung@lowenstein.com)); (vi) counsel to the Ad Hoc Group of Second Lien Noteholders: Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038 (Attn: Jayme T. Goldstein, Esq. (jgoldstein@stroock.com)); (vii) any party that has requested notice pursuant to Bankruptcy Rule 2002; and (viii) such other parties as the Bankruptcy Court may order.

Bankruptcy Rule 9014 governs objections to Confirmation of this Combined Plan and Disclosure Statement. **UNLESS AN OBJECTION TO CONFIRMATION OF THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS TIMELY SERVED UPON THE PARTIES LISTED ABOVE AND FILED WITH THE BANKRUPTCY COURT, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT IN DETERMINING WHETHER TO CONFIRM THIS COMBINED PLAN AND DISCLOSURE STATEMENT.**

2.    **Requirements for Confirmation**

The Bankruptcy Court will confirm this Plan only if the Plan meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in these Chapter 11 Cases is that this Plan (i) is accepted by one impaired Classes of Claims and Interests or, if rejected by an impaired Class, that this Plan "does not discriminate unfairly" against and is "fair and equitable" with respect to such Class; and (ii) is feasible. The Bankruptcy Court must also find, among other things, that:

a.    this Plan has classified Claims and Interests in a permissible manner;

b.    this Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

c.    this Plan has been proposed in good faith.

3.    **Cram Down**

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in sections 1126(c) and (d) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 1127 of the Bankruptcy Code or to seek Bankruptcy Court confirmation of the Plan under section 1129(b) of the Bankruptcy Code (a procedure known as "cram down"), or both. The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted the plan. The "cram down" provisions of the Bankruptcy Code are set forth in section 1129(b) of the Bankruptcy Code.

Under the "cram down" provisions, on the request of a plan proponent the bankruptcy court will confirm a plan despite the lack of acceptance by an impaired class or classes if the bankruptcy court finds that:

- the plan does not discriminate unfairly with respect to each non-accepting impaired class;

- the plan is fair and equitable with respect to each non-accepting impaired class; and

- at least one impaired class has accepted the plan.

These standards ensure that holders of junior interests cannot retain any interest in the debtor under a plan of reorganization that has been rejected by a senior impaired class of claims or interests unless the claims or interests in that senior impaired class are paid in full.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate Classes for the Holders of each type of Claim or Equity Interest and by treating each Holder of a Claim or Equity Interest in each Class similarly, the Plan has been structured in order to satisfy the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured claims or unsecured claims. In general, section 1129(b) of the Bankruptcy Code permits confirmation of a plan despite non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule. This rule requires that the dissenting class be paid in full before a junior class may receive anything under the plan. The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders as follows:

- <u>Secured Creditors</u>. Either: (1) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (2) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (3) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as described in clauses (1) and (2) above.

- <u>Unsecured Creditors</u>. Either: (1) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- 40 -

- Equity Interests. Either: (1) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (2) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

In addition, the Bankruptcy Code requires that a debtor demonstrate that no class senior to a non-accepting impaired class will receive more than payment in full on its claims. If all of the applicable requirements for confirmation of the Plan are satisfied as set forth in sections 1129(a)(1) through (13) of the Bankruptcy Code, except that one or more Classes of Impaired Claims have failed to accept the Plan under section 1129(a)(8) of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court confirm the Plan under the "cram down" procedures in accordance with section 1129(b) of the Bankruptcy Code. The Debtors believe that this Combined Plan and Disclosure Statement satisfies the "cram down" requirements of the Bankruptcy Code, but there can be no assurance that the Bankruptcy Court will determine that this Combined Plan and Disclosure Statement meets the requirements of section 1129(b) of the Bankruptcy Code or that at least one impaired class of Claims will vote to accept the Plan, as required for confirmation of a Plan under the "cram down" procedures.

4.      **Best Interests of Creditors Test**

The Bankruptcy Code requires that, with respect to an impaired Class of Claims or Interests, each Holder of an impaired Claim or Interest in such Class either (i) accepted the plan or (ii) will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount (value) such Holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code on the effective date.

The costs of a chapter 7 liquidation would necessarily include fees payable to a chapter 7 trustee, as well as fees likely to be payable to attorneys, advisors, and other professionals that such a chapter 7 trustee may engage to carry out its duties under the Bankruptcy Code. Other costs of liquidating the Debtors' Estates would include the expenses incurred during the bankruptcy cases and allowed by the Bankruptcy Court in the chapter 7 cases. The foregoing types of claims, costs, expenses, and fees that may arise in a chapter 7 liquidation case would be paid in full before payments would be made towards chapter 11 administrative, priority, and unsecured claims. Without the benefit of settlements and resolutions reached in these Chapter 11 Cases, any recoveries for Holders of Allowed General Unsecured Claims in a chapter 7 liquidation would be significantly diluted.

Accordingly, the Debtors believe that in a chapter 7 liquidation, Holders of Claims and Interests would receive less than such Holders would receive under this Combined Plan and Disclosure Statement. There can be no assurance, however, as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

- 41 -

5.     **Feasibility**

Under section 1129(a)(11) of the Bankruptcy Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor under the plan, unless such liquidation or reorganization is proposed under the plan. Under this Combined Plan and Disclosure Statement, the Litigation Claims are being transferred to the Liquidating Trust for prosecution, liquidation and distribution in accordance with the Liquidating Trust Agreement. Therefore, as this is a liquidating Plan, the Bankruptcy Court's confirmation of this Combined Plan and Disclosure Statement will not be followed by unanticipated liquidation or the need for any further reorganization.

6.     **Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code requires the proponent of this Combined Plan and Disclosure Statement to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such Class. The Debtors believe that this Combined Plan and Disclosure Statement's classification scheme places substantially similar Claims or Interests in the same Class and, thus, meets the requirements of section 1122 of the Bankruptcy Code.

7.     **Impaired Claims or Interests**

Under section 1126 of the Bankruptcy Code, only the Holders of Claims in Classes "impaired" by this Combined Plan and Disclosure Statement and receiving a Distribution under this Combined Plan and Disclosure Statement may vote to accept or reject this Combined Plan and Disclosure Statement. Under section 1124 of the Bankruptcy Code, a Class of Claims may be "impaired" if this Combined Plan and Disclosure Statement alters the legal, equitable, or contractual rights of the Holders of such Claims or Interests treated in such Class. The Holders of Claims not impaired by this Combined Plan and Disclosure Statement are deemed to accept this Combined Plan and Disclosure Statement and do not have the right to vote on this Combined Plan and Disclosure Statement. The Holders of Claims or Interests in any Class that will not receive any Distribution or retain any property under this Combined Plan and Disclosure Statement are deemed to reject this Combined Plan and Disclosure Statement and do not have the right to vote.

8.     **Eligibility to Vote on this Combined Plan and Disclosure Statement**

Unless otherwise ordered by the Bankruptcy Court, only Holders of Allowed Claims in Classes 3 and 5 may vote on this Combined Plan and Disclosure Statement. In order to vote on this Combined Plan and Disclosure Statement, you must hold an Allowed Claim in a voting class or be the Holder of a Claim that has been temporarily Allowed for voting purposes only under Bankruptcy Rule 3018(a).

9.     **Procedure/Voting Deadlines**

In order for your Ballot to count, you must (1) properly complete, date, and execute the Ballot and (2) deliver the Ballot to the Balloting Agent at the following address:

- 42 -

Appvion, Inc. Balloting, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

The Balloting Agent must RECEIVE original ballots on or before **August 6, 2018 at 5:00 p.m.** (prevailing Eastern Time), the Voting Deadline.

Any Ballot that is timely received, that contains sufficient information to permit the identification of the claimant, and that is cast as an acceptance or rejection of this Combined Plan and Disclosure Statement will be counted and cast as an acceptance or rejection, as the case may be, of this Combined Plan and Disclosure Statement.

Absent the prior agreement of the Debtors, with the consent of the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders, the following Ballots will not be counted or considered for any purpose in determining whether this Combined Plan and Disclosure Statement has been accepted or rejected by the class in which such Holder holds a Claim or Interest:

   a. any Ballot submitted that is received after the Voting Deadline, unless the Debtors or the Bankruptcy Court grant an extension of the Voting Deadline with respect to such Ballot;

   b. any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

   c. any Ballot cast by a Person or Entity that does not hold a Claim in a Class that is entitled to vote to accept or reject this Combined Plan and Disclosure Statement;

   d. any Ballot cast for a Claim designated or determined as unliquidated, contingent, or disputed or as zero or unknown in amount and for which no Bankruptcy Rule 3018(a) motion has been Filed by the Bankruptcy Rule 3018(a) motion deadline;

   e. any Ballot timely received that is cast in a manner that indicates neither acceptance nor rejection of this Combined Plan and Disclosure Statement or that indicates both acceptance and rejection of this Combined Plan and Disclosure Statement;

   f. any Ballot not bearing an original signature; or

   g. any Ballot that is submitted by facsimile or electronic mail.

10.   **Releases**

**All Holders of Claims are urged to carefully read the release provisions set forth in Section XII.E of the Plan.  The Plan provides that each Holder of a Claim or an Interest that (i) is a Released Party, (ii) votes to accept the Plan, (iii) votes to reject the Plan and does not mark its ballot to indicate its refusal to grant the Third-Party Release**

- 43 -

contained in Section XII.E of the Plan, (iv) abstains from voting on the Plan (except for those Holders of Claims or Interests whose solicitation packages were returned to the Debtors or the Balloting Agent as undeliverable, which Holders of Claims or Interests shall be identified in the Debtors' voting certification or a notice to be filed by the Debtors or the Balloting Agent) and does not mark its ballot to indicate its refusal to grant the Third-Party Release contained in Section XII.E of the Plan, and (v) is a Related Person with respect to each of the foregoing clauses (i) through (iv), will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged the Released Parties and their Related Persons from any and all Claims and causes of action against the Debtors and the Released Persons. Holders of Class 6 Intercompany Claims and Class 7 Equity Interests, all of whom are deemed to reject this Plan, will be granted an opportunity to opt-out of the release provisions set forth in Section XII.E of the Plan.

The releases provided are critical parts of this Combined Plan and Disclosure Statement and are appropriate under the Third Circuit standard. Such releases are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement from asserting any Claims or causes of action released under the Plan in favor of the Released Parties.

11.    **Acceptance of this Combined Plan and Disclosure Statement**

As a Creditor, your acceptance of this Combined Plan and Disclosure Statement is important. In order for this Combined Plan and Disclosure Statement to be accepted by an impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each impaired Class of Claims) must vote to accept this Combined Plan and Disclosure Statement. At least one impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept this Combined Plan and Disclosure Statement. The Debtors and the Creditors' Committee urge that you vote to accept this Combined Plan and Disclosure Statement. **YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY RETURN THE BALLOT. PLEASE BE SURE TO COMPLETE THE BALLOT PROPERLY AND LEGIBLY IDENTIFY THE EXACT AMOUNT OF YOUR CLAIM AND THE NAME OF THE CREDITOR.**

## V. TREATMENT OF UNCLASSIFIED CLAIMS

A.    **General Administrative Expense Claims**

General Administrative Expense Claims comprise Administrative Expense Claims and Professional Fee Administrative Claims. The 363 Sale Agreement provides for the payment of General Administrative Expense Claims in accordance with the Wind-Down Budget, as amended by the 2L/Committee Settlement, including but not limited to all Allowed Claims arising under section 503(b)(9) of the Bankruptcy Code, all unpaid post-petition obligations, and Allowed Professional Fee Administrative Claims.

With respect to Allowed Administrative Expense Claims, in full and complete satisfaction of such Claims, payment on the later of (i) the 363 Sale Effective Date, (ii) the date such Administrative Expense Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, and (iii) the date such Administrative Expense Claim comes due in the ordinary course of business, with such Administrative Expense Claims being paid in the full amount Allowed in Cash (as determined by agreement, settlement, or Final Order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Administrative Expense Claim, the Debtors, the Majority DIP Lender, and the Creditors' Committee (prior to the Effective Date) and the Liquidating Trustee (after the Effective Date). To be eligible to receive Distributions under this Combined Plan and Disclosure Statement on account of an Administrative Expense Claim that is not otherwise expressly Allowed by this Combined Plan and Disclosure Statement, a request for payment of an Administrative Expense Claim must have been or be Filed on or before the Administrative Expense Claim Bar Date; *provided, however*, that Claims arising under section 503(b)(9) of the Bankruptcy Code shall be and remain subject to the General Bar Date. Any Administrative Expense Claim that is not timely asserted by the Administrative Expense Claim Bar Date or the General Bar Date, as applicable, in accordance herewith and the General Bar Date Order, as applicable, shall be deemed disallowed under this Combined Plan and Disclosure Statement and shall be forever barred against the Debtors, the Estates, the Liquidating Trust, or any of their Assets or property, and the Purchaser, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim.

With respect to Professional Fee Administrative Claims, in full and complete satisfaction of their Claims, payment on the later of (i) the 363 Sale Effective Date, (ii) the Effective Date, and (iii) the date such Professional Fee Administrative Claim becomes an Allowed Claim by a Final Order of the Bankruptcy Court, to be paid in the full Allowed amount in Cash (as determined by agreement, settlement, or order of the Bankruptcy Court), or such other treatment as may be agreed upon by a Holder of any such Allowed Professional Fee Administrative Claim, the Debtors, and the Purchaser.

The deadline for submission by **all** Professionals (including any applications of members of the Creditors' Committee for expense reimbursement) for Bankruptcy Court approval of Professional Fee Administrative Claims shall be thirty (30) days after the Effective Date. Any Professional or other Person or Entity that is required to File and serve a request for approval of a Professional Fee Administrative Claim that fails to File and serve a timely request will be forever barred, estopped, and enjoined from asserting any request for payment of a Professional Fee Administrative Claim or participating in Distributions under the Plan on account thereof. All Professionals employed by the Debtors or the Creditors' Committee shall provide to the Debtors an estimate of their accrued professional fees and expenses through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) within five (5) Business Days prior to the 363 Sale Effective Date. The aggregate amount of the Professional Fee Administrative Claims shall be held in the Professional Fee Escrow. The Professional Fee Escrow shall be funded on or before the 363 Sale Effective Date. Upon approval of professional fees consistent with the procedures established by the Bankruptcy Court, the Debtors or the

- 45 -

Liquidating Trustee, as applicable, shall release the appropriate amount to the Professionals from the Professional Fee Escrow.

## B.   Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim, shall receive in full satisfaction of such Allowed Priority Tax Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, payment in Cash equal to the Allowed amount of such Priority Tax Claim, on the later of (i) the Effective Date and (ii) the date such Priority Tax Claim becomes an Allowed Claim by Final Order of the Bankruptcy Court, or such other treatment as may be agreed upon by any such Holder of a Priority Tax Claim, the Debtors, and the Creditors' Committee (prior to the Effective Date) and the Liquidating Trustee (after the Effective Date). The Liquidating Trustee reserves the right to prepay such Allowed Priority Tax Claim at any time. On the Effective Date, any Liens securing any Allowed Priority Tax Claim shall be deemed released, terminated, and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.

## C.   Statutory Fees

Statutory Fees from the Petition Date through the Effective Date shall be paid by the Debtors on the Effective Date. Statutory Fees relating to any period of time after the Effective Date shall be paid by the Liquidating Trust.

## D.   ESOP

Any Holder of a beneficial interest in the ESOP wishing to vote on the Plan must hold a Claim against the Debtors in Class 3 or Class 5 that is separate and apart from a Direct ESOP Claim. Any Direct ESOP Claims held by the Holders of beneficial interests in the ESOP on account of their beneficial interest in the ESOP will be asserted by the ESOP Committee, in its discretion, on behalf of all Holders of beneficial interests in the ESOP. Notwithstanding the foregoing, any other party which holds a Direct ESOP Claim may assert such Direct ESOP Claim under applicable law. Notwithstanding anything to the contrary in this Plan, the ESOP Committee shall retain responsibility, standing, and authority to commence, prosecute and settle lawsuits or actions on behalf of the Holders of beneficial interests in the ESOP.

## VI. CLASSIFICATION OF CLAIMS AND INTERESTS; ESTIMATED RECOVERIES

For purposes of voting, confirmation and making Distributions under the Plan, the Plan provides for and is premised upon the substantive consolidation of the Debtors and their Estates. Claims for each of the Debtors – other than Administrative Expense Claims, Professional Fee Administrative Claims, Priority Tax Claims, and Statutory Fees Claims – are classified for all purposes, including voting, confirmation, and Distribution under this Combined Plan and Disclosure Statement, as follows:

| Appvion, Inc. |
| --- |

| Class | Type | Status Under Plan | Voting Status | Anticipated Recovery |
|---|---|---|---|---|
| 1 | DIP Facility Claims | Unimpaired | Deemed to Accept | 100% |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept | 100% |
| 3 | Second Lien Secured Note Claims | Impaired | Entitled to Vote | Warrants, Pro Rata share of the Litigation Proceeds, plus Pro Rata share of the remaining Liquidating Trust Assets, as set forth below |
| 4 | Other Priority Claims | Unimpaired | Deemed to Accept | 100% |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | Pro Rata share of the Litigation Proceeds, plus Pro Rata share of the GUC Cash Pool, plus Pro Rata share of the remaining Liquidating Trust Assets, as set forth below |
| 6 | Intercompany Claims | Impaired | Deemed to Reject | No Distribution |
| 7 | Equity Interests | Impaired | Deemed to Reject | No Distribution |

## VII.    TREATMENT OF CLAIMS AND INTERESTS

### A.    <u>Treatment of Claims and Interests</u>

1.    **DIP Facility Claims (Class 1)**

a.    <u>Classification</u>

Class 1 consists of all DIP Facility Claims against Appvion, PDC, Appvion Receivables, and APVN.

      b.      <u>Impairment and Voting</u>

Class 1 is unimpaired. Holders of Allowed Class 1 DIP Facility Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

      c.      <u>Treatment</u>

All DIP Facility Claims shall be deemed fully and finally satisfied as against the Debtors and their Estates by the credit bid and treatment of such claims upon the 363 Sale Effective Date.

2.      **Other Secured Claims (Class 2)**

      a.      <u>Classification</u>

Class 2 consists of all Other Secured Claims, if any, against any Debtor, secured by such Debtor's assets.

      b.      <u>Impairment and Voting</u>

Class 2 is unimpaired. Holders of Allowed Class 2 Other Secured Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

      c.      <u>Treatment</u>

Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in settlement, and release of each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claim shall receive, on account of its Allowed Other Secured Claim, one of the following treatments, as determined by the Debtors or the Liquidating Trustee, as soon as reasonably practicable after the Effective Date or such later date on which such Other Secured Claim becomes an Allowed Secured Other Claim: (i) payment in full in Cash; (ii) delivery of the collateral securing any such Allowed Other Secured Claim; and/or (iii) other treatment such that the Allowed Other Secured Claim shall be rendered unimpaired.

3.      **Second Lien Secured Note Claims (Class 3)**

      a.      <u>Classification</u>

Class 3 consists of Second Lien Secured Note Claims against the Debtors.

      b.      <u>Impairment and Voting</u>

Class 3 is impaired. Holders of Allowed Class 3 Second Lien Secured Note Claims are entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

      c.    <u>Treatment</u>

Except to the extent that a Holder of an Allowed Second Lien Secured Note Claim agrees to less favorable treatment, in settlement and release of each Allowed Second Lien Secured Note Claim, each Holder of an Allowed Second Lien Secured Note Claim shall receive on account of its Allowed Second Lien Secured Note Claim, consistent with the terms and conditions of the 2L/Committee Settlement, on or as soon as practicable after the Effective Date:

(i) its Pro Rata share of the Warrants, which shall be distributed by the Debtors only to the Holders of Allowed Second Lien Secured Note Claims, and

(ii) a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed Second Lien Secured Note Claim to the following on each applicable Distribution Date:

(a) its Pro Rata share of the Litigation Proceeds (net of Liquidating Trust Operating Expenses, repayments of the Plan Contribution Payment, and any other Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed Second Lien Secured Note Claims in Class 3 are paid in full or the Litigation Proceeds are exhausted, and

(b) its Pro Rata share of the remaining Liquidating Trust Assets (excluding the GUC Cash Pool, the Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed Second Lien Secured Note Claims in Class 3 are paid in full or the remaining Liquidating Trust Assets are exhausted.

**4.**    **Other Priority Claims (Class 4)**

      a.    <u>Classification</u>

Class 4 consists of all Other Priority Claims, if any, against the Debtors.

b.    Impairment and Voting

Class 4 is unimpaired.  Holders of Allowed Class 4 Other Priority Claims are conclusively presumed to have accepted this Combined Plan and Disclosure Statement under section 1126(f) of the Bankruptcy Code and, thus, are not entitled to vote to accept or reject this Combined Plan and Disclosure Statement.

c.    Treatment

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in settlement and release of each Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, on account of its Allowed Other Priority Claim, payment in full in Cash as soon as reasonably practicable after the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

5.    **General Unsecured Claims (Class 5)**

a.    Classification

Class 5 consists of all General Unsecured Claims against the Debtors.

b.    Impairment and Voting

Class 5 is impaired, and Holders of Allowed General Unsecured Claims are entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    Treatment

Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, and after satisfaction in full of all senior Claims (except the Second Lien Secured Note Claims as provided for in the 2L/Committee Settlement), in settlement and release of each Allowed General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on account of such Allowed General Unsecured Claim, consistent with the terms and conditions of the 2L/Committee Settlement, on or as soon as practicable after the Effective Date:

(i) such Holder's Pro Rata share of the GUC Cash Pool in Cash, which shall be distributed only to the Holders of Allowed General Unsecured Claims, and

(ii) a beneficial interest in the Liquidating Trust, which beneficial interest shall entitle such Holder of an Allowed General Unsecured Claim to the following on each applicable Distribution Date:

(a) its Pro Rata share of the Litigation Proceeds (net of Liquidating Trust Operating Expenses, repayments of the Plan Contribution Payment, and any other Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax

- 50 -

Claims, Allowed Other Secured Claims and Allowed Other Priority Claims), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed General Unsecured Claims in Class 5 are paid in full or the Litigation Proceeds are exhausted; and

(b) its Pro Rata share of the remaining Liquidating Trust Assets (excluding the GUC Cash Pool, the Litigation Proceeds, repayments of the Plan Contribution Payment, and any other Cash Distributions that are to be made to Holders of Allowed General Administrative Expense Claims, Allowed Statutory Fee Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims and Allowed Other Priority Claims, and the Liquidating Trust Operating Expenses), which shall be distributed by the Liquidating Trust on a Pro Rata basis only to the Holders of Allowed Second Lien Secured Note Claims in Class 3 and Holders of Allowed General Unsecured Claims in Class 5, until all Allowed General Unsecured Claims in Class 5 are paid in full or the remaining Liquidating Trust Assets are exhausted.

6.      **Intercompany Claims (Class 6)**

a.      Classification

Class 6 consists of all Intercompany Claims.

b.      Impairment and Voting

Class 6 is impaired, and Holders of Allowed Intercompany Claims against the Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.      Treatment

Holders of Intercompany Claims in Class 6 will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Intercompany Claim will be canceled as of the Effective Date.

7.      **Equity Interests (Class 7)**

a.      Classification

Class 7 consists of all Equity Interests in the Debtors.

b.      Impairment and Voting

Class 7 is impaired, and Holders of Allowed Equity Interests in the Debtors are not entitled to vote to accept or to reject this Combined Plan and Disclosure Statement.

c.    Treatment

Holders of Equity Interests in Class 7 will not receive a Distribution under the Combined Plan and Disclosure Statement, and their Equity Interests will be canceled as of the Effective Date.

## B.    Modification of Treatment of Claims and Interests

The Plan Proponents, with the consent of the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee, reserve the right to modify the treatment of any Allowed Claim or Equity Interest in any manner adverse only to the Holder of such Claim or Equity Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Equity Interest whose Allowed Claim or Equity Interest, as the case be, is being adversely affected.

## VIII.    PROVISIONS REGARDING THE LIQUIDATING TRUST

## A.    Appointment of the Liquidating Trustee

The Liquidating Trustee shall be selected by the Creditors' Committee and Second Lien Noteholders in consultation with the Debtors, and shall be identified by the Debtors in the Plan Supplement. At the Plan Confirmation Hearing, the Bankruptcy Court shall consider and, if appropriate, ratify the selection of the Liquidating Trustee. All compensation for the Liquidating Trustee shall be paid from the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement. The approved Persons shall serve as the Liquidating Trustee upon execution of the Liquidating Trust Agreement on the Effective Date. The Liquidating Trustee shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The Liquidating Trust Agreement shall be provided in the Plan Supplement. On the Effective Date, all Beneficiaries of the Liquidating Trust shall be deemed to have ratified and become bound by the terms and conditions of the Liquidating Trust Agreement. In the event that the Liquidating Trustee resigns or is removed, terminated, or otherwise unable to serve as Liquidating Trustee, then successors shall be appointed as set forth in the Liquidating Trust Agreement. Any successor Liquidating Trustee appointed shall be bound by and comply with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, and the Liquidating Trust Agreement.

Following the Effective Date, the Liquidating Trustee shall also be, and shall enjoy the powers of, the Debtors' authorized representative for all purposes, including, without limitation, section 1123 of the Bankruptcy Code. No further proof of such power shall be necessary or required.

## B.    Creation of Liquidating Trust

On the Effective Date, the Liquidating Trustee shall sign the Liquidating Trust Agreement and, in its capacity as Liquidating Trustee, accept all Liquidating Trust Assets on behalf of the Beneficiaries thereof, as well as the obligation to repay the Plan Contribution Payment in accordance with the terms of this Plan and the 2L/Committee Settlement, and be authorized to obtain, collect, seek the turnover of, liquidate, and collect all of the Liquidating

- 52 -

Trust Assets not in its possession or control and to prosecute the Litigation Claims. The Liquidating Trust will then be created and effective without any further action by the Bankruptcy Court or any Person as of the Effective Date. The Liquidating Trust shall be established for the primary purpose of prosecuting the Litigation Claims, liquidating the Liquidating Trust Assets and making Distributions in accordance with this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, with no objective to continue or engage in the conduct of a trade or business, except only in the event and to the extent necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

## C.   Beneficiaries of Liquidating Trust

The Holders of Allowed Second Lien Secured Note Claims and Allowed General Unsecured Claims entitled to Distributions hereunder shall be the Beneficiaries of the Liquidating Trust. Such Beneficiaries shall be bound by the Liquidating Trust Agreement. The interests of the Beneficiaries in the Liquidating Trust shall be uncertificated and transferable in accordance with the terms set forth in this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement.

## D.   Vesting and Transfer of Assets to the Liquidating Trust

Under section 1141(b) of the Bankruptcy Code, the Liquidating Trust Assets shall be assigned, transferred, and vest in the Liquidating Trust upon the Effective Date free and clear of all Claims and Liens; *provided, however*, that the Liquidating Trustee may abandon or otherwise not accept any Assets that the Liquidating Trustee believes, in good faith, to have no value to, or will be unduly burdensome to, the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement. Any Assets that the Liquidating Trustee so abandons or otherwise does not accept shall not be property of the Liquidating Trust. As of the Effective Date, all Liquidating Trust Assets vest in the Liquidating Trust and all Assets dealt with in this Combined Plan and Disclosure Statement shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in this Combined Plan and Disclosure Statement or in the Plan Confirmation Order; *provided, further*, that nothing herein shall relieve the Liquidating Trust of its obligation to repay the Plan Contribution Payment in accordance with the terms of this Plan and the 2L/Committee Settlement.

## E.   Funding of the Liquidating Trust

In accordance with the terms of the 2L/Committee Settlement, the Liquidating Trust shall be funded from (i) the Plan Contribution Payment, (ii) the GUC Cash Pool, (iii) net recoveries resulting from the prosecution of any and all Litigation Claims, (iv) the proceeds of any Insurance Policies, and (v) any and all other Assets belonging to the Debtors' Estates.

To the extent not paid in full in Cash on the Effective Date, reserves for payment of Disputed Claims and Professional Fee Administrative Claims shall be set aside and held by Liquidating Trustee until such Claims are approved, Allowed and authorized to be paid, by the Bankruptcy Court.

On the Effective Date, the Debtors and the Debtors' Estates shall transfer and be deemed to have transferred the Liquidating Trust Assets to the Liquidating Trust and such

- 53 -

Liquidating Trust Assets shall vest in the Liquidating Trust to be utilized, administered, and distributed by the Liquidating Trustee in accordance with the terms and conditions of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, and the 2L/Committee Settlement.

## F.    Distributions from the Liquidating Trust

Distributions from the Liquidating Trust shall be made in accordance with the Combined Plan and Disclosure Statement and the Liquidating Trust Agreement. For the avoidance of doubt, the Litigation Proceeds shall be used to pay any Liquidating Trust Operating Expenses and repayments of the Plan Contribution Payment prior to making any Distributions to Beneficiaries of the Liquidating Trust.

## G.    Certain Powers and Duties of the Liquidating Trust and Liquidating Trustee

### 1.    General Powers of the Liquidating Trustee

The Liquidating Trustee shall have, and enjoy the powers of, the Debtors' authorized representative for all purposes and shall have the power and authority to perform the acts described in the Liquidating Trust Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of this Combined Plan and Disclosure Statement, including without limitation any set forth herein, *provided, however*, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Liquidating Trustee to act as specifically authorized by any other provision of this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and/or any applicable law, and to act in such manner as the Liquidating Trustee may deem necessary or appropriate, including, without limitation, to discharge all obligations assumed by the Liquidating Trustee or provided herein, to conserve and protect the Liquidating Trust and the Liquidating Trust Assets, or to confer on the Beneficiaries the benefits intended to be conferred upon them by this Combined Plan and Disclosure Statement. The powers, rights, and responsibilities of the Liquidating Trustee shall be specified in the Liquidating Trust Agreement and shall include the authority, power, and responsibility to: (a) receive, manage, invest, supervise, and protect Liquidating Trust Assets; (b) pay taxes or other obligations incurred by the Liquidating Trust and issue to employees or other Persons, and/or file with the appropriate Governmental Units, applicable tax and wage returns and forms; (c) retain and compensate, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist in the administration, prosecution and Distribution of Liquidating Trust Assets; (d) calculate and implement Distributions of Liquidating Trust Assets; (e) investigate, prosecute, compromise, and settle, in accordance with the specific terms of the Liquidating Trust Agreement and without further order of the Bankruptcy Court, the Litigation Claims vested in the Liquidating Trust, as set forth in the Liquidating Trust Agreement; (f) resolve issues involving Claims and Equity Interests in accordance with this Combined Plan and Disclosure Statement, including the power to object to Claims, and to subordinate and recharacterize Claims by objection, motion, or adversary proceeding; (g) undertake all administrative functions of the Chapter 11 Cases, including the payment of Statutory Fees incurred post-Effective Date and the ultimate closing of the Chapter 11 Cases and dissolution of the Debtor entities; (h) dissolve the Debtors' Employee Benefit Plans

- 54 -

other than the ESOP and KSOP not sold and transferred to the Purchaser in connection with the 363 Sale; and (i) take such other action as may be vested in or assumed by the Liquidating Trustee consistent with this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, and any applicable Orders of the Bankruptcy Court, or as may be necessary and proper to carry out the provisions of this Combined Plan and Disclosure Statement.

Except as expressly set forth in this Combined Plan and Disclosure Statement and in the Liquidating Trust Agreement, the Liquidating Trustee, on behalf of the Liquidating Trust, shall have absolute discretion to pursue or not to pursue any Litigation Claims as he/she/it determines is in the best interests of the Liquidating Trust's Beneficiaries and consistent with the purposes of the Liquidating Trust, and shall be indemnified to the fullest extent permitted under applicable law by the Liquidating Trust for the outcome of his, her, or its decisions, other than those decisions constituting fraud, gross negligence, willful misconduct, bad faith or self-dealing. The Liquidating Trustee may incur any reasonable and necessary expenses in liquidating and converting the Liquidating Trust Assets to Cash. Other than as provided for in the 363 Sale Documents, the Liquidating Trust is the successor to the Debtors, their Estates, their books and records, and their Privileges and protections (it being understood that to the extent the Liquidating Trustee is a successor with respect to documents subject to a common interest privilege with any third party, nothing herein shall relieve the Liquidating Trustee of any formal or informal obligations with respect to such common interest agreements). The Liquidating Trustee shall have standing, authority, power, and right to assert, prosecute, and/or settle the Litigation Claims, including, with respect to the Liquidating Trust, making a claim under Insurance Policies based upon its powers as a bankruptcy-appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators, or similar officials. The Litigation Claims will vest in the Liquidating Trust as set forth in the Liquidating Trust Agreement; *however*, there can be no assurance as to the outcome of such Litigation Claims or the dollar amount of any recovery that will be obtained by the Liquidating Trust. With respect to the provisions of the Transition Services Agreement, which survive the Effective Date and Consummation of this Plan, the Liquidating Trustee shall be deemed a permitted assignee of the Debtors under the Transition Services Agreement and shall receive the benefit thereunder.

2.    **Books and Records**

On the Effective Date, the Liquidating Trust shall: (a) take possession of all books, records, and files of the Debtors and the Estates that were not sold and transferred in connection with the 363 Sale; and (b) provide for the retention and storage of such books, records, and files until such time as the Liquidating Trustee determines, in accordance with the Liquidating Trust Agreement, that retention of same is no longer necessary or beneficial.

3.    **Investments of Cash**

The Liquidating Trust may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code or in other prudent investments, *provided*, *however*, that such investments are permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

EAST\152399891.23

4.  **Costs and Expenses of Administration of the Liquidating Trust**

All Liquidating Trust Operating Expenses shall be the responsibility of and paid by the Liquidating Trust in accordance with the Liquidating Trust Agreement from the Liquidating Trust Assets.

5.  **Reporting**

In no event later than thirty (30) Business Days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Cash in the Liquidating Trust has been released or paid out in accordance with this Combined Plan and Disclosure Statement, the Liquidating Trustee shall File reports setting forth the amounts, recipients, and dates of all Distributions through each applicable reporting period.

H.  **Federal Income Tax Treatment of the Liquidating Trust for the Liquidating Trust Assets**

For federal income tax purposes, it is intended that the Liquidating Trust be classified as a liquidating trust under section 301.7701-4 of the Treasury regulations and that the trust be owned by its Beneficiaries. Accordingly, for federal income tax purposes, it is intended that the Beneficiaries be treated as if they had received a distribution from the Estates of an undivided interest in the Liquidating Trust Assets (to the extent of the value of their respective share in the applicable Assets) and then contributed such interests to the Liquidating Trust, and the Liquidating Trust's Beneficiaries will be treated as the grantors and owners thereof.

The Liquidating Trustee shall be responsible for filing all federal, state, and local tax returns for the Liquidating Trust and for the Debtors. The Liquidating Trust shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions made by the Liquidating Trust shall be subject to any such withholding and reporting requirements. The Liquidating Trustee shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a Distribution, the Holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each Holder. Notwithstanding any other provision of this Combined Plan and Disclosure Statement, (a) each Holder of an Allowed Claim that is to receive a Distribution from a Liquidating Trust shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income and other tax obligations, on account of such Distribution, and (b) no Distribution shall be made to or on behalf of such Holder under this Combined Plan and Disclosure Statement unless and until such Holder has made arrangements satisfactory to the Liquidating Trustee to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed by the Liquidating Trust shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution to be held by the Liquidating Trustee, as the case may be, until such time as Liquidating Trustee is satisfied with the Holder's arrangements for any withholding tax obligations.

I.  **Term of Liquidating Trust**

- 56 -

The Liquidating Trustee shall be discharged and the Liquidating Trust shall be terminated, at such time as (i) all Disputed Claims have been resolved, (ii) all of the Litigation Claims have been prosecuted to completion and the Liquidating Trust Assets have been collected and liquidated, (iii) all duties and obligations of the Liquidating Trustee under the Liquidating Trust Agreement have been fulfilled, (iv) all Distributions required to be made by the Liquidating Trust under this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement have been made, and (v) the Chapter 11 Cases have been closed; *provided, however*, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Bankruptcy Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, unless the Liquidating Trust has procured a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

## J.    Limitation of Liability of the Liquidating Trustee

The Liquidating Trust shall indemnify its Liquidating Trustee and its professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits, or claims that the Liquidating Trustee or its professionals may incur or sustain by reason of being or having been a Liquidating Trustee or professionals of the Liquidating Trust for performing any functions incidental to such service; *provided, however,* the foregoing shall not relieve the Liquidating Trustee or its professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud, or self-dealing, or, in the case of an attorney professional and, as required under Rule 1.8(h)(1) of the Delaware Layers' Rules of Professional Conduct, malpractice.

## IX. ADDITIONAL MEANS FOR IMPLEMENTATION

### A.    Substantive Consolidation

#### 1.    The Basis for Substantive Consolidation

Substantive consolidation of the Debtors and their Estates is an important element of the Debtors' successful implementation of the Plan.  The Debtors' proposed substantive consolidation structure is supported by the applicable legal standards, practical considerations, and available information regarding the Debtors' prepetition financial affairs.

Substantive consolidation is an equitable remedy that a bankruptcy court may apply in the cases of affiliated debtors, among other instances.  When debtors are substantively consolidated, the assets and liabilities of such debtors are pooled and essentially treated as the assets and liabilities of a single debtor.  The United States Court of Appeals for the Third Circuit (the "Third Circuit Court of Appeals"), the circuit in which the Chapter 11 Cases are pending, articulated a test in *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005), for determining whether substantive consolidation is warranted.  In setting forth the test, the Third Circuit Court of Appeals looked to five principles behind substantive consolidation: (i) limiting the cross-creep of

- 57 -

liability by respecting entity separateness is a fundamental ground rule; (ii) the harms substantive consolidation addresses are nearly always those caused by debtors; (iii) mere benefit of administration of the case is hardly a harm calling for substantive consolidation into play; (iv) substantive consolidation should be a rare remedy and one of last resort after considering and rejecting other remedies; and (v) while substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively. *Id.* at 211. Based on these principles, the Third Circuit Court of Appeals held that, in the Third Circuit, the party calling for substantive consolidation must prove: (i) that prepetition, the entities to be consolidated disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) that postpetition, their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors. *Id.* Substantive consolidation is appropriate if either factor is justified. *Id.*

The Debtors believe that the substantive consolidation provided for under the Plan is appropriate under the standards set forth by the Third Circuit Court of Appeals in the *Owens Corning* case, for several reasons. First, the Debtors believe that, prepetition, many of their creditors effectively treated the Debtors as a single entity. Second, the Debtors believe that while they did observe appropriate corporate formalities and separateness during the prepetition period, as a practical matter the Debtors' business was operated as an integrated enterprise. Third, the Plan provides substantial benefits to creditors, available only to the extent that substantive consolidation provided for in the Plan occurs. Fourth, to the extent that individual Debtors have little or no assets, and the recovery to the creditors of such Debtors is comprised largely of the monetary contributions provided for by the Purchaser, individual restructurings of these Debtors would not be a viable option. Accordingly, the Debtors believe that the Plan's partial substantive consolidation structure is beneficial to creditors.

## 2.    **Impracticality of Separate Entity Plans**

Substantive consolidation will avoid the onerous costs and substantial delay that would result from attempting to confirm individual plans of liquidation for each of the Debtors, which separate plans of liquidation will be prone to inaccuracies that may prejudice certain creditors. Separate plans for each entity will inevitably rest on certain assumptions; for instance, as the Debtors were not managed operationally on an individual entity basis, it is difficult to allocate value and operational costs and benefits on a legal entity basis. In addition, many financial obligations of the Debtors are based on the Debtors as a whole or other combinations of entities that make allocation to legal entities difficult, fact-intensive and subject to challenge. Seeking to overcome the inherent limitations of separate plans of liquidation for each of the Debtors would entail the Debtors' dedication of enormous resources and significant time to the project – and it cannot be assured, even after such an endeavor, that such plan of liquidation would be free of such assumptions, or free of potential prejudice to certain creditors resulting from such assumptions.

The assumptions that the Debtors would necessarily adopt to confirm separate plans of liquidation would likely be the focus of protracted and lengthy litigation. The attendant delay from such litigation could threaten the Debtors' consummation of the plans of liquidation in a timely manner. Even if the Estates were exposed to such a risk and cost, there would still be no assurances that the information contained therein would be accurate on an entity-by-entity

- 58 -

basis (if even available at such time). The Debtors believe that substantive consolidation is warranted in these Chapter 11 Cases because of the connection of assets and liabilities of the Debtors.

3.    **Basis for Substantive Consolidation**

Given the significant roadblocks to the proposal of separate, confirmable plans of liquidation, the Debtors reviewed their organizational, operational, and financial history in order to determine the substantive consolidation structure that best meets the application of the existing case law governing substantive consolidation. This Plan is a result of that lengthy and wide-ranging analysis, which revealed that significant creditors conducted business (including extending credit) to the Debtors as consolidated entities, while other creditors extended credit to a single entity.

The factors supporting substantive consolidation are satisfied. The *Owens Corning* court specifically found that entanglement among affiliated debtors provides a basis for substantive consolidation, where, as here, creditors disregarded entity separateness and separating debtor entities would harm creditors.

4.    **The Effect of Substantive Consolidation**

Substantive consolidation of the estates of multiple debtors in a bankruptcy case effectively combines the assets and liabilities of the multiple debtors for certain purposes. The effect of substantive consolidation is the pooling of the assets of, and claims against, consolidated debtors, satisfying liabilities from a common fund and combining the creditors of consolidated debtors without duplication for purposes of voting on the reorganization plan.

On and after the Effective Date, each of the Debtors will be deemed consolidated for the following purposes under the Plan:

- all assets and liabilities of each of the Debtors will be treated as though they were merged with the assets and liabilities of each other Debtor,

- no Distributions will be made under the Plan on account of any Claim held by a Debtor against any other Debtor,

- except as otherwise set forth in the Plan, no Distributions will be made under the Plan on account of any Equity Interest held by a Debtor in any other Debtor,

- all guaranties of any Debtor of the obligations of any other Debtor will be eliminated so that any Claim against any Debtor and any guaranty thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors, and

- each and every Claim filed or to be filed in the Chapter 11 Cases against any of the Debtors will be deemed filed against all of the Debtors, and will be one Claim against, and obligation of, the Debtors.

The Plan shall serve as a motion of the Debtors seeking entry of a Bankruptcy Court order approving the substantive consolidation of the Debtors' Estates provided for in the Plan as well as any additional consolidation that may be proposed by the Debtors in connection with confirmation and consummation of the Plan. The Debtors reserve the right to file appropriate alternative pleadings in support of the proposed substantive consolidation in connection with the Plan Confirmation Hearing. Unless an objection to consolidation is made in writing by any creditor affected by the Plan on or before 4:00 p.m. (prevailing Eastern Time), on the date fixed by the Bankruptcy Court for objections to confirmation of the Plan, the substantive consolidation proposed by the Plan may be approved by the Bankruptcy Court at the Plan Confirmation Hearing.

Upon the Effective Date, without the need for further order of the Bankruptcy Court or motion of, or notice from, the Debtors or the Liquidating Trustee, the Chapter 11 Cases of each of the Debtors shall be deemed closed as of the Effective Date without prejudice to the rights of any party in interest to seek to reopen any of the Chapter 11 Cases under section 350(b) of the Bankruptcy Code; *provided, however*, that the case of Appvion shall remain open until the Liquidating Trustee for Appvion files a motion seeking entry of a final decree closing its case. In accordance with Local Rule 3017-2, the Debtors shall seek entry of separate Orders closing each other case. Furthermore, (i) all motions, contested matters, adversary proceedings and other matters with respect to those closed cases and those Debtors shall be administered in the open case of Appvion, without prejudice to the rights of any party in interest and (ii) the case caption shall be amended to reflect that it is the only remaining open case for each of the Debtors.

## B.    Preservation of Right to Conduct Investigations

The preservation for the Liquidating Trust of any and all rights to conduct investigations under Bankruptcy Rule 2004 is necessary and relevant to the Liquidating Trust and with respect to the prosecution of Litigation Claims and the administration of the Liquidating Trust Assets. Accordingly, any and all rights to conduct investigations under Bankruptcy Rule 2004 held by the Debtors prior to the Effective Date shall vest with the Liquidating Trust and shall continue until dissolution of the Liquidating Trust.

## C.    Prosecution and Resolution of Litigation Claims

From and after the Effective Date, the Liquidating Trust shall have the sole responsibility, standing (including derivative standing), and authority to prosecute and settle all Litigation Claims under this Combined Plan and Disclosure Statement and the Plan Confirmation Order. From and after the Effective Date, the Liquidating Trust shall have exclusive rights, powers, and interests of the Estates, subject to the provisions of the Plan Documents and the 363 Sale Documents, to pursue, settle, or abandon such Litigation Claims as the sole representatives of the Estates under section 1123(b)(3) of the Bankruptcy Code. Any and all Litigation Claims that are not expressly released or waived under this Combined Plan and Disclosure Statement are reserved and preserved and vest in the Liquidating Trust in accordance with this Combined Plan and Disclosure Statement. No Person may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement or the Plan Supplements to any Litigation Claim against it as any indication that the Debtors or Liquidating Trustee will not investigate or pursue any and all available Litigation Claims against such Person. Such Litigation Claims may

- 60 -

include, but are not limited to, claims for breach of fiduciary duties by certain officers and directors, claims grounded in tort, claims for negligence, claims based upon breach of contract, claims for professional malpractice, and/or claims for or relating to the ESOP (other than Direct ESOP Claims), to the fullest extent permitted by law.  The Liquidating Trustee expressly reserves all Litigation Claims, except for Litigation Claims against any Person that are expressly released or waived under this Combined Plan and Disclosure Statement or have otherwise been released under any agreement or Final Order, including, but not limited to, the 2L/Committee Settlement and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Litigation Claims upon, after, or as a consequence of Confirmation or substantial consummation of this Combined Plan and Disclosure Statement.

Unless otherwise provided in this Plan, for the avoidance of doubt, the Debtors and the Liquidating Trustee expressly reserve the right to pursue all claims and Causes of Action other than the Released D&O Claims.

## D.    **Effectuating Documents and Further Transactions**

Upon entry of the Plan Confirmation Order, the Debtors and the Liquidating Trustee shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, notices, resolutions, programs, and other agreements, instruments, and/or documents, and take such acts and actions as may be reasonably necessary or appropriate to effectuate, implement, substantially consummate, and/or further evidence the terms and conditions of this Combined Plan and Disclosure Statement and any transactions described in or contemplated by this Combined Plan and Disclosure Statement.  The Debtors or Liquidating Trustee, as applicable, may, and all Holders of Allowed Claims or Allowed Equity Interests receiving Distributions under this Combined Plan and Disclosure Statement or as Beneficiaries of the Liquidating Trust, at the request or direction of the Debtors or Liquidating Trustee, as applicable, shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Combined Plan and Disclosure Statement.

## E.    **Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the members, managers, or other owners, direct or indirect, of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) under applicable law, without any further vote, consent, approval, authorization, or other action by such members, managers, or other owners of the Debtors or notice to, order of, or hearing before, the Bankruptcy Court.

## F.    **Real Property**

On the Effective Date, except to the extent otherwise provided in this Combined Plan and Disclosure Statement, all real property rights, title and interests of any and all of the

- 61 -

Debtors, including, without limitation the Owned Real Property, shall transfer to the Purchaser, free and clear of all taxes as provided by section 1146(a) of the Bankruptcy Code.

**G.     Cancellation of Documents**

On the Effective Date, except to the extent otherwise provided in this Combined Plan and Disclosure Statement, any and all notes, instruments, debentures, certificates and other documents evidencing Claims against and Equity Interests in the Debtors shall be deemed automatically extinguished, canceled, and of no further effect with the Debtors having no continuing obligations thereunder, and shall be deemed rejected and terminated; *provided*, that notwithstanding Confirmation or the occurrence of the Effective Date, the Second Lien Indenture shall continue in effect solely for purposes of (i) enabling Second Lien Noteholders to receive Distributions under the Plan on account of the Allowed Second Lien Secured Note Claims as provided herein, (ii) allowing the Indenture Trustee to make Distributions on account of the Allowed Second Lien Secured Note Claims, as applicable, (iii) preserving the Indenture Trustee's rights to compensation and indemnification under the Second Lien Indenture, (iv) permitting the Indenture Trustee to enforce any obligation owed to it under the Plan, (v) preserving all rights, including rights of enforcement, of the Indenture Trustee against any Person other than a Released Party, and (vi) permitting the Indenture Trustee to appear in the Chapter 11 Cases or in any related proceeding in the Bankruptcy Court or any other court; *provided, further*, that the preceding proviso shall not affect the discharge of Allowed Second Lien Secured Note Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Debtors or to the Liquidating Trust, except to the extent set forth in or provided for under this Combined Plan and Disclosure Statement; *provided, further*, that nothing in this section shall effect a cancellation of any Warrants.

**H.     Termination of Debtors' Plans**

With the exception of the Pension Plan and the PIUMPF, upon the entry of an order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement, the ESOP and all Employee Benefit Plans not assumed by the Purchaser under the 363 Sale Order shall automatically terminate. Title IV of ERISA provides the exclusive means for terminating the Pension Plan. 29 U.S.C. § 1341(a)(1). Shortly after the hearing approving the 363 Sale, the Debtors and the PBGC began discussing various issues with respect to the Pension Plan, including termination thereof. Because the Purchaser is not assuming the Pension Plan, which will be left with the liquidating debtors, the Debtors anticipate that the PBGC will terminate the Pension Plan under 29 U.S.C. § 1342 during the pendency of the Chapter 11 Cases. Appvion withdrew from the PIUMPF and upon the entry of an order of the Bankruptcy Court confirming this Combined Plan and Disclosure Statement, the withdrawal liability payments will terminate.

**I.     Corporate Action; Effectuating Documents; Further Transactions**

On the Effective Date, all matters and actions provided for under this Combined Plan and Disclosure Statement that would otherwise require approval of the directors, officers, members, or managers of the Debtors shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors, officers, members, and managers of the Debtors. The Debtors and the Liquidating

- 62 -

Trustee are authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement.

## J.   Release of Liens

Except as otherwise provided in this Combined Plan and Disclosure Statement, or in any contract, instrument, release, or other agreement or document created under this Combined Plan and Disclosure Statement, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other interests in or against any property of the Estates shall be deemed fully released without any further action of any party, including, but not limited to, further Order of the Bankruptcy Court or filing updated schedules or statements typically filed under the Uniform Commercial Code or other applicable law.

## K.   Exemption from Securities Laws

The Purchaser shall be deemed the legal successor of the Debtors within the meaning of section 1145 of the Bankruptcy Code and the offering, issuance and distribution of (a) beneficial interests in the Liquidating Trust under this Combined Plan and Disclosure Statement, (b) the Warrants under this Combined Plan and Disclosure Statement, and (c) all shares of common stock of the Purchaser or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, shall be exempt from, among other things, the registration and prospectus delivery requirements under the Securities Act or any similar federal, state, or local laws in reliance upon section 1145 of the Bankruptcy Code to the maximum extent permitted and applicable.

In addition, any and all (x) beneficial interests in the Liquidating Trust issued or distributed under this Combined Plan and Disclosure Statement, (y) Warrants issued or distributed under this Combined Plan and Disclosure Statement, and (z) shares of common stock of the Purchaser or other securities issued upon exercise of the Warrants in accordance with the terms of the Warrant Agreement, in each such case, will be freely tradable by the recipients thereof, subject to: (A) the provisions of Bankruptcy Code section 1145(b)(1) relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, as amended, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (B) in the case of the beneficial interests in the Liquidating Trust, the provisions of the Liquidating Trust Agreement; and (C) in the case of the Warrants, the provisions of the Warrant Agreement.

## L.   Exemption from Certain Taxes and Fees

Under section 1146(a) of the Bankruptcy Code, the making or delivery of any instrument or transfer from a Debtor to the Liquidating Trust, or to any other Person under this Combined Plan and Disclosure Statement, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Plan

Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the forgoing instruments or other documents without the payment of any such tax or governmental assessment.

## M.    Privileges as to Certain Causes of Action

Effective as of the Effective Date, all Privileges of the Debtors relating to the Liquidating Trust Assets shall be deemed transferred, assigned, and delivered to the Liquidating Trust, without waiver or release, and shall vest with the Liquidating Trust. The Liquidating Trustee shall hold and be the beneficiary of all such Privileges and is entitled to assert such Privileges. No such Privilege shall be waived by disclosures to the Liquidating Trustee of the Debtors' documents, information, or communications subject to attorney-client privileges, work product protections or other immunities (including those related to common interest or joint defense with third parties), or protections from disclosure held by the Debtors. The Debtors' Privileges relating to the Liquidating Trust Assets will remain subject to the rights of third parties under applicable law, including any rights arising from the common interest doctrine, the joint defense doctrine, joint attorney-client representation, or any agreement. Nothing contained herein or in the Plan Confirmation Order, nor any Professional's compliance herewith and therewith, shall constitute a breach of any Privileges of the Debtors.

## N.    Preservation of Causes of Action

Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, the Plan Confirmation Order or the 2L/Committee Settlement, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors and the Liquidating Trustee shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, and the Debtors' rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. **No entity may rely on the absence of a specific reference in this Combined Plan and Disclosure Statement, the Plan Supplement, or the Plan Confirmation Order to any Cause of Action against them as any indication that the Debtors or the Liquidating Trustee will not pursue any and all available Causes of Action against them. The Debtors and the Liquidating Trustee expressly reserve all rights to prosecute any and all Causes of Action against any entity, except as otherwise expressly provided herein.** Unless any Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in this Combined Plan and Disclosure Statement, the Debtors and the Liquidating Trustee expressly reserve all Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of this Combined Plan and Disclosure Statement.

In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action preserved pursuant to this Section IX.N that any of the Debtors may hold against any entity shall be transferred to the Liquidating Trust upon the Effective Date. The Liquidating Trustee, through its authorized agents or representatives, shall retain and may exclusively

enforce any and all such Causes of Action. The Liquidating Trustee shall have the exclusive right, authority and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court, except for as otherwise expressly set forth in this Combined Plan and Disclosure Statement.

**O.**     **Insurance Policies**

Nothing in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement, alters the rights and obligations of the Debtors (and their Estates) and the Debtors' insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms and conditions thereof or diminishes or impairs the enforceability of the Insurance Policies, including any replacement or tail policies or coverages following the 363 Sale Effective Date. All of the Debtors' Estates' benefits, rights, interests and proceeds under any Insurance Policy to which the Debtors and/or the Debtors' Estates may be insureds or beneficiaries shall vest with the Liquidating Trust for the benefit of the Beneficiaries of the Liquidating Trust and all of the beneficiaries of such policies.

**P.**     **Filing of Monthly and Quarterly Reports and Payment of Statutory Fees**

The Filing of the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly Liquidating Trust reports shall be the responsibility of the Liquidating Trustee. All Statutory Fees shall be payable as set forth in Section V.C hereof and such obligation shall continue until such time as the Chapter 11 Case of Appvion is closed, dismissed, or converted. All monthly operating reports covering pre-Effective Date periods shall be prepared and filed by the Debtors.

**Q.**     **Closing of the Chapter 11 Cases**

When all Liquidating Trust Assets have been collected, liquidated and converted into Cash and such Cash has been distributed in accordance with the Liquidating Trust Agreement and the Plan Confirmation Order, the Liquidating Trustee shall seek authority from the Bankruptcy Court to close the Appvion Chapter 11 Case in accordance with the Bankruptcy Code, Bankruptcy Rules, and Local Rules.

## X.  PROVISIONS GOVERNING DISTRIBUTIONS UNDER THIS COMBINED PLAN AND DISCLOSURE STATEMENT

**A.**     **Distribution Record Date; Transferability**

The Liquidating Trustee shall set such Distribution Record Dates as may be necessary in accordance with the terms of the Liquidating Trust Agreement. To the fullest extent permitted by applicable law, the beneficial interests in the Liquidating Trust may be assigned or otherwise transferred by any Beneficiary to any Person, subject to the terms of the Liquidating Trust Agreement.

**B.**    **Method of Payment**

Unless otherwise expressly agreed, in writing, all Cash payments to be made under this Combined Plan and Disclosure Statement shall be made by check drawn on a domestic bank or an electronic wire transfer.

**C.**    **Claims Objection Deadline**

The Liquidating Trustee, and any other party in interest to the extent permitted under section 502(a) of the Bankruptcy Code, shall File and serve any objection to any Claim no later than the Claims Objection Deadline; *provided, however*, the Claims Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Liquidating Trustee.   The filing of such a motion shall automatically extend the Claims Objection Deadline until entry of an order on account of such motion, in accord with Local Rule 9006-2.

**D.**    **No Distribution Pending Allowance**

Notwithstanding any other provision of this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, no Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim unless and until all objections to such Claim are resolved by Final Order or as otherwise permitted by this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement.   For the avoidance of doubt, the Second Lien Secured Notes Claims are not Disputed Claims.   The procedures with respect to resolution of Disputed Claims shall be set forth in the Liquidating Trust Agreement.

**E.**    **Reserve of Cash Distributions**

On any date that Distributions are to be made under the terms of this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement, the Liquidating Trustee shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims as if each such Disputed Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.   Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed Claims pending determination of their entitlement thereto.

**F.**    **Distribution After Allowance**

Within the later of (i) seven (7) Business Days after such Claim becomes an Allowed Claim and (ii) thirty (30) days after the expiration of the Claims Objection Deadline, the Liquidating Trustee shall distribute, to the extent available, all distributable Cash or other property, including any interest, dividends or proceeds thereof, to which a Holder of an Allowed Claim is then entitled; *provided*, that to the extent any Liquidating Trust Assets have not yet been collected or liquidated by the Liquidating Trustee, including any Litigation Proceeds, such Liquidating Trust Assets shall be distributed to Holders of Allowed Claims as soon as reasonably practicable following the collection and liquidation thereof.

EAST\152399891.23

## G.  Delivery of Distributions

Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses set forth on the respective proofs of Claim last Filed by such Holders; (ii) at the addresses set forth in any written notices of address changes delivered to the Liquidating Trustee after the date of any related proof of Claim; or (iii) at the address reflected in the Schedules if no proof of Claim is Filed and the Liquidating Trustee has not received a written notice of a change of address.

If the Distribution to the Holder of any Claim is returned to the Liquidating Trustee as undeliverable, no further Distribution shall be made to such Holder unless and until the Liquidating Trustee is notified in writing of such Holder's then current address. Undeliverable Distributions shall remain in the possession of the Liquidating Trustee until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution under Section X.H of this Combined Plan and Disclosure Statement.

Until such time as an undeliverable Distribution becomes an Unclaimed Distribution, within thirty (30) days after the end of each calendar quarter following the Effective Date, or upon such other interval as the Bankruptcy Court may order, but in no event less frequently than annually, the Liquidating Trustee shall make Distributions of all Cash and property that has become deliverable during the preceding quarter. Each such Distribution shall include the net return yielded from the investment of any undeliverable Cash, from the date such Distribution would have been due had it then been deliverable to the date that such Distribution becomes deliverable.

The Liquidating Trustee shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions, *provided, however*, nothing contained in this Combined Plan and Disclosure Statement shall require the Liquidating Trustee to locate any Holder of an Allowed Claim.

## H.  Unclaimed Distributions

Any Cash or other property to be distributed under this Combined Plan and Disclosure Statement shall revert to the Liquidating Trustee if it is not claimed by the Holder within one hundred and twenty (120) days after the date of such Distribution. If such Cash or other property is not claimed on or before such date, the Distribution made to such Holder shall be deemed to be reduced to zero and such returned, undeliverable, or unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code.

## I.  Set-Off

Except as otherwise provided herein, the Debtors and Liquidating Trustee, as applicable, retain the right to reduce any Claim by way of setoff in accordance with the Debtors' books and records. Rights of a setoff against any Entity or Person are preserved for the purpose of asserting such rights as a defense to any Claims or Causes of Action of the Debtors, their Estates, or the Liquidating Trustee and regardless of whether such Entity or Person is the Holder of an Allowed Claim.

- 67 -

**J.      Postpetition Interest**

        Interest shall not accrue on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Allowed secured claims under section 506(b) of the Bankruptcy Code.

**K.      Distributions After Effective Date**

        For Disputed Claims as of the Effective Date, any Distributions made after the Effective Date to Holders of such Disputed Claims (which later become Allowed Claims after the Effective Date) shall be deemed to have been made on the Effective Date.

**L.      Distributions Free and Clear**

        Except as may be otherwise provided in this Combined Plan and Disclosure Statement, all Distributions hereunder shall be free and clear of any Liens, Claims, encumbrances, and other interests.

**M.      Allocation of Distributions Between Principal and Interest**

        To the extent that any Allowed Claim entitled to a Distribution under this Combined Plan and Disclosure Statement comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

**N.      De-Minimis Distribution and Donation**

        There shall be no Distribution on account of Allowed General Unsecured Claims to the extent such Distribution will result in a payment of less than $50.00 to the Holder of such Claim, and such amount otherwise payable upon such Claim shall revert back to the Liquidating Trust.  Unless otherwise set forth in this Plan, the Liquidating Trustee may donate remaining Assets of the Liquidating Trust to a charitable institution if the Distribution of such Assets is too costly, too burdensome, or impracticable.

**O.      Prepayment**

        Except as otherwise provided herein or the Plan Confirmation Order, the Debtors and the Liquidating Trustee, as applicable, shall have the right to prepay, without penalty, all or any portion of an Allowed Claim.

## XI. EXECUTORY CONTRACTS

**A.      Rejection of Executory Contracts**

        On the Effective Date, all Executory Contracts not previously assumed and/or assigned (including in connection with the 363 Sale and under the 363 Sale Order), not subject to

EAST\152399891.23

a pending motion to assume and/or assign as of the Effective Date, not administered under the Transition Services Agreement, or not rejected before the Effective Date, will be deemed rejected. The Plan Confirmation Order shall constitute an order approving such rejection as of the Effective Date.

Unless otherwise specified, each Executory Contract assumed or rejected by the Debtors shall be assumed or rejected *cum onere,* to include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly to any agreement, instrument, or other document that in any manner affects such Executory Contract.

**B.    Deadline for Filing Proofs of Claim Relating to Executory Contracts Rejected Under this Combined Plan and Disclosure Statement**

If the rejection by the Debtors, under this Combined Plan and Disclosure Statement or otherwise, of an Executory Contract gives rise to a Claim for rejection damages in accordance with section 502(g) of the Bankruptcy Code, a proof of Claim must be filed with the Claims Agent at the following address: Prime Clerk LLC, 830 3rd Avenue, 3rd Floor New York, NY 10022, by no later than thirty (30) days after the earlier of (i) the Effective Date or (ii) the date provided in any other applicable Order of the Bankruptcy Court. Any proofs of Claim with respect to a Rejection Damages Claim not filed within such time shall be forever barred from assertion against the Debtors, the Estates, the Liquidating Trust, the Liquidating Trust Assets, and their property and such Persons holding such Claims will not receive and will be barred from receiving any Distributions on account of such untimely Rejection Damages Claims, absent further order of the Bankruptcy Court. All Rejection Damages Claims will be treated as General Unsecured Claims under this Combined Plan and Disclosure Statement and, to the extent they are deemed Allowed General Unsecured Claims, will receive the treatment afforded Allowed General Unsecured Claims.

## XII.    INJUNCTION, EXCULPATION AND RELEASES

**A.    Injunction to Protect Estate Assets**

From and after the Effective Date, all Persons and Entities who have held, hold, or may hold Claims or rights giving rise to any equitable relief against the Assets or any Equity Interests in the Debtors arising prior to the Effective Date are permanently enjoined from taking any of the following actions against the Estates, the Released Parties, any member of the Creditors' Committee in its capacity as such, the Liquidating Trust, the Liquidating Trustee, or any of their respective property or Assets (collectively, the "Estate Assets") on account of any such Claims or Equity Interests: (a) commencing or continuing, in any manner or in any place, any action or proceeding seeking to collect or to recover in any manner against, or assert control or dominion over, the Estate Assets; (b) enforcing, attaching, collecting, or recovering in any manner against the Estate Assets, any judgment, award, decree or order; (c) creating, perfecting, or enforcing any Lien or encumbrance against the Estate Assets; (d) asserting setoff unless such setoff was formally asserted in a timely Filed proof of Claim or in a pleading Filed with the Bankruptcy Court prior to entry of the Plan Confirmation Order (notwithstanding any indication in any proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff) or right

- 69 -

of subrogation of any kind against any debt, liability, or obligation due to the Debtors; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with or with respect to any such Claims or Interests discharged, released, exculpated, or settled pursuant to the Plan or that is otherwise inconsistent with the provisions of the Plan; *provided, however*, that such Persons and Entities shall not be precluded from exercising their rights under and consistent with the terms of this Combined Plan and Disclosure Statement, the Plan Confirmation Order, or the Liquidating Trust Agreement.

## B.    Term of Injunctions or Stays

Unless otherwise provided in this Combined Plan and Disclosure Statement or Plan Confirmation Order, all injunctions or stays in the Chapter 11 Cases (pursuant to sections 105 or 362 of the Bankruptcy Code or any Order of the Bankruptcy Court) and existing on the Plan Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the later of the Effective Date and the date indicated in the Order providing for such injunction or stay and to the extent consistent with the terms and provisions of this Combined Plan and Disclosure Statement or the Plan Confirmation Order, as applicable.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## C.    Injunction Against Interference with Plan

Upon the Bankruptcy Court's entry of the Plan Confirmation Order, all Holders of Claims and Equity Interests, and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the Debtors', the Liquidating Trust's, the Liquidating Trustee's, and their respective Related Persons' implementation or substantial Consummation of this Combined Plan and Disclosure Statement.  Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

## D.    Exculpation

The Exculpated Parties shall not have or incur any liability for, and each Exculpated Party is hereby released and exculpated from, any Claim, action, proceeding, Cause of Action, Avoidance Action, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, setoff, or right to payment arising or accruing on or after the Petition Date, or the decision to initiate these Chapter 11 Cases, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, admitted, secured, or unsecured, with or without priority, and whether asserted or assertable directly or derivatively, in law, equity, or otherwise to one another or to any Claim Holder or Holder of an Equity Interest, or any other party in interest, or any of their respective Related Persons, for any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases, the negotiation, solicitation, Filing, and confirmation of this Combined Plan and Disclosure Statement, the pursuit of confirmation of this Combined Plan and Disclosure Statement, the substantial Consummation or Consummation of this Combined Plan and Disclosure Statement, the

- 70 -

administration of this Combined Plan and Disclosure Statement, or the property to be liquidated and/or distributed under this Combined Plan and Disclosure Statement, except for their fraud, willful misconduct or gross negligence as determined by a Final Order of a court of competent jurisdiction, and in all respects shall be entitled to rely reasonably upon the advice of counsel with respect to their duties and responsibilities under this Combined Plan and Disclosure Statement. With respect to any Exculpated Party that is not also an Estate fiduciary, such exculpation shall be as provided for by Bankruptcy Code section 1125(e). Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

E.    **Releases**

1.    **Debtor Releases**

Except as may otherwise be expressly provided in this Combined Plan and Disclosure Statement, as of the Effective Date, for good and valuable consideration provided by each of the Released Parties and each member of the Creditors' Committee (solely in its capacity as such), the adequacy of which is hereby confirmed, on the Plan Confirmation Date and effective as of the Effective Date, to the fullest extent permitted under applicable law, the Released Parties are deemed released and discharged by the Debtors and the Estates of and from any and all Claims, interests, obligations, suits, judgments, damages, demands, debts, rights, remedies, causes of action, setoffs and liabilities (other than the rights of the Debtors to enforce this Combined Plan and Disclosure Statement, and the contracts, instruments, releases, and other agreement or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act or omission, transaction, event, or other occurrences, whether direct or derivative, taking place on or prior to the Effective Date in connection with, or related to, (i) the Debtors or their operations; (ii) the Chapter 11 Cases; (iii) any investment by any Releasing Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest in the Debtors; (iv) any action or omission with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases; (vi) the negotiation, formulation, preparation, entry into, or dissemination of the (a) the Prepetition Credit Agreement; (b) 363 Sale Documents; (c) the DIP Credit Agreements; (d) the Second Lien Indenture and related documents; (e) the Combined Plan and Disclosure Statement; and (f) any other action or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; (vii) any Challenge Proceeding (as defined in the DIP Credit Agreements) including the transactions referenced or described in the Standing Motion; and (viii) any action taken in furtherance of the formation of the Purchaser, other than with respect to Claims, causes of action or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to constitute actual fraud, willful misconduct, or gross negligence.

Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Liquidating Trustee's, or the Debtors' Estates asserting any claim, Cause of Action or other assertion of liability released pursuant to the Debtor Release.

Notwithstanding anything to the contrary contained in the Combined Plan and Disclosure Statement, and notwithstanding anything to the contrary contained in the Confirmation Order, the PBGC does not release, discharge, or exculpate any claim or cause of action relating to any liability under Title I or Title IV of ERISA against any persons or entities other than the Debtors in these Chapter 11 Cases. For the avoidance of doubt, nothing in this Plan or the Confirmation Order shall enjoin, impair, or prevent the PBGC from pursuing or collecting any such liability from any liable party.

Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any claims of or obligations owed to Domtar, or the first priority liens and security interests of Domtar, arising under the Supply Agreement and the Consignment Agreement (the "**Domtar Agreements**"), the Domtar DIP Order and applicable law, and provided for in the order of the Bankruptcy Court dated May 14, 2018 [D.I. 751] approving the sale of substantially all of the Debtors' assets to the Purchaser (the "**Sale Order**"), including but not limited to the cure obligation set forth in the Sale Order and any unpaid post-petition obligations and any obligations owed to Domtar under the Domtar Agreements, which have been assumed by the Purchaser.

2.      **Releases by Holders of Claims**

To the fullest extent permitted under applicable law, all of the Releasing Parties shall be deemed fully, completely, unconditionally, irrevocably, and forever to release the Released Parties of and from any and all Claims and causes of action and any other debts, obligations, rights, suits, damages, actions, setoffs, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to (i) the Debtors or their operations; (ii) the Chapter 11 Cases; (iii) any investment by any Releasing Party in the Debtors or the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of

- 72 -

any security, asset, right, or interest in the Debtors; (iv) any action or omission of any Releasing Party with respect to any indebtedness under which the Debtors are or were a borrower or guarantor, or any equity investment in the Debtors; (v) the subject matter of, or the transactions or events giving rise to, any Claim or Interest in the Chapter 11 Cases; (vi) the negotiation, formulation, preparation, entry into, or dissemination of the (a) the Prepetition Credit Agreement; (b) the 363 Sale Documents; (c) the DIP Credit Agreements; (d) the Second Lien Indenture and related documents; (e) the Combined Plan and Disclosure Statement; and (f) any other action or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, related thereto; (vii) any Challenge Proceeding (as defined in the DIP Credit Agreements) including the transactions referenced or described in the Standing Motion; and (viii) any action taken in furtherance of the formation of the Purchaser. Notwithstanding the foregoing, nothing in this Plan or the Plan Confirmation Order shall release any of the Litigation Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) essential to the Confirmation of the Plan; (3) given in exchange for the good and valuable consideration provided by the Released Parties; (4) a good-faith settlement and compromise of the claims released by the Third-Party Release; (5) in the best interests of the Debtors and their Estates; (6) fair, equitable, and reasonable; (7) given and made after due notice and opportunity for hearing; and (8) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

3.      Waiver of Statutory Limitations on Releases

Each of the parties providing the releases contained in Sections XII.E.I and XII.E.II above expressly acknowledges that although ordinarily a general release may not extend to Claims or causes of action that the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the Released Party. The releases contained in this Combined Plan and Disclosure Statement are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

F.      **Necessity and Approval of Releases and Injunctions**

The releases, exculpations, and injunctions set forth in Section XII of this Combined Plan and Disclosure Statement are not severable and are appropriately tailored and constitute integral consideration and critical parts of this Combined Plan and Disclosure Statement, and the Released Parties have relied on the efficacy and conclusive effects of such

EAST\152399891.23

releases and injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such releases and injunctions when making concessions and exchanging consideration in connection with the Chapter 11 Cases and under this Combined Plan and Disclosure Statement. Under Bankruptcy Code sections 1123(a)(5), 1123(b)(3), and 1123(b)(6), as well as Bankruptcy Rule 9019, entry of the Plan Confirmation Order shall constitute the Bankruptcy Court's approval of the releases, exculpations, and injunctions set forth in Section XII of this Combined Plan and Disclosure Statement and shall constitute the Bankruptcy Court's finding that such releases, exculpations, and injunctions are: (i) in exchange for the good, valuable, and reasonably equivalent consideration provided by the Released Parties; (ii) in the best interests of the Debtors, the Estates, and Holders of Claims and Interests; (iii) fair, equitable, and reasonable; and (iv) a bar to all Persons barred as set forth in this Combined Plan and Disclosure Statement asserting any Claims or causes of action released under the Plan in favor of the Released Parties.

### G.   Releases, Exculpations, Waivers and Injunctions under Plan and Related Documents Shall Not Affect Fifth Third Bank and KeyBank Suits for Damages under DIP Credit Agreement

Notwithstanding anything in the Combined Plan and Disclosure Statement, any other Plan Documents, and/or the Plan Confirmation Order to the contrary, the releases, exculpations, waivers and injunctions provided under such Combined Plan and Disclosure Statement, any other Plan Document, and/or the Plan Confirmation Order, including, without limitation, Section XII of such Combined Plan and Disclosure Statement, shall not affect in any way, and shall not provide any releases, exculpations, waiver and/or injunctions or otherwise affect in any way, the claims and causes of action asserted or that may be asserted (including claims that may be asserted against additional parties) against any of the current defendants (and/or the agents and/or other parties to the DIP Credit Agreement) in the Supreme Court of New York for the County of New York in civil actions captioned (a) KeyBank National Association vs. Franklin Advisors Inc., et al., Index No. 651517/2018 and (b) Fifth Third Bank vs. Franklin Advisors, Inc., et al., Index No. 651518/2018, along with (c) any successor or related action(s) and or as such litigation(s) may have been or may be in the future be transferred, removed or remanded (as and if applicable) under applicable law (collectively, the "Litigations"), and any related claims, rights, defenses or counterclaims thereto; provided, however, that the plaintiffs in the Litigations agree that no claim or cause of action in the Litigations shall constitute a collateral attack on any order of this Court (including, but not limited to, this Sale Order, the Initial DIP Order, the Senior DIP Order), the DIP Facility Documents (as defined in the Initial DIP Credit Agreement), or the Senior DIP Facility Documents (as defined in the Senior DIP Credit Agreement).

### XIII.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   General

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtors and to certain Holders of Allowed Claims. This summary does not address the federal income tax consequences to Holders of

Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, or Holders whose Claims are entitled to payment in full in Cash.

This summary is based on the Internal Revenue Code ("IRC"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the federal income tax consequences described below.

The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local or foreign income or other tax consequences of the Plan.

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all Distributions to Holders of Claims will be taxed accordingly.

ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

## B.    **Consequences to the Debtors**

1.    Asset Disposition

The sale of the Debtors' Assets during the pendency of the Plan may produce taxable income, but the Debtors are not expected to be taxed on such taxable income as they do not pay income tax.

2.    Cancellation of Debt

The Debtors may realize cancellation of debt ("COD") income by reason of the discharge of the Debtors' indebtedness. COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of Cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the canceled debt would have given rise to a tax deduction). Consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not expect to incur COD as a result of the implementation of the Plan prior to the distribution of all or substantially all of its Assets (other than to the extent any Allowed Claim's Distribution is subject to a maximum or has been or is separately settled for less than its carrying value). The Debtors are not expected to be taxed on any COD incurred as the Debtors do not pay income tax.

- 75 -

3.    Transfer of Assets to Liquidating Trust

The Debtors' transfer of Assets to the Liquidating Trust may result in the recognition of gain or loss by the Debtors, depending in part on the value of such Assets on the date of such transfer to the Liquidating Trust relative to the Debtors' tax basis in such Assets. As indicated above, the Debtors are not expected to be taxed on any gain as they do not pay income tax.

**C.    Consequences to Holders of Claims and Equity Interests**

1.    Realization and Recognition of Gain or Loss, In General

The federal income tax consequences of the implementation of the Plan to a Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the Holder's Claim, when the Holder receives payment in respect of such Claim or Equity Interest, whether the Holder reports income using the accrual or cash method of tax accounting, whether the Holder acquired its Claim at a discount, whether the Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes. A Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust Interests and Pro Rata share of the Warrants), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the Holder, including, as discussed below, any beneficial interests in a Liquidating Trust or Pro Rata share of the Warrants (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the Holder's taxable income).

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the Holder and has been held for more than one year. Each Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

As discussed below, each Holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust). Pursuant to the Plan, the Liquidating Trustee will in good faith value the Assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including Holders of Claims and Equity Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A Holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the Assets of the Liquidating Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying Assets of the Liquidating Trust.

A Holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the Holder's holding period generally will begin the day following the establishment of a Liquidating Trust. A Holder's tax basis in the Warrants should equal the fair market value of the Holder's Pro Rata share of the Warrants and the holding period of the Warrants received on the Effective Date would begin on the date following the Effective Date.

2.    Allocation of Consideration to Interest

Pursuant to the Section X.M of the Plan, all Distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received (whether stock, Cash, or other property) by a Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income under the Holder's normal method of accounting). Conversely, a Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

**D.    Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests**

1.    Classification of the Liquidating Trust

A Liquidating Trust, if created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the Liquidating Trust Beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. Any Liquidating Trust will be structured to comply with such general criteria. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors. The following discussion assumes that any Liquidating Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may

- 77 -

not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

2.      General Tax Reporting by the Liquidating Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those Assets, directly to the Holders of the respective Claims or Equity Interests receiving Liquidating Trust Interests (with each Holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the Holders of such Assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the Holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets, consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its Assets (valued at their tax book value, and other than Assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating Distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, Holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

- 78 -

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a Holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any Cash or other proceeds. Thus, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent Distribution to the Holder. In general, a Distribution of Cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the Beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).

The Liquidating Trustee will comply with all applicable governmental withholding requirements. Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders; accordingly, such Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a granter trust pursuant to Treasury Regulation section 1.671-4(a). The Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

## E.    Tax Treatments of Holders of Warrants

As described above, certain Holders of Allowed Claims that receive a Pro Rata share of the Warrants and other consideration should be treated as exchanging such Allowed Claim for the Warrants and other consideration in fully taxable exchange.

Holders of Warrants generally will not realize gain or loss upon the exercise of the Warrants into common stock of the Purchaser. A Holder's basis in the stock of the Purchaser received upon the exercise of such Holder's Warrants will equal the sum of (i) the exercised portion of the fair market value of such Holder's Pro Rata share of the Warrants on the Effective Date and (ii) the aggregate exercise price of the exercised Warrants. A Holder's holding period

in the stock of the Purchaser acquired through exercise of Warrants will begin on the date of exercise of the Warrants.

Sales or other taxable dispositions (including lapse of unexercised Warrants) by Holders of Warrants generally will give rise to gain or loss equal to the difference between the amount realized on the disposition, if any, and the Holder's tax basis in such Warrants. In general, gain or loss recognized on the sale or exchange of Warrants may be long-term capital gain or loss if the Warrants disposed of are capital assets in the hands of the Holder and have been held for more than one year. Each Holder should consult its own tax advisor to determine whether gain or loss recognized by such Holder will be long-term capital gain or loss and the specific tax effect thereof on such Holder.

## F.   <u>Withholding on Distributions, and Information Reporting</u>

All Distributions to Holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. These categories are very broad; however, there are numerous exceptions. Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a Holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate. As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases. *A non-U.S. Holder may also be subject to other adverse consequences in connection with the implementation of the Plan. As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. Holders. Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trustee.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated

by the Plan would be subject to these Treasury Regulations and require disclosure on the Holder's tax returns.

## XIV.   CONDITIONS PRECEDENT TO AND OCCURRENCE OF CONFIRMATION AND THE EFFECTIVE DATE

### A.   Conditions Precedent to Confirmation

Confirmation of this Combined Plan and Disclosure Statement shall not occur, and the Plan Confirmation Order shall not be entered, until each of the following conditions precedent have been satisfied or waived in accordance with Section XIV.E of the Plan:

1. The proposed Plan Confirmation Order shall be reasonably acceptable in form and substance to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

2. The Plan Supplements and any other exhibits or schedules incorporated as part of this Combined Plan and Disclosure Statement are in form and substance reasonably acceptable to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

### B.   Conditions Precedent to the Effective Date

This Combined Plan and Disclosure Statement shall not become effective unless and until the following conditions shall have been satisfied or waived in accordance with Section XIV.E of the Plan:

1. The Plan Confirmation Order shall have become a Final Order in full force and effect with no stay thereof then in effect, and shall be in form and substance reasonably acceptable to the Debtors, the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

2. The Plan Confirmation Date shall have occurred and no request for revocation of the Plan Confirmation Order under section 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending.

3. All actions, documents, and agreements necessary to implement this Combined Plan and Disclosure Statement, including, without limitation, all actions, documents, and agreements necessary to implement any transactions contemplated under this Combined Plan and Disclosure Statement, including the Liquidating Trust Agreement, shall have been effectuated or executed.

4. The absence of any pending or threatened government action or any law that has the effect of or actually does prevent Consummation of any transaction contemplated under this Combined Plan and Disclosure Statement.

5. All Statutory Fees incurred for periods arising prior to the Effective Date shall be paid by the Debtors or placed in a reserve for such purpose.

6.      The 363 Sale Effective Date shall have occurred.

7.      The Liquidating Trust Agreement shall have been executed by the Liquidating Trustee in form and substance reasonably acceptable to the Majority DIP Lender, the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

8.      The Warrant Agreement shall have been executed by the Purchaser in form and substance acceptable to the Ad Hoc Group of Second Lien Noteholders, and the Warrants shall have been issued by the Purchaser to the Debtors for the benefit of the Second Lien Noteholders.

9.      All terms and conditions of the 2L/Committee Settlement have been satisfied.

## C.      **Establishing the Effective Date**

The calendar date to serve as the Effective Date shall be a Business Day of, on, or promptly following the satisfaction or waiver of all conditions the Effective Date, which date will be selected by the Debtors in consultation with the Ad Hoc Group of Second Lien Noteholders and the Creditors' Committee.

## D.      **Effect of Failure of Conditions**

If each condition to the Effective Date has not been satisfied or duly waived within one hundred and twenty (120) days after the Plan Confirmation Date, then upon motion by any party in interest if applicable, and upon notice to such parties in interest as the Bankruptcy Court may direct, the Plan Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that notwithstanding the Filing of such motion, the Plan Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtors, if applicable, before any Order granting such relief becomes a Final Order. If the Plan Confirmation Order is vacated, this Combined Plan and Disclosure Statement shall be deemed null and void in all respects and nothing contained herein shall (i) constitute an admission or a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtors; *provided, however*, that if the Plan Confirmation Order is vacated, neither the 2L/Committee Settlement nor the 363 Sale Order shall be vacated and both shall remain in full force and effect.

## E.      **Waiver of Conditions to Confirmation and Effective Date**

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtors with the consent of the Creditors' Committee, the Majority DIP Lender and the Ad Hoc Group of Second Lien Noteholders, and, in the case of the conditions set forth in Sections XIV.A.1, XIV.A.2, XIV.B.1, XIV.B.2, and XIV.B.3, without notice or an Order of the Bankruptcy Court.

## XV.    RETENTION OF JURISDICTION

Following the Effective Date, the Bankruptcy Court shall retain jurisdiction to the fullest extent provided by law, including, without limitation over all matters arising in, arising under, and related to the Chapter 11 Cases as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement are carried out.  The Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases, this Combined Plan and Disclosure Statement, and the Liquidating Trust Agreement for, among other things, the following purposes:

1.    To hear and determine any objections to Claims and to address any issues relating to Disputed Claims;

2.    To enter and implement such Orders as may be appropriate in the event the Plan Confirmation Order is for any reason stayed, revoked, modified, or vacated;

3.    To issue such Orders in aid of execution and Consummation of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

4.    To consider any amendments to or modifications of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Plan Confirmation Order;

5.    To hear and determine all requests for compensation and reimbursement of expenses under section 330 or 503 of the Bankruptcy Code;

6.    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Combined Plan and Disclosure Statement, the DIP Credit Agreements, the 363 Sale Documents, and the Liquidating Trust Agreement, including the releases, exculpations, and injunctions provided hereunder;

7.    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

8.    To hear any other matter not inconsistent with the Bankruptcy Code;

9.    To enter a final decree closing the Chapter 11 Cases;

10.    To ensure that Distributions to Holders of Allowed Claims are accomplished under the provisions of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

11.    To decide or resolve any motions, adversary proceedings, contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases, the DIP Credit

- 83 -

Agreements, the 363 Sale Documents, including those brought by the Liquidating Trustee on behalf of the Liquidating Trust;

12.    To issue injunctions, enter and implement other Orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Combined Plan and Disclosure Statement and the Liquidating Trust Agreement;

13.    To approve, as may be necessary or appropriate, any Claims settlement entered into or offset exercised by the Liquidating Trust;

14.    To resolve any dispute or matter arising under or in connection with the Liquidating Trust, including any request for an extension of the term of the Liquidating Trust;

15.    To determine any other matters that may arise in connection with or related to this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, the DIP Credit Agreements, the 363 Sale Documents, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with this Combined Plan and Disclosure Statement or the Liquidating Trust Agreement;

16.    To enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed), including, without limitation, the 363 Sale Order;

17.    To resolve disputes concerning the 363 Sale Agreement, the 363 Sale Order, and any related documents or matters;

18.    To resolve disputes concerning the 2L/Committee Settlement, and any related documents or matters;

19.    To resolve disputes concerning the Prepetition Credit Agreement, including the State Court Lender Dispute, or DIP Credit Agreements and any related documents or matters.

20.    To resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

21.    To hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance; and

22.    To resolve any other matter or for any purpose specified in this Combined Plan and Disclosure Statement, the Plan Confirmation Order, the Liquidating Trust Agreement, or any other document entered into in connection with any of the foregoing.

## XVI.    MISCELLANEOUS PROVISIONS

### A.    Amendment or Modification of this Combined Plan and Disclosure Statement

This Combined Plan and Disclosure Statement or any exhibits hereto, including, without limitation, the Plan Supplement, may be amended, modified, or supplemented by the Plan Proponents with the consent of the Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders and consistent with the terms of the 2L/Committee Settlement in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure under section 1125 of the Bankruptcy Code. In addition, after the Plan Confirmation Date, the Debtors or Liquidating Trustee, as applicable, with the consent of the Ad Hoc Group of Second Lien Noteholders and the Creditors Committee and consistent with the terms of the 2L/Committee Settlement, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Combined Plan and Disclosure Statement or the Plan Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of this Combined Plan and Disclosure Statement. The Debtors may make appropriate technical adjustments and modifications to this Combined Plan and Disclosure Statement prior to the Effective Date without further order or approval of the Bankruptcy Court. Notwithstanding the foregoing, any amendment, modification, supplement or adjustment to this Combined Plan and Disclosure Statement, any exhibits thereto, or the Plan Confirmation Order that adversely affect a Released Party, shall require the prior written consent of such Released Party.

### B.    Severability

This Combined Plan and Disclosure Statement is not severable; all of the terms and conditions are fully integrated. Nevertheless, if, prior to the entry of the Plan Confirmation Order, any term or provision of this Combined Plan and Disclosure Statement is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Combined Plan and Disclosure Statement will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Plan Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Combined Plan and Disclosure Statement, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable under its terms.

### C.    Revocation or Withdrawal of this Combined Plan and Disclosure Statement

The Plan Proponents reserve the right to revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date. If the Plan Proponents revoke or withdraw this Combined Plan and Disclosure Statement before the Plan Confirmation Date, then this Combined Plan and Disclosure Statement shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or

- 85 -

against the Debtors or the Liquidating Trustee or to prejudice in any manner the rights of the Debtors or the Liquidating Trustee in any further proceedings involving the Debtors.

**D.**     **Binding Effect**

This Combined Plan and Disclosure Statement shall be binding upon and inure to the benefit of the Debtors, the Holders of Claims, the Holders of Interests, and the Released Parties and their respective successors and assigns.

**E.**     **Notices**

All notices to or requests of the Plan Proponents or Liquidating Trustee by parties in interest in connection with this Combined Plan and Disclosure Statement shall be in writing and delivered either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) overnight delivery, all charges prepaid, and shall be deemed to have been given when received by:

If to the Debtors (prior to the Effective Date):

Appvion, Inc.
825 East Wisconsin Avenue, P.O. Box 359
Appleton, Wisconsin 54912.
Attn: Alan Holtz

-with a copy to-

DLA Piper LLP (US)
444 W. Lake Street, Suite 900
Chicago, Illinois, 60601
Attn: Richard A. Chesley, Esq.

DLA Piper LLP (US)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Attn:   Stuart M. Brown, Esq.
            Kaitlin Mackenzie Edelman, Esq.

DLA Piper LLP (US)
1251 Avenue of the Americas, 27th Floor
New York, New York 10020
Attn:   Jamila Justine Willis, Esq.

If to the Liquidating Trustee and the Debtors (after the Effective Date):

Liquidating Trustee
c/o Alan D. Halperin
Halperin Battaglia Benzija, LLP

40 Wall Street, 37th Floor
New York, New York 10005
Email: ahalperin@halperinlaw.net

and

Eugene I. Davis
PIRINATE Consulting Group, LLC
5 Canoe Brook Drive
Livingston, New Jersey 07039
Email: genedavis@pirinateconsulting.com

If to the Majority DIP Lender or the Purchaser:

Franklin Advisors, Inc.
c/o O'Melveny & Myers LLP
Seven Times Square
New York, New York
Attn: Daniel Shamah, Esq.

**F.**    <u>**Governing Law**</u>

Except to the extent the Bankruptcy Code, Bankruptcy Rules, or other federal law is applicable, or to the extent an exhibit to this Combined Plan and Disclosure Statement provides otherwise, the rights and obligations arising under this Combined Plan and Disclosure Statement shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**G.**    <u>**Withholding and Reporting Requirements**</u>

In connection with the Consummation of this Combined Plan and Disclosure Statement, the Debtors and the Liquidating Trustee shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. All Beneficiaries, as a condition to receiving any Distribution, shall provide the Liquidating Trustee with a completed and executed Form W-9. Failure to timely provide the Liquidating Trustee with a completed and executed Form W-9 may result, at the option of the Liquidating Trustee, in the forfeiture by a Holder of Claim of its Distribution under the Plan and Liquidating Trust Agreement.

**H.**    <u>**Headings**</u>

Headings are used in this Combined Plan and Disclosure Statement for convenience and reference only, and shall not constitute a part of this Combined Plan and Disclosure Statement for any other purpose.

**I.**    <u>**Exhibits/Schedules**</u>

The Plan Documents are an integral part of this Combined Plan and Disclosure Statement, and are hereby incorporated by reference and made a part thereof.

**J.     Filing of Additional Documents**

On or before substantial Consummation of this Combined Plan and Disclosure Statement, the Debtors or Liquidating Trustee, as applicable, shall File such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Plan and Disclosure Statement; *provided that* the Plan Supplement shall be Filed on or before August 7, 2018.

**K.     No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in this Combined Plan and Disclosure Statement shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**L.     Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Plan and Disclosure Statement shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or assignee of such Person or Entity.

**M.     Reservation of Rights**

Except as expressly set forth herein, this Combined Plan and Disclosure Statement shall have no force or effect unless the Bankruptcy Court shall enter the Plan Confirmation Order. None of the Filing of this Combined Plan and Disclosure Statement, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Combined Plan and Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights or Causes of Action of the Debtors, Holders of Claims, or Equity Interest before the Effective Date.

**N.     Inconsistency**

In the event of any inconsistency among this Combined Plan and Disclosure Statement, the Liquidating Trust Agreement, or any other instrument or document created or executed under this Combined Plan and Disclosure Statement, the provisions of this Combined Plan and Disclosure Statement shall govern; *provided that* in the event of any inconsistency among this Combined Plan and Disclosure Statement and the Plan Confirmation Order, the provisions of the Plan Confirmation Order shall govern.

**O.     Dissolution of the Debtors**

Immediately following the Distribution of all of the Debtors' and the Estates' property under the terms of this Combined Plan and Disclosure Statement, on the Effective Date, the Debtors' members, directors, managers, and officers and any remaining employees shall be deemed to have resigned, the entity dissolved for all purposes and of no further legal existence

- 88 -

under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the State of Delaware or any other state or government authority, and, as to Appvion, upon termination of the Liquidating Trustee or the wind down of the Liquidating Trust, Appvion shall be deemed dissolved for all purposes and of no further legal existence under any applicable state or federal law, without the need to take any further action or file any plan of dissolution, notice, or application with the Secretary of State of the Delaware or any other authority.

### P.    Dissolution of the Creditors' Committee

Upon the occurrence of the Effective Date, the Creditors' Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be discharged and released from any duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) obligations arising under confidentiality agreements, which shall remain in full force and effect, (ii) prosecuting applications for payment of fees and reimbursement of expenses of Professionals or attending to any other issues related to applications for payment of fees and reimbursement of expenses of Professionals, (iii) any motions or motions for other actions seeking enforcement of implementation of the provisions of this Combined Plan and Disclosure Statement, and (iv) prosecuting or participating in any appeal of the Plan Confirmation Order or any request for reconsideration thereof.

## XVII.    RISKS AND OTHER CONSIDERATIONS

### A.    Bankruptcy Considerations

Although the Plan Proponents believe that this Combined Plan and Disclosure Statement will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will confirm this Combined Plan and Disclosure Statement as proposed. Moreover, there can be no assurance that modifications of this Combined Plan and Disclosure Statement will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the occurrence of the Effective Date is conditioned on the satisfaction (or waiver) of the conditions precedent specified herein, and there can be no assurance that such conditions will be satisfied or waived. In the event such conditions precedent have not been satisfied or waived (to the extent possible hereunder) within one hundred and twenty (120) days after the Plan Confirmation Date, which period may be extended by the Plan Proponents, then the Plan Confirmation Order may be vacated, no Distributions will be made under this Combined Plan and Disclosure Statement, and the Debtors and all Holders of Claims and Interests will be restored to the *status quo ante* as of the day immediately preceding the Plan Confirmation Date as though the Plan Confirmation Date had never occurred.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponents believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each Class of Claims and Interests encompass Claims or Interests,

- 89 -

as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

While the Plan Proponents believe that there are sufficient Liquidating Trust Assets to make Distributions to Liquidating Trust Beneficiaries, there can be no assurance that the Liquidating Trust Assets will be sufficient to pay all Liquidating Trust Operating Expenses or make Distributions to the Liquidating Trust Beneficiaries.

**B.    No Duty to Update Disclosures**

The Plan Proponents have no duty to update the information contained in this Combined Plan and Disclosure Statement as of the date hereof, unless otherwise specified herein, or unless the Plan Proponents are required to do so under an Order of the Bankruptcy Court. Delivery of this Combined Plan and Disclosure Statement after the date hereof does not imply that the information contained herein has remained unchanged.

**C.    Alternatives to Confirmation and Consummation of the Plan**

1.    **Alternate Plan**

If this Combined Plan and Disclosure Statement is not confirmed, the Debtors or any other party in interest (if, under section 1121 of the Bankruptcy Code, the Debtors have not Filed a plan within the time period prescribed under the Bankruptcy Code) could attempt to formulate and propose a different plan. Such a plan likely would result in additional costs, including, among other things, additional professional fees or potential asserted substantial contribution claims, all of which would likely constitute Administrative Expense Claims (subject to allowance). The Plan Proponents believe that this Combined Plan and Disclosure Statement, which is the result of extensive negotiations provides for an orderly and efficient liquidation of the Debtors' remaining Assets and enables creditors to realize the best return under the circumstances.

2.    **Chapter 7 Liquidation**

If a plan under chapter 11 of the Bankruptcy Code is not confirmed by the Bankruptcy Court, the Chapter 11 Cases may be converted to liquidation cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed, under applicable provisions of chapter 7 of the Bankruptcy Code, to liquidate the Assets of the Debtors for Distribution in accordance with the priorities established by the Bankruptcy Code. The Plan Proponents believe that such a liquidation would result in smaller Distributions being made to the Debtors' creditors than those provided for in this Combined Plan and Disclosure Statement because (a) the likelihood that other Assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion, (b) additional administrative expenses attendant to the appointment of a trustee and the trustee's employment of attorneys and other professionals, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation. *See* Liquidation Analysis, attached to this Plan as **Exhibit B**.

**D.    Certain Federal Tax Consequences**

- 90 -

1.    **General**

The following discussion summarizes certain material U.S. federal income tax consequences to Holders of Claims entitled to vote on this Combined Plan and Disclosure Statement. This discussion is based on current provisions of the IRC, applicable Treasury Regulations, judicial authority and current administrative rulings and pronouncements of the IRS. There can be no assurance that the IRS will not take a contrary view, no ruling from the IRS has been or will be sought nor will any counsel provide a legal opinion as to any of the expected tax consequences set forth below.

Legislative, judicial, or administrative changes or interpretations may be forthcoming that could alter or modify the statements and conclusions set forth herein. Any such changes or interpretations may or may not be retroactive and could affect the tax consequences to the Holders of Claims, the Liquidating Trust, or the Debtors. It cannot be predicted at this time whether any tax legislation will be enacted or, if enacted, whether any tax law changes contained therein would affect the tax consequences described herein.

The following summary is for general information only. The tax treatment of a Holder may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant to a Holder, including any alternative minimum tax consequences and does not address the tax consequences to a Holder that has made an agreement to resolve its claim in a manner not explicitly provided for in this Combined Plan and Disclosure Statement. This summary also does not address the U.S. federal income tax consequences to persons not entitled to vote on this Combined Plan and Disclosure Statement or Holders subject to special treatment under the U.S. federal income tax laws, such as brokers or dealers in securities or currencies, certain securities traders, tax-exempt entities, financial institutions, insurance companies, foreign persons, partnerships and other pass-through entities, Holders that have a "functional currency" other than the United States dollar and Holders that have acquired Claims in connection with the performance of services. The following summary assumes that the Claims are held by Holders as "capital assets" within the meaning of section 1221 of the IRC and that all Claims denominated as indebtedness are properly treated as debt for U.S. federal income tax purposes.

The tax treatment of Holders and the character, amount, and timing of income, gain, or loss recognized as a consequence of this Combined Plan and Disclosure Statement and the Distributions provided for hereby may vary, depending upon, among other things: (i) whether the Claim (or portion thereof) constitutes a Claim for principal or interest; (ii) the type of consideration received by the Holder in exchange for the Claim and whether the Holder receives Distributions hereunder in more than one taxable year; (iii) whether the Holder is a citizen or resident of the United States for tax purposes, is otherwise subject to U.S. federal income tax on a net basis, or falls into any special class of taxpayers, such as those that are excluded from this discussion as noted above; (iv) the manner in which the Holder acquired the Claim; (v) the length of time that the Claim has been held; (vi) whether the Claim was acquired at a discount; (vii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years; (viii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (ix) the method of tax accounting of the Holder; (x) whether the Claim is an installment obligation for U.S. federal

- 91 -

income tax purposes; and (xi) whether the "market discount" rules are applicable to the Holder. Therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by this Combined Plan and Disclosure Statement.

**The following discussion is intended only as a summary of certain U.S. federal tax consequences of this Combined Plan and Disclosure Statement and is not a substitute for careful tax planning with a tax professional. The following discussion is for information purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Holder's particular circumstances. Accordingly, each Holder is strongly urged to consult its tax advisor regarding the U.S. federal, state, local, and applicable non-U.S. income and other tax consequences of this Combined Plan and Disclosure Statement.**

2. **U.S. Federal Income Tax Consequences to the Debtors**

If there is a discharge of a debt obligation by a debtor (or, in the case of indebtedness with multiple obligors, indebtedness that is allocable to such debtor) for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments), such discharge generally would give rise to cancellation of debt income, which must be included in the debtor's income (or, in the case of a debtor that is treated as a disregarded entity for U.S. federal income tax purposes, in the income of its owner). However, the Debtors should be able to utilize a special tax provision that excludes from income debts discharged in a chapter 11 case. Notably, the Debtors may not recognize income as a result of the discharge of debt under this Combined Plan and Disclosure Statement because section 108 of the IRC provides that taxpayers in bankruptcy cases do not recognize income from discharge of indebtedness. A taxpayer is, however, required to reduce its "tax attributes" by the amount of the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses for the taxable year of the discharge, and any net operating loss carryover to such taxable year; (ii) general business credits; (iii) minimum tax credits; (iv) capital loss carryovers; (v) the basis of the property of the taxpayer; (vi) passive activity loss and credit carryovers; and (vii) foreign tax credit carryovers.

3. **U.S. Federal Income Tax Treatment With Respect to the Liquidating Trust**

It is intended that the Liquidating Trust will be treated as a "grantor trust" for U.S. federal income tax purposes. In general, a grantor trust is not a separate taxable entity. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advance ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Debtors are not requesting a private letter ruling regarding the status of the Liquidating Trust as a grantor trust. Consistent with the requirements of Revenue Procedure 94-45, however, the Liquidating Trust Agreement will require all relevant parties to treat, for federal income tax purposes, the transfer of the Debtors' Assets to the Liquidating Trust as (i) a transfer of such Assets to the Beneficiaries of the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets) followed by (ii) a transfer of such Assets by such Beneficiaries to the Liquidating Trust (to the extent of the value of their respective interests in the applicable Liquidating Trust Assets), with the Beneficiaries of the Liquidating Trust being

- 92 -

treated as the grantors and owners of the Liquidating Trust. Each Beneficiary of the applicable Liquidating Trust will generally recognize gain (or loss) in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of Cash and the fair market value of any other Assets received or deemed received for U.S. federal income tax purposes under this Combined Plan and Disclosure Statement in respect of such Holder's Claim. A Holder that is deemed to receive for U.S. federal income tax purposes a non-Cash asset under this Combined Plan and Disclosure Statement in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its deemed receipt.

Beneficiaries of the Liquidating Trust should value the Assets of the Liquidating Trust consistently with the values determined by the Liquidating Trustee for all U.S. federal, state, and local income tax purposes. As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the Assets transferred to the Liquidating Trust.

Consistent with the treatment of the Liquidating Trust as a grantor trust, each Holder should report on its U.S. federal income tax return its allocable share of the Liquidating Trust's income. Therefore, a Holder may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Liquidating Trust whether or not the Liquidating Trust has made any Distributions to such Holder. The character of items of income, gain, deduction, and credit to any Holder and the ability of such Holder to benefit from any deduction or losses will depend on the particular situation of such Holder.

In general, a Distribution of underlying Assets from the Liquidating Trust to a Beneficiary thereof may not be taxable to such Holder because such Holders are already regarded for U.S. federal income tax purposes as owning such Assets. Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of Distributions from the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust as a grantor trust under Treasury Regulation Section 1.671-4(a) and will also send to each Holder a separate statement setting forth such Holder's share of items of Liquidating Trust income, gain, loss, deduction, or credit. Each such Holder will be required to report such items on its U.S. federal income tax return.

The discussion above assumes that the Liquidating Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to successfully challenge such classification, the U.S. federal income tax consequences to the Liquidating Trust and the Beneficiaries of the Liquidating Trust could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Liquidating Trust).

EAST\152399891.23

4.    **U.S. Federal Income Tax Treatment With Respect to Holders of Allowed Claims that are Beneficiaries of the Liquidating Trust**

Holders of Allowed Claims as of the Effective Date that are Beneficiaries of the Liquidating Trust should be treated as receiving from the Debtors their respective shares of the applicable Assets of the Liquidating Trust in satisfaction of their Allowed Claims, and simultaneously transferring such Assets to the Liquidating Trust. Accordingly, a Holder of such Claim should generally recognize gain or loss in an amount equal to the amount deemed realized on the Effective Date (as described above) less its adjusted tax basis of its Claim. Additionally, such Holders should generally recognize their allocable share of income, gain, loss and deductions recognized by the Liquidating Trust on an annual basis.

Because a Holder's ultimate share of the Assets of the Liquidating Trust based on its Allowed Claim will not be determinable on the Effective Date due to, among other things, the existence of Disputed Claims and the value of the Assets at the time of actual receipt not being ascertainable on the Effective Date, such Holder should recognize additional or offsetting gain or loss if, and to the extent that, the aggregate amount of Cash and fair market value of the Assets of the Liquidating Trust ultimately received by such Holder is greater than or less than the amount used in initially determining gain or loss in accordance with the procedures described in the preceding paragraph. It is unclear when a Holder of an Allowed Claim that is a Beneficiary of the Liquidating Trust should recognize, as an additional amount received for purposes of computing gain or loss, an amount attributable to the disallowance of a Disputed Claim.

The character of any gain or loss as capital gain or loss or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including: (i) the nature and origin of the Claim; (ii) the tax status of the Holder of the Claim; (iii) whether the Claim has been held for more than one year; (iv) the extent to which the Holder previously claimed a loss or bad debt deduction with respect to the Claim; and (v) whether the Claim was acquired at a market discount. A Holder that purchased its Claim from a prior Holder at a market discount may be subject to the market discount rules of the IRC. Under those rules (subject to a *de minimis* exception), assuming that such Holder has made no election to accrue the market discount and include it in income on a current basis, any gain recognized on the exchange of such Claim generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

It is possible that the IRS may assert that any loss should not be recognizable until the Liquidating Trustee makes their final Distributions of the Assets of the Liquidating Trust Holders should consult their tax advisors regarding the possibility that the recognition of gain or loss may be deferred until the final Distribution of the Assets of the Liquidating Trust.

Although not free from doubt, Holders of Disputed Claims should not recognize any gain or loss on the date that the Assets of the Debtors are transferred to the Liquidating Trust, but should recognize gain or loss in an amount equal to: (i) the amount of Cash and the fair market value of any other property actually distributed to such Holder less (ii) the adjusted tax basis of its Claim. It is possible, however, that such Holders may be required to recognize the fair market value of such Holder's allocable share of the Liquidating Trust's Assets, as an

EAST\152399891.23

amount received for purposes of computing gain or loss, either on the Effective Date or the date such Holder's Claim becomes an Allowed Claim.

Holders of Allowed Claims will be treated as receiving a payment of interest (includible in income in accordance with the Holder's method of accounting for tax purposes) to the extent that any Cash or other property received (or deemed received) under this Combined Plan and Disclosure Statement is attributable to accrued but unpaid interest, if any, on such Allowed Claims. The extent to which the receipt of Cash or other property should be attributable to accrued but unpaid interest is unclear. The Debtors and the Liquidating Trust intend to take the position that such Cash or property distributed under this Combined Plan and Disclosure Statement will first be allocable to the principal amount of an Allowed Claim and then, to the extent necessary, to any accrued but unpaid interest thereon. Each Holder should consult its tax advisor regarding the determination of the amount of consideration received under this Combined Plan and Disclosure Statement that is attributable to interest (if any). A Holder generally will be entitled to recognize a loss to the extent any accrued interest was previously included in its gross income and is not paid in full.

## XVIII. **RECOMMENDATION AND CONCLUSION**

The Plan Proponents and the Creditors' Committee believe that this Combined Plan and Disclosure Statement is in the best interests of the Estates and the Creditors and urge the Holders of impaired Claims entitled to vote to vote to accept this Combined Plan and Disclosure Statement and to evidence such acceptance by properly voting and timely returning their Ballots.

**OLDAPCO, INC. (f/k/a APPVION, INC.)**

By: _/s/ Alan D. Holtz_
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO PDC CORP. (f/k/a PAPERWEIGHT DEVELOPMENT CORP.)**

By: _/s/ Alan D. Holtz_
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO PDC CAP CORP. (f/k/a PDC CAPITAL CORPORATION)**

By: _/s/ Alan D. Holtz_
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

**OLDAPCO ARFI LLC (f/k/a APPVION RECEIVABLES FUNDING I LLC)**

By: _/s/ Alan D. Holtz_
    Name: Alan D. Holtz
    Title: Chief Restructuring Officer

EAST\152399891.23

**OLDAPCO APVN LLC (f/k/a APVN HOLDINGS LLC)**

By: /s/ *Alan D. Holtz*
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

**EXHIBIT A**

**PLAN SUPPLEMENT**

**SCHEDULE 1:**

**Form of Liquidating Trust Agreement**

# LIQUIDATING TRUST AGREEMENT

This Liquidating Trust Agreement (this "Agreement"), dated and effective as of _____, 2018 by and among Oldapco, Inc. (f/k/a Appvion, Inc.); Oldapco PDC Corp. (f/k/a Paperweight Development Corp.); Oldapco PDC Cap Corp. (f/k/a PDC Capital Corporation); Oldapco ARFI LLC (f/k/a Appvion Receivables Funding I LLC); and Oldapco APVN LLC (f/k/a APVN Holdings, LLC) (collectively, the "Debtors"), Alan D. Halperin, as co-trustee ("Halperin Trustee") and Eugene I. Davis, as co-trustee ("Davis Trustee", and collectively with Halperin Trustee, the "Trustees"), provides for the establishment of a liquidating trust (the "Liquidating Trust") under the terms of the Joint Combined Disclosure Statement and Chapter 11 Plan of Liquidation, dated _____, 2018 [Dkt No. ___] (as may be amended, modified or supplemented, the "Plan") confirmed by the United States Bankruptcy Court for the District of Delaware (the "Court") by order dated _____, 2018 [Dkt No. ___] (the "Confirmation Order") in the Debtors' Chapter 11 cases jointly administered under Case Number _____ (the "Cases").

## WITNESSETH

WHEREAS, on October 1, 2017, each of the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the Court;

WHEREAS, the Plan became effective on _____, 2018 (the "Effective Date"), and copies of the Plan and the Confirmation Order are attached hereto as Exhibits "A" and "B" respectively, and are incorporated herein by reference;

WHEREAS, this Agreement is executed to establish the Liquidating Trust and to facilitate implementation of the Plan;

WHEREAS, the Plan provides for the Liquidating Trust to be established in order to, among other things, receive and liquidate the Liquidating Trust Assets, prosecute, settle or resolve the Disputed Claims, investigate, assert, prosecute or settle the Litigation Claims, make Distributions in accordance with the provisions of the Plan, and take any and all other actions not inconsistent with the terms of the Plan and this Agreement that are necessary or appropriate to effectuate the wind-up and liquidation of the Debtors and their Estates;

WHEREAS, the primary purposes of the Liquidating Trust are: (a) investigating, asserting, prosecuting and/or settling the Litigation Claims, and (b) liquidating the Liquidating Trust Assets, including (without limitation) the Litigation Claims, for the benefit of Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims in accordance with Treasury Regulation Section 301.7701-4(d) and distributing such assets to the Beneficiaries as provided for in the Plan;

WHEREAS, the Liquidating Trust shall not be operated with the objective of continuing or engaging in the conduct of a trade or business, except to the extent reasonably necessary to

**DRAFT**

preserve or enhance the liquidation value of the Liquidating Trust Assets, and consistent with the liquidating purpose of the Liquidating Trust;

WHEREAS, this Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes, and the Trustees shall operate and maintain the Liquidating Trust in compliance with the guidelines for liquidating trusts as set forth in the applicable provisions of Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and Treasury Regulation Sections 1.671-4(a) and 301.7701-4(d) and all subsequent guidelines regarding liquidating trusts issued by the Internal Revenue Service, U.S. Treasury Department and other applicable legislative, administrative, regulatory and judicial agencies and departments; and

WHEREAS, pursuant to the Plan, the Debtors, the Trustees and the Beneficiaries are required to treat, for all federal income tax purposes, the transfer of the Liquidating Trust Assets to the Liquidating Trust as a transfer of the Liquidating Trust Assets by the Debtors to the Beneficiaries in satisfaction of their Allowed Second Lien Secured Note Claims and their Allowed General Unsecured Claims, followed by a transfer of the Liquidating Trust Assets by the Beneficiaries to the Liquidating Trust in exchange for the beneficial interest therein, and to treat the Beneficiaries as the grantors and owners of the Liquidating Trust in accordance with Treasury Regulation § 301.7701-4.

NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein and in the Plan, the Debtors and the Trustees agree as follows:

ARTICLE I

DEFINITIONS AND INTERPRETATIONS

1.1    _Definitions_.  The following definitions apply to the capitalized terms wherever those terms appear throughout this Agreement.  Any capitalized term defined in the prefatory paragraph, the recitals, this Section or any Section below shall have the meaning ascribed to such term therein.  Any capitalized term not otherwise defined in this Agreement shall have the meaning set forth in the Plan.

1.1.1    "_Available Cash_" shall mean the aggregate cash proceeds of the Liquidating Trust Assets available for Distribution to the Beneficiaries after (a) satisfaction of Allowed Other Claims in accordance with the terms of the Plan, (b) repayments of the Plan Contribution Payment, and (c) payment of the PBGC Priority Payment, and subject to reserves for Liquidating Trust Operating Expenses, Disputed Claims and any other reserves determined in the Trustees' reasonable discretion.

1.1.2    "_Beneficiaries_" and each, a "_Beneficiary_", shall mean Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims.  For the avoidance of doubt, Holders of Allowed Other Claims are not Beneficiaries.

1.1.3    "_DTC_" shall mean the Depository Trust Company.

1.1.4    "DTC Account" shall mean account # [_____] at the DTC.

1.1.5    "Indemnified Parties" shall have the meaning ascribed to such term in Section 7.6 of this Agreement.

1.1.6    "Member" and "Members" shall have the meanings ascribed to such terms in Section 11.1 of the Agreement.

1.1.7    "Other Claims" shall mean General Administrative Expense Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims.

1.1.8    "PBGC Priority Payment" shall mean the $350,000 payable to the Pension Benefit Guaranty Corporation on account of its Allowed Other Priority Claim in accordance with the settlement approved by the Bankruptcy Court [Docket ____].

1.1.9    "Permitted Investments" shall include (a) short-term direct obligations of, or obligations guaranteed by, the United States of America, (b) short-term obligations of any agency or corporation that is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof, (c) such other investments as the Court may approve from time to time, or (d) demand deposits or certificates of deposit at any bank or trust company that has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000. The Trustees may take action reasonably necessary to maintain the value of the Liquidating Trust Assets and to further the liquidating purpose of the Liquidating Trust; provided, however, that the scope of any Permitted Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulation § 301.7701-4(d), may be permitted to hold, pursuant to Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise. Permitted Investments shall not include listed stocks or securities.

1.2    Interpretation. The headings in this Agreement are for convenience only and shall not affect the meaning or understanding of this Agreement or any provision hereof. Words defined, denoted or stated in the singular form also include the plural form and vice versa, and words defined, denoted or stated in the masculine, feminine or neuter form include each of the masculine, feminine and neuter forms. The word "including" means "including but not limited to." The word "or" is not exclusive.

1.3    Particular Words. Reference in this Agreement to any Section or Article is, unless otherwise specified, to such Section or Article under this Agreement. The words "hereof," "herein," "hereto" and similar terms shall refer to this Agreement and not to any particular Section or Article of this Agreement.

ARTICLE II

DECLARATION OF TRUST

DRAFT

2.1    <u>Creation and Name</u>. The Debtors, on behalf of themselves and the Beneficiaries, and the Trustees hereby create the Liquidating Trust, which shall be known as the "Appvion Liquidating Trust", which is the trust referred to as the "Liquidating Trust" in the Plan. The Trustees may conduct the affairs of the Liquidating Trust under the name of the "Appvion Liquidating Trust."

2.2    <u>Purpose of Liquidating Trust</u>. Pursuant to the Plan, the Liquidating Trust is created for the purpose of collecting, liquidating and distributing the Liquidating Trust Assets for the benefit of the Beneficiaries in accordance with the terms of this Agreement, the Plan and Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The activities of the Liquidating Trust shall be limited to those activities set forth in this Agreement and as otherwise contemplated by the Plan. The Trustees shall make continuing efforts to collect and liquidate the Liquidating Trust Assets, make timely distributions and not unduly prolong the duration of the Liquidating Trust.

2.3    <u>Transfer of Liquidating Trust Assets</u>. As of the Effective Date, the Debtors irrevocably grant, release, assign, convey, transfer and deliver, on behalf of the Beneficiaries, all of the Debtors' right, title and interest in the Liquidating Trust Assets to the Liquidating Trust in trust for the benefit of the Beneficiaries, pursuant to sections 1123(a)(5)(B) and 1123(b)(3)(B) of the Bankruptcy Code and in accordance with the Plan and Confirmation Order and notwithstanding any prohibition on assignment under nonbankruptcy law, and the Liquidating Trust Assets shall vest in the Liquidating Trust free and clear of any and all Liens, Claims, encumbrances and Interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible under section 1141(c) of the Bankruptcy Code for the uses and purposes as specified in this Agreement and the Plan, but subject only to (i) the Allowed General Unsecured Claims and the Allowed Second Lien Secured Note Claims of the Beneficiaries, (ii) the Liquidating Trust Operating Expenses, including the obligation of the Liquidating Trust to repay the Plan Contribution Payment in accordance with the terms of the Plan and the 2L/Committee Settlement, and (iii) the Allowed Claims of Holders of Other Claims; provided, however, that the Trustees may abandon or otherwise not accept any Assets that the Trustees believe, in good faith, will have no value to, or will be unduly burdensome to, the Liquidating Trust.

2.4    <u>Title to Liquidating Trust Assets</u>. From and after the Effective Date, legal title to the Liquidating Trust Assets shall be vested at all times in the Liquidating Trust as a separate legal entity, except where applicable law in any jurisdiction in which the Liquidating Trust property may be located requires title to any part of the Liquidating Trust Assets to be vested in a trustee, in which case title shall be deemed vested in the Trustees. No Beneficiary shall have legal title to any part of the Liquidating Trust Assets.

2.5    <u>Tax Treatment</u>. The Liquidating Trust shall be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Tax Code. In furtherance of this objective, the Trustees shall, in their business judgment, endeavor in good faith not to unduly prolong the duration of the Liquidating Trust. For all federal income tax

purposes, all parties (including the Debtors, the Trustees, and the Beneficiaries) shall treat the transfer of the Liquidating Trust Assets allocable to the Beneficiaries as a transfer to such Beneficiaries of their proportionate interests in the Liquidating Trust Assets followed by a transfer by such Beneficiaries of such interests in the Liquidating Trust Assets to the Liquidating Trust in exchange for beneficial interests in the Liquidating Trust. The Beneficiaries under the Liquidating Trust will be treated as the deemed owners of the Liquidating Trust.

2.6     Securities Law. It is intended that the interests of the Beneficiaries in the Liquidating Trust and the entitlements hereunder, if any, of such Beneficiaries, shall not constitute "securities." Under section 1145 of the Bankruptcy Code, the issuance of beneficial interests in the Liquidating Trust to the Beneficiaries under the Plan shall be exempt from registration under the Securities Act of 1933, as amended and the rules and regulations promulgated thereunder (the "Securities Act"), and all applicable state and local laws requiring registration of securities. If the Trustees determine, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities and Exchange Act of 1934, as amended and the rules and regulations promulgated thereunder (the "Exchange Act"), the Trust Indenture Act of 1939, as amended (the "Trust Indenture Act") or the Investment Company Act of 1940, as amended (the "Investment Company Act"), then the Trustees shall take any and all actions to comply with such reporting requirements and file necessary periodic reports with the Securities and Exchange Commission. Nothing herein shall be deemed to preclude the Trustees from amending this Agreement to make such changes as are deemed necessary or appropriate by the Trustees, with the advice of counsel, to ensure that the Liquidating Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act or the Investment Company Act.

2.7     Appointment and Acceptance of Trustees. Solely with respect to the Liquidating Trust, the Trustees shall be deemed to be appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Trustees accept the Liquidating Trust created by this Agreement and the grant, assignment, transfer, conveyance and delivery to the Liquidating Trust, on behalf, and for the benefit, of the Beneficiaries, by the Debtors of all of their right, title and interest in the Liquidating Trust Assets, upon and subject to the terms and conditions set forth in this Agreement, the Plan and the Confirmation Order.

2.8     Status of Trustees. The Trustees shall each be a "representative of the estate" as that phrase is used in section 1123(b)(3)(B) of the Bankruptcy Code with respect to the rights and powers granted in this Agreement, the Plan and the Confirmation Order. Except as otherwise set forth in the Plan, the Trustees shall each be the successor-in-interest to the Debtors solely with respect to: (a) the Liquidating Trust Assets, including all Litigation Claims that were or could have been commenced by the Debtors prior to the Effective Date and shall be deemed substituted for the same as the party in such action; and (b) any objections, setoffs, defenses or counterclaims that have been or could have been raised by the Debtors with respect to any Claim. All actions, claims, rights or interests constituting Liquidating Trust Assets are preserved and retained and may be enforced by the Trustees as the representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Trustees shall each have the authority to bind the Liquidating Trust, and for all purposes of this Agreement, shall each be acting as a Trustee, and not in their individual capacity. Subject to the provisions of this Agreement, as of

**DRAFT**

the date that the Liquidating Trust Assets are transferred to the Liquidating Trust, the Trustees on behalf of the Liquidating Trust may control and exercise authority over the Liquidating Trust Assets, over the acquisition, management and disposition thereof, and over the management and conduct of the affairs of the Liquidating Trust.

2.9    <u>No Reversion to Debtors</u>.  The Debtors shall have no claim to, right, or interest in, whether direct, residual, contingent or otherwise, the Liquidating Trust Assets once such assets have been transferred to the Liquidating Trust.  In no event shall any part of the Liquidating Trust Assets be distributed to any of the Debtors, except as otherwise set forth herein.

2.10    <u>Capacity of Liquidating Trust</u>.  Notwithstanding any state or federal law to the contrary or anything herein, the Liquidating Trust shall itself have the capacity, in its own right and name, to act or refrain from acting, including the capacity to sue and be sued and to enter into contracts.  The Liquidating Trust may alone be the named movant, respondent, party plaintiff or defendant, or the like in all adversary proceedings, contested matters, and other state or federal proceedings brought by or against it, and may settle and compromise all such matters in its own name.  Subject to the terms of the Plan, Confirmation Order, and this Agreement, the Liquidating Trust shall also be entitled to assert all of the Estates' rights under section 558 of the Bankruptcy Code.

ARTICLE III

ADMINISTRATION OF THE LIQUIDATING TRUST

3.1    <u>Rights, Powers and Privileges</u>.  The Trustees shall have only the rights, powers and privileges expressly provided in this Agreement, the Plan and the Confirmation Order.  For the avoidance of doubt, the inclusion of a right, power or privilege of the Trustees shall not be deemed an obligation of the Trustees to exercise such right, power or privilege, if in the judgment of the Trustees such action is not in the best interest of the Liquidating Trust and the Beneficiaries.  Subject to the terms of this Agreement, including <u>Sections 3.4, 11.4 and 11.5</u> of this Agreement, the Trustees shall each have the power to take the actions granted in this <u>Section 3.1</u> and any powers reasonably incidental thereto that the Trustees reasonably determine to be necessary or appropriate to fulfill the purpose of the Liquidating Trust, without any further Bankruptcy Court approval, including but not limited to:

A.    Acting as the liquidating trustees for the Liquidating Trust and administering the Liquidating Trust;

B.    Acting for the Liquidating Trust in accordance with the provisions of the Plan and this Agreement;

C.    Exercising all power and authority that may be or could have been exercised and taking all actions that may be or could have been taken solely with respect to the Liquidating Trust Assets by any officer, director, shareholder or other party acting in the name of the Debtors or their Estates with like effect as if duly authorized, exercised, and taken by action of such officers, directors, shareholders or other party;

D.    Representing the Debtors' Estates before the Court and other courts of competent jurisdiction solely with respect to matters concerning the Liquidating Trust and the Liquidating Trust Assets;

E.    Taking any action necessary to collect and transfer the Liquidating Trust Assets to the Liquidating Trust;

F.    Receiving, managing, investing, supervising, and protecting the Liquidating Trust Assets;

G.    Paying taxes or other obligations incurred by the Liquidating Trust and issuing to employees or other Persons, and/or filing with the appropriate Governmental Units, applicable tax and wage returns and forms;

H.    Retaining and compensating, without further order of the Bankruptcy Court, the services of employees, professionals, and consultants to advise and assist the Trustees in carrying out their powers and duties under this Agreement, including the investigation, commencement, prosecution and/or settlement of the Litigation Claims, and paying, in accordance with Section 8.8 hereof and without Court approval, all reasonable fees and expenses of such employees, professionals, advisors and consultants retained by the Liquidating Trust, accruing from and after the Effective Date;

I.    Calculating and implementing Distributions of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries and Holders of Allowed Other Claims;

J.    Investigating (including causing the Liquidating Trust to seek the examination of any Person pursuant to Federal Rule of Bankruptcy Procedure 2004), commencing, prosecuting, settling, assigning or otherwise compromising, releasing, dismissing or abandoning for the benefit of the Liquidating Trust any and all Litigation Claims, including, without limitation, taking any action with respect to appeals, counterclaims and defenses of or with respect to such claims and causes of action, including retaining counsel to pursue the Litigation Claims, and to confer with the Oversight Committee with respect to all such Litigation Claims;

K.    Entering into, or cause to be entered into, litigation finance arrangements, including for the funding of counsel fees, expert fees, and court costs, in connection with the commencement, prosecution, appeal, settling or otherwise compromising any and all Litigation Claims;

L.    Undertaking all administrative functions of the Cases, including the payment of Statutory Fees incurred post-Effective Date and the ultimate closing of the Cases and dissolution of the Debtor entities;

**DRAFT**

M.      Reviewing and resolving any Claims in the Cases without Bankruptcy Court approval, filing or litigating objections to the allowance of any such Claims, seeking to estimate, subordinate and/or recharacterize Claims by objection, motion, or adversary proceeding or otherwise, and conferring with the Oversight Committee with respect to all such objections to Claims, and addressing any issues with respect to Equity Interests to the extent necessary or desirable;

N.      Executing any documents and taking any other actions related to, or in connection with, the liquidation of the Liquidating Trust Assets and the exercise of the Trustees' powers granted in this Agreement, the Plan and Confirmation Order;

O.      Holding legal title to any and all rights of the Beneficiaries in, to or arising from the Liquidating Trust Assets;

P.      Establishing reserves as may be necessary and appropriate for the proper operation of matters incident to the Liquidating Trust;

Q.      Protecting and enforcing the rights to the Liquidating Trust Assets vested in the Trustees by this Agreement by any method reasonably determined to be appropriate, including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

R.      Preparing and filing any and all tax returns with respect to the Debtors and on behalf of the Liquidating Trust, paying taxes properly payable by the Liquidating Trust, if any, and causing the Liquidating Trust to make all tax withholdings, file tax information returns, file and prosecute tax refund claims, and make tax elections by and on behalf of the Liquidating Trust;

S.      Making all necessary filings on behalf of the Liquidating Trust in accordance with any applicable law, statute or regulation;

T.      Determining and satisfying from the Liquidating Trust Assets any and all taxes and ordinary course liabilities incurred by or on behalf of the Liquidating Trust;

U.      Investing the Liquidating Trust Assets received by the Liquidating Trust or the Trustees or otherwise held by the Liquidating Trust or Trustees in accordance with Section 3.6 of this Agreement;

V.      In the event that the Trustees determine that the Beneficiaries or the Liquidating Trust may, will or have become subject to different tax consequences than those described in this Agreement, taking such actions that will, or are intended to, address such different tax consequences;

W.      Creating sub-trusts of which the Liquidating Trust or the Beneficiaries hold the beneficial or ownership interests, as may be necessary and in each case pursuant to and in accordance with the Plan and the treatment of Trust Beneficiaries as set forth therein;

X.      Enforcing, waiving, assigning or releasing rights, privileges or immunities of any kind;

Y.      Sending annually to each Beneficiary a separate statement stating the Beneficiary's share of income, gain, loss, deduction or credit and instructing all such Beneficiaries to report such items on their federal tax returns;

Z.      Filing reports with the Court on a quarterly basis setting forth the amounts, recipients, and dates of all Distributions through each applicable reporting period, beginning no later than thirty (30) Business Days after the end of the first full quarter following the Effective Date and on a quarterly basis thereafter until all Liquidating Trust Assets have been liquidated to Cash and all Cash in the Liquating Trust has been released or paid out in accordance with the Plan.

AA.     Opening and maintaining bank accounts on behalf of or in the name of the Liquidating Trust, determining and satisfying any and all liabilities created, incurred, or assumed by the Liquidating Trust and paying all expenses, debts, and other liabilities of the Liquidating Trust;

BB.     Purchasing customary insurance coverage in accordance with Section 3.11 of this Agreement on behalf of the Liquidating Trust or the Trustees (including but not limited to errors and omissions policies) to the extent the Trustees deem reasonably necessary or advisable, paying all insurance premiums and costs as the Trustees deem reasonably necessary or advisable, and requesting and receiving reports from any insurer under the Insurance Policies regarding the payment of any proceeds of such policies;

CC.     In reliance upon the official claims register maintained in the Cases and any applicable court order, maintaining on the Trustees' books and records a register evidencing the beneficial interest in the Liquidating Trust held by each Beneficiary;

DD.     Maintaining the books and records of the Liquidating Trust;

EE.     Implementing, enforcing or discharging all of the terms, conditions and all other provisions of, and all duties and obligations under, the Plan, the Confirmation Order and this Agreement;

3.2   Litigation Claims.   The Liquidating Trust shall have the sole responsibility, standing (including derivative standing), and authority to commence, prosecute and settle all Litigation Claims. Any and all Litigation Claims that are not expressly released or waived under the Plan are reserved and preserved and vest in the Liquidating Trust in accordance with the Plan. No person may rely on the absence of a specific reference in the Plan or this Agreement or any other Plan Supplements to any Litigation Claim against it as any indication that the Trustees will not investigate and/or pursue any and all available Litigation Claims against such Person. Litigation Claims may include, but are not limited to, claims against certain officers and directors for breach of fiduciary duty, breach of the duty of loyalty, failure to monitor fiduciaries of the

**DRAFT**

Estates; claims for professional malpractice or mismanagement; claims grounded in tort; claims for breach of contract; and/or claims based upon the malfeasance or omissions of parties in connection with the valuation and administration of the ESOP (other than Direct ESOP Claims), to the fullest extent permitted by law.

3.3    <u>Agents and Professionals</u>.  The Trustees may, but shall not be required to, consult with and retain attorneys, financial advisors, accountants or other professionals and employees as the Trustees deem appropriate in the reasonable exercise of their discretion, and who the Trustees reasonably determine to have qualifications necessary to assist the Trustees in the proper administration of the Liquidating Trust.  Subject to <u>Section 8.8</u> of this Agreement, the Trustees may pay the reasonable fees, costs and expenses of such persons (including the Trustees) out of the Liquidating Trust Assets in the ordinary course of business pursuant to the Plan and Confirmation Order.  Subject to this <u>Section 3.3</u> and the other terms and conditions of this Agreement, the Plan and Confirmation Order, the Trustees may retain professionals who previously were employed by the Creditors' Committee, the Ad Hoc Group of Second Lien Noteholders and/or the Debtors.  For the avoidance of doubt, and without limitation of applicable law, nothing in this Agreement shall limit the Trustees from engaging each Trustee's respective firm or its affiliates to do work for the Liquidating Trust.

3.4    <u>Safekeeping of Liquidating Trust Assets</u>.  All Liquidating Trust Assets shall, until distributed or paid over as provided herein or in the Plan, be held in trust for the benefit of the Beneficiaries in accordance with the Plan and this Agreement.  The Trustees shall be under no liability for interest or producing income on any moneys received by them under this Agreement and held for Distribution or payment to the Beneficiaries, except as such interest or income shall actually be received by the Trustees.

3.5    <u>Limitations on Trustees</u>.  The Trustees shall have no authority to take any action in contravention of this Agreement, the Plan, the Confirmation Order or applicable law, or any action that would make it impossible to carry on the activities of the Liquidating Trust.  Neither of the Trustees shall at any time, on behalf of the Liquidating Trust or Beneficiaries, enter into or engage in any trade or business, and no part of the Liquidating Trust Assets or the proceeds, revenue or income therefrom shall be used or disposed of by the Liquidating Trust in furtherance of any trade or business.

3.6    <u>Investment</u>.    The Trustees may, but shall not be required to, invest Cash (including any earnings thereon or proceeds therefrom) in the Liquidating Trust only in (i) Permitted Investments, in a manner consistent with the requirements of section 345 the Bankruptcy Code or any order of the Court modifying such requirements, or (ii) to the extent authorized by the Oversight Committee, in Permitted Investments other than those described in section 345 of the Bankruptcy Code.  To the extent the Trustees invest the Liquidating Trust Assets in accordance with the terms of this <u>Section 3.6</u>, the Trustees and the Oversight Committee shall have no liability in the event of insolvency of any institution in which the Trustees have invested any of the Liquidating Trust Assets or reserves or any proceeds, revenue or income therefrom.

**DRAFT**

3.7    <u>Trustees Action</u>.    The Trustees shall hold, collect, conserve, protect and administer the Liquidating Trust in accordance with the provisions of this Agreement, the Plan and the Confirmation Order, and pay and distribute amounts as set forth herein for the purposes set forth in this Agreement, the Plan and the Confirmation Order.  Any good faith determination by the Trustees, and the Oversight Committee to the extent applicable by <u>Sections 11.4 and 11.5</u>, as to what actions are in the best interests of the Liquidating Trust shall be determinative.

3.8    <u>Court Approval of Trustees Actions</u>.  Except as provided in the Plan or otherwise specified in this Agreement, the Trustees need not obtain an order or approval of the Court in the exercise of any power, rights or discretion conferred hereunder, or account to the Court, including with respect to the sale of assets or the settlement of controversies.  The Trustees shall exercise their business judgment for the benefit of the Beneficiaries in order to maximize the value of the Liquidating Trust Assets and Distributions, giving due regard to the cost, risk and delay of any course of action.  Notwithstanding the foregoing in this <u>Section 3.8</u>, but subject to <u>Section 3.5</u> of this Agreement, the Trustees may submit to the Court any question or questions regarding which the Trustees may desire to have explicit approval of the Court for the taking of any specific action proposed to be taken by the Trustees with respect to the Liquidating Trust Assets, the Liquidating Trust, the Agreement, the Plan or the Debtors, including the administration and Distribution of the Liquidating Trust Assets.   The Court shall retain jurisdiction for such purposes and shall approve or disapprove any such proposed action upon motion.   In addition, subject to <u>Section 3.4</u> of this Agreement, the Trustees shall have the authority, but not the obligation, to seek Court approval to sell any Asset free and clear of any and all Liens, Claims and encumbrances.

3.9    <u>No Personal Gain</u>.  The Trustees shall, during the period that each serves as a Trustee under this Agreement and following the termination of this Agreement or their removal or resignation hereunder, not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Liquidating Trust Assets or Reserves relate or which he has become aware of in his capacity as a Trustee.

3.10    <u>United States Trustee Fees and Reports</u>.  After the Effective Date, the Trustees shall pay as an expense of the Liquidating Trust all fees incurred under 28 U.S.C. § 1930 by reason of the Trust's disbursements as required under the Plan and Confirmation Order until the Cases are closed.  After the Confirmation Date, the Liquidating Trust shall prepare and serve on the Office of the U.S. Trustee such quarterly disbursement reports for the Liquidating Trust as required by the U.S. Trustee for as long as the Cases remain open.

3.11    <u>Insurance</u>.  The Trustees may, in their discretion, use Liquidating Trust Assets in the Trustees' reasonable business judgment to maintain customary insurance coverage, if available, for the protection of the Liquidating Trust Assets, the Trustees and the Oversight Committee.

3.12    <u>Abandonment; Donation</u>.    If, in the Trustees' reasonable judgment, any Liquidating Trust Assets cannot be sold or distributed in a commercially reasonable manner or the Trustees believe in good faith that such property has inconsequential value to the Liquidating Trust or its Beneficiaries or is insufficient to render a further Distribution practicable, or exceed

the amounts required to be paid under the Plan, the Trustees shall have the right, for Liquidating Trust Assets with an aggregate value of up to $10,000 (and for Liquidating Trust Assets in excess of $10,000, with the approval of the Oversight Committee), to cause the Liquidating Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, under applicable federal and state laws selected by the Trustees.

3.13    <u>Incentive Fund</u>.  One percent (1%) of all Litigation Proceeds in excess of $20 million (after the payment of, or reserves for, Liquidating Trust Operating Expenses, repayment of the Plan Contribution Payment, and payment of the PBGC Priority Payment) shall be allocated to an incentive fund that shall be used to provide additional compensation for the Trustees and compensation for the Oversight Committee Members, which compensation shall be subject to Court approval.

# ARTICLE IV

# DISTRIBUTIONS TO TRUST BENEFICIARIES

4.1    <u>Distribution Record Dates</u>.  Prior to each Distribution Date with respect to Distributions to Beneficiaries, the Trustees shall set a Distribution Record Date for determining the Beneficiaries entitled to participate in the Distribution on such Distribution Date.  The Distribution Record Date shall not apply to the Second Lien Secured Note Claims, the Holders of which shall receive Distributions in accordance with the customary procedures of DTC on or as soon as practicable after the Distribution Date.

4.2    <u>Timing and Amount of Distributions from the GUC Cash Pool</u>.  The Trustees shall in their reasonable discretion make Distributions of Available Cash from the GUC Cash Pool on a Pro Rata basis to the Holders of Allowed General Unsecured Claims, consistent with the Plan, on each Distribution Date; provided, however, that on any date that Distributions are to be made under the terms of the Plan or this Agreement, the Trustees shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed General Unsecured Claims as if each such Disputed General Unsecured Claim were an Allowed Claim but for the pendency of a dispute with respect thereto.  Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed General Unsecured Claims pending determination of their entitlement thereto.

4.3    <u>Timing and Amount of Distributions of Litigation Proceeds and Liquidating Trust Assets (Other Than the GUC Cash Pool)</u>.  The Trustees shall in their reasonable discretion, subject to approval by the Oversight Committee, make Distributions of Available Cash (other than the GUC Cash Pool) on a Pro Rata basis to the Holders of Allowed Second Lien Secured Note Claims and Holders of Allowed General Unsecured Claims, consistent with the Plan, on each Distribution Date; provided, that the Trustees shall make Distributions to Holders of Allowed Second Lien Secured Note Claims solely via transfer to the DTC Account; provided, further, that the Trustees shall distribute at least annually to the Beneficiaries the net income (i.e., taxable income as determined for U.S. federal income tax purposes) of the Liquidating Trust, other than the amount of net income reasonably necessary to pay current expenses and liabilities

(including but not limited to satisfying Allowed Other Claims in accordance with the terms of the Plan, repaying the Plan Contribution Payment, and paying the PBGC Priority Payment) and preserve the value of the Liquidating Trust Assets or meet the Liquidating Trust's claims and contingent liabilities (including but not limited to reserves for Liquidating Trust Operating Expenses, Disputed Claims and any other reserves determined in the Trustees' reasonable discretion); provided, however, that on any date that Distributions are to be made under the terms of the Plan or this Agreement, the Trustees shall reserve Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed General Unsecured Claims as if each such Disputed General Unsecured Claim were an Allowed Claim but for the pendency of a dispute with respect thereto. Such Cash or property shall be held in trust for the benefit of the Holders of all such Disputed General Unsecured Claims pending determination of their entitlement thereto. For the avoidance of doubt, Available Cash from the Liquidating Trust Assets (including the Litigation Proceeds but excluding the GUC Cash Pool) shall be used to satisfy <u>first</u>, any Cash Distributions that are necessary to satisfy Claims held by Holders of Allowed Other Claims in accordance with the terms of the Plan, provided, that Available Cash shall only be used to satisfy Allowed Other Claims to the extent that such Allowed Other Claims are the subject of an established reserve and/or have otherwise been included in the Debtors' wind-down budget and such funds have been transferred to the Trust, and shall not be satisfied from any other Liquidation Trust Assets (including the Plan Contribution Payment), without the written consent of the Trustees, <u>second</u>, the Liquidating Trust Operating Expenses, <u>third</u>, repayments of the Plan Contribution Payment, and <u>fourth</u>, payment of the PBGC Priority Payment, prior to making any Distributions to Beneficiaries of the Liquidating Trust on a Pro Rata basis. For the avoidance of doubt, the Debtors shall provide the Trustees with a copy of the wind-down budget indicating which claimants have not yet been paid and for which the Debtors have turned over funds to cover such payments, and the Trustees shall be entitled to rely on such information following the Effective Date as current and wholly accurate.

4.4     <u>Location for Distributions; Notice of Change of Address</u>. Distributions to the Beneficiaries shall be made by the Trustees to the Beneficiaries at the last address: (a) set forth on the respective proofs of Claim last Filed by such Beneficiaries; (b) set forth in any written notices of address changes delivered to the Trustees by such Beneficiaries after the date of any related proof of Claim; or (c) reflected in the Schedules if no proofs of Claim were filed by such Beneficiaries and the Trustees have not received a written notice of a change of address. The Trustees may, in their sole discretion, attempt to determine a Beneficiary's current address or otherwise locate a Beneficiary, but nothing in this Agreement or the Plan shall require the Trustees to do so. For the avoidance of doubt, the Trustees shall be entitled to rely on the claims register provided to them by the Debtors or the claims agent, as the case may be, following the Effective Date as current and wholly accurate (including, without limitation, with respect to the most current address, among other things), and shall have not any obligation to conduct diligence with respect to any change of address notices provided to the Debtors or to the claims agent prior to the effectiveness of this Agreement.

4.5     <u>Tax Information</u>. The Trustees shall require the Beneficiaries to furnish to the Trustees in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and completed IRS Form W-9 or, if applicable, IRS Form W-8, within thirty

(30) days of a written request, and the Trustees shall make two (2) such requests to the extent necessary.  Failure of a Beneficiary to respond to the Trustees' second request for such tax information within 45 days of the second request shall result in the Beneficiary forfeiting its Liquidating Trust interest and rights to any Distribution, and such forfeited amounts shall revest in the Liquidating Trust and be distributed to the remaining Beneficiaries on the next Distribution Date.

      4.6    Distributions After Allowance or Disallowance of a Disputed Claim.  Upon a Disputed Claim becoming an Allowed Claim, the Trustees shall distribute to the Holder thereof no later than the next Distribution Date, such amount as would have been distributed to such Holder if its Claim had been an Allowed Claim on the Effective Date.

      4.7    Payments Limited to Liquidating Trust Assets.  All payments to be made by the Trustees to or for the benefit of any Beneficiary on behalf of the Liquidating Trust shall be made only from the Liquidating Trust Assets.

      4.8    Undeliverable Distributions and Unclaimed Property.  If any Distribution to a Beneficiary is returned to the Trustees as undeliverable, no further Distributions shall be made to such Beneficiary unless and until the Trustees are notified in writing of such Beneficiary's then current address.  Undeliverable Distributions shall remain in the possession of the Trustees until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.  Such Unclaimed Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and all title to and beneficial interest in the Liquidating Trust Assets represented by any such undeliverable Distribution shall be cancelled and revert to and/or remain in the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).  In the event any check sent to a Beneficiary respecting a Distribution to such Beneficiary has not been cashed within one hundred and twenty (120) days after the date of the respective Distribution, such check shall be cancelled, no replacement Distribution shall be made to such Beneficiary, and the Claims of such Beneficiary that may have been entitled to such Distribution shall be discharged and forever barred from receiving Distributions under this Agreement, the Plan and Confirmation Order. The uncashed Distributions shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and shall become Liquidating Trust property and revert to the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

ARTICLE V

DISTRIBUTIONS TO
HOLDERS OF OTHER CLAIMS

      5.1    Distribution Record Dates.  Prior to each Distribution Date with respect to Distributions to Holders of Allowed Other Claims, the Trustees shall set a Distribution Record

**DRAFT**

Date for determining the Holders of Allowed Other Claims entitled to participate in the Distribution on such Distribution Date.

5.2     <u>Timing of Distributions to Holders of Other Claims</u>.  On or as soon as reasonably practicable after the date any Other Claim that is not otherwise to be paid by the Purchaser becomes an Allowed Claim, the Trustees shall make the Distributions required to be made under the Plan to Holders thereof.

5.3     <u>Distributions After Allowance or Disallowance of a Disputed Other Claim</u>.  On or as soon as reasonably practicable after a Disputed Other Claim becomes an Allowed Claim, the Trustees shall distribute to the Holder thereof such amount as would have been distributed to such Holder if its Other Claim had been an Allowed Claim on the Effective Date, in accordance the Plan.

5.4     <u>Location for Distributions; Notice of Change of Address</u>. Distributions shall be made by the Trustees to the Holders of Allowed Other Claims at the last address: (a) set forth on the respective proofs of Claim or notices of General Administrative Expense Claims last Filed by such Holders of Allowed Other Claims; (b) set forth in any written notices of address changes delivered to the Trustees by such Holders of Allowed Other Claims after the date of any related proof of Claim or notice of General Administrative Expense Claim; or (c) reflected in the Schedules if no proofs of Claim or notices of General Administrative Expense Claims were filed by such Holders of Allowed Other Claims and the Trustees have not received a written notice of a change of address.  The Trustees may, in their sole discretion, attempt to determine a Holder's current address or otherwise locate a Holder, but nothing in this Agreement or the Plan shall require the Trustees to do so.

5.5     <u>Tax Information.</u>  The Trustees may, in their discretion, require the Holders of Other Claims to (i) furnish to the Trustees in writing his, her or its name, address, Employer or Taxpayer Identification Number as assigned by the IRS and completed IRS Form W-9 or, if applicable, IRS Form W-8, or (ii) establish to the satisfaction of the Trustees an applicable exemption from the requirement to provide such forms, within thirty (30) days of a written request, and the Trustees shall make two (2) such requests to the extent necessary.  Failure of any Holder of the Other Claims to respond to the Trustees' second request for such tax information within 30 days of the second request shall result in their forfeiting their rights to any Distribution, and such forfeited amounts shall revest in the Liquidating Trust and be distributed to the remaining Beneficiaries on the next Distribution Date.

5.6     <u>Undeliverable Distributions and Unclaimed Property.</u>  If the Distribution to the Holder of any Allowed Other Claim is returned to the Trustees as undeliverable, no further Distribution shall be made to such Holder unless and until the Trustees are notified in writing of such Holder's then current address.  Undeliverable Distributions shall remain in the possession of the Trustees until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.  Such Unclaimed Distribution shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and all title to and beneficial interest in the Liquidating Trust Assets represented by any such undeliverable Distribution shall be cancelled and revert to and/or remain in the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any

**DRAFT**

applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary). In the event any check sent to a Holder of any Allowed Other Claim respecting a Distribution to such Holder has not been cashed within one hundred and twenty (120) days after the date of the respective Distribution, such check shall be cancelled, no replacement Distribution shall be made to such Holder, and the Claims of such Holder that may have been entitled to such Distribution shall be discharged and forever barred from receiving Distributions under this Agreement, the Plan and Confirmation Order. The uncashed Distributions shall be deemed unclaimed property within the meaning of section 347(b) of the Bankruptcy Code and shall become Liquidating Trust property and revert to the Liquidating Trust automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned or unclaimed property laws to the contrary).

ARTICLE VI

BENEFICIARIES

6.1    <u>Incidents of Ownership</u>. The Beneficiaries shall be the sole beneficiaries of the Liquidating Trust, and the Trustees shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized in this Agreement, the Plan and the Confirmation Order.

6.2    <u>Interest Beneficial Only</u>. Each Beneficiary shall take and hold its beneficial interest in the Liquidating Trust subject to all of the terms and provisions of this Agreement and the Plan. The ownership of a beneficial interest in the Liquidating Trust shall not entitle any Beneficiary or the Debtors to any title in or to the Liquidating Trust Assets or to any right to call for a partition or division of such assets or to require an accounting, except as specifically provided herein or in the Plan. A Beneficiary shall have no title or right to, or possession, management, or control of, the Liquidating Trust Assets and the interest of a Beneficiary in the Liquidating Trust is in all respects personal property, and the death, insolvency, or incapacity of an individual Beneficiary shall not terminate or affect the validity of this Agreement. No surviving spouse, heir, or devisee of any deceased Beneficiary shall have any right of dower, homestead, inheritance, partition, or any other right, statutory or otherwise, in the Liquidating Trust Assets, and their sole interest shall be the rights and benefits given to the Beneficiaries under this Agreement.

6.3    <u>Evidence of Beneficial Interest</u>. Ownership of a beneficial interest in the Liquidating Trust shall not be evidenced by any certificate, security or receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidating Trust by the Trustees and, with respect to the Allowed Second Lien Secured Note Claims, on the records held by DTC.

6.4    <u>Identification of Beneficiaries</u>. On or immediately prior to the Effective Date, the Debtors shall provide the Trustees with a true and correct copy of the claims register maintained in the Cases or other document setting forth the names, addresses, any tax identification numbers and Claim amounts, and noting whether any Claims are Disputed or Allowed as of such date, and if Allowed, the Allowed amount. For the avoidance of doubt, the Second Lien Secured Note Claims are Allowed. The Trustees shall use this register to create a register of Beneficiaries (the

**DRAFT**

"Beneficiary Register"), which shall be maintained by the Trustees and updated periodically, including as Disputed General Unsecured Claims become Allowed General Unsecured Claims. The beneficial interests in the Liquidating Trust held by the Holders of Allowed Second Lien Secured Note Claims shall be identified in the aggregate on the Beneficiary Register as the "Holders of Allowed Second Lien Secured Note Claims" and represented by an "escrow" CUSIP held at DTC. Any Distributions made by the Trustees on account of Second Lien Secured Note Claims shall be made solely to the DTC Account and shall not be made to individual holders of Second Lien Secured Note Claims. None of the Debtors, the Liquidating Trust, the Trustees and Members of the Oversight Committee shall incur any liability in connection with the determination of the interests of the Beneficiaries in the Liquidating Trust and the size of any Disputed Claims reserve, nor shall they incur any liability for any charging lien asserted by the Indenture Trustee. The Liquidating Trust and the Trustees shall have the absolute and unconditional right to rely on the information provided by the Debtors for purposes of notices and distributions under this Agreement and the Plan and neither the Liquidating Trust, the Trustees nor the Members of the Oversight Committee shall incur any liability by relying on the information it receives under this Section 6.4.

6.5     Transferability.  The beneficial interests in the Liquidating Trust held by the Holders of Allowed Second Lien Secured Note Claims, which are represented by an "escrow" CUSIP held at DTC, shall be freely tradeable and transferable and any such trade and transfer shall be reflected on the DTC's books and records. The beneficial interests in the Liquidating Trust held by the Holders of Allowed General Unsecured Claims shall not be transferable, except upon prior written consent of the Trustees.

6.6     Conflicting Claims. If any conflicting claims or demands are made or asserted with respect to a Claim of a Beneficiary, the Trustees shall be entitled, in their sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustees shall: (a) make no payment or Distribution with respect to the Claim represented by the claims or demands involved, or any part thereof, and (b) refer such conflicting claims and demands to the Court, which shall have exclusive jurisdiction over the resolution of such conflicting claims or demands. In so doing, the Trustees shall not be liable to any party for their refusal to comply with any such conflicting claims or demand. The Trustees shall be entitled to refuse to comply with conflicting claims and demands until either (a) the rights of the adverse claimants have become adjudicated by a Final Order of the Court or (b) the conflict has been resolved by a written agreement among such parties and the Trustees, which agreement shall include a complete release of the Liquidating Trust, the Trustees and the Oversight Committee with respect to the subject matter of the dispute.

ARTICLE VII

THIRD PARTY RIGHTS AND LIMITATION OF LIABILITY

7.1     Parties Dealing With the Trustees.  In the absence of actual knowledge to the contrary, any person dealing with the Liquidating Trust or the Trustees shall be entitled to rely on the authority of the Trustees or any of the Trustees' agents to act in connection with the Liquidating Trust Assets.  There is no obligation on any Person dealing with the Trustees to

**DRAFT**

inquire into the validity, expediency or propriety of any transaction by the Trustees or any agent of the Trustees.

7.2     Limited Recourse.   All Persons (including any professionals retained by the Trustees in accordance with this Agreement) engaged in transactions with the Liquidating Trust or the Trustees shall look only to the Liquidating Trust Assets (or to any insurance that may cover such claim) to satisfy any liability incurred in connection with carrying out the terms of this Agreement, the Plan or the Confirmation Order.

7.3     Limitation of Liability.   The Indemnified Parties (defined below) shall enjoy immunity from suit and shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Liquidating Trust Assets, the Reserves, the acts associated with carrying out the terms of this Agreement, the Plan or the Confirmation Order or the affairs of the Liquidating Trust, except for their own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty.  Without limiting the generality of the foregoing, the Trustees and/or Oversight Committee Members shall have no liability to any Beneficiary or Holder of an Other Claim on account of the Trustees' investment or non-investment of any Litigation Trust Assets or any losses with respect to any such investments of Litigation Trust Assets, provided such investments are made, or the Trustees' decision not to invest any Litigation Trust Assets in any case is made, in accordance with the terms of this Litigation Trust Agreement.

7.4     Non-Liability for Acts of Others.   Except as expressly provided in this Agreement, the Plan or the Confirmation Order, neither the Liquidating Trust nor the Trustees shall assume any of the liabilities, obligations or duties of the Debtors or the Beneficiaries.  The Trustees may accept and rely upon any accounting made by or on behalf of the Debtors and any statement or representation made by the Debtors or their agents and professionals as to the assets comprising the Liquidating Trust Assets or the Reserves or as to any other fact bearing upon the creation of the Liquidating Trust, so long as the Trustees have a good faith basis to do so.  Any successor Trustees may accept and rely upon any accounting made by or on behalf of any predecessor Trustees hereunder, and any statement or representation made by a predecessor Trustees or their agents as to the assets comprising the Liquidating Trust Assets, the Reserves or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as the successor Trustees have a good faith basis to do so.  The Trustees shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue.  The Trustees or successor Trustees shall not be liable for any act or omission of any predecessor Trustees, nor have a duty to enforce any claims against any predecessor Trustees on account of any such act or omission.  The Trustees or the Members of the Oversight Committee may, in connection with the performance of their functions, and in their sole and absolute discretion, consult with their attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in good faith reliance upon the advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the Trustees nor the Members of the Oversight Committee shall be under any obligation to consult with attorneys, accountants, financial advisors or agents, and their determination not to do so shall not result in the imposition of liability on the Trustees or the

**DRAFT**

Members and/or their designees, unless such determination is based on its own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty. For the avoidance of doubt, the Trustees have no obligation, and shall not be deemed to have any obligation, to administer, operate, wind-down, or otherwise exercise any control over or responsibilities for, any Employee Benefit Programs or Employee Benefit Plans. Nor shall any Trustee or the Liquidating Trust be, or be deemed to be, a fiduciary, sponsor or successor of any such Employee Benefit Programs or Employee Benefit Plans.

      7.5    <u>Indemnification, Exculpation and Reimbursement</u>. The Trustees, the Oversight Committee and its Members, and each of their current equity holders, including shareholders, partnership interest holders and limited liability company unit holders, Affiliates, partners, firms, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, together with their respective predecessors, successors and assigns (in each case, solely in their capacity as such) (collectively, the "Indemnified Parties") shall be indemnified and held harmless by the Liquidating Trust, to the fullest extent permitted by law, solely from the Liquidating Trust Assets and/or any applicable insurance coverage and the proceeds thereof, for any losses, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in connection with any action, suit, proceeding or investigation brought or threatened against one or more of the Indemnified Parties on account of the acts or omissions of an Indemnified Party solely in its capacity as such; provided, however, that the Liquidating Trust shall not be liable to indemnify any Indemnified Party for any act or omission constituting gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty by such Indemnified Party. Notwithstanding any provision in this Agreement to the contrary, the Indemnified Parties shall be entitled to request advances from the Liquidating Trust to cover reasonable fees and necessary expenses incurred in connection with defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such; provided, however, that the Trustees shall not be required to make any such advances; provided further, however, that any Indemnified Parties receiving such advances shall repay the amounts so advanced to the Liquidating Trust upon the entry of a Final Order of a court of competent jurisdiction finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this <u>Section 7.5</u>. This indemnification shall survive the death, dissolution, resignation or removal, as may be applicable, of the Indemnified Parties, or the termination of the Liquidating Trust, and shall inure to the benefit of the Indemnified Parties' heirs and assigns.

      7.6    <u>Reliance by the Trustees</u>. The Trustees may absolutely and unconditionally rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the Trustees in good faith to be genuine and to have been signed or presented by an authorized party or parties. The Trustees may consult with legal counsel, financial or accounting advisors, and other professionals to be selected by the Trustees and may rely, in good-faith, on the advice thereof, and shall not be liable for any action taken or omitted to be taken in accordance with the advice thereof.

**DRAFT**

7.7    <u>Confirmation of Survival of Provisions.</u>  Without limitation in any way of any provision of this Agreement, the provisions of this <u>Article VII</u> shall survive the death, dissolution, liquidation, resignation, replacement, or removal, as may be applicable, of the Trustees or Members of the Oversight Committee, or the termination of the Liquidating Trust or this Agreement, and shall inure to the benefit of the Trustees' and the Members' respective heirs, successors, and assigns.

ARTICLE VIII

SELECTION, REMOVAL AND COMPENSATION OF TRUSTEE

8.1    <u>Initial Trustees.</u>  The initial Trustees shall be the : (i) Halperin Trustee; and (ii) Davis Trustee, who shall serve as co-Trustees of the Liquidating Trust with equal power and authority concerning the administration and oversight of the Liquidating Trust and all powers set forth in the Plan and this Agreement.

8.2    <u>Term of Service.</u>  The Trustees shall serve as of the Effective Date until: (a) the completion of all of the Trustees' duties, responsibilities and obligations under this Agreement and the Plan; (b) termination of the Liquidating Trust in accordance with this Agreement, or (c) the respective Trustee's death or dissolution, incapacitation, resignation or removal.

8.3    <u>Removal of a Trustee.</u>  Either or both Trustees may be removed with or without cause, at any time by the Oversight Committee in accordance with <u>Sections 8.5 and 11.4</u> hereof, (i) upon not less than sixty (60) days' prior written notice to the affected Trustee if removed without cause, or (ii) immediately or as determined by the Oversight Committee if removed with cause.  If one of the Trustees is removed pursuant to this <u>Section 8.3</u>, the remaining Trustee shall continue to serve as the sole Trustee.  If the sole Trustee is removed pursuant to this <u>Section 8.3</u>, (a) the Oversight Committee shall appoint a successor Trustee to replace the last removed Trustee as soon as reasonably practicable, or (b) and if a successor Trustee is not appointed or does not accept his or her appointment pursuant to this <u>Section 8.3</u> within thirty (30) days from the date of the removal notice served upon such last removed Trustee, any Beneficiary may petition the Court for the appointment of a successor Trustee to replace such last removed Trustee.  For notice purposes only and not for approval, the Oversight Committee shall file with the Court a notice appointing such successor Trustee.  In the event of a removal, the Trustee(s) shall render to the Oversight Committee prior to the date of such Trustee's removal or as soon as reasonably practicable thereafter a full and complete accounting of monies and assets received, disbursed and held during the term of office of the removed Trustee. In the event of the removal of a Trustee, such Trustee shall be entitled to payment of all compensation earned by such Trustee through and including the effective date of such removal.

8.4    <u>Resignation of a Trustee.</u>  Either or both Trustees may resign by giving not less than sixty (60) days' prior written notice thereof to the Oversight Committee.  If one of the Trustees resigns pursuant to this <u>Section 8.4</u>, the remaining Trustee shall continue to serve as the sole Trustee.  If the sole Trustee resigns pursuant to this <u>Section 8.4</u>, the Oversight Committee shall appoint a successor Trustee to replace the last resigned Trustee as soon as reasonably

**DRAFT**

practicable.  Resignation shall become effective on the later to occur of: (a) the day specified in such notice, (b) the appointment of a successor Trustee by the Oversight Committee and the acceptance by such successor of such appointment, or (c) the date the accounting described in the last sentence of this section is delivered.   If the sole Trustee resigns pursuant to this Section 8.4 (a) the Oversight Committee shall appoint a successor Trustee to replace the last resigned Trustee as soon as reasonably practicable, or (b) and if a successor Trustee is not appointed or does not accept his or her appointment within thirty (30) days following delivery of notice of resignation, any Beneficiary may petition the Court for the appointment of a successor Trustee to replace such last resigned Trustee.  For notice purposes only and not for approval, the Oversight Committee shall file with the Court a notice appointing such successor Trustee.  In the event of a resignation, the Trustee(s) shall render to the Oversight Committee prior to the date of such Trustee's resignation or as soon as reasonably practicable thereafter a full and complete accounting of monies and assets received, disbursed and held during the term of office of that resigned Trustee. In the event of a resignation of the Trustee, the resigning Trustee shall be entitled to payment of all compensation earned by such Trustee through and including the effective date of such resignation.

    8.5    Appointment of a Successor Trustee.  Upon the resignation, death, incapacity or removal of a Trustee, the Oversight Committee shall promptly appoint a successor Trustee in accordance with Section 11.4 to fill the vacancy so created.  Any successor Trustee so appointed shall consent to and accept in writing the terms of this Agreement and agree that the provisions of this Agreement shall be binding upon and inure to the benefit of the successor Trustee. Notwithstanding anything in this Agreement to the contrary, in the event that a successor Trustee is not appointed within thirty (30) days of the occurrence or effectiveness, as applicable, of the prior Trustee's resignation, death, incapacity or removal, any Beneficiary shall be authorized to move the Court for the appointment of a successor Trustee.

    8.6    Powers and Duties of a Successor Trustee.  A successor Trustee shall have all the rights, privileges, powers and duties of the predecessor Trustee being replaced under this Agreement and the Plan.

    8.7    Liquidating Trust Continuance.  The death, incapacity, resignation or removal of a Trustee shall not terminate the Liquidating Trust or revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by a Trustee.

    8.8    Compensation and Costs of Administration.  The terms of the compensation of the Trustees are set forth on Exhibit C hereto.   Payment of the Trustees' non-deferred compensation and documented reasonable out of pocket expenses shall be payable automatically at the beginning of each month from the Liquidating Trust Assets. Solely with respect to the Trustees' deferred compensation, the Trustees shall deliver their invoices to the Oversight Committee before payment from the Liquidating Trust Assets shall be allowed. The Trustees may retain and compensate professionals (including such Trustees' respective firms or affiliates) as provided for in Section 3.3 of this Agreement.   The reasonable and documented fees and actual, necessary and documented expenses of such professionals shall be paid by the Trustees upon each monthly submission of a fee statement to the Trustees in accordance with the procedures described in this Section.  Any professionals retained by the Trustees pursuant to this

**DRAFT**

Agreement shall deliver their invoices or fee statements to the Trustees for approval before payment from the Liquidating Trust Assets shall be allowed.  Any Members of the Oversight Committee shall deliver their invoices for any fees and expenses, in each case solely to the extent permitted by Section 11.7 hereof, to the Trustees for approval before payment from the Liquidating Trust Assets shall be allowed.[1]  In each instance, the Trustees and Oversight Committee, as applicable, shall have ten (10) days from the delivery of any invoice or fee statement to submit an objection thereto.  In the event no objections are timely raised, the Trustees may pay the fees and expenses, or that portion of the fees and expenses that are not subject to an objection. For an objection to be valid, it shall (i) be in writing, (ii) set forth in detail the specific fees objected to and the basis for the objection, and (iii) be delivered within the ten (10) day period to the party whose invoice is subject to the objection, along with a copy to the Trustees and the Oversight Committee Members. Any objection that remains unresolved fifteen (15) days after it is made may be submitted to the Court for resolution.  The Trustees may pay their respective compensation and the Liquidating Trust Operating Expenses before approving or making any Distributions to Beneficiaries.

8.9     No Bond. The Trustees shall not be required to post any bond or surety or other security for the performance of their duties unless otherwise ordered by the Court and, in the event the Trustees are so otherwise ordered, all reasonable costs and expenses of procuring any such bond or surety shall be borne by the Liquidating Trust and paid for from the Liquidating Trust Assets.

8.10     Reporting and Filing Requirements.  On an annual basis, within sixty (60) days of the close of each calendar year, the Trustees shall deliver to the Oversight Committee a report of the Liquidating Trust's activity, including: (i) all Liquidating Trust Assets transferred to and accepted by the Liquidating Trust during the preceding calendar year, including whether such assets continue to be held and the date of any disposal thereof, (ii) a summary of all Distributions made to the Beneficiaries during the preceding calendar year, (iii) a summary of all pending Litigation Claims, and (iv) financial statements, including all fees, income and expenses related to the Liquidating Trust during the preceding calendar year.  The Trustees shall also timely prepare, file and distribute such additional statements, reports and submissions as may be necessary to cause the Liquidating Trust and the Trustees to be in compliance with applicable law.

8.11     Allocation of Trustee Responsibilities.  Notwithstanding Section 8.1, the Halperin Trustee shall have primary decision making authority regarding all matters concerning the receipt, maintenance, investment and Distributions concerning the GUC Cash Pool, as well as the general administration of the Liquidating Trust, subject to the review and approval of the Oversight Committee.  For all decisions concerning the planning, strategy, commencement, settlement, or otherwise affecting any litigation that the Liquidating Trust may commence or defend against (including but not limited to Litigation Claims) the Trustee Halperin and the Trustee Davis shall have co-decision making authority, subject to the review and approval of the Oversight Committee.

---

[1] For the avoidance of doubt, a Member of the Oversight Committee shall not be entitled to reimbursement of fees or expenses incurred by professionals retained by such Member.

**DRAFT**

## ARTICLE IX

## LIQUIDATING TRUST TAX OBLIGATIONS

9.1     The Trustees shall file tax returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulation § 1.671-4(a) and any other applicable laws or regulations.

9.2     On an annual basis, the Trustees shall send to each Beneficiary a statement setting forth the Beneficiary's share of items of income, gain, loss, deduction or credit and will instruct all such Holders to report such items on their federal income tax returns.  Such a statement also shall be sent to each Beneficiary after the dissolution of the Liquidating Trust.  The Liquidating Trust's taxable income, gain, loss, deduction or credit will be allocated (subject to provisions of the Plan and Confirmation Order relating to Disputed Claims) to the Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust, as determined pursuant to this Agreement.  For purposes of allocation of the Liquidating Trust's net taxable income, the Pension Benefit Guaranty Corporation shall be allocated the first $350,000 of any such net taxable income as a priority allocation.

9.3     As soon as practicable after the Effective Date, the Trustees (to the extent that they deem it necessary or appropriate in the reasonable exercise of their discretion) shall, in good faith, value the Liquidating Trust Assets, and shall apprise the Beneficiaries of such valuation.  The valuation shall be used consistently by all parties (including the Debtors, the Trustees and the Beneficiaries) for all federal income tax purposes.  The Court shall resolve any dispute regarding the valuation of the Liquidating Trust Assets.

## ARTICLE X

## MAINTENANCE OF RECORDS

10.1     Books and Records.  The Trustees shall maintain books and records relating to the Claims of the Beneficiaries, the Liquidating Trust Assets, the income of the Liquidating Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof. Said books and records shall be open to reasonable inspection by any Beneficiary upon written request to the Trustees.  The Trustees shall furnish to any Beneficiary upon written request an annual statement of receipts and disbursements, including a summary of all income and expenses of the Liquidating Trust.

10.2     Notice of Intent to Destroy.  Should the Trustees determine that the retention of certain of the Debtors' books and records is no longer necessary or beneficial to the Liquidating Trust, the Trustees shall File no less than 30 days' written notice of its intent to destroy or abandon such books and records in the Cases.  To the extent a final decree has been entered in the Chapter 11 Cases and the Chapter 11 Cases are closed, the Trustees may alternatively provide 30 days' written notice of such intent to [____].

10.3    Confidentiality. The Trustees shall hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any of the Liquidating Trust Assets or of which the Trustees become aware in their capacity as such; provided, however, that this Section 10.2 shall not apply to information provided in compliance with an Order of the Bankruptcy Court.

ARTICLE XI

LIQUIDATING TRUST OVERSIGHT COMMITTEE

11.1    Oversight Committee. As of the Effective Date, the initial members of the Oversight Committee (each, a "Member" and, together, the "Members") shall be comprised of: (i) up to two members of the Creditors' Committee that shall agree to serve on the Oversight Committee (the "UCC Members"); and (ii) up to three representatives selected by the Ad Hoc Group of Second Lien Noteholders that shall agree to serve on the Oversight Committee (the "2L Members"). The UCC Members shall hold two (2) votes in the aggregate, and the 2L Members shall hold three (3) votes in the aggregate. The initial Members and votes of the Members shall be as set forth in the table below:

| Member Type | Member Name | Number of Votes |
|---|---|---|
| UCC Member | Pace Industry Union-Management Pension Fund | 1 |
| UCC Member | Pension Benefit Guaranty Corporation, | 1 |
| 2L Member | Barings LLC | 1 |
| 2L Member | Cross Sound Management LLC | 2 |

The 2L Members may reallocate their votes among the 2L Members at any time or from time to time, provided, that the 2L Members shall notify the Trustees and the Oversight Committee of any such reallocation by email as soon as reasonably practicable. Should any of the Members resign from or otherwise cease to serve on the Oversight Committee, replacements, if any, may be selected in accordance with Section 11.8. In all circumstances, the Oversight Committee and its Members shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Liquidating Trust. The Oversight Committee shall not take any action which will cause the Liquidating Trust to fail to qualify as a "liquidating trust" for U.S. federal income tax purposes.

11.2    Oversight Committee Approval. Except as otherwise expressly provided herein, the following shall constitute an act or decision of the Oversight Committee:

A.    Meeting Vote: A majority affirmative vote of the Members present at a meeting at which a quorum is present shall be the act of the Oversight Committee (a "Meeting Vote"). Members holding a majority of the voting power of all Members then sitting on the Oversight Committee shall constitute a quorum for the transaction of

business at any meeting of the Oversight Committee. Any or all of the Members may participate in a regular or special meeting by, or conduct the meeting through the use of, telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangement (rather than or in addition to the place) for holding thereof. Any Member participating by this means is deemed to be present in person at the meeting.

      B.    <u>Unanimous Written Consent</u>: Any actions required or permitted to be taken by the Oversight Committee at a meeting may be taken without a meeting if the action is taken by unanimous written consent (a "<u>UWC</u>", and together with the Meeting Vote, "<u>Affirmative Consent</u>"), as evidenced by one or more written consents describing the action taken and signed by the Members.

      C.    <u>Email Consent</u>: Solely to the extent permitted in <u>Section 11.5</u>, the Trustees may make recommendations for the action or inaction of the Oversight Committee via email on four (4) business days' notice (the "<u>Voting Period</u>"), and in the absence of Members who hold a majority of the voting power of all Members rejecting the recommendation within the Voting Period, the recommendation shall be deemed to have been approved by a majority vote of the Members ("<u>Email Consent</u>"). For the avoidance of doubt, Email Consent is not Affirmative Consent.

    11.3    <u>Reports to the Oversight Committee</u>. Notwithstanding any other provision of this Agreement, the Trustees shall report to the Oversight Committee as may be requested by the Oversight Committee, but not less than quarterly, and such reports shall include any material updates and any such other matters and information as reasonably requested by the Oversight Committee. The Oversight Committee shall keep all such information strictly confidential, except to the extent the Oversight Committee deems it reasonably necessary to disclose such information to the Court [(in which case, a good faith effort shall be made to file such information under seal)].

    11.4    <u>Actions Requiring Approval by Affirmative Vote of the Oversight Committee</u>. Notwithstanding anything to the contrary herein, the Trustees shall obtain the approval of the Oversight Committee prior to taking any of the following actions, which approval must be by Affirmative Consent:

      A.    The commencement or settlement of any Litigation Claims against any third parties, other than Claim objections;

      B.    The selection of Liquidating Trust professionals with respect to the prosecution of Litigation Claims and the terms of the engagement thereof;

      C.    The timing for payment of any deferred compensation to the Trustees;

      D.    The removal of any Trustee, the appointment of any successor Trustee, and the appointment of any successor Member of the Oversight Committee;

**DRAFT**

    E.      The modification or amendment of this Liquidating Trust Agreement in accordance with Section 13.8; and

    F.      The decision to cause the Liquidating Trust to abandon or otherwise dispose of such property, including by donation of such remaining funds to a charitable institution qualified as a not-for-profit corporation, in accordance with Section 3.12.

    11.5   Actions Subject to Approval by Affirmative Vote or Email Consent of the Oversight Committee. Notwithstanding anything to the contrary herein, the Trustees shall obtain the approval of the Oversight Committee prior to taking any of the following actions, which approval may be made by Affirmative Consent or Email Consent:

    A.      The settlement, compromise, withdrawal, dismissal or other resolution of any Claims or Objections to Claims where the settlement, compromise, withdrawal, dismissal or other resolution amount exceeds $250,000;

    B.      The sale, transfer, abandonment, assignment or other disposition of any Liquidating Trust Assets having a valuation in excess of $50,000;

    C.      The borrowing of any funds by the Liquidating Trust or pledge of any portion of the Liquidating Trust Assets and the terms of any such arrangements;

    D.      The amount and timing of Distributions to Beneficiaries from Liquidating Trust Assets or the proceeds of Liquidating Trust Assets (other than Distributions to Holders of Allowed General Unsecured Claims from the GUC Cash Pool); and

    E.      The investment of the Liquidating Trust Assets in Permitted Investments other than those described in section 345 of the Bankruptcy Code.

    11.6   Conflicts. To the extent one of the Trustees cannot take any action, including, without limitation, the prosecution of any Litigation Claims or the objection to any Claim, by reason of an actual or potential conflict of interest, the remaining Trustee, if any, shall be authorized to take any such action(s) in his place and stead.  To the extent both of the Trustees (or the sole Trustee, if applicable) cannot take any action, including, without limitation, the prosecution of any Litigation Claims or the objection to any Claim, by reason of an actual or potential conflict of interest, the  Oversight Committee acting by a majority of voting power shall be authorized to take any such action(s) in his place and stead, including without limitation, the retention of professionals (which may include professionals retained by the Trustees) for such purpose of taking such actions.

    11.7   Compensation of the Oversight Committee. The Members shall be entitled to (i) compensation as set forth in Section 3.13 of this Agreement to the extent such compensation is approved by the Court; and (ii) reimbursement of all reasonable out-of-pocket expenses incurred in such Members' duty on behalf of the Oversight Committee, in each case payable in accordance with Section 8.8 of this Agreement; provided, that such Members shall not be reimbursed for the fees, costs or expenses of separate counsel, but such Members may consult with the Liquidating Trustees' counsel and any other of the Liquidating Trustees' professionals at no cost to the individual Members.

**DRAFT**

11.8    <u>Tenure and Replacement of the Members</u>.  The authority of the Members will be effective as of the Effective Date and will remain and continue in full force and effect until the Liquidating Trust is dissolved in accordance with the terms of this Agreement.  The service of the Members will be subject to the following terms and conditions:

A.    The Members will serve until death, incapacitation or resignation.

B.    A Member may resign at any time by providing a written notice of resignation to the Trustees and remaining members of the Oversight Committee.    Such resignation will be effective on the earlier of: (a) when a successor is appointed as provided herein; (b) at a time mutually agreed to by the Trustees and the Oversight Committee; and (c) thirty (30) days after the date of the notice of resignation, and as such time, the resigning member shall have no further liability or responsibility with respect thereto.

C.    Upon the resignation, death, or incapacity of a Member, the successor UCC Member shall be appointed by the remaining UCC Member, and the successor 2L Member shall be appointed by the remaining 2L Members.

D.    Immediately upon appointment of a successor Member, all rights, powers, duties, authority, and privileges of the predecessor Member hereunder shall be vested in, and be undertaken by, the successor Member without any further act, and the successor Member shall not be liable for any act or omission of the predecessor Member.

11.9    <u>Recusal</u>.    A Member shall be recused from the Oversight Committee's deliberations and votes on any matters as to which such Member has a conflicting interest.  If a Member does not voluntarily recuse itself from any such matter, that Member may be recused from such matter by the unanimous vote of the remaining Members that are not recused from the matter.  In such event, (a) a unanimous affirmative vote of the non-recused Members shall be required to constitute an act of the Oversight Committee, and (b) the recused Member may challenge such vote, and the vote which resulted in the involuntary recusal of the Member, and the Court shall have jurisdiction to adjudicate such matter.

11.10    <u>Proxies</u>.    With respect to any act or decision taken by Meeting Vote, UWC, or Email Consent, any Member of the Oversight Committee may vote for itself or by proxy.  Any Member of the Oversight Committee may appoint a proxy in writing and such appointment shall be transmitted to the proxyholder and the Trustees by email at any time.  The appointment of a proxy shall be effective for the period expressly specified in the appointment form.

11.11    <u>Limitation of Liability</u>.  Neither the Oversight Committee nor any of its Members shall be liable for the act, omission, default or misconduct of any other Member of the Oversight Committee, nor shall any Member be liable for anything other than such Member's own gross negligence, willful misconduct, fraud, bad faith, self-dealing or breach of the duty of loyalty. The Oversight Committee may, in connection with the performance of its duties, and in its sole and absolute discretion, consult with the Liquidating Trustee's counsel and any other of the Liquidating Trustee's professionals, and the Oversight Committee shall not be liable for anything done or omitted in accordance with the advice or opinions of such professionals. If the Oversight Committee determines not to consult with counsel, accountants or other professionals, such

**DRAFT**

failure to consult shall not be deemed to impose any liability on the Oversight Committee or its Members.

<h2 style="text-align:center">ARTICLE XII</h2>

<h3 style="text-align:center">DURATION OF LIQUIDATING TRUST</h3>

12.1   <u>Duration</u>.  The Liquidating Trust shall become effective upon the Effective Date of the Plan, and the Liquidating Trust and its provisions herein shall remain and continue in full force and effect until the Liquidating Trust is terminated.

12.2   <u>Termination</u>.  The Trustees and the Oversight Committee shall be discharged and the Liquidating Trust shall be terminated, at such time as: (i) all Disputed Claims have been resolved; (ii) all of the Litigation Claims have been prosecuted to completion and the Liquidating Trust Assets have been collected and liquidated; (iii) all duties and obligations of the Trustees under this Agreement have been fulfilled; (iv) all Distributions required to be made by the Liquidating Trust under the Plan and this Agreement have been made; and (v) the Cases have been closed; provided, however, that in no event shall the Liquidating Trust be dissolved later than five (5) years from the Effective Date unless the Court, upon motion within the six-month period prior to the fifth anniversary (or the end of any extension period approved by the Court), determines that a fixed period extension (not to exceed one (1) year, together with any prior extensions, unless the Liquidating Trust has procured a favorable letter ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  After the termination of the Liquidating Trust, the Trustees shall retain for a period of twelve (12) months the books, records, Beneficiary lists and certificates and other documents and files which shall have been delivered to or created by the Trustees.  At the Trustees' discretion, all of such records and documents may, but need not, be destroyed at any time after twelve (12) months from the termination of the Liquidating Trust.  Except as otherwise set forth in this Section 12.2, upon termination of the Liquidating Trust, the Trustees shall have no further duties or obligations hereunder.

<h2 style="text-align:center">ARTICLE XIII</h2>

<h3 style="text-align:center">MISCELLANEOUS</h3>

13.1   <u>Jurisdiction</u>.  The Court shall have exclusive jurisdiction over (a) the Liquidating Trust and the Trustees, with respect to the administration of and activities relating to the Liquidating Trust, and (b) any issues or disputes arising out of this Agreement or the administration of and activities relating to the Liquidating Trust; provided, however, that notwithstanding the foregoing, the Trustees shall have the power and authority to bring any action in any court of competent jurisdiction to prosecute the Litigation Claims.

13.2   <u>Notices</u>.  All notices to be given to the Holders of Claims and the Beneficiaries may be given by ordinary mail at the addresses appearing on the books kept by Trustees.  Any

**DRAFT**

notice or other communication which may be or is required to be given, served or sent to the Trustees shall be in writing and shall be sent by registered or certified United States mail, return receipt requested, postage prepaid, or transmitted by hand delivery or facsimile (if receipt is confirmed) addressed as follows:

If to the Trust/Trustees:

Alan D. Halperin.
Halperin Battaglia Benzija, LLP
40 Wall Street, 37th Floor
New York, New York 10005
Email: ahalperin@halperinlaw.net

and

Eugene I. Davis
PIRINATE Consulting Group, LLC
5 Canoe Brook Drive
Livingston, New Jersey 07039
Email: genedavis@pirinateconsulting.com

If to the Oversight Committee:

Charles Knight
Pace Industry Union-Management Pension Fund
Tel:  615.315.0292
Email:  CKnight@uswbenefitfunds.com

Thomas Taylor
Pension Benefit Guaranty Corporation
Tel: 202.326.4020 Ext. 3303
Email:  taylor.thomas@pbgc.gov

Barings LLC
Attn: Bryan High
Email: Bryan.High@barings.com

Cross Sound Management LLC
Attn: David Dunn
Email: Dunn@cross-sound.com

or to such other address as may from time to time be provided in written notice by the Trustees or the Oversight Committee.

13.3    Governing Law.  This Agreement is made in the State of Delaware, and the Liquidating Trust and this Agreement, and the rights and obligations of the Trustees and the

EAST\158265739.3 -29-

NY 77263700

**DRAFT**

Oversight Committee are to be governed by and construed and administered according to the laws of the State of Delaware without regard to such state's principles of conflicts of law, provided, however, that, except as expressly provided in this Agreement, there shall not be applicable to the Liquidating Trust, the Trustees, the Oversight Committee or its Members, or this Agreement (a) the provisions of Section 3540 of Title 12 of the Delaware Code, or (b) any provisions of the laws (statutory or common) of the State of Delaware pertaining to trusts which relate to or regulate: (i) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (ii) affirmative requirements to post bonds for trustees, officers, agents or employees of a trust, (iii) the necessity for obtaining court or other governmental approval concerning the acquisition, holding or disposition of real or personal property, (iv) fees or other sums payable to trustees, officers, agents or employees of a trust, (v) the allocation of receipts and expenditures to income or principal, (vi) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage or other manner of holding of trust assets, or (vii) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees, which are inconsistent with the limitations or liabilities or authorities and powers of the Trustees set forth or referenced in this Agreement.

13.4    <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and their respective successors and assigns.

13.5    <u>No Execution</u>.  All funds in the Liquidating Trust and the Reserves shall be deemed *in custodia legis* until such times as the funds have actually been paid to or for the benefit of a Beneficiary or a Holder of the Other Claims, or as otherwise permitted by this Agreement, as applicable, and no Beneficiary or any other Person can bind, pledge, encumber, execute upon, garnish or attach the Liquidating Trust Assets or the Reserves in any manner or compel payment from the Liquidating Trust or the Trustees except by Final Order of the Court. All payments and Distributions will be governed solely by the Plan and this Agreement.

13.6    <u>Plan and Confirmation Order</u>.  To the extent that the terms of this Agreement are inconsistent with the terms set forth in the Plan, then the terms of the Plan shall govern and control.  To the extent that the terms of this Agreement are inconsistent with the terms set forth in the Confirmation Order, then the terms of the Confirmation Order shall govern and control.

13.7    <u>Intention of Parties to Establish Grantor Trust</u>.  This Agreement is intended to create a grantor trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a grantor trust, and any ambiguity herein shall be construed consistent herewith, and if necessary, this Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

13.8    <u>Amendment</u>.  The Trustees may, with the approval of Members who hold a majority of the voting power of all Members of the Oversight Committee, modify, supplement or amend this Agreement, but only to clarify any ambiguity or inconsistency, or render the Agreement in compliance with its stated tax purposes, and only if such amendment (a) does not materially and adversely affect the interests, rights, treatment or Distributions of any Beneficiaries, and (b) is not inconsistent with the Plan or the Confirmation Order.  In the event

**DRAFT**

that the Oversight Committee is unable to reach a majority vote regarding a proposed modification, supplement or amendment, the Trustees may seek Court approval of any such modification, supplement or amendment.

13.9    Severability.  If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

13.10    Integration.  This Agreement, the Plan and the Confirmation Order constitute the entire agreement with, by and among the parties thereto, and there are no representations, warranties, covenants or obligations except as set forth herein, in the Plan and in the Confirmation Order.  This Agreement, together with the Plan and the Confirmation Order, supersede all prior and contemporaneous agreements, understandings, negotiations and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.

13.11    Third Party Beneficiary.  This Liquidating Trust Agreement shall be binding upon and inure to the benefit of each of the parties hereto and, additionally, shall inure to the benefit of the Oversight Committee and its successors and assigns and the Beneficiaries and each of their respective successors and assigns and, except as provided hereunder, nothing herein is intended or shall be construed to give any other Person any right, remedy or claim under, to or in respect of this Liquidating Trust Agreement, the Liquidating Trust Assets or the Liquidating Trust or any part thereof.

13.12    Counterparts.   This Agreement may be signed by the parties hereto in counterparts, which, when taken together, shall constitute one and the same document.

13.13    Actions Taken on Other Than Business Day.  In the event that any payment or act hereunder is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

[Remainder of page intentionally blank]

IN WITNESS WHEREOF, the parties have executed this Agreement (or are deemed to have so executed this Agreement) as of the day and year first written above.

**Debtors:**

**OLDAPCO, INC.**

By: /s/ *DRAFT*
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

**OLDAPCO PDC CORP.**

By: /s/ *DRAFT*
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

**OLDAPCO PDC CAP CORP.**

By: /s/ *DRAFT*
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

**OLDAPCO ARFI LLC**

By: /s/ *DRAFT*
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer

*Signature Page of the Liquidating Trust Agreement*

**DRAFT**

## OLDAPCO APVN LLC

By: /s/ *DRAFT*_____
    Name:  Alan D. Holtz
    Title:  Chief Restructuring Officer


### Co-Trustees:


By: /s/ *DRAFT*_____
    Name:  Alan D. Halperin
    Title:  Co-Trustee to the Liquidating
    Trust


By: /s/ *DRAFT*_____
    Name:  Eugene I. Davis
    Title:  Co-Trustee to the Liquidating
    Trust

**08/13/2018 DRAFT**

<u>EXHIBIT A</u>


<u>Plan</u>

EAST\158265739.3

NY 77263700

**DRAFT**

EXHIBIT B


Confirmation Order

**DRAFT**

## EXHIBIT C

### Trustees' Compensation

The Trustees shall be compensated at an aggregate monthly rate of $20,000 for the duration of the Liquidating Trust, with $10,000 per month in compensation to Trustee Halperin and $10,000 per month in compensation to Trustee Davis.

Of the $20,000 per month in compensation, only $10,000 per month shall be immediately payable on a monthly basis to the Trustees from the Liquidating Trust Assets (each Trustee receiving $5,000 per month). The balance of the monthly compensation owed to each Trustee shall accrue on a monthly basis and shall be payable only to the extent that there are sufficient funds available from Litigation Proceeds to pay the accrued compensation.

The Trustees shall be entitled to additional compensation as set forth in Section 3.13 to the extent such additional compensation is approved by the Court.

## SCHEDULE 2:

### Identity of the Liquidating Trustee

## Identification of the Liquidating Trustee

The Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders, in consultation with the Debtors, have selected and appointed Eugene Davis and Alan Halperin as co-trustees to serve as the Liquidating Trustee.

**SCHEDULE 3:**

**Warrant Agreement**

EAST\158243192.2

Execution Version

## WARRANT AGREEMENT

THIS WARRANT AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), dated as of June 13, 2018, is by and among Appvion Holding Corp., a Delaware corporation (the "Company"), and Computershare Inc., a Delaware corporation ("Computershare"), and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent").

## RECITALS

WHEREAS, Appvion, Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and commenced reorganization cases thereunder (the "Chapter 11 Cases") on October 1, 2017 in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under Case No. 17-12082 (KJC);

WHEREAS, on March 12, 2018, the Bankruptcy Court entered an order approving bidding procedures for a sale of substantially all of the Debtors' assets, including among other things, a process for submitting qualified bids and scheduling an auction and a hearing to approve the sale of the Debtors' assets to the successful bidder [Docket No. 565];

WHEREAS, on April 30, 2018, the Debtors filed the *Notice of Cancellation of Auction and Designation of Stalking Horse Bidder as the Successful Bidder* [Docket No. 709];

WHEREAS, on May 14, 2018, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to the Company [Docket No. 751];

WHEREAS, on May 9, 2018, the Company, the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of Second Lien Noteholders (as defined below) and Franklin Advisers, Inc. as investment manager on behalf of certain funds and accounts entered into a Settlement Agreement (the "Settlement Agreement") to resolve any and all disputes and issues existing among the parties thereto with respect to the Chapter 11 Cases, including without limitation, all disputes and issues regarding the proposed sale of substantially all of the Debtors' assets to the Company, the ultimate distribution of the proceeds of the proposed sale, and the distribution of proceeds of any other property of the Debtors' estates, which Settlement Agreement was approved by the Bankruptcy Court on May 14, 2018 [Docket No. 753];

WHEREAS, certain of the terms and conditions of the Settlement Agreement have been incorporated into the *Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation*, dated as of May 23, 2018 (as may be amended, supplemented or otherwise modified from time to time, the "Plan") [Docket No. 792];

WHEREAS, pursuant to the terms of the Settlement Agreement, on the date hereof, the Company will issue and deliver warrants to purchase shares of common stock, par value $0.01 per share, of the Company ("Common Stock") representing an aggregate total of 5.0% of the issued and outstanding shares of Common Stock as of the date hereof on a fully-diluted basis after giving

effect to the exercise in full of all of the Warrants (as defined below) ("Diluted Outstanding Common Stock") to the Debtors to hold in trust for the benefit of the Second Lien Noteholders (as defined below);

WHEREAS, on the effective date of the Plan (the "Effective Date") the Debtors will distribute the Warrants under the Plan to the Second Lien Noteholders in exchange for the Allowed Second Lien Secured Note Claims (as defined below) pursuant to section 1145 of the Bankruptcy Code;

WHEREAS, the Warrants will be issued in two tranches: (a) Tranche A warrants to purchase shares of Common Stock representing, in the aggregate, 2.5% of the Diluted Outstanding Common Stock (the "Tranche A Warrants") at an exercise price of $27.17 per share (subject to adjustment from time to time as provided in Article V) (the "Tranche A Exercise Price"), and (b) Tranche B warrants to purchase shares of Common Stock representing, in the aggregate, 2.5% of the Diluted Outstanding Common Stock (the "Tranche B Warrants" and together with the Tranche A Warrants, the "Warrants") at an exercise price of $31.25 per share (subject to adjustment from time to time as provided in Article V) (the "Tranche B Exercise Price");

WHEREAS, the Company desires to provide for the form and provisions of the Warrants, the terms upon which they shall be issued and exercised, and the respective rights, limitation of rights, and immunities of the Company, the Warrant Agent, and the holders of the Warrants;

WHEREAS, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing to so act, in connection with the issuance, registration, transfer, exchange, exercise and cancellation of the Warrants; and

WHEREAS, all acts and things have been done and performed which are necessary to make the Warrants, when issued, the valid, binding and legal obligations of the Company, and to authorize the execution and delivery of this Agreement.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1    Definition of Terms.

As used in this Agreement, the following capitalized terms shall have the following respective meanings:

(a)    "Ad Hoc Group of Second Lien Noteholders" has the meaning set forth in the Plan.

(b)    "Additional Shares of Common Stock" has the meaning set forth in Section 5.5(b) hereof.

2

(c) "Affiliate" has the meaning set forth in Rule 12b-2 of the Exchange Act.

(d) "Agreement" has the meaning set forth in the preamble.

(e) "Allowed Second Lien Secured Note Claims" has the meaning set forth in the Plan.

(f) "Appropriate Officer" means the Chief Executive Officer, President, Chief Financial Officer, Treasurer, Assistant Treasurer, Secretary, Assistant Secretary or any Vice President (or higher or equivalent officer) of the Company.

(g) "Bankruptcy Code" has the meaning set forth in the Recitals.

(h) "Bankruptcy Court" has the meaning set forth in the Recitals.

(i) "Beneficial Holders" means, with respect to any Warrants represented by a Global Warrant Certificate, any Person that "beneficially owns" (as such term is defined and determined pursuant to Rule 13d-3 promulgated under the Exchange Act) such Warrants.

(j) "Black Scholes Value" means the value of the unexercised portion of any Warrants remaining on the date of the consummation of the Change of Control, which value is calculated using the Black Scholes Option Pricing Model for a "call" option, as obtained from the "OV" function on Bloomberg, L.P. utilizing (i) an underlying price per share equal to the greater of (1) the Current Sale Price of the Common Stock on the Business Day immediately preceding the consummation of the Change of Control and (2) the sum of the price per share being offered in cash in the Change of Control (if any) plus the value of the non-cash consideration being offered in the Change of Control (if any), (ii) a strike price equal to the Exercise Price in effect on the date of the consummation of the Change of Control, (iii) a risk-free interest rate corresponding to the stated rate on the United States Treasury security with a maturity closest to the remaining term of the Warrant as of the date of consummation of the Change of Control, (iv) a zero cost of borrow, (v) the term of the Warrants shall be the amount of time remaining in the Exercise Period as of the date of consummation of the Change of Control and (vi) an expected volatility equal to thirty-seven percent (37%).

(k) "Blackout Period" has the meaning set forth in Section 9.18(f) hereof.

(l) "Board of Directors" means the Board of Directors of the Company.

(m) "Book-Entry Warrants" has the meaning set forth in Section 3.1(d) hereof.

(n) "Business Day" means any day other than a Saturday, Sunday or any other day on which banking institutions in the State of New York are authorized or obligated by law or executive order to close.

(o) "Certificated Warrant" has the meaning set forth in Section 3.1(d) hereof.

(p) "Change of Control" means the consummation, in one transaction or a series of related transactions, of any of the following: (i) any consolidation, merger, share exchange

3

or other business combination of the Company with or into any other Person, other than any such transaction in which the holders of the Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the continuing, resulting or surviving entity of such transaction, or the parent thereof, outstanding immediately after such transaction and in substantially the same proportions relative to each other (provided, however, that such holders of Common Stock shall be deemed to hold substantially the same proportions relative to each other even if they change their percentage holdings relative to each other so long as the holders of Common Stock that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction (determined based on the fewest number of holders that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction) own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the continuing, resulting or surviving entity of such transaction, or the parent thereof, outstanding immediately after such transaction), (ii) any sale or other disposition of Common Stock (other than any sale of Common Stock to any Affiliate of the holder of Common Stock being sold or disposed) representing more than fifty percent (50%) of all of the issued and outstanding shares of Common Stock, or (iii) any sale, lease or other Transfer of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole, to any other Person (other than a direct or indirect Subsidiary of the Company), other than any such transaction in which the holders of Common Stock immediately prior to such transaction own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the acquiring or transferee entity, or the parent thereof, outstanding immediately after such transaction and in substantially the same proportions relative to each other (provided, however, that such holders of Common Stock shall be deemed to hold substantially the same proportions relative to each other even if they change their percentage holdings relative to each other so long as the holders of Common Stock that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction (determined based on the fewest number of holders that owned or held, directly or indirectly, more than fifty percent (50%) of the Common Stock immediately prior to such transaction) own or hold, directly or indirectly, more than fifty percent (50%) of the total voting power of all Voting Securities of the acquiring or transferee entity, or the parent thereof, outstanding immediately after such transaction).  For purposes of determining the holders of Common Stock as of immediately prior to any transaction that is described in clause (i), (ii) or (iii) above, if any such transaction is consummated through a series of related transactions (including a combination of different types or forms of transactions described in any of clause (i), (ii) or (iii) above), then such determination shall be made as of immediately prior to the first transaction in such series of related transactions.

(q)  "Chapter 11 Cases" has the meaning set forth in the Recitals.

(r)  "Common Stock" has the meaning set forth in the Recitals, and shall include any successor security as a result of any recapitalization, reorganization, reclassification or similar transaction involving the Company.

(s)  "Company" has the meaning set forth in the preamble.

(t)  "Computershare" has the meaning set forth in the preamble.

(u)  "Convertible Securities" means any securities (directly or indirectly) convertible into or exchangeable for Common Stock, but excluding Options.

(v)  "Current Sale Price" of the Common Stock on any date of determination is reasonably determined in good faith by the Board of Directors; provided, however, that where a public market exists for the Common Stock at the date of determination, the Current Sale Price shall be the average of the closing sale prices quoted on the national securities exchange on which the Common Stock is quoted or listed for the ten (10) trading day period ending immediately prior to the date of determination (or, if no closing sale price is reported on any day in such ten (10) trading day period, the average of the closing bid and asked prices of the Common Stock on such day), or, if the Common Stock is not listed or quoted on a national securities exchange, the average of the closing bid and asked prices of the Common Stock in the over-the-counter market as reported by the OTC Markets or other similar organization for the ten (10) trading day period ending immediately prior to the date of determination.  If any Warrants are exercised in connection with or conditioned upon a Change of Control, then the Current Sale Price of the Common Stock on the applicable Exercise Date for purposes of Section 4.3(b) shall be deemed to be equal to the greater of (i) the Current Sale Price of the Common Stock on the Business Day immediately preceding the consummation of the Change of Control, as determined pursuant to the immediately preceding sentence, and (ii) the sum of the price per share being offered in cash in the Change of Control (if any) plus the value of the non-cash consideration being offered in the Change of Control (if any).

(w)  "Date of Issuance" has the meaning set forth in Section 3.1(b) hereof.

(x)  "Debtors" has the meaning set forth in the Recitals.

(y)  "Depositary" has the meaning set forth in Section 3.1(d) hereof.

(z)  "Diluted Outstanding Common Stock" has the meaning set forth in the Recitals.

(aa) "Direct Registration Warrants" has the meaning set forth in Section 3.1(d) hereof.

(bb) "e-mail" has the meaning set forth in Section 9.3 hereof.

(cc) "Effective Date" has the meaning set forth in the Recitals.

(dd) "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(ee) "Exercise Date" means, in connection with any exercise of Warrants by a Holder, any date on or prior to the expiration of the Exercise Period on which such Holder exercises the Warrant once all conditions to such exercise specified in Section 4.3(d) hereof have been satisfied; provided, however, that if any Warrants are exercised conditioned upon the occurrence of a Change of Control, then the Exercise Date shall be on the date of the consummation of such Change of Control.

5

(ff) "Exercise Form" has the meaning set forth in Section 4.3(d) hereof.

(gg) "Exercise Period" has the meaning set forth in Section 4.2 hereof.

(hh) "Exercise Price" means (i) with respect to the Tranche A Warrants, the Tranche A Exercise Price, and (ii) with respect to the Tranche B Warrants, the Tranche B Exercise Price.

(ii) "Funds" has the meaning set forth in Section 9.15 hereof.

(jj) "GAAP" means generally accepted accounting principles in the United States, as in effect from time to time, consistently applied.

(kk) "Global Warrant Certificates" has the meaning set forth in Section 3.1(d) hereof.

(ll) "Governmental Authority" means any (i) government, (ii) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal) or (iii) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature, in each case, whether federal, state, local, municipal, foreign, supranational or of any other jurisdiction.

(mm) "Holder" has the meaning set forth in Section 4.1 hereof.

(nn) "issuance", for purposes of Section 5.5 hereof, has the meaning set forth in Section 5.5 hereof.

(oo) "Law" means all laws, statutes, rules, regulations, codes, injunctions, decrees, orders, ordinances, registration requirements, disclosure requirements and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

(pp) "nonelecting share" has the meaning set forth in Section 5.6 hereof.

(qq) "Options" means any warrants or other rights or options to subscribe for or purchase Common Stock or Convertible Securities.

(rr) "Organic Change" means any recapitalization, reorganization, reclassification, consolidation, merger, sale of all or substantially all of the Company's equity securities or assets or other similar transaction, in each case, which is effected in such a way that the holders of Common Stock are entitled to receive (either directly or upon subsequent liquidation) cash, stock, securities or other assets or property with respect to or in exchange for Common Stock, other than a transaction which is a Change of Control or which triggers an adjustment pursuant to any provision of Article V, as applicable, other than Section 5.6.

(ss) "OTC Markets" means either the OTCQX or the OTCQB.

(tt) "Person" means any individual, firm, corporation, partnership, limited partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Authority or any political subdivision thereof, or any other entity (as such term is defined in the Bankruptcy Code).

(uu) "Plan" has the meaning set forth in the Recitals.

(vv) "Pro Rata" has the meaning set forth in the Plan.

(ww) "Pro Rata Repurchase Offer" means any offer to purchase shares of Common Stock by the Company or any Affiliate thereof pursuant to (i) any tender offer or exchange offer subject to Section 13(e) or 14(e) of the Exchange Act or Regulation 14E promulgated thereunder or (ii) any other offer available to substantially all holders of Common Stock (subject to satisfaction of any conditions to participation therein such as those relating to minimum holding percentages or accredited status) to purchase or exchange their shares of Common Stock, in the case of both clauses (i) and (ii), whether for cash, shares of capital stock of the Company, other securities of the Company, evidences of indebtedness of the Company or any other Person, or any other property (including, without limitation, shares of capital stock, other securities or evidences of indebtedness of a Subsidiary of the Company), or any combination thereof, effected while the Warrants are outstanding. The "effective date" of a Pro Rata Repurchase Offer shall mean the date of acceptance of shares for purchase or exchange by the Company under any tender or exchange offer which is a Pro Rata Repurchase Offer or the date of purchase with respect to any Pro Rata Repurchase Offer that is not a tender or exchange offer.

(xx) "Registered Holder" has the meaning set forth in Section 3.3(d) hereof.

(yy) "Requisite Holders" means, as of any date of determination, Holders of Warrants exercisable for a majority of the Common Stock issuable upon exercise of all Warrants then outstanding; provided, however, that any Warrants held by (i) the Company, (ii) any Affiliate of the Company or (iii) any officer or director of the Company or any Affiliate of the Company shall be disregarded and not outstanding for purposes of determining Requisite Holders.

(zz) "SEC" means the Securities and Exchange Commission or any other federal agency at the time administering the Securities Act or the Exchange Act.

(aaa) "Second Lien Noteholders" has the meaning set forth in the Plan.

(bbb) "Securities Act" means the Securities Act of 1933, as amended.

(ccc) "Settlement Agreement" has the meaning set forth in the Recitals.

(ddd) "Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company or other business entity of which (i) if a corporation, a majority of the total voting power of the Voting Securities of such corporation is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a partnership, limited liability

company or other business entity (other than a corporation), a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if such Person or Persons shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the general partner, the managing member or entity performing similar functions of such partnership, limited liability company or other business entity.

(eee)   "Tranche A Exercise Price" has the meaning set forth in the Recitals.

(fff) "Tranche A Warrants" has the meaning set forth in the Recitals.

(ggg)   "Tranche B Exercise Price" has the meaning set forth in the Recitals.

(hhh)   "Tranche B Warrants" has the meaning set forth in the Recitals.

(iii) "Transfer" means any transfer, sale, assignment or other disposition.

(jjj) "Voting Securities" means, with respect to any Person, the securities of such Person, the holders of which are ordinarily entitled to vote for the election of directors (or Persons performing similar functions) of such Person (other than securities entitled to vote only by reason of the happening of a contingency).

(kkk)   "Warrant Agent" has the meaning set forth in the preamble and shall include any successor to the Warrant Agent pursuant to Section 8.1 hereof.

(lll) "Warrant Certificate" has the meaning set forth in Section 3.1(d) hereof.

(mmm) "Warrant Exercise Shares" means the shares of Common Stock issuable upon the exercise of a Warrant.

(nnn)   "Warrant Register" has the meaning set forth in Section 3.3(c) hereof.

(ooo)   "Warrant Restrictions" has the meaning set forth in Section 3.1(d).

(ppp)   "Warrant Statements" has the meaning set forth in Section 3.1(d) hereof.

(qqq)   "Warrants" has the meaning set forth in the Recitals.

Section 1.2    Rules of Construction.

(a)   The singular form of any word used herein, including the terms defined in Section 1.1 hereof, shall include the plural, and vice versa. The use herein of a word of any gender shall include correlative words of all genders.

(b)   Unless otherwise specified, references to Articles, Sections, Exhibits and other subdivisions of this Agreement are to the designated Articles, Sections, Exhibits and other

subdivisions of this Agreement. The words "hereof", "herein", "hereunder", "hereby" and words of similar import refer to this Agreement as a whole. The words "include", "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation".

       (c)   References to "$" are to dollars in lawful currency of the United States of America.

       (d)   The Exhibits attached hereto are an integral part of this Agreement.

       (e)   This Warrant Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II

## APPOINTMENT OF WARRANT AGENT

       Section 2.1   <u>Appointment</u>.   The Company hereby appoints the Warrant Agent to act as agent for the Company for the Warrants in accordance with the express terms and subject to the conditions set forth in this Agreement (and no implied terms or conditions), and the Warrant Agent hereby accepts such appointment and agrees to perform the same in accordance with the express terms and conditions set forth in this Agreement.

## ARTICLE III

## WARRANTS

       Section 3.1   <u>Issuance of Warrants</u>.

       (a)   On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Settlement Agreement, on the date of this Agreement, the Company will issue the Warrants to the Debtors to hold in trust for the benefit of the Second Lien Noteholders.

       (b)   On the terms and subject to the conditions of this Agreement and in accordance with the terms of the Settlement Agreement, on the Effective Date (such date, the "<u>Date of Issuance</u>") the Debtors will distribute the Warrants under the Plan to the Second Lien Noteholders in exchange for the Allowed Second Lien Secured Note Claims pursuant to section 1145 of the Bankruptcy Code, as set forth in the Plan, and the Company and Warrant Agent will take all commercially reasonable action to effect such distribution.

       (c)   [Intentionally Deleted.]

       (d)   Unless otherwise provided in this Agreement, the Warrants (such Warrants being referred to as "<u>Book-Entry Warrants</u>") shall be issued through the book-entry facilities of The Depository Trust Company, as depositary (the "<u>Depositary</u>"), in the form of global warrant certificates ("<u>Global Warrant Certificates</u>"), duly executed on behalf of the Company and

9

countersigned, either by manual, facsimile or other electronically submitted signature, by the Warrant Agent, in the manner set forth in Section 3.2(b) below, which the Company shall deliver, or cause to be delivered to the Depositary, on or as soon as reasonably practicable after the Date of Issuance. Notwithstanding the foregoing, any Warrants which are not issuable through the book-entry facilities of the Depositary shall either be (x) represented by certificates (together with the Global Warrant Certificates, "Warrant Certificates"; and any Warrant represented by a Warrant Certificate, other than a Global Warrant Certificate, being referred to as a "Certificated Warrant") or (y) issued by electronic entry registration on the books of the Warrant Agent ("Direct Registration Warrants") and shall be reflected on statements issued by the Warrant Agent from time to time to the holders thereof (the "Warrant Statements"); provided, that any Certificated Warrants or Direct Registration Warrants that are not subject to any restriction on Transfer or exercise, or are not subject to any vesting requirements (such restrictions or requirements, but excluding any restrictions included in this Agreement or any restrictions imposed under applicable federal or state securities Laws, "Warrant Restrictions"), may be exchanged at any time for a corresponding number of Book-Entry Warrants, in accordance with Section 6.1(d) and the applicable procedures of the Depositary and the Warrant Agent (it being understood that none of the Warrants issued to the Debtors as of the date of this Agreement and none of the Warrants that will be distributed by the Debtors under the Plan to the Second Lien Noteholders will be subject to any Warrant Restrictions).

Section 3.2    Form of Warrant; Execution of Warrant Certificates.

(a)    Subject to Section 6.1 of this Agreement, the Global Warrant Certificate for the Tranche A Warrants shall be in substantially the form set forth in Exhibit A-1 attached hereto and the Global Warrant Certificate for the Tranche B Warrants shall be in substantially the form set forth in Exhibit A-2 attached hereto. The certificates for Certificated Warrants for the Tranche A Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-3 attached hereto and the certificates for Certificated Warrants for the Tranche B Warrants, with the forms of election to exercise and of assignment printed on the reverse thereof, shall be in substantially the form set forth in Exhibit A-4 attached hereto. The Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Agreement, may have such letters, numbers or other marks of identification or designation and such legends or endorsements placed thereon as may be required by the Depositary and as are consistent with the provisions of this Agreement, or as may be required to comply with any Law or with any rules or regulations made pursuant thereto or with any rules of any securities exchange on which the Warrants may be listed or as may be reasonably determined (in a manner consistent with the provisions of this Agreement) by the Appropriate Officer of the Company executing such Warrant Certificates, as evidenced by their execution of the Warrant Certificates. Such signatures may be manual, facsimile or other electronically transmitted signatures of such authorized officers and may be imprinted or otherwise reproduced on the Warrant Certificates.

(b)    In case any Appropriate Officer of the Company who shall have signed any of the Warrant Certificates (either manually or by facsimile or other electronically transmitted signature) shall cease to be such Appropriate Officer before the Warrant Certificates so signed shall have been countersigned (either manually or by facsimile or other electronically

transmitted signature) by the Warrant Agent or delivered or disposed of by or on behalf of the Company, such Warrant Certificates nevertheless may be countersigned and delivered or disposed of with the same force and effect as though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Warrant Certificate may be signed on behalf of the Company by any Person who, at the actual date of the execution of such Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Warrant Certificate, although at the date of the execution of this Agreement any such Person was not such Appropriate Officer.

(c)   The Global Warrant Certificates shall be deposited on or after the Date of Issuance with the Warrant Agent and registered in the name of Cede & Co., as the nominee of the Depositary. Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Agreement.

(d)   A Warrant Certificate shall be, and shall remain, subject to the provisions of this Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been cancelled in accordance with the terms hereof.

Section 3.3    Registration and Countersignature.

(a)   Upon receipt of a written order of the Company signed by an Appropriate Officer instructing the Warrant Agent to do so, the Warrant Agent (i) shall upon receipt of Warrant Certificates, including the Global Warrant Certificates, duly executed on behalf of the Company, countersign, either by manual, facsimile or other electronically transmitted signature, such Warrant Certificates evidencing Warrants, and record such Warrant Certificates, including the Registered Holders thereof, in the Warrant Register, and (ii) shall register in the Warrant Register any Direct Registration Warrants in the names of the initial Registered Holders thereof. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Certificated Warrants or Direct Registration Warrants and the name of the Registered Holders thereof, and the number of Warrants that are to be issued as Book-Entry Warrants, and the Warrant Agent may rely conclusively on such written order.

(b)   No Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Warrant Certificate has been countersigned by the manual, facsimile or other electronically transmitted signature of the Warrant Agent. Such signature by the Warrant Agent upon any Warrant Certificate executed by the Company shall be conclusive evidence that such Warrant Certificate so countersigned has been duly issued hereunder.

(c)   The Warrant Agent shall keep or cause to be kept, at an office designated for such purpose, books (the "Warrant Register") in which, subject to such reasonable regulations as it may prescribe, it shall register the Certificated Warrants or Direct Registration Warrants, and the Warrants represented by Global Warrant Certificates, and exercises, exchanges, cancellations and Transfers of outstanding Warrants in accordance with the

11

procedures set forth in <u>Section 6.1</u> of this Agreement, all in a form reasonably satisfactory to the Company and the Warrant Agent. No service charge shall be made for any exchange or registration of Transfer of the Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on any Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that any payments required by the immediately preceding sentence have been made.

(d)   Prior to due presentment for registration of Transfer or exchange of any Warrants in accordance with the procedures set forth in this Agreement, the Company and the Warrant Agent may deem and treat the Person in whose name such Warrants are registered upon the Warrant Register (the "<u>Registered Holder</u>" of such Warrants) as the absolute owner of such Warrants, for all purposes including, without limitation, for the purpose of any exercise thereof (subject to <u>Section 4.3(d)(z)</u>), any distribution to the Holder thereof and for all other purposes (subject to <u>Section 4.1(ii)</u>), and neither the Warrant Agent nor the Company shall be affected by notice to the contrary. Neither the Company nor the Warrant Agent will be liable or responsible for any registration or Transfer of any Warrants that are registered or to be registered in the name of a fiduciary or the nominee of a fiduciary.

## ARTICLE IV

## TERMS AND EXERCISE OF WARRANTS

Section 4.1    <u>Exercise Price</u>. Each Tranche A Warrant and each Tranche B Warrant shall entitle (i) in the case of the Certificated Warrants or Direct Registration Warrants, the Registered Holder thereof and (ii) in the case of Book-Entry Warrants, the Beneficial Holder thereof ((i) and (ii) collectively, the "<u>Holder</u>"), subject to the provisions of this Agreement, the right to purchase from the Company one share of Common Stock (subject to adjustment from time to time as provided in <u>Article V</u> hereof), at the Tranche A Exercise Price and Tranche B Exercise Price, respectively. Notwithstanding any provision to the contrary in this Agreement, from the date of this Agreement until the Date of Issuance, the Debtors will hold the Warrants in trust solely for the benefit of the Second Lien Noteholders and are not considered a "Holder" of the Warrants entitled to exercise the Warrants.

Section 4.2    <u>Exercise Period</u>. Warrants may be exercised by the Holder thereof, in whole or in part, at any time and from time to time after the Date of Issuance and prior to 5:00 P.M., New York time on June 13, 2023 (the "<u>Exercise Period</u>"). Any fractional shares of Common Stock that would otherwise be issued upon the exercise of any Warrants are subject to the terms of <u>Section 4.6</u>. To the extent that a Warrant or portion thereof is not exercised prior to the expiration of the Exercise Period, it shall be automatically cancelled with no action by any Person, and with no further rights thereunder, upon such expiration.

Section 4.3    <u>Method of Exercise</u>.

(a)   In connection with the exercise of any Warrant, (i) in the case of Certificated Warrants, the Holder shall surrender the Warrant Certificate that represents such Certificated Warrants (or any affidavit of loss if the Holder does not have possession of such Warrant

12

Certificate at the time of exercise) to the Warrant Agent for the number of Warrant Exercise Shares being exercised, up to the aggregate number of Warrant Exercise Shares for which such Certificated Warrants are exercisable and (ii) the Exercise Price shall be paid, at the option of the Holder, (x) in United States dollars by personal, certified or official bank check payable to the Company (if by certified or official bank check the Holder's Computershare account number and name and address must be typeset on the check), or by wire transfer to an account specified in writing by the Company or the Warrant Agent to such Holder, in either case in immediately available funds in an amount equal to the aggregate Exercise Price for the Warrant Exercise Shares for which the Warrants are being exercised as specified in the Exercise Form or (y) by cashless exercise as set forth in Section 4.3(b).

> (b)  In lieu of paying the Exercise Price by personal, certified or official bank check or by wire transfer, any Holder may elect to exercise Warrants by authorizing the Company to withhold and not issue to such Holder, in payment of the Exercise Price thereof, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares for which the Warrants are being exercised, and (y) the Exercise Price, divided by (ii) the Current Sale Price on the Exercise Date (and such withheld shares shall no longer be issuable under such Warrants, and the Holder shall not have any rights or be entitled to any payment with respect to such withheld shares).

> (c)  Upon exercise of any Warrants, the Warrant Agent will as promptly as practicable, within a reasonable time period to enable the Company to meet its obligations under Section 4.4(a), deliver written notice to the Company to confirm the number of Warrant Exercise Shares issuable in connection with such exercise. The Company shall calculate and transmit to the Warrant Agent in a written notice, and the Warrant Agent shall have no duty, responsibility or obligation to calculate, the number of Warrant Exercise Shares issuable in connection with any exercise. The Warrant Agent shall be entitled to rely conclusively on any such written notice provided by the Company, and the Warrant Agent shall not be liable for any action taken, suffered or omitted to be taken by it in accordance with such written instructions or pursuant to this Agreement. Such written notice from the Company shall also set forth the cost basis for such shares of Common Stock issued pursuant to such exercise.

> (d)  Subject to the terms and conditions of this Agreement, in order to validly exercise, in whole or in part, any of the Warrants, the Holder of such Warrants must exercise such Holder's right to purchase the Warrant Exercise Shares issuable upon exercise of such Warrants by: (x) in the case of Certificated Warrants, providing an exercise form for the election to exercise such Warrants (including the exercise forms referred to in clauses (y) and (z) below, an "Exercise Form") substantially in the form of Exhibit B-1, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, (y) in the case of Direct Registration Warrants, providing an Exercise Form substantially in the form of Exhibit B-2 hereto, properly completed and duly executed by the Registered Holder thereof, to the Warrant Agent, and (z) in the case of Book-Entry Warrants, providing an Exercise Form in compliance with the practices and procedures of the Depositary and its direct and indirect participants, as applicable.

> (e)  Any exercise of Warrants pursuant to the terms of this Agreement shall be irrevocable as of the date of delivery of the Exercise Form and shall constitute a binding

agreement between the Holder and the Company, enforceable in accordance with the terms of this Agreement; provided, however, an exercise of Warrants may be conditioned upon the occurrence of any Change of Control that is specified in the Exercise Form and such conditional exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the range of dates (which date of occurrence or range of dates shall occur or end, as applicable, no later than a date that is the later of (i) 30 days from the date of delivery of the Exercise Form, and (ii) the proposed effective date of the Change of Control specified in the notice of the Change of Control delivered by the Company pursuant to Section 7.2 ), specified in such Exercise Form.

(f)    In the case of Certificated Warrants, upon receipt of the Warrant Certificate with the properly completed and duly executed Exercise Form, or in the case of Direct Registration Warrants, upon receipt of the properly completed and duly executed Exercise Form, in each case pursuant to Section 4.3(d), the Warrant Agent shall:

(i)    examine the Exercise Form and all other documents delivered to it by or on behalf of Holders as contemplated hereunder to ascertain whether or not, on their face, such Exercise Form and any such other documents have been executed and completed in accordance with their terms and the terms hereof;

(ii)    if an Exercise Form or other document appears, on its face, to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrants exists, endeavor to inform the appropriate parties (including the Person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems between the information provided on any Exercise Form received and the information on the Warrant Register;

(iv)    advise the Company as promptly as practicable, within a reasonable time period to enable the Company to meet its obligations under Section 4.4(a), after receipt of an Exercise Form, of (A) the receipt of such Exercise Form and the number of Warrant Exercise Shares in respect of which the Warrants are requested to be exercised in accordance with the terms and conditions of this Agreement, (B) the instructions with respect to delivery of the Common Stock deliverable upon such exercise, subject to timely receipt of such information by the Warrant Agent, and (C) such other information as the Company shall reasonably request; and

(v)    subject to Common Stock being made available to the Warrant Agent by or on behalf of the Company, and written instructions from the Company, liaise with the transfer agent for the Common Stock for the issuance and registration of the number of shares of Common Stock issuable upon exercise of the Warrants in accordance with the Exercise Form.

The Company reserves the right reasonably to reject any and all Exercise Forms that it determines are not in proper form or for which any corresponding agreement by the Company to exchange

14

would, in the opinion of the Company, be unlawful. Any such determination by the Company shall be final and binding on the Holders of the Warrants, absent manifest error. Moreover, the Company reserves the absolute right to waive any of the conditions to any particular exercise of Warrants or any defects in the Exercise Form(s) with regard to any particular exercise of Warrants. The Company shall provide prompt written notice to the Warrant Agent of any such rejection or waiver.

(g) In the case of Book-Entry Warrants, the Company and the Warrant Agent shall cooperate with the Depositary and its direct and indirect participants in order to effectuate the exercise of such Warrants, in accordance with the applicable practices and procedures of the Depositary and such participants, including the manner of delivery of notice of exercise by the Beneficial Holders thereof, in such form as shall be prescribed by such participants, as applicable.

(h) The Warrant Agent shall forward funds received for warrant exercises in a given month by the fifth (5th) Business Day of the following month by wire transfer to an account designated by the Company.

Section 4.4    Issuance of Common Stock.

(a) Upon the effectiveness of any exercise of any Warrants pursuant to Section 4.3, the Company shall, subject to Section 4.6, promptly at its expense, and in no event later than five (5) Business Days after the Exercise Date, (i) cause to be issued as directed by the Holder of such Warrants the total number of whole shares of Common Stock for which such Warrants are being exercised (as the same may be hereafter adjusted pursuant to Article V) in such denominations as are requested by the Holder by electronic entry on the books of the Company's transfer agent or, if the Common Stock is then held through the book-entry facilities of the Depositary, through the book-entry facilities of the Depositary, and (ii) in the case of Certificated Warrants where less than the full number of Certificated Warrants evidenced by the Warrant Certificate are being exercised, deliver or cause to be delivered to the Holder thereof a new Warrant Certificate, of like tenor, for the number of Certificated Warrants evidenced by such Warrant Certificate, less the number of Warrants then being exercised.

(b) The Warrant Exercise Shares shall be deemed to have been issued at the time at which all of the conditions to such exercise have been fulfilled, and the Holder, or other Person to whom the Holder shall direct the issuance thereof, shall be deemed for all purposes to have become the holder of such Warrant Exercise Shares at such time.

Section 4.5    Reservation of Shares.

(a) During the Exercise Period, the Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock solely for the purpose of issuance upon the exercise of the Warrants, a number of shares of Common Stock equal to the aggregate Warrant Exercise Shares issuable upon the exercise of all outstanding Warrants. The Company shall use commercially reasonable efforts to take all such actions as may be necessary to assure that all such shares of Common Stock may be so issued without violating the Company's governing documents, any agreements to which the Company is a party, any

15

requirements of any national securities exchange upon which shares of Common Stock may be listed or any applicable Laws. The Company shall not at any time permit the number of authorized but unissued shares of Common Stock to be less than the number of such shares required to be reserved hereunder for issuance upon exercise of all outstanding Warrants.

(b)  The Company covenants that it will take such actions as may be necessary or appropriate in order that all Warrant Exercise Shares issued upon exercise of the Warrants will, upon issuance in accordance with the terms of this Agreement, be validly issued, fully paid and non-assessable, and free from any and all (i) security interests and liens (other than security interests and liens created by a Holder) and (ii) taxes and charges with respect to the issuance thereof, other than income taxes incurred in connection with the exercise of the Warrants or taxes in respect of any Transfer occurring contemporaneously therewith. If at any time prior to the expiration of the Exercise Period the number and kind of authorized but unissued shares of the Company's capital stock shall not be sufficient to permit exercise in full of all outstanding Warrants, the Company will promptly take such corporate action as may, in the opinion of its counsel, be reasonably necessary (including seeking stockholder approval, if required) to increase its authorized but unissued shares to such number of shares as shall be sufficient for such purposes. The Company agrees that its issuance of Warrants shall constitute full authority to its officers who are charged with the issuance of Warrant Exercise Shares to issue Warrant Exercise Shares upon the exercise of Warrants. Without limiting the generality of the foregoing, the Company will not increase the stated or par value per share, if any, of the Common Stock above the Exercise Price per share in effect immediately prior to such increase in stated or par value. If shares of Common Stock are listed for trading on a securities exchange, the Company covenants that all Warrant Exercise Shares will, at all times that Warrants are exercisable, be duly approved for listing on such exchange.

Section 4.6    Fractional Shares. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not be required to issue any fraction of a share of its capital stock in connection with the exercise of any Warrants, and in any case where a Holder of Warrants would, except for the provisions of this Section 4.6, be entitled under the terms thereof to receive a fraction of a share upon the exercise of such Warrants, the Company shall (a) round up to the nearest whole number of Warrant Exercise Shares for fractions of half or greater or (b) round down to the nearest whole number of Warrant Exercise Shares for fractions of less than half; provided, that the number of whole Warrant Exercise Shares which shall be issuable upon the contemporaneous exercise of any Warrants by a Holder shall be computed on the basis of the aggregate number of Warrant Exercise Shares issuable upon exercise of all such Warrants.

Section 4.7    Close of Books; Par Value. The Company shall not close its books against the Transfer of any Warrants or any Warrant Exercise Shares in a manner which interferes with the timely exercise of such Warrants. Without limiting Section 4.5(b), the Company shall use commercially reasonable efforts to, from time to time, take all such action as may be necessary to assure that the par value per share of the unissued shares of Common Stock acquirable upon exercise of the Warrants is at all times equal to or less than the Tranche A Exercise Price then in effect.

Section 4.8    Payment of Taxes. In connection with the exercise of any Warrants, the Company shall not be required to pay any tax or other charge imposed in respect of any Transfer

involved in the Company's issuance and delivery of shares of Common Stock (including certificates therefor) (or any payment of cash or other property in lieu of such shares) to any recipient other than the Holder of the Warrants being exercised, and in case of any such tax or other charge, the Warrant Agent and the Company shall not be required to issue or deliver any such shares (or cash or other property in lieu of such shares) until (x) such tax or charge has been paid or an amount sufficient for the payment thereof has been delivered to the Warrant Agent or the Company or (y) it has been established to the Company's and the Warrant Agent's satisfaction that any such tax or other charge that is or may become due has been paid. For the avoidance of doubt, the Warrant Agent shall not have any duty or obligation to take any action under any section of this Agreement that requires the payment of taxes or charges, unless and until the Warrant Agent is satisfied that all such taxes and/or charges have been paid.

## ARTICLE V

## ADJUSTMENT OF EXERCISE PRICE AND NUMBER OF WARRANT EXERCISE SHARES

In order to prevent dilution of the rights granted under the Warrants, the Exercise Price shall be subject to adjustment from time to time as provided in this Article V, and the number of shares of Common Stock issuable upon exercise of each Warrant shall be subject to adjustment from time to time as provided in this Article V.

Section 5.1    Subdivision or Combination of Common Stock.

In the event that, at any time after the date of this Agreement but prior to the expiration of the Exercise Period, the amount of outstanding shares of Common Stock is increased or decreased by combination (by reverse stock split or reclassification) or subdivision (by any stock split or reclassification) of the Common Stock, then, on the effective date of such combination or subdivision, the number of Warrant Exercise Shares issuable on exercise of the Warrants shall be increased or decreased, as applicable, in proportion to such increase or decrease, as applicable, in the outstanding Common Stock. Whenever the number of Warrant Exercise Shares issuable upon the exercise of the Warrants is adjusted pursuant to this Section 5.1, then, on the effective date of the applicable combination or subdivision, the Exercise Price shall be adjusted (to the nearest cent ($0.01)) by multiplying such Exercise Price immediately prior to such adjustment by a fraction (a) the numerator of which shall be the number of Warrant Exercise Shares issuable upon the exercise of a Warrant immediately prior to such adjustment and (b) the denominator of which shall be the number of Warrant Exercise Shares so issuable immediately thereafter.

Section 5.2    Common Stock Dividends. If the Company at any time after the date of this Agreement but prior to the expiration of the Exercise Period declares or otherwise authorizes a dividend or any other distribution on the Common Stock in shares of Common Stock, then the number of Warrant Exercise Shares issuable upon exercise of each outstanding Warrant shall be increased to equal the product of (a) the number of Warrant Exercise Shares issuable upon exercise of a Warrant in effect immediately prior to the record date for such dividend or other distribution and (b) a fraction, (i) the numerator of which is the sum of (x) the total number of shares of Common Stock issued and outstanding immediately prior to the record date for such dividend or other distribution and (y) the total number of shares of Common Stock to be issued pursuant to

17

such dividend or other distribution, and (ii) the denominator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the record date for such dividend or other distribution.  The Exercise Price for each outstanding Warrant shall be correspondingly decreased by <u>dividing</u> the Exercise Price for each outstanding Warrant in effect immediately prior to the record date for such dividend or other distribution <u>by</u> the fraction referred to in <u>clause (b)</u> of the immediately preceding sentence.  An adjustment made pursuant to this <u>Section 5.2</u> shall be made effective immediately prior to the open of business on the first Business Day immediately following the record date for such dividend or other distribution; <u>provided</u>, that any exercise of a Warrant following the record date but prior to the dividend or distribution being made is subject to <u>Section 5.11</u>.  In the event that such dividend or other distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to make such dividend or distribution, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such dividend or other distribution had not been so declared or authorized.

Section 5.3    <u>Other Distributions</u>.  If the Company at any time after the date of this Agreement but prior to the expiration of the Exercise Period declares or otherwise authorizes a dividend or other distribution to all holders of shares of Common Stock (other than a dividend or other distribution of shares of Common Stock referred to in <u>Section 5.2</u>, any dividend or distribution made in connection with the consummation of an Organic Change referred to in <u>Section 5.6</u>, any issuance or deemed issuance of Additional Shares of Common Stock referred to in <u>Section 5.5</u>, or any distribution pursuant to <u>Section 5.4</u> or <u>Section 5.7</u>) of securities, evidences of indebtedness, assets, cash, rights or warrants, then, in each such case, the Exercise Price for each outstanding Warrant in effect immediately prior to the record date for such dividend or other distribution shall be adjusted thereafter to the price determined by the following formula:

$$EP_1 = EP_0 \; x \; ((CP_0 - FV)/CP_0)$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this <u>Section 5.3</u>;

$EP_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this <u>Section 5.3</u>;

$CP_0$    =    the Current Sale Price of the Common Stock on the last Business Day preceding the first date on which the Common Stock is without the right to receive such dividend or distribution; and

FV    =    the amount of cash and/or the fair market value of the securities, evidences of indebtedness, assets, rights or warrants to be so distributed in respect of one share of Common Stock, as reasonably determined in good faith by the Board of Directors.

Any adjustment made pursuant to this Section 5.3 shall be made effective immediately prior to the open of business on the first Business Day immediately following the record date for the dividend or other distribution; provided, that any exercise of a Warrant following the record date but prior to the dividend or distribution being made is subject to Section 5.11. In such event, the number of Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by dividing (x) the product of (1) the number of Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment by (y) the new Exercise Price immediately following such adjustment.

In the event that such dividend or distribution is not so made, the Exercise Price and the number of Warrant Exercise Shares issuable upon exercise of the Warrants then in effect shall be readjusted, effective as of the date when the Board of Directors determines not to distribute such shares, evidences of indebtedness, assets, rights, cash or warrants, as the case may be, to the Exercise Price that would then be in effect and the number of Warrant Exercise Shares that would then be issuable upon exercise of the Warrants if such dividend or distribution was not so declared or authorized.

Section 5.4    Pro Rata Repurchase Offer of Common Stock.

If at any time after the date of this Agreement but prior to the expiration of the Exercise Period the Company consummates a Pro Rata Repurchase Offer, then the Exercise Price shall be reduced to the price determined by the following formula:

$$EP_1 = EP_0 \, x \frac{(OS_0 \, x \, CP_0) - AP}{(OS_0 - SP) \, x \, CP_0}$$

where

$EP_1$    =    the Exercise Price in effect immediately following the application of the adjustments in this Section 5.4 (but in no event greater than $EP_0$);

$EP_0$    =    the Exercise Price in effect immediately prior to the application of the adjustments in this Section 5.4;

$OS_0$    =    the number of shares of Common Stock outstanding immediately before consummation of such Pro Rata Repurchase Offer;

$CP_0$    =    the Current Sale Price of a share of Common Stock on the

Business Day immediately preceding the first public announcement of the intent to effect such Pro Rata Repurchase Offer;

AP    =    the aggregate purchase price (including the fair market value, as reasonably determined in good faith by the Board of Directors, of any non-cash consideration included therein) paid for the shares of Common Stock in the Pro Rata Repurchase Offer; and

SP    =    the number of shares of Common Stock so repurchased in the Pro Rata Repurchase Offer.

In such event, the Warrant Exercise Shares issuable upon the exercise of each Warrant shall be increased to the number obtained by <u>dividing</u> (x) the product of (1) the Warrant Exercise Shares issuable upon the exercise of each Warrant before such adjustment, and (2) the Exercise Price in effect immediately prior to the adjustment <u>by</u> (y) the new Exercise Price immediately following such adjustment. For the avoidance of doubt, no increase to the Exercise Price or decrease in the Warrant Exercise Shares issuable upon exercise of the Warrants shall be made pursuant to this <u>Section 5.4</u>.

Section 5.5    <u>Dilutive Issuances</u>.

(a)    In the event the Company at any time or from time to time after the date of this Agreement but prior to the expiration of the Exercise Period shall issue, sell, grant or otherwise distribute Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to <u>Section 5.5(c)</u>) (each, an "<u>issuance</u>") without consideration or for consideration per share less than the Current Sale Price on the Business Day immediately prior to the date of such issuance (or the earlier announcement thereof), then the Exercise Price for each outstanding Warrant in effect on the date of such issuance shall be reduced to an amount equal to the product of (A) such Exercise Price and (B) a fraction, (i) the numerator of which is the sum of (x) the number of shares of Common Stock outstanding immediately prior to such issuance and (y) the number of shares of Common Stock which the aggregate consideration received by or payable to the Company for the total number of Additional Shares of Common Stock so issued would purchase at the Current Sale Price on the Business Day immediately prior to the date of such issuance (or the earlier announcement thereof), and (ii) the denominator of which shall be the sum of (x) the number of shares of Common Stock outstanding immediately prior to such issuance and (y) the number of Additional Shares of Common Stock so issued. If the Exercise Price of a Warrant is reduced as hereinabove provided, the number of Warrant Exercise Shares issuable upon exercise of such Warrant shall be correspondingly increased by <u>dividing</u> it by the same fraction referred to in the immediately preceding sentence. An adjustment made pursuant to this <u>Section 5.5</u> shall be made effective concurrently with the consummation of the applicable issuance.

(b)    For purposes of this <u>Section 5.5</u>, the term "<u>Additional Shares of Common Stock</u>" shall mean all shares of Common Stock issued (or, pursuant to <u>Section 5.5(c)</u>, deemed to be issued) by the Company after the date of this Agreement, other than:

20

      (i)    shares of Common Stock issued or issuable upon exercise of Warrants;

      (ii)    shares of Common Stock issued or issuable in a subdivision to which Section 5.1 applies, in a dividend or distribution to which Section 5.2 or Section 5.3 applies, or in an Organic Change to which Section 5.6 applies;

      (iii)    shares of Common Stock issued directly or upon the exercise of Options to directors, officers, employees, or consultants of the Company in connection with their service as directors of the Company, their employment by the Company or their retention as consultants of the Company pursuant to any employee benefit plan or program, incentive compensation plan or program, executive compensation agreement or directors' compensation program, in each case approved by the Board of Directors; and

      (iv)    shares of Common Stock issued as bona fide "equity kickers" following the date of this Agreement in connection with one or more debt financings of the Company provided by any Person other than any Affiliate of the Company and only so long as such shares of Common Stock are only issued to the Persons that are providing such debt financings.

Notwithstanding anything to the contrary herein, issuances referenced in clauses (i) - (iv) of this Section 5.5(b) include any deemed issuances pursuant to Section 5.5(c) and there shall be no adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon the exercise of the Warrants pursuant to this Section 5.5 with respect to any issuances referenced in clauses (i) - (iv) above.

      (c)   Subject to Section 5.5(b) above, in the event the Company at any time or from time to time after the date of this Agreement but prior to the expiration of the Exercise Period shall issue any Options or Convertible Securities, then the maximum number of shares of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issuance; provided, that in any such case in which Additional Shares of Common Stock are deemed to be issued:

      (i)    no further adjustments in the Exercise Price of a Warrant or the number of Warrant Exercise Shares issuable upon exercise of such Warrant shall be made upon the subsequent issuance of shares of Common Stock upon the exercise of such Options or conversion or exchange of such Convertible Securities (or, in the case of Options for the purchase of Convertible Securities, the subsequent issue of the Convertible Securities or the shares of Common Stock issuable upon conversion or exchange thereof); and

      (ii)    if such Options or Convertible Securities by their terms (other than terms designed to protect against dilution) provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Company, or increase or decrease in the number of shares of Common Stock issuable, upon the exercise, conversion

or exchange thereof, the Exercise Price of each Warrant and the number of Warrant Exercise Shares issuable upon exercise of each Warrant computed upon the original issuance thereof, and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities; provided, however, that no readjustment pursuant to this clause (ii) shall have the effect of increasing the Exercise Price to an amount that exceeds the Exercise Price of a Warrant in effect immediately prior to the issuance of the applicable Options or Convertible Securities or decreasing the number of shares of Common Stock issuable upon exercise of a Warrant to a number that is less than the number of shares of Common Stock issuable upon exercise of a Warrant in effect immediately prior to the issuance of the applicable Options or Convertible Securities.

(d)  For purposes of this Section 5.5, the consideration received by or payable to the Company in connection with the issuance of any Additional Shares of Common Stock shall be computed as follows:

(i)      Such consideration shall:

(A)    insofar as it consists of cash, be computed at the aggregate amount of cash received by or payable to the Company therefor prior to deducting therefrom any discounts, commissions or other expenses allowed, paid or incurred by the Company for any underwriting or otherwise in connection with the issuance and sale thereof;

(B)    insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issuance, as reasonably determined in good faith by the Board of Directors, except where a public market exists for such securities, in which case the fair value of such securities shall be the average of the closing sale prices quoted on the national securities exchange on which such securities are quoted or listed for the ten (10) trading day period ending immediately prior to the date of determination (or, if no closing sale price is reported on any day in such ten (10) trading day period, the average of the closing bid and asked prices for such securities on such day), or, if such securities are not listed or quoted on a national securities exchange, the average of the closing bid and asked prices of such securities in the over-the-counter market as reported by the OTC Markets or other similar organization for the ten (10) trading day period ending immediately prior to the date of determination; and

(C)    in the event Additional Shares of Common Stock are issued together with other securities or property of the Company for consideration which covers both the Additional Shares of Common Stock and such other securities or property, be the proportion of such consideration so received in respect of the Additional Shares of Common Stock, computed as provided in clauses (A) and (B) above, as reasonably determined in good faith by the Board of Directors.

22

(ii)    The consideration per share received by or payable to the Company for Additional Shares of Common Stock deemed to have been issued pursuant to Section 5.5(c) relating to Options and Convertible Securities shall be determined by dividing:

(A)    the total amount, if any, received by or payable to the Company as consideration for the issuance of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) received by or payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(B)    the maximum number of shares of Common Stock (as set forth in the instruments relating thereto, without regard to any provision contained therein designed to protect against dilution) issuable upon the exercise of such Options or conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

Section 5.6    Organic Changes.  If there occurs any Organic Change after the date of this Agreement but prior to the expiration of the Exercise Period, then each Holder of a Warrant shall have the right to acquire and receive, upon valid exercise of such Warrant pursuant to Article IV at any time after the consummation of such Organic Change, in lieu of Warrant Exercise Shares that would have been issuable upon exercise of such Warrant, such cash, stock, securities or other assets or property as would have been issued or payable in such Organic Change with respect to or in exchange for, as applicable, the number of Warrant Exercise Shares that would have been issued upon exercise of such Warrant if such Warrant had been exercised immediately prior to the consummation of such Organic Change assuming no rights of election, if any, as to the kind or amount of cash, stock, securities or other assets or property receivable upon such Organic Change were exercised (provided that, if the kind or amount of cash, stock, securities or other assets or property receivable upon such Organic Change is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("nonelecting share"), then for the purposes of this Section 5.6, the kind and amount of cash, stock, securities or other assets or property receivable upon such Organic Change shall be deemed to be the kind and amount so receivable per share by a plurality of the nonelecting shares).  The Company shall not affect any Organic Change unless, prior to the consummation thereof, the continuing, resulting, acquiring or surviving Person (if other than the Company) from or in such Organic Change shall assume, by written instrument substantially similar in form and substance to this Agreement in all material respects (including with respect to the provisions of this Article V), the obligation to deliver to the Holders such cash, stock, securities or other assets or property which, in accordance with the foregoing provision, the Holders shall be entitled to receive upon exercise of the Warrants.  The provisions of this Section 5.6 shall apply to successive Organic Changes.

Section 5.7      Change of Control.

In the event of a Change of Control after the date of this Agreement but prior to the expiration of the Exercise Period, the Company shall be required to redeem all outstanding Warrants simultaneously with the consummation of such Change of Control without any further action on behalf of the Holder. Such redemption shall be made by the Company irrevocably paying to each Holder the Black Scholes Value of the Warrants owned or held by such Holder in full in cash simultaneously with the consummation of such Change of Control; provided, however, that if a Change of Control shall be consummated prior to the distribution by the Debtors of the Warrants under the Plan to the Second Lien Noteholders, then the Company shall pay, simultaneously with the consummation of such Change of Control, an aggregate amount of cash equal to the Black Scholes Value of all outstanding Warrants (for the avoidance of doubt, all Warrants held by the Debtors in trust for the Second Lien Noteholders shall be deemed outstanding and the Debtors shall not have any rights to be paid the Black Scholes Value of the Warrants upon a Change of Control) to the holders of Second Lien Secured Note Claims (such amount to be shared Pro Rata among such holders). The payments described in the immediately preceding sentence shall be in full and complete satisfaction of all of the Company's obligations under the Warrants and, upon any such payment being made, the Warrants shall automatically terminate. Nothing in this Section 5.7 shall have any effect on the exercise of any Warrants made prior to, or in connection with, any Change in Control.

Section 5.8      Notice of Adjustments.

Whenever the number and/or kind of Warrant Exercise Shares or the Exercise Price is adjusted as herein provided, the Company shall (i) prepare and deliver, or cause to be prepared and delivered, forthwith to the Warrant Agent a written statement setting forth the adjusted number and/or kind of shares issuable upon the exercise of Warrants and the Exercise Price of such shares after such adjustment, the facts requiring such adjustment and the computation by which such adjustment was made, and (ii) cause the Warrant Agent to give written notice to each Holder in the manner provided in Section 9.3 below, of the record date or the effective date of the event. Failure to give such notice, or any defect therein, shall not affect the legality or validity of such event. The Warrant Agent shall be fully protected in relying upon any such written notice delivered in accordance with this Section 5.8, and on any adjustment therein contained, and shall not be deemed to have knowledge of any such adjustment unless and until it shall have received such written notice. Notwithstanding anything to the contrary contained herein, the Warrant Agent shall have no duty or obligation to investigate or confirm whether the information contained in any such written notice complies with the terms of this Agreement or any other document. The Warrant Agent shall have no duty to determine when an adjustment under this Article V should be made, how any such adjustment should be calculated, or the amount of any such adjustment.

Section 5.9      Deferral or Exclusion of Certain Adjustments.

No adjustment to the Exercise Price or the number of Warrant Exercise Shares shall be required hereunder unless such adjustment together with other adjustments carried forward as provided below, would result in an increase or decrease of at least one percent (1%) of the applicable Exercise Price or the number of Warrant Exercise Shares; provided, that any adjustments which by reason of this Section 5.9 are not required to be made shall be carried

forward and taken into account in any subsequent adjustment. Subject to Section 4.5(b), no adjustment need be made for a change in the par value of the shares of Common Stock. All calculations under this Section 5.9 shall be made to the nearest one one-thousandth (1/1,000) of one cent ($0.01) or to the nearest one one-thousandth (1/1,000) of a share, as the case may be.

Section 5.10    Form of Warrant After Adjustments.

The form of Warrant Certificate need not be changed because of any adjustments in the Exercise Price or the number and/or kind of shares issuable upon exercise of the Warrants, and Warrant Certificates theretofore or thereafter issued may continue to express the same price and number and kind of shares as are stated therein, as initially issued; provided, that such adjustments in the Exercise Price or the number and/or kind of shares issuable upon exercise of the Warrants pursuant to the terms of this Agreement shall nonetheless have effect upon exercise of the Warrants. The Company, however, may at any time in its sole discretion make any change in the form of Warrant Certificate that it may deem appropriate to give effect to such adjustments and that does not affect the substance of the Warrant Certificate or this Agreement (including the rights, duties, liabilities or obligations of the Warrant Agent), and any Warrant Certificate thereafter issued, whether in exchange or substitution for an outstanding Warrant Certificate, may be in the form so changed.

Section 5.11    Temporary Suspension of Certain Adjustments.

In any case in which Section 5.2 or Section 5.3 shall result in an adjustment to the number of Warrant Exercise Shares issuable upon exercise of any Warrants and the Exercise Price becoming effective prior to the occurrence of a specified event and any Warrant is exercised after the time at which the adjustment becomes effective but prior to the occurrence of such specified event, the Company may elect in its sole discretion to defer until the occurrence of such specified event (a) the issuance to the Holder of such Warrant (or other Person entitled thereto) of, and the registration of such Holder (or other Person) as the record holder of, the Warrant Exercise Shares over and above the Warrant Exercise Shares issuable upon such exercise on the basis of the number of Warrant Exercise Shares obtainable upon exercise of such Warrant immediately prior to such adjustment and to require payment in respect of such number of Warrant Exercise Shares the issuance of which is not deferred on the basis of the Exercise Price in effect immediately prior to such adjustment and (b) the corresponding reduction in the Exercise Price; provided, however, that the Company shall deliver to such Holder or other Person such additional Warrant Exercise Shares upon the occurrence of such specified event requiring such adjustment (without payment of any additional Exercise Price in respect of such additional Warrant Exercise Shares).

## ARTICLE VI

## TRANSFER AND EXCHANGE
## OF WARRANTS

Section 6.1    Registration of Transfers and Exchanges.

(a) *Transfer and Exchange of Book-Entry Warrants.*  The Transfer and exchange of Book-Entry Warrants shall be effected through the Depositary and its direct and

25

indirect participants, in accordance with the practices and procedures therefor of the Depositary and such participants.

(b) *Exchange of Book-Entry Warrants for Certificated Warrants or Direct Registration Warrants.* If at any time the Depositary for the Global Warrant Certificates notifies the Company that the Depositary is unwilling or unable to continue as Depositary for the Global Warrant Certificates and a successor Depositary for the Global Warrant Certificates is not appointed by the Company within ninety (90) days after delivery of such notice, then upon written instructions signed by an Appropriate Officer of the Company, the Warrant Agent shall register and issue Certificated Warrants, or shall register Direct Registration Warrants, in an aggregate number equal to the number of Book-Entry Warrants represented by the Global Warrant Certificates, in accordance with such written instructions. Such written instructions provided by the Company shall state that the Certificated Warrants or Direct Registration Warrants issued in exchange for Book-Entry Warrants pursuant to this Section 6.1(b) shall be registered in such names and in such amounts as the Depositary, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.

(c) *Transfer and Exchange of Certificated Warrants or Direct Registration Warrants.* When Certificated Warrants or Direct Registration Warrants are presented to the Warrant Agent with a written request:

(i) to register the Transfer of such Certificated Warrants or Direct Registration Warrants; or

(ii) to exchange such Certificated Warrants or Direct Registration Warrants for an equal number of Certificated Warrants or Direct Registration Warrants, respectively, of other authorized denominations, the Warrant Agent shall register the Transfer or make the exchange, and in the case of Certificated Warrants shall issue such new Warrant Certificates, as requested if its customary requirements for such transactions are met, provided, that the Warrant Agent shall have received (x) a written instruction of Transfer in form reasonably satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, duly authorized in writing along with evidence of authority that may be required by the Warrant Agent, including but not limited to, a signature guarantee from an eligible guarantor institution participating in a signature guarantee program approved by the Securities Transfer Association, (y) a written order of the Company signed by an Appropriate Officer authorizing such exchange and (z) in the case of Certificated Warrants, surrender of the Warrant Certificate or Certificate(s) representing same duly endorsed for Transfer or exchange.

(d) *Exchange of Certificated Warrants or Direct Registration Warrants for Book-Entry Warrants.* Certificated Warrants or Direct Registration Warrants that are not subject to any Warrant Restrictions may be exchanged for Book-Entry Warrants upon satisfaction of the requirements set forth below. Upon receipt by the Warrant Agent of appropriate written instruments of transfer with respect to such Certificated Warrants or Direct Registration Warrants, in form reasonably satisfactory to the Warrant Agent, duly executed by the Registered Holder thereof or by his attorney, and in the case of Certificated Warrants, surrender of the Warrant Certificate(s) representing the same duly endorsed for Transfer or

exchange (or any affidavit of loss if the Holder does not have possession of such Warrant Certificate), together with written instructions directing the Warrant Agent to make, or to direct the Depositary to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Certificated Warrants or Direct Registration Warrants, then the Warrant Agent shall cancel such Certificated Warrants or Direct Registration Warrants on the Warrant Register and cause or direct the Depositary to cause, in accordance with the standing instructions and procedures existing between the Depositary and the Warrant Agent, the number of Book-Entry Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificates are then outstanding, or if the Global Warrant Certificates then outstanding cannot be used for such purposes, the Company shall issue and the Warrant Agent shall countersign (by either manual, facsimile or other electronically transmitted signature), a new Global Warrant Certificate representing the appropriate number of Book-Entry Warrants.

   (e) *Restrictions on Transfer and Exchange of Global Warrant Certificates.* Notwithstanding any other provisions of this Agreement (other than the provisions set forth in Section 6.1(f)), unless and until it is exchanged in whole for Certificated Warrants or Direct Registration Warrants, a Global Warrant Certificate may not be Transferred as a whole except by the Depositary to a nominee of the Depositary or by a nominee of the Depositary to the Depositary or another nominee of the Depositary or by the Depositary or any such nominee to a successor Depositary or a nominee of such successor Depositary.

   (f) *Restrictions on Transfer.* No Warrants or Warrant Exercise Shares shall be sold, exchanged or otherwise Transferred in violation of the Securities Act or state securities Laws or the Company's articles of incorporation. Notwithstanding anything in this Agreement to the contrary, until the Company separately becomes subject to the reporting requirements of the Exchange Act and the rules and regulations thereunder, no Transfer of Warrants is permitted if, after giving effect to such Transfer, and after giving effect to the conversion, exercise or exchange of all such Warrants, such Transfer would result in the Company becoming subject to the reporting requirements of the Exchange Act. If any Holder purports to Transfer Warrants to any Person in a transaction that would violate the provisions of this Section 6.1(f), such Transfer shall be void ab initio and of no effect.

   (g) *Exchange of Global Warrant Certificate.* A Global Warrant Certificate may be exchanged for another Global Warrant Certificate of like or similar tenor for purposes of complying with the practices and procedures of the Depositary.

   (h) *Cancellation of Global Warrant Certificate.* At such time as all beneficial interests in a Global Warrant Certificate have either been exchanged for Certificated Warrants or Direct Registration Warrants, exercised, redeemed, repurchased or cancelled, the Global Warrant Certificate shall be returned to, or retained and cancelled pursuant to applicable Law by, the Warrant Agent, upon written instructions from the Company satisfactory to the Warrant Agent.

Section 6.2    <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(a)  All Certificated Warrants or Direct Registration Warrants issued upon any registration of Transfer or exchange of Certificated Warrants or Direct Registration Warrants, respectively, shall be the valid obligations of the Company, entitled to the same benefits under this Agreement as the Certificated Warrants or Direct Registration Warrants surrendered upon such registration of Transfer or exchange. No service charge shall be made to a Registered Holder for any registration, Transfer or exchange of any Certificated Warrants or Direct Registration Warrants, but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the Registered Holder in connection with any such exchange or registration of Transfer. The Warrant Agent shall forward any such sum collected by it to the Company or to such Persons as the Company shall specify by written notice. The Warrant Agent shall have no obligation to effect an exchange or register a Transfer unless and until it is satisfied that all such taxes and/or charges have been paid.

(b)  So long as the Depositary, or its nominee, is the registered owner of a Global Warrant Certificate, the Depositary or such nominee, as the case may be, shall be considered by the Company, the Warrant Agent, and any agent of the Company or the Warrant Agent as the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Agreement (subject to <u>Sections 4.1(ii)</u> and <u>4.3(d)(z)</u>). Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy, or other authorization furnished by the Depositary or impair the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(c)  Subject to <u>Section 6.1(c)</u>, and this <u>Section 6.2</u>, the Warrant Agent shall:

(i)  in the case of Certificated Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Certificated Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of the Warrant Certificate representing such Certificated Warrants, properly endorsed for transfer, by the Registered Holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney; and upon any such registration of Transfer, a new Warrant Certificate shall be issued to the transferee; and

(ii)  in the case of Direct Registration Warrants, upon receipt of all information required to be delivered hereunder, from time to time register the Transfer of any outstanding Direct Registration Warrants in the Warrant Register, upon delivery by the Registered Holder thereof, at the Warrant Agent's office designated for such purpose, of a form of assignment substantially in the form of <u>Exhibit C</u> hereto, properly completed and duly executed by the Registered Holder thereof or by the duly appointed legal

representative thereof or by a duly authorized attorney; and upon any such registration of Transfer, a new Direct Registration Warrant shall be issued to the transferee.

Section 6.3      Fractional Warrants.

The Warrant Agent shall not effect any registration of Transfer or exchange which will result in the issuance of a fraction of a Warrant.

## ARTICLE VII

## OTHER PROVISIONS RELATING TO RIGHTS OF HOLDERS OF WARRANTS

Section 7.1      No Rights or Liability as Stockholder.

Nothing contained herein shall be construed as conferring upon the Holder or his, her or its transferees the right to vote or to receive dividends or to consent or to receive notice as a stockholder in respect of any meeting of stockholders for the election of directors of the Company or of any other matter, or any rights whatsoever as stockholders of the Company. The vote or consent of any Holder shall not be required with respect to any action or proceeding of the Company and no Holder shall have any right not expressly conferred hereunder or under, or by applicable Law with respect to, the Warrants held by such Holder. No Holder, by reason of the ownership or possession of a Warrant, shall have any right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date preceded, the date of the exercise of such Warrant. No provision thereof and no mere enumeration therein of the rights or privileges of the Holder shall give rise to any liability of such Holder for the Exercise Price hereunder or as a stockholder of the Company, whether such liability is asserted by the Company or by creditors of the Company.

Section 7.2      Notice to Registered Holders.

The Company shall give notice to Registered Holders by regular mail or electronic mail, and prompt written notice thereof to the Warrant Agent, if at any time prior to the expiration or exercise in full of the Warrants, any of the following events shall occur:

(a) the payment of any dividend payable in any securities upon shares of Common Stock or the making of any distribution (other than a regular quarterly cash dividend) to all holders of Common Stock;

(b) the issuance to all holders of Common Stock of any additional shares of Common Stock or other securities, or of rights, options or warrants to subscribe for or purchase Common Stock, other securities or of any other subscription rights, options or warrants;

(c) a Pro Rata Repurchase Offer;

(d) an Organic Change;

(e) a Change of Control;

29

(f)    a dissolution, liquidation or winding up of the Company; or

(g)    the occurrence of any other event that would result in an adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon exercise of the Warrants under <u>Article V</u>.

Such giving of notice shall be made at least ten (10) days prior to the record date or the date of closing of the Company's stock transfer books for the determination of the stockholders entitled to such dividend, distribution, additional shares of Common Stock, other securities, rights, options or warrants, or of the stockholders entitled to vote on such Organic Change, Change of Control, dissolution, liquidation or winding up (or, if there is no record date, the proposed effective date of such Organic Change, Change of Control, dissolution, liquidation or winding up), or the proposed commencement date or effective date of a Pro Rata Repurchase Offer or any other event that would result in an adjustment to the Exercise Price or the number of Warrant Exercise Shares issuable upon exercise of the Warrants under <u>Article V</u>. Such notice shall specify such record date or the date of closing the stock transfer books or proposed commencement date or effective date, as the case may be. Failure to provide such notice shall not affect the validity of any action taken. For the avoidance of doubt, no such notice (or the failure to provide it to any Holder) shall supersede or limit any adjustment called for by <u>Article V</u> by reason of any event as to which notice is required by this <u>Section 7.2</u>.

Section 7.3     <u>Lost, Stolen, Mutilated or Destroyed Warrant Certificates</u>.

If any Warrant Certificate is lost, stolen, mutilated or destroyed, the Company may issue, and upon written request by the Company, the Warrant Agent shall countersign (either by manual, facsimile or other electronically transmitted signature) and deliver, in exchange and substitution for and upon cancellation of the mutilated Warrant Certificate, or in lieu of and substitution for the Warrant Certificate lost, stolen or destroyed, a new Warrant Certificate of like tenor in accordance with written instructions from the Company, subject to (at the Company's or the Warrant Agent's request) reimbursement to the Company and the Warrant Agent of all reasonable expenses incidental thereto. In the case of Warrant Certificates other than Global Warrant Certificates, the Warrant Agent shall require evidence reasonably satisfactory to it of the loss, theft or destruction of such Warrant Certificate, and an open penalty surety bond satisfactory to it and holding the Company and the Warrant Agent harmless, absent notice to Warrant Agent that such certificates have been acquired by a bona fide purchaser.

Section 7.4     <u>Cancellation of Warrants</u>.

If the Company shall purchase or otherwise acquire Warrants (including the redemption of any unexercised portion of the Warrants in the event of a Change of Control in accordance with <u>Section 5.7</u>), such Warrants shall be cancelled and retired and shall cease to be outstanding for all purposes of this Agreement, in the case of Certificated Warrants or Direct Registration Warrants, by appropriate notation on the Warrant Register, and, in the case of Book-Entry Warrants, in accordance with the practices and procedures of the Depositary, including if required by such practices and procedures by appropriate notation on the applicable Global Warrant Certificate. Further, after the date of this Agreement, if the Plan is not confirmed by the Bankruptcy Court, the Company shall cause the cancellation of the Warrants and terminate this Agreement in accordance

with Section 9.12.

## ARTICLE VIII

## CONCERNING THE WARRANT AGENT AND OTHER MATTERS

Section 8.1    Resignation, Removal, Consolidation or Merger of Warrant Agent.

(a) *Appointment of Successor Warrant Agent.*  The Warrant Agent, or any successor to it hereafter appointed, may resign its duties and be discharged from all further duties and liabilities hereunder after giving thirty (30) days' notice in writing to the Company. In the event the transfer agency relationship in effect between the Company and the Warrant Agent terminates, the Warrant Agent will be deemed to have resigned automatically and be discharged from its duties under this Agreement as of the effective date of such termination. If the office of the Warrant Agent becomes vacant by resignation or incapacity to act or otherwise, the Company shall appoint in writing a successor Warrant Agent in place of the Warrant Agent. If the Company shall fail to make such appointment within a period of thirty (30) days after it has been notified in writing of such resignation or incapacity by the Warrant Agent or by the Holder of a Warrant, then the Holder of any Warrant may apply to the Supreme Court of the State of New York for the County of New York for the appointment of a successor Warrant Agent at the Company's cost.  The Company may, at any time and for any reason at no cost to the Holders, remove the Warrant Agent and appoint a successor Warrant Agent by written instrument signed by the Company and specifying such removal and the date when it is intended to become effective, one copy of which shall be delivered to the Warrant Agent being removed and one copy to the successor Warrant Agent.  Any successor Warrant Agent, whether appointed by the Company or by such court, shall be a Person organized and existing under the Laws of the United States of America, or any state thereunder, in good standing.  After appointment, any successor Warrant Agent shall be vested with all the authority, powers, rights, immunities, duties and obligations of its predecessor Warrant Agent with like effect as if originally named as Warrant Agent hereunder, without any further act or deed; but if for any reason it becomes necessary or appropriate, the predecessor Warrant Agent shall execute and deliver, at the expense of the Company and without assumption of any liability or any other obligation by the predecessor Warrant Agent, an instrument transferring to such successor Warrant Agent all the authority, powers, rights, immunities, duties and obligations of such predecessor Warrant Agent hereunder; and upon request of any successor Warrant Agent, the Company shall make, execute, acknowledge and deliver any and all instruments in writing for more fully and effectually vesting in and confirming to such successor Warrant Agent all such authority, powers, rights, immunities, duties and obligations.

(b) *Notice of Successor Warrant Agent.*  In the event a successor Warrant Agent shall be appointed, the Company shall (i) give notice thereof to the predecessor Warrant Agent and the transfer agent for the Common Stock not later than the effective date of any such appointment, and (ii) in the case of Certificated Warrants or Direct Registration Warrants, cause written notice thereof to be delivered to each Registered Holder at such Registered Holder's address appearing on the Warrant Register and, in the case of Book-Entry Warrants, cause written notice thereof to be delivered to the Depositary, or its nominee.  Failure to give any notice provided for in this Section 8.1(b) or any defect therein shall not affect the legality or

validity of the removal of the Warrant Agent or the appointment of a successor Warrant Agent, as the case may be.

(c)    *Merger, Consolidation or Name Change of Warrant Agent.*

(i)    Any Person into which the Warrant Agent may be merged or with which it may be consolidated or any Person resulting from any merger or consolidation to which the Warrant Agent shall be a party shall be the successor Warrant Agent under this Agreement, without any further act or deed, if such Person would be eligible for appointment as a successor Warrant Agent under the provisions of Section 8.1(a). If any of the Warrant Certificates have been countersigned but not delivered at the time such successor to the Warrant Agent succeeds under this Agreement, any such successor to the Warrant Agent may adopt the countersignature of any previous Warrant Agent; and if at that time any of the Warrant Certificates shall not have been countersigned, any successor to the Warrant Agent may countersign such Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

(ii)    If at any time the name of the Warrant Agent is changed and at such time any of the Warrant Certificates have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Warrant Certificates have not been countersigned, the Warrant Agent may countersign such Warrant Certificates either in its prior name or in its changed name; and in all such cases such Warrant Certificates shall have the full force provided in the Warrant Certificates and in this Agreement.

Section 8.2    Fees and Expenses of Warrant Agent.

(a)    *Remuneration.* The Company agrees to pay the Warrant Agent reasonable remuneration for its services as Warrant Agent hereunder as set forth in the fee schedule agreed upon by the Company and the Warrant Agent dated as of the date hereof and will reimburse the Warrant Agent upon demand for all reasonable and documented out-of-pocket expenses (including reasonable counsel fees and expenses), taxes and governmental charges and other charges of any kind and nature incurred by the Warrant Agent in connection with the negotiation, preparation, delivery, administration, execution, modification, waiver, delivery, enforcement or amendment of this Agreement and the exercise and performance of its duties hereunder.

(b)    *Further Assurances.* The Company agrees to perform, execute, acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be requested or required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

Section 8.3    Duties of Warrant Agent.

(a) *Covered Persons*. References to the Warrant Agent in this Section 8.3 shall include the Warrant Agent and its Affiliates, principles, directors, officers, employees, agents, representatives, attorneys, accountants, advisors and other professionals.

(b) *Liability*.

(i)    The Warrant Agent shall not be liable for or by reason of any of the statements of fact or recitals contained in this Agreement, the Warrant Statements or in the Warrant Certificates (except, in each case, its countersignature thereof) or be required to verify the same, and all such statements and recitals are and shall be deemed to have been made by the Company only. The Warrant Agent shall not be under any responsibility in respect of the validity or sufficiency of this Agreement or the execution and delivery hereof or in respect of the validity or execution of any Warrant Certificate (except, in each case, its countersignature therefor); nor shall the Warrant Agent be responsible for any breach by the Company of any covenant or condition contained in this Agreement; nor shall the Warrant Agent be responsible for the making of any adjustment in the Exercise Price or the number and/or kind of shares issuable upon the exercise of Warrants required under the provisions of Article V or be responsible for the manner, method or amount of any such change or the ascertaining of the existence of facts that would require any such change; nor shall the Warrant Agent by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Warrant Exercise Shares to be issued pursuant to this Agreement or any Warrant or as to whether any Warrant Exercise Shares will, when issued, be validly issued and fully paid and non-assessable. The Warrant Agent shall not be accountable or under any duty or responsibility for the application by the Company of the proceeds of the issue and sale, or exercise, of the Warrants.

(ii)    The Warrant Agent shall have no liability under, and no duty to inquire as to, the provisions of any agreement, instrument or document other than this Agreement.

(iii)    The Warrant Agent may rely on and shall incur no liability or responsibility to the Company, any Holder, or any other Person for any action taken, suffered or omitted to be taken by it upon any notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument furnished to the Warrant Agent hereunder and believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such notice, instruction, request, resolution, waiver, consent, order, certificate, affidavit, statement, or other paper, document or instrument. The Warrant Agent shall not take any instructions or directions except those given in accordance with this Agreement.

(iv)    The Warrant Agent shall act hereunder solely as agent for the Company and in a ministerial capacity and does not assume any obligation or relationship of agency or trust with any of the Holders, and its duties shall be determined solely by the express provisions hereof. The Warrant Agent shall not be liable for any action taken,

33

suffered or omitted to be taken in connection with this Agreement except to the extent that its own gross negligence, willful misconduct or bad faith (as each is determined by a final, non-appealable judgment of a court of competent jurisdiction) was the primary cause of any loss.

(v)    Anything in this Agreement to the contrary notwithstanding, in no event shall the Warrant Agent be liable for any special, incidental, punitive, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Warrant Agent has been advised of the likelihood of such loss or damage.  Notwithstanding anything contained in this Agreement to the contrary, any liability of the Warrant Agent under this Agreement, whether in contract, or in tort, or otherwise, shall be limited in the aggregate to, and shall not exceed, an amount equal to the fees and charges, but not including reimbursable expenses, paid by the Company to the Warrant Agent hereunder during the twelve (12) months immediately preceding the event for which recovery from the Warrant Agent is being sought.

(vi)    All rights and obligations contained in Section 8.2 and this Section 8.3 shall survive the termination of this Agreement and the resignation, replacement, incapacity or removal of the Warrant Agent. Without limiting the generality of the foregoing, all fees and expenses incurred by the Warrant Agent prior to or in connection with the resignation, replacement, incapacity or removal of the Warrant Agent shall be paid by the Company in accordance with this Section 8.3 notwithstanding such resignation, replacement, incapacity or removal of the Warrant Agent.

(vii)    The Warrant Agent shall not be under any liability for interest on any monies at any time received by it pursuant to the provisions of this Agreement.

(viii)    In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

(ix)    In the event the Warrant Agent believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, the Warrant Agent, may, in its sole discretion, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any Holder or other Person for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the satisfaction of Warrant Agent.

(c)    *Reliance on Company Statement*. Whenever in the performance of its duties under this Agreement, the Warrant Agent shall deem it necessary or desirable that any fact or matter be proved or established by the Company prior to taking or suffering any action hereunder, such fact or matter (unless other evidence in respect thereof be herein specifically

prescribed) may be deemed to be conclusively proved and established by a statement signed by an Appropriate Officer of the Company and delivered to the Warrant Agent. The Warrant Agent may rely upon such statement and shall not be liable for any action taken or suffered by it pursuant to the provisions of this Agreement.

(d) *Indemnity*. The Company agrees to indemnify, defend and protect the Warrant Agent and hold it harmless from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, that may be imposed on, incurred by, or asserted against the Warrant Agent, at any time, and in any way relating to or arising out of or in connection with, directly or indirectly, the execution, delivery or performance of this Agreement, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Warrant Agent; provided, however, that the Warrant Agent shall not be entitled to be so indemnified, defended, protected, saved and kept harmless to the extent such loss was caused by its own gross negligence, bad faith or willful misconduct (each as determined in a final non-appealable judgment of a court of competent jurisdiction). Further, the Warrant Agent shall provide prompt notice to the Company of any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses, including without limitation reasonable fees and disbursements of counsel, with respect to which it is requesting indemnification; provided, however, that any delay or failure of the Warrant Agent to give notice to the Company shall not relieve the Company of its indemnification obligations unless the Company is materially prejudiced by reason of such delay or failure. Notwithstanding the foregoing, the Company shall not be responsible for any settlement made without its written consent, which written consent shall not be unreasonably conditioned, withheld or delayed.

(e) *Exclusions*. The Warrant Agent shall have no responsibility with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except, in each case, its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement; nor shall it be responsible to make any adjustments required under the provisions of Article V hereof or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by any act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any Common Stock will, when issued, be valid and fully paid and non-assessable. The Warrant Agent will not be under any duty or responsibility to ensure compliance with any applicable federal or state securities Laws in connection with the issuance, Transfer or exchange of Warrants.

(f) The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, agents or employees, and the Warrant Agent shall not be answerable or accountable for any act, default, neglect or misconduct of any such attorneys, agents or employees or for any loss to the Company or any Person resulting from such neglect or misconduct, provided, that the Warrant Agent acts without gross negligence, willful misconduct or bad faith (each as determined in a

final, non-appealable decision of a court of competent jurisdiction) in connection with the selection of such attorneys, agents or employees.

(g)  The Warrant Agent may consult at any time with legal counsel satisfactory to it (who may be legal counsel for the Company) and the advice or opinion of such counsel shall be full and complete authorization and protection to the Warrant Agent as to any action taken or omitted by such parties in accordance with such advice or opinion.

(h)  The Warrant Agent may buy, sell, or deal in any of the Warrants or other securities of the Company freely as though it was not Warrant Agent under this Agreement. Nothing contained herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other Person.

(i)  The Warrant Agent shall not be required to use or risk its own funds in the performance of any of its obligations or duties or the exercise of any of its rights or powers, and shall not be required to take any action which, in the Warrant Agent's sole and absolute judgment, could involve it in expense or liability unless furnished with security and indemnity satisfactory to it.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

Section 9.1    Binding Effects; Benefits.  This Agreement shall inure to the benefit of and shall be binding upon the Company, the Warrant Agent and the Holders and their respective heirs, legal representatives, successors and assigns.  Nothing in this Agreement, expressed or implied, is intended to or shall confer on any Person other than the Company, the Warrant Agent and the Holders, or their respective heirs, legal representatives, successors or assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 9.2    Compliance with the Securities Act.

(a)  The Company shall be deemed the legal successor of the Debtors within the meaning of section 1145 of the Bankruptcy Code.  The Warrants are issued, and any shares of underlying Common Stock shall be issued, in reliance upon the exemption from the registration requirements of Section 5 of the Securities Act provided by section 1145 of the Bankruptcy Code.  Neither the Warrants nor any shares of underlying Common Stock will be registered under the Securities Act or any state or local Law requiring registration for offer or sale of a security.  To the extent a Holder is an "underwriter" as defined in section 1145(b) of the Bankruptcy Code, the Warrants and shares of underlying Common Stock may not be sold or Transferred in the absence of an effective registration statement under the Securities Act or an available exemption from registration thereunder.

(b)  The Company may stop any Transfer of Warrants or underlying Common Stock if (i) such Warrants or underlying Common Stock are not registered under the Securities Act and (ii) the Company has reasonable grounds to believe such Transfer may not be exempt from registration under the Securities Act.  The Company may require any Holder to provide evidence that a Transfer of Warrants or underlying Common Stock is exempt from registration

under the Securities Act if the Company has reasonable grounds to believe such Transfer may not be exempt.

(c)  To the extent the Company reasonably determines that the exemption from registration provided under section 1145 of the Bankruptcy Code is not available with respect to any issuance or Transfer of Warrants or shares of underlying Common Stock, the Warrant Certificates representing such Warrants or certificate representing such shares of underlying Common Stock may be stamped or otherwise imprinted with a legend, and the Warrant Register may include a restrictive notation with respect to such Warrants, in substantially the following form:

"THE WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF. "

In the event that such shares of underlying Common Stock are uncertificated, such shares shall be subject to a restrictive notation substantially similar to such legend in the stock ledger or other appropriate records maintained by the Company or its transfer agent.

(d)  Any legend or restrictive notation referenced in Section 9.2(c) shall be removed from the Warrant Register, Warrant Certificates or certificates for the shares of underlying Common Stock (or, in the case of uncertificated shares, from the appropriate

records) at any time after the restrictions described in such legend or restrictive notation cease to be applicable, _provided_, that the Company may request from any Holder opinions, certificates or other evidence that such restrictions have ceased to be applicable before removing such legend or restrictive notation.

Section 9.3    Notices.

Any notice, request, demand, document delivery or other communication required or which may be given or made hereunder shall be in writing and shall be sent by first-class mail, postage prepaid, certified or regular mail (return receipt requested, postage prepaid), by private national courier service, by personal delivery, by facsimile transmission or electronic mail ("e-mail")(except with respect to notices to the Warrant Agent).  Such notice, request, demand, document delivery or other communication shall be deemed given, provided, made or received (i) if mailed, two (2) days after the date of mailing, (ii) if sent by national courier service, one (1) Business Day after being sent, (iii) if delivered personally, when so delivered or (iv) if sent by e-mail or facsimile transmission, one (1) Business Day after such e-mail or facsimile is transmitted, in each case as follows:

if to the Warrant Agent, to:

> Computershare Inc.
> Voluntary Corporate Actions
> 250 Royall Street
> Suite V
> Canton, MA 02021
> Facsimile: (781) 575-2901
> Email: ed.eismont@computershare.com (as a courtesy copy, but which shall not constitute notice)

if to the Company, to:

> Appvion Holding Corp.
> 825 E, Wisconsin Avenue
> Appleton, Wisconsin 549121
> Attention: George Wurtz
> E-mail: george.wurtz@yahoo.com

with copies (which shall not constitute notice) to:

> O'Melveny & Myers LLP
> Times Square Tower
> 7 Times Square
> New York, NY 10036
> Facsimile: (212) 326-2000
> Attention: Daniel Shamah and Jeeho Lee
> Email: dshamah@omm.com and jeeholee@omm.com

if to Holders, in the case of Certificated Warrants and Direct Registration Warrants, at the

addresses, facsimile numbers or e-mail addresses of the Registered Holders as they appear in the Warrant Register and, if different, at the addresses, facsimile numbers or e-mail addresses appearing in the records of the transfer agent or registrar for the Common Stock, and in the case of Book-Entry Warrants, notice shall be delivered to the Depositary or its nominee.

Section 9.4    Persons Having Rights under this Agreement.

Nothing in this Agreement expressed and nothing that may be implied from any of the provisions hereof is intended, or shall be construed, to confer upon, or give to, any Person other than the parties hereto and the Holders, any right, remedy, or claim under or by reason of this Agreement or of any covenant, condition, stipulation, promise, or agreement hereof; provided, however, that the Second Lien Noteholders are intended third party beneficiaries of, and shall be entitled to enforce, the provisions of the proviso set forth in Section 5.7 and the Ad Hoc Group of Second Lien Noteholders are intended third party beneficiaries of, and shall be entitled to enforce, the provisions of the last two sentences of Section 9.12(a). All covenants, conditions, stipulations, promises, and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto, the Holders, the Second Lien Noteholders (with respect to the provisions of the proviso set forth in Section 5.7), the Ad Hoc Group of Second Lien Noteholders (with respect to the provisions set forth in the last two sentences of Section 9.12(a)) and each of their respective successors and assigns. Notwithstanding any provision to the contrary in this Agreement, from the date of this Agreement until the Date of Issuance, the Debtors will hold the Warrants in trust solely for the benefit of the Second Lien Noteholders and are not entitled to any rights conferred upon a Holder of Warrants or any other rights under this Agreement.

Section 9.5    Examination of this Agreement.

A copy of this Agreement, and of the entries in the Warrant Register relating to each Registered Holder's Warrants, shall be made available by the Warrant Agent at all reasonable times at an office designated for such purpose by the Warrant Agent, for examination by any Holder; provided, however, such Holder provides reasonable evidence of its Warrant holdings if reasonably requested by the Company.

Section 9.6    Counterparts.

This Agreement may be executed and transmitted in any number of original or facsimile or electronic PDF counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

Section 9.7    Effect of Headings.

The section headings herein are for convenience only and are not part of this Agreement and shall not affect the interpretation hereof.

Section 9.8    Amendments.

(a) Subject to Section 9.8(b) below, this Agreement may not be amended, supplemented, amended and restated, modified or waived except in writing signed by the Company and the Warrant Agent.

(b)  The Company and the Warrant Agent may from time to time amend, supplement, amend and restate, modify or waive this Agreement or the Warrants, solely as follows:

(i)  without the approval of any Holder in order to cure any ambiguity, manifest error or other mistake in this Agreement or the Warrants, or to correct or supplement any provision contained herein or in the Warrants that may be defective or inconsistent with any other provision herein or in the Warrants, or

(ii)  with the prior written consent of Requisite Holders; provided, however, that the consent of each Holder adversely affected thereby shall be required for any amendment, supplement, amendment and restatement, modification or waiver that (i) reduces the term of the Warrants (or otherwise modifies any provisions pursuant to which the Warrants may be terminated or cancelled), or (ii) increases the Exercise Price and/or decreases the number of Warrant Exercise Shares (or, as applicable, the amount of such other securities and/or assets) deliverable upon exercise of the Warrants, other than such increases and/or decreases that are made pursuant to Article V.

(c)  Notwithstanding anything to the contrary herein, upon the delivery of a certificate from an Appropriate Officer which states that the proposed amendment, supplement, amendment and restatement, modification or waiver is in compliance with the terms of this Section 9.8, the Warrant Agent shall execute such amendment, supplement, amendment and restatement, modification or waiver; provided that the Warrant Agent may, but shall not be obligated to, execute any amendment, supplement, amendment and restatement, modification or waiver that affects the Warrant Agent's rights, duties, immunities, liabilities or obligations hereunder.  No supplement or amendment to this Agreement shall be effective unless duly executed by the Warrant Agent. Any amendment, supplement, amendment and restatement, modification or waiver effected pursuant to and in accordance with the provisions of this Section 9.8 shall be binding upon all Holders and upon each future Holder, the Company and the Warrant Agent.  In the event of any amendment, supplement, amendment and restatement, modification or waiver, the Company shall give prompt notice thereof to all Registered Holders in the case of Certificated Warrants and Direct Registration Warrants, and to the Depositary or its nominee in the case of Book-Entry Warrants.  Any failure of the Company to give such notice or any defect therein shall not, however, in any way impair or affect the validity of any such amendment, supplement, amendment and restatement, modification or waiver.

(d)  Anything herein to the contrary notwithstanding, the Company and the Warrant Agent shall not amend, supplement, amend and restate, modify or waive this Agreement or any term, condition or provision hereof prior to the Date of Issuance and the distribution of the Warrants under the Plan to the Second Lien Noteholders pursuant to section 1145 of the Bankruptcy Code.

(e)  Nothing in this Section 9.8 shall change, affect, restrict or otherwise alter the provisions of Section 9.12 or any of the provisions of the Settlement Agreement relating to the subject matter of Section 9.12.

Section 9.9      No Inconsistent Agreements.

The Company shall not, on or after the date hereof, enter into any agreement with respect to its securities which conflicts with the rights granted to the Holders in this Agreement or the obligations of the Company in this Agreement.  The Company represents and warrants to the Holders that the rights granted to the Holders hereunder and the obligations of the Company hereunder do not in any way conflict with any other agreement, document, instrument or contract to which the Company is a party or to which it is otherwise subject or bound as of the date hereof, including any of the rights granted to holders of the Company's securities under any other agreements.

Section 9.10      Integration/Entire Agreement.

As between the Warrant Agent, on the one hand, and the Company and the Holders, on the other hand, this Agreement and the Warrants are intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company, the Warrant Agent and the Holders in respect of the subject matter contained herein. As between the Company and the Holders, this Agreement, together with the Settlement Agreement, is intended by the parties as a final expression of their agreement and intended to be a complete and exclusive statement of the agreement and understanding of the Company and the Holders in respect of the subject matter contained herein.  There are no restrictions, promises, warranties or undertakings, other than those set forth or referred to herein with respect to the Warrants (and in the Settlement Agreement, as between the Company and the Holders). This Agreement supersedes all prior agreements and understandings between the parties with respect to the Warrants (except for the Settlement Agreement, as between the Company and the Holders, but not the Warrant Agent).

Section 9.11      Governing Law, Etc.

This Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the Laws of the State of New York and for all purposes shall be governed by and construed in accordance with the Laws of such State. Each party hereto consents and submits to the exclusive jurisdiction of the courts of the State of New York located in New York County and of the U.S. federal courts located in the Southern District of New York in connection with any action or proceeding brought against it that arises out of or in connection with, that is based upon, or that relates to this Agreement or the transactions contemplated hereby.  In connection with any such action or proceeding in any such court, each party hereto hereby waives personal service of any summons, complaint or other process and hereby agrees that service thereof may be made in accordance with the procedures for giving notice set forth in Section 9.3 hereof.  Each party hereto hereby waives any objection to jurisdiction or venue in any such court in any such action or proceeding and agrees not to assert any defense based on forum *non conveniens* or lack of jurisdiction or venue in any such court in any such action or proceeding.

Section 9.12      Termination.

(a)  This Agreement will terminate on the earliest of (i) such date when all Warrants have been exercised with respect to all shares subject thereto, (ii) the expiration of the

Exercise Period, (iii) upon written notice by the Company to the Warrant Agent in accordance with the last sentence of this Section 9.12(a); and (iv) the consummation of a Change of Control and the irrevocable payment by the Company of the applicable cash payments in accordance with the terms of Section 5.7. Pursuant to the terms of the Settlement Agreement, if the Effective Date does not occur or upon the happening or existence of any event that shall render the Effective Date incapable of occurring, the Ad Hoc Group of Second Lien Noteholders may, at its election, require the Company to (x) cancel the Warrants and (y) enter into a new warrant agreement (on the same terms as this Agreement) and issue new warrants for the purchase of shares of Common Stock (on the same terms as the Warrants) directly to the Second Lien Noteholders; provided, that, such issuance is exempt from the registration requirements of the Securities Act and any other applicable federal or state securities laws; provided, however, that the Company shall use its best efforts to ensure that such issuance is exempt. If the Company shall receive any such election by the Ad Hoc Group of Second Lien Noteholders referred to in the immediately preceding sentence, then the Company shall immediately deliver to the Warrant Agent a written notice electing to terminate this Agreement and shall immediately enter into a new warrant agreement and issue new warrants to the Second Lien Noteholders, as described in the immediately preceding sentence and contemplated by the Settlement Agreement.

(b) The provisions of Section 8.2, Section 8.3 and this Article IX shall survive such termination and the resignation, replacement or removal of the Warrant Agent.

Section 9.13  Waiver of Trial by Jury.

Each party hereto, including each Holder by its receipt of a Warrant, hereby irrevocably and unconditionally waives the right to a trial by jury in any action, suit, counterclaim or other proceeding (whether based on contract, tort or otherwise) arising out of, connected with or relating to this Agreement and the transactions contemplated hereby.

Section 9.14  Remedies.

The Company hereby agrees that, in the event that the Company violates any provisions of the Warrants (including the obligation to deliver shares of Common Stock upon the exercise thereof), the remedies at Law available to the Holder of such Warrant may be inadequate. In such event, the Requisite Holders and, other than in the event the Company fails to deliver Warrant Exercise Shares upon a Holder's exercise of its Warrants (which shall not require the consent of the Requisite Holders), with the prior written consent of the Requisite Holders, the Holder of such Warrants, shall have the right, in addition to all other rights and remedies any of them may have, to specific performance and/or injunctive or other equitable relief with respect to the Company to enforce the provisions of this Agreement and the Warrants.

Section 9.15  Bank Accounts.

All funds received by Computershare under this Agreement that are to be distributed or applied by Computershare in the performance of its services hereunder (the "Funds") shall be held by Computershare as agent for the Company and deposited in one or more bank accounts to be maintained by Computershare in its name as agent for the Company. Until paid pursuant to the

terms of this Agreement, Computershare will hold the Funds through such accounts in: deposit accounts of commercial banks with Tier 1 capital exceeding $1 billion or with an average rating above investment grade by Standard & Poor's Financial Services LLC (Long-Term Local Issuer Credit Rating), Moody's Investors Service (Long Term Rating) and Fitch Ratings, Inc. (Long-Term Issuer Default Rating) (each as reported by Bloomberg Finance L.P.). Computershare shall have no responsibility or liability for any diminution of the Funds that may result from any deposit made by Computershare in accordance with this paragraph, including any losses resulting from a default by any bank, financial institution or other third party. Computershare may from time to time receive interest, dividends or other earnings in connection with such deposits. Computershare shall not be obligated to pay such interest, dividends or earnings to the Company, any holder or any other party.

Section 9.16    Severability.

In the event that any one or more of the provisions contained in this Agreement, or the application thereof in any circumstances, is held invalid, illegal or unenforceable, the validity, legality and enforceability of any such provisions in every other respect and of the remaining provisions contained herein shall not be affected or impaired thereby; provided, however, that if any such excluded provision shall adversely affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to immediately resign.

Section 9.17    Confidentiality.    The Warrant Agent and the Company agree that the Warrant Register and personal, non-public Holder information, which are exchanged or received pursuant to the negotiation or carrying out of this Agreement, shall remain confidential and shall not be voluntarily disclosed to any other Person, except as may be required by Law, including, without limitation, pursuant to subpoenas from state or federal government authorities (e.g., in divorce and criminal actions), or pursuant to the requirements of the SEC.

Section 9.18    Information Rights.

(a)    The Company shall make available to each Holder, within ninety (90) days after the end of each fiscal year of the Company, an annual report with respect to the Company and its Subsidiaries containing:

(i)    audited year-end consolidated financial statements of the Company and its consolidated Subsidiaries (including balance sheets, statements of operations and statements of cash flows that would be required from an SEC registrant in an Annual Report on Form 10-K (or any successor or comparable form) prepared in accordance with GAAP, including a report on the annual financial statements by certified independent accountants; and

(ii)    the information described in Items 101 and 303 of Regulation S-K under the Securities Act ("*Description of Business*" and "*Management's Discussion and Analysis of Financial Condition and Results of Operations*," respectively) with respect to such period, to the extent such information would otherwise be required to be filed in an Annual Report on Form 10-K if the Company were required to file such report with the SEC.

(b)  The Company shall make available to each Holder, within forty-five (45) days after the end of each fiscal quarter, a quarterly report with respect to the Company and its Subsidiaries containing:

(i)    unaudited quarterly consolidated financial statements of the Company and its consolidated Subsidiaries (including balance sheets, statements of operations and statements of cash flows) that would be required from an SEC registrant in a Quarterly Report on Form 10-Q, (or any successor or comparable form) prepared in accordance with GAAP, subject to normal year-end adjustments; and

(ii)    the information described in Item 303 of Regulation S-K under the Securities Act with respect to such period, to the extent such information would otherwise be required to be filed by an SEC registrant in a Quarterly Report on Form 10-Q if the Company were required to file such report with the SEC.

(c)  The Company shall make available to each Holder, within five (5) Business Days after the occurrence of each event that would have been required to be reported in a Current Report on Form 8-K if the Company had been a reporting company under the Exchange Act, current reports containing substantially all of the information that would have been required to be contained in a Current Report on Form 8-K under the Exchange Act under such items if the Company had been a reporting company under the Exchange Act; provided, however, that (i) no such current report will be required to be furnished if the Company determines in its good faith judgment that such event is not material to stockholders or the business, assets, operations, financial positions or prospects of the Company and its Subsidiaries, taken as a whole, and (ii) the Company shall not be required to provide information required by Items 3.02 (Unregistered Sales of Equity Securities), 5.02(e) (Executive Compensation) or 5.07 (Submission of Matters to a Vote of Security Holders).

(d)  Notwithstanding the foregoing and for the avoidance of doubt, (i) the Company shall not be required to furnish any information, certificates or reports required by Section 302, Section 404 or Section 906 of the Sarbanes-Oxley Act of 2002, or related Items 307, 308, 402 or 407 of Regulation S-K, (ii) the information and reports referred to in Sections 9.18(a), (b) and (c) will not be required to contain the separate financial statements or other information contemplated by Rule 3-05, Rule 3-09, Rule 3-10 or Rule 3-16 of Regulation S-X, (iii) the information and reports referred to in Sections 9.18(a), (b) and (c) shall not be required to present compensation or beneficial ownership information and (iv) the information and reports referred to in Sections 9.18(a), (b) and (c) shall not be required to include any exhibits required by Item 5 or 15 of Form 10-K or Item 6 of Form 10-Q.

(e)  The Company shall:

(i)    within ten (10) Business Days after causing the annual report required by Section 9.18(a)(i) or the quarterly report required by Section 9.18(b)(i) to be furnished to the Holders, use commercially reasonable efforts to hold a conference call to discuss such report and the results of operations for the applicable reporting period with the Holders;

(ii)    issue a notice to the Holders no fewer than three (3) Business Days prior to the date of the conference call required to be held in accordance with this Section 9.18(e), announcing the time and date of such conference call and either including all information necessary to access the call or directing the Holders to contact the appropriate person at the Company to obtain such information; and

(iii)    maintain a website (which shall be non-public and password protected) to which the Holders, holders of Common Stock, prospective investors of Common Stock or Warrants that certify that they are accredited investors and that they are not involved in the design or manufacturing of specialty and high value-added coated paper products or otherwise competitors of the Company, bona fide purchasers of the Common Stock or Warrants that certify that they are not involved in the design or manufacturing of specialty and high value-added coated paper products or otherwise competitors of the Company, and broker dealers or market makers are given access and to which all of the information required by this Section 9.18 is posted.

(f)    The Company may cease providing the information set forth in Section 9.18 (i) upon the date when no Warrants remain outstanding, (ii) during any period starting with the date ninety (90) days before the Company's good-faith estimate of the date of filing of a registration statement with the SEC if the Company reasonably concludes that it must do so during such period to comply with the SEC's rules and regulations applicable to such registration statement and related offering; provided, that the Company's obligations under this Section 9.18 will be reinstated (including with respect to any information that the Company had ceased providing during such period) at such time as the Company is no longer actively employing its commercially reasonable efforts to cause such registration statement to become effective, and (iii) during any period during which the Company is a reporting company under the Exchange Act.  Further, the Company may elect not to provide (x) any information that would otherwise be included in an annual report delivered pursuant to Section 9.18(a) or a quarterly report delivered pursuant to Section 9.18(b), in either case to the extent that such information addresses the Company's future prospects or events that may occur in the future that would reasonably likely have a material effect on the Company, or (y) any information that would otherwise be included in a Current Report on Form 8-K delivered pursuant to Section 9.18(c), in each case, if the Company reasonably determines, in good faith, that the disclosure of such information would interfere with any financing, acquisition, corporate reorganization, strategic or other similar transaction involving the Company or its Subsidiaries (each, a "Blackout Period"), provided, however, that the Company may not institute a Blackout Period for more than two (2) consecutive quarters.

[*Signature Page Follows*]

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned parties hereto as of the date first above written.

APPVION HOLDING CORP.

By: _____
Name: George W. Wurtz III
Title: Chairman, President and Chief
Executive Order

COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST COMPANY, N.A.
collectively, as Warrant Agent

By: _____
Name:
Title:

[*Signature Page to Warrant Agreement*]

IN WITNESS WHEREOF, this Agreement has been duly executed by the undersigned parties hereto as of the date first above written.

APPVION HOLDING CORP.


By: _____
        Name: George W. Wurtz III
        Title:  Chairman, President and Chief
                Executive Order

COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST COMPANY, N.A.
collectively, as Warrant Agent


By: *Collinekeogu*
        Name:  Collin Ekeogu
        Title:
            Manager, Corporate Actions

*[Signature Page to Warrant Agreement]*

**EXHIBIT A-1**

**THE TRANCHE A WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE A WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE A WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE A WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.**

**FACE OF GLOBAL WARRANT CERTIFICATE FOR TRANCHE A WARRANTS**

**VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON June 13, 2023**

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred pursuant to Section 6.1(e) of the Warrant Agreement and as set forth below.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee or as otherwise set forth in Section 6.1(e) of the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

THE SECURITIES REPRESENTED BY THIS TRANCHE A GLOBAL WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS TRANCHE A GLOBAL WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS TRANCHE A WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

### TRANCHE A WARRANT TO PURCHASE

### 244,167 SHARES OF COMMON STOCK OF

### APPVION HOLDING CORP.*

CUSIP # 03835B 118
ISSUE DATE:  [●]

No. [W-1A]

     This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after [●]$^1$ until a period ending at 5:00 p.m., New York time, on June 13, 2023, the number of fully paid and non-assessable shares of Common Stock, par value $0.01 per share ("Common Stock") of the Company set forth above at the Tranche A Exercise Price (as defined in the Warrant Agreement). The Tranche A Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement. The initial Tranche A Exercise Price shall be $27.17.

     This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

---

\*    Exercisable for 244,167 shares of Common Stock for all Tranche A Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.

$^1$    This date is the Effective Date.

IN WITNESS WHEREOF, this Tranche A Warrant Global Certificate has been duly executed by the Company as of the [●] day of [●].

APPVION HOLDING CORP.

By: _____

Print Name: _____

Title: _____

Attest: _____

Computershare Inc., and Computershare Trust
Company, N.A. collectively, as Warrant
Agent

By: _____
     Name:
     Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

FORM OF REVERSE OF TRANCHE A GLOBAL WARRANT CERTIFICATE

The Tranche A Warrants evidenced by this Global Warrant Certificate are a part of a duly authorized issue of Tranche A Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used but not defined in this Global Warrant Certificate that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof (subject to Section 4.3(d)(z) of the Warrant Agreement) and for all other purposes (subject to Section 4.1(ii) of the Warrant Agreement), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-2**

**THE TRANCHE B WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, _PROVIDED_ THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS GLOBAL WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE B WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE B WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE B WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.**

FACE OF GLOBAL WARRANT CERTIFICATE FOR TRANCHE B WARRANTS

VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

This Global Warrant Certificate is held by The Depository Trust Company (the "Depositary") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any person under any circumstances except that (i) this Global Warrant Certificate may be exchanged in whole but not in part pursuant to Section 6.1(g) of the Warrant Agreement, (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Section 6.1(h) of the Warrant Agreement and (iii) this Global Warrant Certificate may be transferred pursuant to Section 6.1(e) of the Warrant Agreement and as set forth below.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depositary to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co. or such other entity as is requested by an authorized representative of the Depositary (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depositary), any transfer, pledge or other use hereof for value or otherwise by or to any person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

Transfers of this Global Warrant Certificate shall be limited to transfers in whole, but not in part, to nominees of the Depositary or to a successor thereof or such successor's nominee or as otherwise set forth in Section 6.1(e) of the Warrant Agreement.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

THE SECURITIES REPRESENTED BY THIS TRANCHE B GLOBAL WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS TRANCHE B GLOBAL WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

THIS TRANCHE B WARRANT WILL BE VOID IF NOT EXERCISED PRIOR TO
5:00 P.M., NEW YORK CITY TIME, ON JUNE 13, 2023

### TRANCHE B WARRANT TO PURCHASE

### 244,167 SHARES OF COMMON STOCK OF

### APPVION HOLDING CORP.*

CUSIP # 03835B 126
ISSUE DATE:  [●]

No. [W-1B]

This certifies that, for value received, Cede & Co. and its registered assigns (collectively, the "Registered Holder"), is entitled to purchase from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after [●][2] until a period ending at 5:00 p.m., New York time, on June 13, 2023, the number of fully paid and non-assessable shares of Common Stock, par value $0.01 per share ("Common Stock") of the Company set forth above at the Tranche B Exercise Price (as defined in the Warrant Agreement).  The Tranche B Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche B Exercise Price shall be $31.25.

This Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

---

*  Exercisable for 244,167 shares of Common Stock for all Tranche B Warrants in the aggregate, subject to adjustment in accordance with Article V of the Warrant Agreement.
[2]  This date is the Effective Date.

IN WITNESS WHEREOF, this Tranche B Warrant Global Certificate has been duly executed by the Company as of the [•] day of [•].

APPVION HOLDING CORP.

By: _____

Print Name: _____

Title: _____

Attest: _____

Computershare Inc., and Computershare Trust Company, N.A. collectively, as Warrant Agent

By: _____
     Name:
     Title:

Address of Registered Holder for Notices (until changed in accordance with this Warrant):
Cede & Co.
55 Water Street
New York, New York 10041

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

FORM OF REVERSE OF TRANCHE B GLOBAL WARRANT CERTIFICATE

The Tranche B Warrants evidenced by this Global Warrant Certificate are a part of a duly authorized issue of Tranche B Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement hereby is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used but not defined in this Global Warrant Certificate that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws.

This Warrant does not entitle the Registered Holder to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof (subject to Section 4.3(d)(z) of the Warrant Agreement) and for all other purposes (subject to Section 4.1(ii) of the Warrant Agreement), and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-3**

THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "BANKRUPTCY CODE") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, PROVIDED THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE A WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE A WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE A WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE A WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "WARRANT AGREEMENT").

Certificate Number _____

Warrants _____
CUSIP  03835B 118

This certifies that

is the holder of

TRANCHE A WARRANTS TO PURCHASE COMMON STOCK OF
APPVION HOLDING CORP.

transferable on the books of the Company by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed.  Each Tranche A Warrant entitles the holder and its registered assigns (collectively, the "Registered Holder") to purchase by exercise from Appvion Holding Corp., a Delaware corporation (the "Company"), subject to the terms and conditions hereof, at any time after [•][3] until a period ending at 5:00 p.m., New York time, on June 13, 2023, one fully paid and non-assessable share of Common Stock, par value $0.01 per share ("Common Stock") of the Company at the Tranche A Exercise Price (as defined in the Warrant Agreement). The Tranche A Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche A Exercise Price shall be $27.17.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

---

[3]    This date is the Effective Date.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the facsimile signatures of the Company's duly authorized officers.

DATED

_____

Authorized Officer

Attest:

COUNTERSIGNED AND
REGISTERED
**COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST
COMPANY, N.A.**
COLLECTIVELY, AS WARRANT
AGENT

_____
Secretary

By _____

AUTHORIZED SIGNATURE

FORM OF REVERSE OF TRANCHE A WARRANT

APPVION HOLDING CORP.

The Tranche A Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Tranche A Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, dated as of June 13, 2018, between Appvion Holding Corp. (the "Company") and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent" and the agreement, the "Warrant Agreement"), a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Warrants represented by this Warrant Certificate do not entitle the Registered Holder to any of the rights of a stockholder of the Company. The Company and the Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT A-4**

THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE HAVE BEEN, AND THE SECURITIES ISSUABLE UPON THE EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE WILL BE, ISSUED PURSUANT TO SECTION 1145 OF THE U.S. BANKRUPTCY CODE, AS AMENDED (THE "<u>BANKRUPTCY CODE</u>") THAT PROVIDES AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED (THE "<u>SECURITIES ACT</u>"), AND APPLICABLE STATE STATUTES, AND MAY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED WITHOUT REGISTRATION UNDER THE SECURITIES ACT, <u>PROVIDED</u> THAT THE HOLDER IS NOT DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE. IF THE HOLDER IS DEEMED TO BE AN UNDERWRITER AS SUCH TERM IS DEFINED IN SECTION 1145(B) OF THE BANKRUPTCY CODE, THEN THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE MAY ONLY BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED (1) PURSUANT TO (A) A REGISTRATION STATEMENT WITH RESPECT TO SUCH SECURITIES THAT IS EFFECTIVE UNDER THE SECURITIES ACT OR (B) AN AVAILABLE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT RELATING TO THE DISPOSITION OF SECURITIES AND (2) IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. NO TRANCHE B WARRANT MAY BE SOLD, EXCHANGED OR OTHERWISE TRANSFERRED IN VIOLATION OF THE SECURITIES ACT OR STATE SECURITIES LAWS. ACCORDINGLY, THE COMPANY RECOMMENDS THAT HOLDERS OF TRANCHE B WARRANTS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH TRANCHE B WARRANTS OR THE SECURITIES ISSUABLE UPON EXERCISE THEREOF.

THE SECURITIES REPRESENTED BY THIS WARRANT CERTIFICATE (INCLUDING THE SECURITIES ISSUABLE UPON EXERCISE OF THE TRANCHE B WARRANTS REPRESENTED BY THIS WARRANT CERTIFICATE) ARE SUBJECT TO ADDITIONAL AGREEMENTS SET FORTH IN THE WARRANT AGREEMENT DATED AS OF JUNE 13, 2018, BY AND BETWEEN THE COMPANY AND THE WARRANT AGENT (THE "<u>WARRANT AGREEMENT</u>").

Certificate Number _____

Warrants _____
CUSIP  03835B 126

This certifies that

is the holder of

TRANCHE B WARRANTS TO PURCHASE COMMON STOCK OF
APPVION HOLDING CORP.

transferable on the books of the Company by the holder hereof in person or by duly authorized attorney upon surrender of the certificate properly endorsed.  Each Tranche B Warrant entitles the holder and its registered assigns (collectively, the "<u>Registered Holder</u>") to purchase by exercise from Appvion Holding Corp., a Delaware corporation (the "<u>Company</u>"), subject to the terms and conditions hereof, at any time after [●][4] until a period ending at 5:00 p.m., New York time, on June 13, 2023, one fully paid and non-assessable share of Common Stock, par value $0.01 per share ("<u>Common Stock</u>") of the Company at the Tranche B Exercise Price (as defined in the Warrant Agreement). The Tranche B Exercise Price and the number and kind of shares purchasable hereunder are subject to adjustment from time to time as provided in Article V of the Warrant Agreement.  The initial Tranche B Exercise Price shall be $31.25.

---

[4] This date is the Effective Date.

To the extent that any provision hereof conflicts with any provision of the Warrant Agreement, the provision in the Warrant Agreement shall control.

This certificate is not valid unless countersigned and registered by the Warrant Agent.

**WITNESS** the facsimile signatures of the Company's duly authorized officers.

DATED

_____
Authorized Officer

Attest:

COUNTERSIGNED AND
REGISTERED
**COMPUTERSHARE INC., AND
COMPUTERSHARE TRUST
COMPANY, N.A.**
COLLECTIVELY, AS WARRANT
AGENT

_____
Secretary

By _____
AUTHORIZED SIGNATURE

FORM OF REVERSE OF TRANCHE B WARRANT

APPVION HOLDING CORP.

The Tranche B Warrants evidenced by this Warrant Certificate are a part of a duly authorized issue of Tranche B Warrants to purchase 244,167 shares of Common Stock issued pursuant to the Warrant Agreement, dated as of June 13, 2018, between Appvion Holding Corp. (the "Company") and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent" and the agreement, the "Warrant Agreement"), a copy of which may be inspected at the office of the Warrant Agent designated for such purpose. The Warrant Agreement is incorporated by reference in and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the Registered Holders of the Warrants. All capitalized terms used in this Warrant Certificate but not defined that are defined in the Warrant Agreement shall have the meanings assigned to them therein.

The Company shall not be required to issue fractions of Common Stock or any certificates that evidence fractional Common Stock. No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act or state securities laws. The Warrants represented by this Warrant Certificate do not entitle the Registered Holder to any of the rights of a stockholder of the Company. The Company and the Warrant Agent may deem and treat the Registered Holder hereof as the absolute owner of this Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

**EXHIBIT B-1**

### EXERCISE FORM FOR REGISTERED HOLDERS HOLDING CERTIFICATED WARRANTS
(To be executed upon exercise of Warrants)

The undersigned Registered Holder of this Warrant Certificate, being the holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[5] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent") hereby irrevocably elects [(subject to the immediately succeeding paragraph of this Exercise Form)] to exercise [Tranche A] [Tranche B] Warrants, for the purchase of [_____] shares of Common Stock, par value $0.01 per share ("Common Stock") and (check one):

☐    herewith tenders payment for _____ of the Warrant Exercise Shares to the order of Appvion Holding Corp. in the amount of $_____ in accordance with the terms of the Warrant Agreement; or

☐    agrees that it is electing to use the cashless exercise provisions set forth in Section 4.3(b) of the Warrant Agreement by authorizing the Company to withhold and not issue to the undersigned Registered Holder, in payment of the Exercise Price for the Warrant Exercise Shares set forth above, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares set forth above, and (y) the Exercise Price, and divided by (ii) the Current Sale Price on the Exercise Date. This exercise and election shall be immediately effective [(subject to the immediately succeeding paragraph of this Exercise Form)].

[The undersigned is exercising [Tranche A] [Tranche B] Warrants pursuant to this Exercise Form in connection with, or in contemplation of, the occurrence of: [Describe Change of Control (including the date on which, or range of dates during which, such Change of Control is expected to occur)]. The undersigned hereby elects to condition such exercise upon the occurrence of such Change of Control and such exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the dates, specified in this paragraph.]

The undersigned requests that the Warrant Exercise Shares, or the net number of shares of Common Stock issuable upon exercise of the [Tranche A] [Tranche B] Warrants pursuant to the cashless exercise provisions of Section 4.3(b) of the Warrant Agreement, be issued in the name of the undersigned Holder or as otherwise indicated below:

Name        _____
Address     _____
            _____
Email       _____

If said number of [Tranche A] [Tranche B] Warrants shall not be all the [Tranche A] [Tranche B] Warrants represented by the applicable Warrant Certificate, the undersigned requests that a new Warrant Certificate representing the balance of such [Tranche A] [Tranche B] Warrants shall be issued in the name of the undersigned Holder or as otherwise indicated below and be delivered to the address indicated below:

Name        _____
Address     _____
            _____
Email       _____

---

[5] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

Delivery Address (if different)

_____

_____

Dated: _____, 20___

HOLDER

[_____]

By _____

Name:

Title:

**EXHIBIT B-2**

### EXERCISE FORM FOR REGISTERED HOLDERS HOLDING DIRECT REGISTERED WARRANTS
(To be executed upon exercise of Warrants)

The undersigned Holder, being the holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[6] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively as warrant agent (together with their respective successors and assigns, the "Warrant Agent"), hereby irrevocably elects [(subject to the immediately succeeding paragraph of this Exercise Form)] to exercise [Tranche A] [Tranche B] Warrants, for the purchase of [_____] shares of Common Stock, par value $0.01 per share ("Common Stock") and (check one):

☐ herewith tenders payment for _____ of the Warrant Exercise Shares to the order of Appvion Holding Corp. in the amount of $_____ in accordance with the terms of the Warrant Agreement; or

☐ agrees that it is electing to use the cashless exercise provisions set forth in Section 4.3(b) of the Warrant Agreement by authorizing the Company to withhold and not issue to the undersigned Registered Holder, in payment of the Exercise Price for the Warrant Exercise Shares set forth above, a number of such Warrant Exercise Shares equal to (i) the product of (x) the number of Warrant Exercise Shares set forth above, and (y) the Exercise Price, and divided by (ii) the Current Sale Price on the Exercise Date. This exercise and election shall be immediately effective [(subject to the immediately succeeding paragraph of this Exercise Form)].

[The undersigned is exercising [Tranche A] [Tranche B] Warrants pursuant to this Exercise Form in connection with, or in contemplation of, the occurrence of: [Describe Change of Control (including the date on which, or range of dates during which, such Change of Control is expected to occur)]. The undersigned hereby elects to condition such exercise upon the occurrence of such Change of Control and such exercise shall be deemed revoked if such Change of Control does not occur on the date, or within the dates, specified in this paragraph.]

The undersigned requests that the Warrant Exercise Shares, or the net number of shares of Common Stock issuable upon exercise of the [Tranche A] [Tranche B] Warrants pursuant to the cashless exercise provisions of Section 4.3(b) of the Warrant Agreement, be issued in the name of the undersigned Holder or as otherwise indicated below:

Name _____

Address _____

_____

Email _____

---

[6] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

**EXHIBIT C**

FORM OF ASSIGNMENT
FOR REGISTERED HOLDERS
HOLDING DIRECT REGISTRATION WARRANTS
(To be executed only upon assignment of Warrants)

For value received, the undersigned Holder of [Tranche A] [Tranche B] Warrants of Appvion Holding Corp., issued pursuant to that certain Warrant Agreement, dated as of June 13, 2018 (the "Warrant Agreement"),[7] by and among Appvion Holding Corp. (the "Company"), and Computershare Inc., a Delaware corporation and its wholly-owned subsidiary, Computershare Trust Company N.A., a federally chartered trust company, collectively]as warrant agent (together with their respective successors and assigns, the "Warrant Agent"), hereby sells, assigns and transfers unto the assignee(s) named below the number of [Tranche A] [Tranche B] Warrants listed opposite the respective name(s) of the assignee(s) named below, and all other rights of the Holder under said [Tranche A] [Tranche B] Warrants, and does hereby irrevocably constitute and appoint _____ attorney, to transfer said [Tranche A] [Tranche B] Warrants, as and to the extent set forth below, on the Warrant Register maintained for the purpose of registration thereof, with full power of substitution in the premises:

| Name(s) of Assignee(s) | Address of Assignee(s) | Number of [Tranche A] [Tranche B] Warrants |
|---|---|---|
| _____ | _____ | _____ |

Dated: _____, 20__

Signature: _____

Name: _____

Note: The above signature and name should correspond exactly with the name of the Holder of the [Tranche A] [Tranche B] Warrants as it appears on the Warrant Register.

---

[7] Capitalized terms used but not defined herein shall have the meanings given to them in the Warrant Agreement.

**SCHEDULE 4:**

**Identity of the Trust Oversight Committee**

## Identification of the Trust Oversight Committee

The Creditors' Committee and the Ad Hoc Group of Second Lien Noteholders have selected and appointed the following entities to serve on the Trust Oversight Committee:

| Member Type | Member Name | Number of Votes |
|---|---|---|
| UCC Member | Pace Industry Union-Management Pension Fund | 1 |
| UCC Member | Pension Benefit Guaranty Corporation, | 1 |
| 2L Member | Barings LLC | 1 |
| 2L Member | Cross Sound Management LLC | 2 |

**SCHEDULE 5:**

**ESOP Committee Professionals**

EAST\158243192.2

100250-00001

**LEGAL REPRESENTATION AGREEMENT**
(Commercial Contingent Fee Arrangement)
(☐With/☒Without Advance Costs Deposit)

THIS AGREEMENT is entered into as of this _____ day of _____, 2018, in Phoenix, Arizona, by and between _____, whose principal address is  (hereinafter referred to as "Client") and BEUS GILBERT PLLC, 701 North 44th Street, Phoenix, Arizona 85008-6504 (hereinafter referred to as "Counsel").

1.    **SCOPE OF ENGAGEMENT.**

1.1.    __Matter Involved__. Client has engaged Counsel to undertake the legal representation of Client in a matter (hereinafter referred to as the "Matter") involving work on claims or evaluation of claims on behalf of the ESOP, the ESOP Committee, or Grant Lyon in his capacity as an ESOP Committee member, or any other tasks requested by Grant Lyon.

This Legal Representation Agreement shall be presented to _____ for their prior approval.

1.2.    __Counsel Functions__.  Counsel agrees to provide its legal services in return for the covenants and promises made by Client herein.  Counsel will perform such legal services as it shall deem appropriate to the Matter. It is specifically understood and agreed by Client that Counsel does not, by this Agreement, promise to perform any specific act of legal representation, nor does Counsel promise to obtain any particular result.  Client acknowledges that Client has relied upon no oral representations to the contrary in entering into this Agreement.

1.3.    __Client Functions__.  Client agrees to perform the following functions:

(a)    __Payment__.  To pay Counsel for the performance of such legal services, and to pay for all fees, costs, charges and expenses incurred in connection therewith, as specified in Section 2 below.

(b)    __Cooperation__.  To cooperate fully with Counsel in representing Client in the Matter.

(c)    __Multiple Clients__.  If Counsel is representing multiple Clients jointly in the Matter, it is each Client's responsibility to advise Counsel if any information concerning the Matter is confidential and is to be withheld from the other Clients.  Otherwise, all relevant communications received from any Client in the Matter will be fully disclosed to the others.  If such a situation arises, Counsel will advise the other Clients that a confidence exists (without divulging it) and will determine if any of the other Clients has any objection to Counsel receiving, retaining, and withholding from them such information.  Counsel retains the right to withdraw from representing any one or more of Clients involved, if in the sole discretion of Counsel, a conflict of interest arises by reason of such confidences which mandates such a withdrawal.

(d)    __Other__.  Such other functions as may be reasonably requested by Counsel from time to time.

(e)    __Authorization and Decision-Making__.  ~~Client authorizes and directs Counsel to take all actions which Counsel deems advisable on Client's behalf in the Matter.  Counsel agrees to notify Client of all significant developments and to consult with Client in advance as to any significant decisions attendant to those developments.~~

2.    **LEGAL FEES AND EXPENSES.**

2.1.    __Method of Determining Fees__.  Client and Counsel agree that the following method is to be used for determining the amount of legal fees:

(a)    Client agrees to pay Counsel a fee contingent upon the outcome of the Matter.  If any recovery is made in the Matter on Client's behalf, Client agrees to pay to Counsel, for legal services rendered, a sum equal to:

| | |
|---|---|
| 25% | of any and all sums recovered by way of settlement of the Matter or any portion thereof prior to instituting a lawsuit; or |
| 33 1/3% | of any and all sums recovered either as a result of trial or by way of settlement of the Matter or any portion thereof after a lawsuit has been instituted; or |
| 40% | of any and all sums recovered if any judgment is appealed, either on behalf of Client or by any adverse party, or if garnishment or any proceeding after judgment is brought to collect the judgment or any portion thereof; or |
| 50% | of any and all sums recovered if the Matter is the subject of a retrial as ordered by a trial or appellate court. |

If there is no recovery, except as provided in Section 3 hereof, there shall be no fees owed by Client to Counsel for representation in the Matter.  Further, it is agreed that if there is no recovery, Client shall not be responsible for fees, costs, charges and expenses as described in Section 2.2 herein.  To the extent there is a partial recovery, Client shall be responsible for fees, costs, charges and expenses to the extent of that recovery, but no more.  In the event there are partial recoveries during the course of the representation, Counsel shall be entitled to costs and expenses and interest thereon as described in Section 2.2 herein, along with interest as described in Section 2.3(d) herein to the extent of recoveries.

(b)    Client agrees that Counsel may deduct from the proceeds of any recovery the applicable fee as agreed upon above, along with all other fees, costs, charges and expenses, with interest, as described in Section 2.2 herein for which Client is responsible and which remain unpaid at the time the recovery proceeds are received.

(c)    Such fee shall be computed on the basis of the gross recovery.  The gross recovery will be total amounts recovered, including cancellation or forgiveness of debt owed by Client, punitive damages, attorneys' fees, interest, and the fair market value of any property, real or personal, tangible or intangible, recovered whether by settlement or judgment, without reduction for the fees, costs, charges and expenses paid by Client or advanced by Counsel in connection with providing legal representation to Client in the Matter.  The fair market value of any property shall be agreed upon by Client and Counsel, and, if they are unable to agree, shall be determined by an appraiser mutually agreeable to Counsel and Client, or if Counsel or Client cannot agree upon an appraiser, an appraiser selected by a Judge of the Superior Court of Maricopa County, Arizona.

(d)    Counsel agrees to make no compromise or settlement in the Matter without the approval of Client as to the specific settlement or compromise.  Counsel agrees to notify Client whenever an offer of settlement or compromise is received by Counsel, and to inform Client of the amount of that offer, and the recommendation of Counsel as to the acceptability thereof.  Likewise, Client agrees to make no compromise or settlement in the Matter without the approval of Counsel.  Client agrees to notify Counsel whenever an offer of settlement or compromise is received by Client, and to inform Counsel of the amount and terms of any such offer.

(e)    Client hereby grants Counsel a lien upon, and security interest in, the claims or causes of action and on any sum recovered by way of settlement and on any judgment that may be recovered in an amount equal to Counsel's fees and other fees, costs, charges and expenses incurred by Counsel pursuant to this Agreement.  Counsel may, in its discretion, execute on Client's behalf and cause to be filed with appropriate agencies, UCC Financing Statements evidencing the foregoing security interest.  Counsel shall have all general, possessory, or retaining liens, and all special or charging liens known to the common law or available under law.

(f)    Client hereby authorizes Counsel to fully investigate the facts and the law relative to the Matter.  Upon the conclusion of such investigation Counsel shall have the discretionary right to determine that it is

not feasible to pursue the Matter, and upon notification to Client of such determination Counsel shall be entitled to withdraw from any further representation of Client pursuant to this Agreement. In such event no legal fees shall be payable to Counsel, but Client agrees to promptly pay Counsel for all fees, costs, charges and expenses incurred pursuant to Section 2.2 hereof prior to the date of such withdrawal in the event there are recoveries or partial recoveries.

(g)    In the event a settlement proposal is made to Client with the affirmative recommendation of Counsel, Counsel shall have the right, if such settlement proposal is rejected by Client, to withdraw from any further representation of Client pursuant to this Agreement upon written notice thereof by Counsel to Client. In such event Client agrees to promptly pay Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of withdrawal, and for all other fees, costs, charges and expenses incurred pursuant to Section 2.2 hereof prior to the date of such withdrawal.

2.2.    Other Fees, Costs, Charges and Expenses.

(a)    Retention of Third Parties. Client authorizes Counsel to retain and agrees to pay the fees and charges of every other person or entity hired by Counsel to perform necessary services related to the Matter. Such other persons and entities may include, but are not limited to, court reporters, appraisers, real estate agents, escrow agents, accountants, investigators, expert witnesses, trust officers, stock brokers, title examiners, surveyors, land planners, engineers, expert consultants, and other attorneys hired for ancillary matters in other localities. Client authorizes Counsel, in its discretion, to direct such other persons and entities to render invoices for services rendered and expenses advanced either directly to Client or to Counsel, in which event Client agrees to promptly pay the full amount of such invoices upon Client's receipt thereof.

(b)    Expenses. Client acknowledges that Counsel may incur various costs, charges and expenses in providing services to Client. Client agrees to reimburse Counsel for all costs, charges and expenses paid or incurred by Counsel. Such costs, charges and expenses include, but are not limited to, charges for serving and filing papers, courier and messenger services, recording and certifying documents, depositions, transcripts, investigations, witnesses, long-distance telephone calls, title insurance premiums, photocopies, printing, facsimiles, overtime clerical assistance, travel expenses, and postage. In addition, Client agrees to reimburse Counsel for all costs, charges and expenses, paid or incurred by Counsel, for Electronic Data Management such as, but not limited to, OCR and ESI processing, document conversion, image branding, video deposition synchronizing and data hosting performed by outside vendors at the actual invoice amount and, if performed in-house, at rates comparable to those charged by outside vendors. Counsel's current charges for photocopies are $0.25 per page and for facsimile transmissions, $1.00 per page. All other internal charges, such as long distance telephone and computerized legal research will be billed at an amount which approximates Counsel's total cost for the items, including an allowance for direct labor and administration.

2.3.    Schedule of Billing and Payments. Client and Counsel agree to the following schedule of billing and payments for fees and expenses:

(a)    Legal Fees. Legal fees determined by the method described in this Agreement will be billed to the Client at the above address.

(b)    Other Fees, Costs, Charges and Expenses. Other fees, costs, charges and expenses incurred by Counsel for Client in the Matter will be billed to Client as they are incurred by Counsel, or may, in Counsel's discretion, be accumulated or billed monthly to Client.

(c)    Payment in Full. Client agrees to pay in full the amount of each separate invoice rendered under Subsection 2.3(c) for other fees, costs, charges and expenses immediately upon receipt except fees, costs, charges and expenses shall be paid solely out of recoveries.

(d)    Interest. Any other fees, costs, charges and expenses incurred by Counsel on behalf of Client not paid by Client to Counsel shall accrue interest at a rate of one and one-fourth percent (1-1/4%) per month from the date the fee, cost, charge or expense is incurred until paid.

(e)    Execution of Promissory Note. Client agrees that in the event any sums are not fully paid on or before the due date thereof, Client, upon the request of Counsel, shall execute in favor of Counsel a promissory note affirming the obligation of Client to pay such sums together with any interest referenced to above. Such promissory note shall contain terms that are fair and reasonable to Client. Prior to signing the promissory note, Counsel shall forward such promissory note to Client and shall advise Client, in writing, that, prior to its signing, Client should seek advice of and consult with independent counsel of Client's choice in regards to the terms of the promissory note. Counsel cannot advise Client as to the fairness and reasonableness of the terms of such promissory note. No note shall require payment in excess of the amount of recovery.

2.4.    Information Provided in Invoices. Counsel agrees to include in the invoices sent to Client a general identification of the services of Counsel for which Client is being charged and a specific identification of all other fees, costs, charges and expenses for which Counsel seeks reimbursement.

2.5.    Payments Directly to Counsel. The parties agree that any amounts recovered, whether by settlement, judgment, or otherwise, shall be payable directly to Counsel, to be held in trust until such time as Counsel shall become entitled to payment for fees, costs, charges and expenses, as provided for in this Agreement, at which time Counsel shall be entitled to pay itself those fees, costs, charges and expenses from such amounts being held in trust, and to remit all remaining amounts to Client.

## 3.    GENERAL MATTERS.

3.1.    Assigned Claims. Client and Counsel recognize that some or all of the claims asserted by Counsel on behalf of Client may include claims which are assigned by Client to others, including a liquidating trustee. Client acknowledges that Counsel has no obligation to any party other than Client and no obligation to pursue any claim other than those claims which may lawfully be brought by Client under applicable law. The attorney/client relationship is solely between Counsel and Client.

3.2.    Information to Be Made Available to Client. Counsel agrees to make reasonable efforts to keep Client informed at all times as to the status of the Matter and as to the courses of action which are being followed, or are being recommended, by Counsel. Counsel agrees to make reasonably available to Client for reading in Counsel's office all written materials sent or received by Counsel pertaining to the Matter. Copies of all such materials will be provided at Client's request and Client's expense. All of Counsel's work product will be owned by Counsel.

3.3.    Confidentiality.

(a)    Client's communications with Counsel are generally protected by the attorney-client privilege and ethical rules prohibiting the disclosure of information relating to Counsel's representation of Client. Counsel will undertake reasonable efforts to maintain the confidentiality of such communications and information; however, Client authorizes Counsel to disclose such communications and information to the extent Counsel deems necessary in order to carry out Counsel's representation of Client in the Matter. Client further authorizes Counsel to disclose that Counsel represents Client in the Matter and/or that Counsel has represented Client in other matters. Client may revoke this consent by informing Counsel in writing that Client no longer consents to such disclosure.

(b)    Counsel may from time to time communicate about the Matter with Client or third parties via facsimile, mobile telephone, instant message, text message, email or other form of electronic communication. Counsel may also store Client's documents and other documents relating to Counsel's representation of Client in electronic format, and these documents may be stored on servers maintained by third parties. Counsel may preserve these documents in electronic format only and may destroy any paper copies. Data may be transmitted and stored in unencrypted format. No form of communication or data storage is completely secure, and these forms of communication and data storage have some risk of unauthorized interception, unauthorized access, corruption or loss even though Counsel employs reasonable measures to maintain the security, integrity and confidentiality of Client's information. Client hereby acknowledges these risks and consents to Counsel's use of these technologies in connection with Counsel's representation of Client. Client agrees to provide Counsel with an email address that Counsel may use for correspondence relating to Counsel's representation of Client. Client agrees to check this email address regularly. Client is responsible for ensuring that third parties do not have access to his/her/its email

4

address, so that Client can receive confidential correspondence from Counsel at this email address. Client is further responsible for ensuring that Client's "spam" filters do not block emails from Counsel and that emails with attachments can be received at this email address. Client agrees to notify Counsel promptly if Client becomes unable to receive emails at this email address, the security of Client's emails has been compromised or any other issue arises that would affect Counsel's communication with Client by email. Client agrees to inform Counsel if any document or information provided by Client requires enhanced security measures for any reason.

      3.4.   <u>Conflicting Engagement</u>.  Counsel agrees not to accept, without prior approval from Client, any engagement known by Counsel to be in direct conflict with the interests of Client in the Matter. If, in the course of representing multiple Clients, Counsel determines in its sole discretion that a conflict of interest exists, Counsel will notify all affected Clients of such conflict and may withdraw from representing any one or more of the Clients to the extent such a withdrawal would be permitted or required by applicable provisions of the Arizona Rules of Professional Conduct or the rules of courts of the State of Arizona or of the state in which the Matter is pending.

      3.5.   <u>No Guarantees</u>.

        (a)   It is impossible for Counsel to predict the total amount of fees, costs, charges and expenses that will be incurred in regard to Counsel's representation of Client. No guarantees have been made, nor can they be made, to Client with respect to the fees, costs, charges and expenses relating to such representation. Any estimate of fees, costs, charges and expenses that Counsel may have discussed represents only an estimate of such fees, costs, charges and expenses.

        (b)   Litigation necessarily involves many risks beyond Counsel's control. During the course of Counsel's representation, Counsel may express opinions or beliefs concerning the litigation or various courses of action and the results that might be anticipated. Any such statement made by anyone on behalf of Counsel is intended to be an expression of opinion only, based on information available to Counsel at the time, and it should not be construed by Client as a promise or guarantee of the outcome. Counsel cannot and does not guarantee that the outcome of the Matter will be acceptable to Client or that any particular result will be achieved.

      3.6.   <u>Awards of Fees and Costs</u>.

        (a)   There may be a statutory or contractual basis for the award of attorneys' fees and costs in the Matter. In Counsel's experience, however, the court rarely orders one party to pay all of the fees of attorneys and other professionals incurred by the other party, and the court may order each party to pay all of such party's own attorneys' and other professional fees and costs. The court's determination of the attorneys' fees and other professional fees and costs that Client may recover from, or be obligated to pay, the opposing party shall not constitute a determination concerning the reasonableness of the fees and costs charged by Counsel or payable by Client. If the court orders the opposing party to pay Client's fees, costs, charges or expenses, Client is still responsible for the payment of all fees, costs, charges and expenses due hereunder, whether or not the other party actually pays the court-ordered fees, costs, charges and expenses.

        (b)   Client should realize that, in the event that Client does not prevail in the Matter, the opponent may have the right to recover its attorneys' fees, costs, charges and expenses from Client. Payment of any such award of fees, costs, charges and expenses is exclusively Client's responsibility. For this reason, it is essential that Client always consider the reasonableness of Client's position before Counsel is directed to proceed with a claim or defense or to reject an offer of settlement.

      3.7.   <u>Termination of Representation</u>.  The relationship established by this Agreement is subject to termination only as follows:

        (a)   <u>Withdrawal by Counsel</u>.  Counsel reserves the right to withdraw from any representation if Client fails to honor this Agreement, or if Counsel concludes at any time that the Matter does not merit further representation or for any other condition that exists which would permit or require withdrawal under the Arizona Rules of Professional Conduct or by the rules of courts of the State of Arizona or of the state in which the Matter is pending. Notification of withdrawal shall be made in writing to Client. In the event of such withdrawal, Client

agrees to promptly pay Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of withdrawal, and all other fees, costs, charges and expenses incurred pursuant to Section 2.2 of this Agreement prior to the date of such withdrawal.

(b)    Termination for Cause.  Client reserves the right to terminate the representation for cause if Counsel fails to honor this Agreement. Notification of the termination shall be made in writing to Counsel. In the event of any such termination by Client, Counsel waives any further rights to compensation relative to the representation; provided, however, that Client shall promptly pay Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of termination, and for all other fees, charges, and expenses incurred pursuant to Section 2.2 of this Agreement through the date of such termination.

(c)    Termination Without Cause.    Client further reserves the right to terminate the representation without cause, and shall notify Counsel in writing of any such termination. In the event of any such termination, Counsel's compensation due hereunder shall be whichever of the following Counsel elects: (a) prompt payment to Counsel upon receipt of an invoice from Counsel for all services rendered by Counsel, calculated on the basis of actual hours expended at Counsel's normal schedule of hourly rates in effect at the time of termination, and all other fees, charges, and expenses incurred prior to the date of such termination, as provided in Section 2.2 of this Agreement; or (b) a continuing contingent fee as provided in this Agreement, to be shared with successor counsel on the basis of relative time spent by Counsel and successor counsel through the conclusion of the Matter.

(d)    Transition.  Upon termination of this representation for any reason, by either Client or Counsel, Counsel agrees to cooperate with any successor counsel to accommodate a smooth transition of the representation, and upon payment of all amounts owed to Counsel hereunder, to transfer Client files to such successor counsel.

## 4.    ARBITRATION.

4.1.    Arbitration.  As a material term to Counsel's engagement, both Client and Counsel agree to settle any claim, controversy, dispute or any other disagreement of any nature, type or description regardless of the facts or legal theories which may be involved ("Dispute") **arising out of or relating to the professional services rendered to Client by Counsel including, without limitation, issues as to legal fees and costs and claims for professional malpractice, breach of fiduciary duty, breach of contract or any other claim based upon any alleged misconduct or any other alleged breach of duty, by binding arbitration in the City of Phoenix, Arizona**, in accordance with the following:

(a)    The party seeking to initiate arbitration ("Disputing Party") shall notify the other party ("Answering Party") in writing that the Disputing Party demands arbitration as provided hereinbelow, setting forth in specific terms the Disputing Party's proposed statement of the matters in Dispute to be submitted to arbitration and the name and address of the arbitrator selected by the Disputing Party.  Within seven (7) business days following receipt of the Disputing Party's written arbitration demand complying with the requirements of this Subsection 4.1(a), the Answering Party shall notify the Disputing Party in writing, setting forth in specific terms the Answering Party's proposed statement of the matters in Dispute and identifying the name and address of the arbitrator selected by the Answering Party.

(b)    The two (2) arbitrators so selected shall meet and confer within twenty (20) days after receipt by the Disputing Party of the Answering Party's written notice as called for under Subsection 4.1(a) above, and if they are unable within said twenty (20) day period to reach a decision on the matters in Dispute, they shall, at the expiration of said twenty (20) day period, jointly select a third arbitrator. If said arbitrators are unable to choose the third arbitrator, Client and Counsel shall choose the third arbitrator; provided, however, that all arbitrators shall be disinterested individuals knowledgeable in disputes between legal counsel and clients and shall have had not less than fifteen (15) years' experience in litigating, arbitrating or adjudicating disputes between legal counsel and clients in metropolitan Phoenix, Arizona. Subject to the foregoing, the arbitrators, including the third arbitrator, may be selected from any area in the United States. Upon selection of the third arbitrator, the three (3) arbitrators shall, within ten (10) days thereafter, schedule an arbitration hearing at a date, time and place (in metropolitan Phoenix,

6

Arizona) designated by said arbitrators by a majority vote, written notice of which shall be given to the parties not later than thirty (30) days prior to said hearing date. The commencement of the arbitration hearing shall occur no more than one hundred and twenty (120) days from the initial demand for arbitration. At the hearing, each party may be represented by counsel and present testimony and evidence. If at the commencement of the hearing the parties cannot agree on a joint statement of the matters in Dispute to be submitted to the arbitrators, the arbitrators shall be empowered to frame the issue(s). A Certified Court Reporter's transcript may be demanded by any party or by the arbitrators and said official transcript shall be prepared, completed, and delivered to the arbitrators with copies to each party within ten (10) days following the conclusion of the hearing. The original transcript shall be paid for by the party requesting the transcription or the costs of transcription shall be shared equally by the parties if the transcript is requested by the arbitrators. Arbitration sessions following the initial session, if necessary, shall be scheduled by the arbitrators so that the arbitration proceedings (i.e., presentation of evidence and closing arguments, if permitted) are completed within twenty (20) days of the initial session. Each party shall be given the opportunity to file with the arbitrators simultaneous written briefs seven (7) days following receipt by the arbitrators of the official transcript but, if no transcript is demanded as provided in this Agreement, said briefs shall be filed simultaneously seven (7) business days following conclusion of the hearing. Copies of any such briefs shall be provided to the other party concurrently upon filing with the arbitrators.

(c)     Within ten (10) days following the receipt by the arbitrators of the brief(s) (or within ten (10) days following conclusion of the hearing if all parties waive briefs), the arbitrators shall make and deliver to the parties their decision and award in writing. The arbitrators shall have the authority to enter any award or to grant any relief which could be obtained in an Arizona court applying Arizona substantive law and giving full effect to the terms of this Agreement. Reasonable attorneys', expert witnesses', paralegals', arbitrators' and experts' fees, expenses, costs and necessary disbursements of arbitration may be awarded as the arbitrators see fit, consistent with the provisions of this Agreement. A reasoned award shall not be required. The arbitrators, and not any court, shall have the power and authority to decide whether the matter(s) in dispute is/are subject to arbitration; i.e., the arbitrators shall decide arbitrability. The arbitrators shall have no authority to modify, amend or alter the provisions of this Agreement and shall base their decision and award on the language contained in this Agreement and the facts giving rise to the Dispute as presented on the record at the hearing. The parties may mutually stipulate in writing to extend or to shorten the prescribed time periods (including a stipulation to expedite the referral and submission to arbitration) in this Section 4. All provisions of this Agreement not in dispute shall be observed and performed by the parties without interruption during the pendency of any proceeding called for under this Section 4. **Any arbitration award shall be final, binding and conclusive upon Client and Counsel, shall be non-appealable, and shall be enforceable in all courts of competent jurisdiction. Client and Counsel agree that to the extent permitted by law, binding arbitration, as provided in this Section 4, is the sole and exclusive remedy of such parties and Client and Counsel each waive and forego any and all rights to pursue any action in any court or other legal forum to resolve any Dispute.**

(d)     If a third arbitrator is required pursuant to Subsection 4.1(b) above, each party shall pay its pro rata share of any required retainer or other payments required by such arbitrator upon such arbitrator's demand, with the ultimate responsibility for the arbitrators' fees to be determined by the arbitrators in the final arbitration award pursuant to Subsection 4.1(c) above; otherwise, each party shall bear its own costs, charges and expenses in connection with any proceedings under this Section and, in any event, each party shall pay the fees of the arbitrator it selects.

4.2.    <u>Advantages of Arbitration</u>. The advantages of arbitration include:

(a)     The decisions of the arbitrators are final and are subject only to very limited review by the courts.

(b)     Costs are usually lower as compared to cost of court proceedings.

(c)     Generally, a final resolution can be reached more quickly through arbitration.

(d)     Normally, parties in arbitration have greater control over procedural matters and can set a timetable for hearings.

7

(e)     Arbitration can offer more confidentiality and privacy than a court hearing.

(f)     Procedures are relatively informal; rules of evidence are not strictly adhered to.

(g)     Arbitration usually provides a friendlier forum than litigation.

(h)     Arbitration possibly allows for more creative solutions than a court may offer.

(i)     Arbitrators are generally selected because of their knowledge of the subject matter, and the parties have the benefit of the arbitrators' experience.

4.3.    <u>Disadvantages of Arbitration</u>.  **The disadvantages of arbitration include:**

(a)     **In arbitration, the parties are waiving their right to litigate in court, including their right to a jury trial.**

(b)     **Arbitration is final and binding on the parties.  The right to appeal or seek modification of arbitrators' rulings is extremely limited.**

(c)     **Discovery in arbitration is generally more limited than discovery in court.**

(d)     **Arbitrators are not required to include factual findings or legal reasoning in their awards.**

(e)     **Costs of an arbitrator or arbitrators can be significant because of the number of arbitrators that may be required to participate, depending on the complexity of the arbitration.**

4.4.    <u>Review By Independent Counsel</u>.  If Client has any questions regarding the effect of Arbitration on the Client's rights in the event of a Dispute arising under this Agreement and the waiver of such rights, prior to signing this Agreement, Client should seek advice of and consult with independent counsel of Client's choice in regard to the terms of these arbitration provisions.

5.      **ADDITIONAL MATTERS.**

5.1.    <u>Commencement of Representation</u>.  Counsel shall not be required to commence representation of Client in the Matter until Counsel receives a copy of this Agreement signed by Client.

5.2.    <u>Retention of Files</u>.  Counsel agrees to assert reasonable efforts, subject to Subsection 3.7(d) hereof and causes beyond the control of Counsel, to retain and maintain the files relative to the Matter for a period of five (5) years following the conclusion of the Matter.  Thereafter, prior to destruction of such files, Counsel agrees to use reasonable efforts to notify Client at the Client's principal address stated above or such other address as Client provides to Counsel hereafter in writing, or to the e-mail address of Client hereafter provided.  In the alternative, Counsel may deliver the entire file to Client, in which case Counsel shall have no further responsibility in regards to Counsel's retention of the files.  Counsel shall not be required to maintain a copy of the files upon such delivery to Client, and Client shall take adequate measures to protect such files.

5.3.    <u>Original Documents</u>.  Upon termination of the representation, Counsel agrees to deliver to Client all original documents received by Counsel during the course of Counsel's engagement relative to the Matter.

5.4.    <u>Complete Integration; Binding Upon All Parties; Severability</u>.  This Agreement contains the entire agreement between Client and Counsel regarding Counsel's handling of the Matter and the fees, costs, charges and expenses to be paid relative thereto.  This Agreement shall not be modified, nor shall Counsel's contractual obligations with respect to the Matter be enlarged, except by written agreement signed by Client and by a member of Counsel.  This Agreement shall be binding upon Client and Counsel and their respective heirs, executors, legal

8

representatives, and successors. If any portion of this Agreement is determined to be invalid or unenforceable, the remaining portions shall continue to be binding and enforceable in accordance with their terms. The headings and captions used in this Agreement are for convenience and ease of reference only and shall not be used to construe, interpret, expand or limit the terms of this Agreement.

5.5.    Multiple Parties.  If more than one individual signs this Agreement on behalf of Client, the liability of all such persons shall be joint and several.

5.6.    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona.

CLIENT HAS READ THE FOREGOING LEGAL REPRESENTATION AGREEMENT AND CLIENT'S SIGNATURE BELOW INDICATES THAT CLIENT FULLY UNDERSTANDS AND AGREES TO ALL OF THE TERMS OF THIS AGREEMENT INCLUDING, BUT NOT LIMITED TO, ITS ARBITRATION PROVISIONS.  THE TERMS OF THE ENGAGEMENT OF COUNSEL, AS STATED ABOVE, ARE HEREBY ACCEPTED AND APPROVED BY CLIENT.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

CLIENT: _____

Grant Lyon

_IN SOLE CAPACITY AS TRUSTEE_
Title of signer (if applicable) _In my capacity_

E-Mail Address:  glyon@caissacap.com

COUNSEL:     BEUS GILBERT PLLC

By: _____
Leo R. Beus, Founding Member

*Signed during meeting in New York on June 5*

BEUS GILBERT PLLC

SCHEDULE OF RATES

June 2016

## HOURLY RATES[1]

Members ................................................................................................. $335 - $730

Associates ............................................................................................ $185 - $275

Planning Consultants ......................................................................... $245

Assistant Planning Consultants........................................................ $110

Paralegals .......................................................................................... $175 - $205

Project Assistants.............................................................................. $55 - $100

Support Staff Overtime..................................................................... $18 - $53

---

[1] These rates are subject to change from time to time.

**EXHIBIT B**

**LIQUIDATION ANALYSIS**

## Liquidation Analysis

The Debtors believe that the Plan satisfies section 1129(a)(7) of the Bankruptcy Code and that each Holder of an Impaired Claim or Interest will receive value under the Plan on the Effective Date that is not less than the value such holder would receive if the Debtors liquidated under chapter 7 of the Bankruptcy Code. This liquidation analysis and the conclusions set forth herein represent management's best judgment regarding the results of such a liquidation. This liquidation analysis was prepared for the sole purpose of assisting the Bankruptcy Court and Holders of Impaired Claims or Interests in making this determination and should not be used for any other purpose. Nothing contained in this liquidation analysis is intended as or constitutes a concession or admission for any purpose other than the presentation of a hypothetical Chapter 7 liquidation analysis for purposes of meeting the requirements of section 1129(a)(7) of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Combined Plan and Disclosure Statement.

The liquidation analysis is shown on a consolidated basis and reflects the estimated cash proceeds, net of liquidation-related costs, that would be realized if the Debtors liquidated under chapter 7 of the Bankruptcy Code commencing immediately. Also reflected is an analysis of estimated cash proceeds available under the Debtors' chapter 11 Plan of Liquidation, for purposes of comparison. Management of the Debtors prepared the liquidation analysis with the assistance of AP Services, LLP. A number of estimates and assumptions underlie the analysis that, while considered reasonable, are inherently subject to significant uncertainties and contingencies beyond the control of the Debtors, management and their advisors. Independent accountants have not examined or reviewed the liquidation analysis. THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO LIQUIDATEUNDER CHAPTER 7.

The liquidation analysis assumes that the Debtors' liquidation would commence under the direction of a Chapter 7 trustee and would continue for a period of two months. During this time, all of the Debtors' assets would be sold and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with the priorities established under the Bankruptcy Code.

The liquidation itself would likely trigger certain priority payments that otherwise would not be due in the ordinary course of business. These priority payments would be made in full before any distribution of proceeds to pay Holders of general unsecured claims or to make distributions in respect of Interests. The liquidation may also create a larger number of unsecured creditors that would subject the chapter 7 estates to additional claims.

The liquidation analysis contains an estimate of the value of Claims that ultimately will become Allowed Claims based on the Debtors' books and records as of July 31, 2018. The Debtors have not evaluated, nor has the Bankruptcy Court determined, the amount of each such Claim. Accordingly, the final amount of Allowed Claims may differ from the Claim amounts presented in this liquidation analysis. Upon information and belief, the Debtors

1

do not believe that any variance between the estimates contained herein and the final Allowed Claims would have a material effect on the liquidation analysis for purposes of section 1129(a)(7) of the Bankruptcy Code.

The liquidation analysis further assumes that there are no recoveries from the pursuit of any potential preferential payments or fraudulent conveyances, or from any other causes of action, which would be expected to be the same under both a chapter 7 and a chapter 11 scenario.

**Appvion, Inc.**
**Liquidation Analysis**
**As of June 13, 2018\***

$000s

| | | Note | Chapter 7 Liquidation Low Recovery | Chapter 7 Liquidation High Recovery | Chapter 11 Liquidation |
|---|---|---|---|---|---|
| **A.** | **Estimated Proceeds** | | | | |
| | Cash | 1 | $ 11,284 | $ 11,284 | 11,284 |
| | Restricted Cash - Escrow | 2 | 5,228 | 5,228 | 5,228 |
| | Other Receivable | 3 | 1,568 | 1,568 | 1,568 |
| | D & O Insurance Refund Receivable | 4 | 15 | 15 | 15 |
| | Settlement Proceeds | 5 | 950 | 950 | 950 |
| | Total Estimated Proceeds | | 19,045 | 19,045 | 19,045 |
| **B.** | **Estimated Wind-Down Expenses** | | | | |
| | Corporate Wind-Down Expenses | 6 | (183) | (183) | (183) |
| | Ch 11 and Wind-Down Professional Fees | 7 | (12,113) | (12,113) | (12,113) |
| | Ch. 7 Trustee Fees | 8 | (571) | (571) | - |
| | Ch. 7 Professional Fees | 9 | (1,050) | (700) | - |
| | Chapter 11 Trustee fees | | - | - | (350) |
| | Total Estimated Wind-Down Expenses | | (13,918) | (13,568) | (12,646) |
| | **Estimated Proceeds Available for Claim Distributions** | | $ 5,127 | $ 5,477 | $ 6,399 |
| **C.** | **Estimated Administrative Claims** | | | | |
| | 503(b)(9) Claims | 10 | $ (2,215) | $ (2,215) | $ (2,215) |
| | Post-Petition Taxes | 11 | (292) | (292) | (292) |
| | PBGC Administrative Claim | 12 | (2,800) | (2,800) | (2,800) |
| | Total Estimated Administrative Claims | | (5,307) | (5,307) | (5,307) |
| | *% Recovery to Administrative Expenses* | | *100.0%* | *100.0%* | *100%* |
| | **Estimated Proceeds Available for Priority Claims, Second Lien Secured Note Claims, and General Unsecured Claims** | | $ (179) | $ 171 | $ 1,092 |
| **D.** | **Estimated Priority Claims** | | | | |
| | Priority Taxes | 13 | $ (232) | $ (232) | $ (232) |
| | PBGC Priority Claim | 12 | (610) | (610) | (260) |
| | Total Estimated Priority Claims | | (842) | (842) | (492) |
| | *% Recovery to Priority Claims* | | *-21.3%* | *20.3%* | *100%* |
| | **Estimated Proceeds Available for Second Lien Secured Note Claims, and General Unsecured Claims** | 14 | $ (1,022) | $ (672) | $ 600 |

2

<u>Notes to Liquidation Analysis</u>

\*      **Amounts included for proceeds, expenses and claims reflect best estimates at the time the analysis was prepared (early August 2018). All amounts in the analysis are reflected *as of* June 13, 2018, when substantially all of the Debtors' assets were sold under a Section 363 sale transaction (the "Closing"). Cash assets have been (and continue to be) used to satisfy certain expenses and claims in the normal course since the Closing, and thus, amounts are not necessarily reflective of current balances, although estimated net proceeds available to creditors remains the same.**

1.      Represents cash proceeds from Purchaser's funding of Wind-down Budget, including $10.8 million funded at Closing and $0.4 million funded subsequently, net of amounts escrowed (see Note 2).

2.      Represents cash placed into separate escrow accounts at Closing for the payment of certain pre-sale professional fees and transaction fees.

3.      Represents estimated amounts receivable from the investment advisor for benefit plans not assumed by Purchaser and being terminated. Amount has subsequently been collected.

4.      Represents anticipated refund of unearned premium related to a D&O insurance policy not assumed by Purchaser.

5.      Represents amounts funded by the Purchaser for the General Unsecured Creditors' Cash Pool ($0.6 million) and Liquidating Trust ($0.35 million), under terms of Settlement Agreement.

6.      Represents estimate for expenses (other than professional fees) during the wind-down period.

7.      Represents accrued and unpaid professional fees at Closing and professional fees required to wind down the Debtors' estates through the time of a Chapter 7 Trustee appointment.

8.      Represents fees for the appointed Chapter 7 Trustee, estimated at 3% of distributable proceeds.

9.      Represent fees for legal and financial advisors of Chapter 7 Trustee, estimated to range between 2x ($0.7 million) and 3x ($1.05 million) the fees allocated to the Chapter 11 Liquidating Trust under the Settlement Agreement ($0.35 million). Such amounts in either scenario would be used to fund investigation and litigation related costs to pursue causes of action, and such costs are expected to be greater in the Chapter 7 scenario due to greater availability of funds.

10.      Represents amounts owed to creditors for goods delivered within the 20 days prior to the bankruptcy filing and adjustments required to resolve objections to cure notices sent to creditors.

11.      Represents estimate of income taxes, sales and use taxes, franchise taxes and UK-VAT taxes owed by the Debtor as of Closing.

12.      Represents post-Closing settlement with PBGC for priority and administrative claims. A $0.35 million portion of the priority claim in the Chapter 11 scenario is contingent upon receiving litigation proceeds, and thus not reflected.

13. Represents prepetition sales and use taxes owed by the Debtors, based upon audits conducted by the respective taxing authorities.

14. Second Lien Secured Note Claims would share in any Chapter 11 recoveries in excess of $0.6 million, as this amount has been earmarked for General Unsecured Creditor Claims under the terms of the Settlement.