# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA, INC., *et al.*,[1] | Case No. 25-10475 (TMH) |
| | (Jointly Administered) |
| | Hearing Date: Feb. 20, 2026 at 10:00a.m. |
| | Objection Deadline: Feb. 16, 2026 at 12:00 p.m. (extended by agreement) |
| Debtors. | Re: D.I. 1318 & 1319 |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) CONDITIONALLY APPROVING THE DISCLOSURE STATEMENT, (II) SCHEDULING THE COMBINED HEARING, (III) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF PLAN AND FINAL APPROVAL OF ADEQUACY OF DISCLOSURES, (IV) ESTABLISHING SOLICITATION, VOTING, AND RELATED PROCEDURES, (V) APPROVING RELATED DATES, DEADLINES, AND PROCEDURES, AND (VI) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Regions 3 and 9 ("U.S. Trustee"), files this

objection ("Objection") to the *Debtors' Motion for Entry of Order (I) Conditionally Approving*

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

*the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates, Deadlines, and Procedures, and (VI) Granting Related Relief* (the "<u>Solicitation Motion;</u>" D.I. 1319), and in support of the Objection states:

## . **PRELIMINARY STATEMENT**

1.      First, the Debtors' proposed *Disclosure Statement* (the "<u>Disclosure Statement</u>") *for the Joint Chapter 11 Plan of Liquidation* (the "<u>Plan;</u>" D.I. 1319) *of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates* (the "<u>Disclosure Statement;</u>" D.I. 1318) should not be approved for purposes of solicitation because it fails to provide adequate information[2] regarding the releases under the Plan.[3]

2.      Second, the Disclosure Statement should not be conditionally approved because, among other things, the non-consensual third-party releases render the proposed Plan unconfirmable.  Through the Plan, the Debtors seek to extinguish a broad range of direct claims against non-debtor parties held by other non-debtor parties without their affirmative consent, including claims held by: (i) all creditors who are deemed to accept the Plan and who do not timely opt out; (ii) all creditors who vote to accept the Plan, who are not provided the ability to opt out;[4]

---

[2]   The U.S. Trustee's counsel has provided informal comments to Debtors' counsel to the Disclosure Statement, the form of order approving the Disclosure Statement, and the solicitation procedures and related notices which counsel expects will be resolved by agreement. The U.S. Trustee understands such changes are forthcoming, but for purposes of this Objection only discusses items that have been filed on the Docket. Those changes will be insufficient to address this objection in full.

[3]   *Joint Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates* (the "<u>Plan;</u>" D.I. 1317).

[4]   The definitions in the Plan prohibit a party that accepts from being able to opt-out, but contrary language is included in the Disclosure Statement and in the proposed form of Ballots, risking confusion for parties that are afforded the opportunity to vote on the Plan.  *Compare* Disclosure Statement at p. 1 ("**PLEASE NOTE THAT A *HOLDER OF A CLAIM WHO VOTES TO ACCEPT THE PLAN AND WHO DOES***

2

(iii) all creditors who abstain from voting on the Plan and who do not timely opt out; and (iv) all creditors and equity holders who are sent a notice of non-voting status package and who do not timely opt out.  In addition, under the Plan all "Related Parties" of the "Released Parties" are providing the releases without the ability to opt out, and, if they are not independently a creditor or equity holder of the Debtors, without any notice.[5]

3.     As the discussion below demonstrates, neither the Disclosure Statement nor the Debtors' proposed solicitation procedures should be approved, and the Motion should be denied in its current form.

## JURISDICTION & STANDING

4.     Under 28 U.S.C. § 586(a)(3), the U.S. Trustee is charged with administrative oversight of the bankruptcy system in this District.  This oversight is part of the U.S. Trustee's overarching responsibility to enforce the laws as written by Congress and interpreted by the courts. *See, e.g.*, *In re United Artists Theatre Co. v. Walton*, 315 F.3d 217, 225 (3d Cir. 2003) (holding that United States Trustees "protect the public interest by aiding bankruptcy judges in monitoring certain aspects of bankruptcy proceedings"); *U.S. Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that the U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest); *see*

---

*NOT TIMELY SUBMIT A RELEASE OPT-OUT* **IN ACCORDANCE WITH THE BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN WILL BE DEEMED TO <u>CONSENT TO THE RELEASES CONTAINED IN ARTICLE X OF THE PLAN</u>**") (italics added) *with* Plan Art. I.A. ("'Releasing Party' means (a) the Released Parties; (b) all Holders of Claims or Interests that are Unimpaired; (c) all Holders of Claims or Interests that (i) vote to accept the Plan or (ii) do not vote on the Plan, and for each of the foregoing, do not make a Release Opt-Out Election; (d) all Holders of Claims or Interests who receive a Notice of Non-Voting Status Package and do not make a Release Opt-Out Election;").

[5]  The release by Related Parties applies "solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity . . . ."  Plan Art. I.A. "Releasing Party"

*also* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 88 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049 (United States Trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena").

5.      Under 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases, and to file "in connection with hearings under [11 U.S.C. §§ 1125 and 1128] comments with respect to such plans and disclosure statements" whenever the U.S. Trustee considers it to be appropriate.

6.      Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the issues raised in this pleading.

## STATEMENT OF FACTS

7.      On March 17, 2025, each of the above-captioned Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

8.      On April 1, 2025, the U.S. Trustee filed an Amended Notice regarding the appointment of the Official Committee of Unsecured Creditors ("Committee").

9.      The Debtors filed their Plan and Disclosure Statement on January 29, 2026. The Debtors filed the Solicitation Motion that same day, which seeks (i) conditional approval of the Disclosure Statement for purposes of solicitation and (ii) approval of certain procedures concerning the solicitation of votes on the Plan.

**The Solicitation Procedures**

10.     The Solicitation Motion requests approval of the form of ballot for use in soliciting votes from Class 3B (Non-Library Debtors General Unsecured Claims) and Class 4 (Senior Secured Notes Claims).  Solicitation Mot. ¶¶ 3, 9 & Ex. 2-A & 2-B (Form Ballots).

11.     Page 3 of the Ballot contains conflicting language regarding the mechanics of the Third-Party Release:

**Item 2. Vote on Plan.**

The Holder of the Class 3B Claim set forth in Item 1 votes to (please check only <u>one</u> box):

| ☐ | **ACCEPT** (vote FOR) the Plan | ☐ | **REJECT** (vote AGAINST) the Plan |
|---|---|---|---|

### IMPORTANT INFORMATION REGARDING THE THIRD PARTY RELEASE IN ARTICLE XI.B OF THE PLAN:

**IF YOU ARE A "RELEASED PARTY" OR YOU VOTE TO ACCEPT THE PLAN AND DO NOT OTHERWISE OPT-OUT, YOU SHALL BE A "RELEASING PARTY" UNDER THE PLAN, AND YOU WILL BE DEEMED TO HAVE CONSENTED TO THE THIRD-PARTY RELEASE PROVISIONS CONTAINED IN THE PLAN. YOUR DECISION ON THIS ELECTION DOES NOT AFFECT THE AMOUNT OF DISTRIBUTION YOU WILL RECEIVE UNDER THE PLAN. IF YOU ABSTAIN FROM VOTING OR VOTE TO REJECT THE PLAN, YOU MAY OPT IN TO THE THIRD-PARTY RELEASES BY CHECKING THE BOX AT OPTION "B" BELOW.**

**A. Release Opt-Out Election. (ONLY APPLICABLE IF YOU <u>DID NOT VOTE TO ACCEPT</u> THE PLAN).** Check this box if you elect <u>not to grant</u> the releases contained in Article XI.B of the Plan. Election to opt-out is at your option and is in your sole discretion. If you vote to accept the Plan and do not check the box below, you shall be deemed to have consented to the release provisions set forth in Article XI.B of the Plan.

The Holder of the Class 3B Claim against the Debtors set forth in Item 1 elects to:
☐ **OPT OUT** of the Third-Party Release set forth in Article XI.B of the Plan

**Item 3. The Plan Includes Certain Injunction, Release, and Exculpation Provisions.**

**Selected Defined Terms in the Plan**

Solicitation Mot. Ex. 2-A at p. 3.

12.     The conspicuous language between Item 2 and Item A indicates a party may vote to accept and then also "opt-out", which is contradicted by additional conspicuous language in Item A, stating the opting out is "only applicable if you did not vote to accept the Plan." *Id.* (emphasis removed). The Ballot also makes reference to an Item B for an "Opt-In" which is not included in the Ballot. *See id.* While the definition of "Releasing Party" is otherwise included in the ballots, the instructions could lead a party voting in favor of the Plan to believe that it has validly opted out of the releases by checking the opt-out box because of the contradictory language.

13.     The Motion also requests approval of the Combined Hearing Notice and Notices of Non-Voting status, with Packages for Unimpaired Classes and Impaired Classes. Solicitation Mot.

5

¶¶ 3, 9 & Ex. 1, 3-A & 3-B. Neither of these notices mention the Third-Party Releases prominently at the outset. There is no separate warning that the failure to object or otherwise opt out will be deemed consent; rather, the recipient must wade through definitions in the Disclosure Statement and Plan to determine that they are deemed to give releases and how to opt out. No context or other information is provided regarding the Third-Party Releases. There is no form provided for non-voting creditors and equity holders to return to opt-out, and no instructions are provided on how to opt-out or the deadline for doing so. This is especially problematic for creditors in classes deemed to accept the Plan, or unknown creditors receiving only publication notice, as they are not being served with the actual Plan and Disclosure Statement.

14.     The Plan does separately define "Release Opt-Out Election" to include "(ii) selects the option set forth on the Ballot or the Notice of Non-Voting Status Package, as applicable[,] to not grant the releases set forth in Article XI of this Plan, or (b) *Filing a written objection to the releases* set forth in Article XI of this Plan by the Confirmation Objection Deadline." Plan Art. I.A. (bracketed text and emphasis added).  The term "Release Opt-Out Election" is not included in the "definitions" section of the Ballots or other materials, but the term is used in the Releasing Party definition that is included.  Ex. 2-A & 2-B at p. 4.

15.     Holders of Administrative Claims and Priority Tax Claims are not classified into voting classes, consistent with 11 U.S.C. § 1123(a)(1). The Bankruptcy Code provides that only those *classes* of claims that are unimpaired are presumed to have accepted the plan. 11 U.S.C. § 1126.  If the Debtors intend that holders of unclassified claims will be deemed as providing consent to the releases if they do not opt out, the Plan, the Disclosure Statement and the various notices need to be amended. If holders of Administrative and Priority Tax Claims are not granting the

releases and therefore do not need to opt out, the Disclosure Statement and notices should make this clear in plain English.

**Relevant Plan Provisions**

16.    The Disclosure Statement purports to include a Liquidation Analysis, which was not initially attached, but has since been filed. D.I. 1328.

17.    The third-party release provision in the Plan (the "Releases by Holders of Claims and Interests" or the "Third-Party Release") states in relevant part:

> Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties and the other Releasing Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or noncontingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Retained Causes of Action; (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order or (d) any right to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Senior Secured Notes Collateral Agent may have against the Senior Secured Noteholders under the Senior Secured Notes Agreement.
> Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their

Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

Plan Art. XI.B (emphasis removed).

18.     The Plan provides the following with respect to the release of claims by the Debtors

(the "Releases by the Debtors"):

Effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors or their Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any obligations of a Purchaser arising under the applicable Asset Purchase Agreement and Sale Order, or (c) any Retained Causes of Action.

Upon the Effective Date, the Debtors shall be deemed to have released all Claims, Causes of Action, or remedies arising under section 547 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including voidable transfer laws against holders of Allowed Non-Library Debtors General Unsecured Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and

compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates, asserting any claim or Cause of Action released pursuant to the Debtor Release.

Plan Art. XI.A.

19.     The Plan further provides:

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

Plan Art. XII.

20.     In the Plan, "Releasing Parties" are defined as follows:

means (a) the Released Parties; (b) all Holders of Claims or Interests that are Unimpaired; (c) all Holders of Claims or Interests that (i) vote to accept the Plan or (ii) do not vote on the Plan, and for each of the foregoing, do not make a Release Opt-Out Election; (d) all Holders of Claims or Interests who receive a Notice of Non-Voting Status Package and do not make a Release Opt-Out Election; and (e) each Related Party of each Entity in the foregoing clauses (a) through (d), solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (d); provided, however, the Debtors shall not be a Releasing Party to the extent being a Releasing Party is duplicative or inconsistent with the Debtor Releases provided in Article X.A herein or any Retained Cause of Action; and provided further that Releasing Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election.

Plan Art. I.A.

21.     "Released Party" is defined under the Plan as follows:

means each of the following and in each case in its capacity as such: (a) the Debtors; (b) each of the Senior Secured Notes Parties; (c) the Holders of DIP Claims; (d) the Liquidation Trustee; (e) the Committee and its members, each in their capacities as such; (f) the Holders of Existing Equity Interests and (g) each Related Party of each Entity in clause (a) through this clause (f); provided that, a Released Party shall only be a Released Party if it is also a Releasing Party.

9

Plan Art. I.A.

22.    The prior definition also includes the term "Related Parties," who are defined

under the Plan as follows:

> means each of, and in each case in its capacity as such, current and former directors,
> managers, officers, committee members, members of any governing body, equity
> holders (regardless of whether such interests are held directly or indirectly),
> affiliated investment funds or investment vehicles, managed accounts or funds,
> predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners,
> limited partners, general partners, principals, members, management companies,
> fund advisors or managers, employees, agents, trustees, advisory board members,
> financial advisors, attorneys (including any other attorneys or professionals
> retained by any current or former director or manager in his or her capacity as
> director or manager of an entity), accountants, investment bankers, consultants,
> representatives, and other professionals and advisors and any such person's or
> entity's respective heirs, executors, estates, and nominees.

Plan Art. I.A.

## ARGUMENT[6]

## I.    The Disclosure Statement Does Not Contain Adequate Information.

23.    Section 1125 of the Bankruptcy Code provides that a disclosure statement must

contain "adequate information" describing a confirmable plan. 11 U.S.C. § 1125; *see In re Quigley

Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007). The Bankruptcy Code defines "adequate

information" as:

> [i]nformation of a kind, and in sufficient detail, as far as is
> reasonably practicable in light of the nature and history of the debtor
> and the condition of the debtor's books and records, including a
> discussion of the potential material Federal tax consequences of the
> plan to the debtor, any successor to the debtor, and a hypothetical
> investor typical of the holders of claims or interests in the case, that
> would enable such a hypothetical reasonable investor of the relevant
> class to make an informed judgment about the plan . . . .

---

[6] The U.S. Trustee reserves any objection to the confirmation of the Debtors' Plan, and has already provided
certain informal comments with respect to Plan confirmation beyond the items identified in this Objection.

11 U.S.C. § 1125(a)(1) (emphasis added); *see Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.,* 233 B.R. 46, 54 (S.D.N.Y. 1999).

24.     The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (*citing Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.),* 848 F.2d 414 (3d Cir. 1988)).

25.     The "adequate information" requirement is designed to help creditors in their negotiations with debtors over the plan. *See Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions.  See 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.,* 228 F.3d 224, 248 (3d Cir. 2000).

26.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re Duratech Indus.,* 241 B.R. 291, 298 (Bankr. E.D.N.Y.), aff'd, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan); *In re McLean Indus.,* 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan").

27.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less. *See In re Crowthers McCall Pattern, Inc.,* 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors. *See In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988)).

28.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case." *See Oneida,* 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

29.     A disclosure statement must inform the average creditor what it is going to get and when, and what contingencies there are that might intervene. *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). Although the adequacy of the disclosure is determined on a case-by-case basis, the disclosure must "contain simple and clear language delineating the consequences of the proposed plan on [creditors'] claims and the possible [Bankruptcy Code] alternatives . . . ." *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988).

30.     Here, the Debtors do not include in the Plan certain information that is necessary to creditors deciding how to respond to or vote on the Plan.  In the Disclosure Statement, the Debtors do not adequately inform creditors about the Plan's Third-Party Releases; the Disclosure Statement does not identify all entities proposed to be released via the Third-Party Release provision, nor does it include any discussion of the alleged consideration being provided (or not being provided) in exchange for such releases.  The term Released Parties includes various generic categories of persons and entities.  Similarly, the term Related Parties is defined to include broad categories of people and entities who are not identified in the Disclosure Statement or anywhere else.

31.     The proposed ballots and notices do not clearly set forth the precise contours of how and when claimants/creditors may opt out of the Third-Party Releases.  In addition, the ballots are internally contradictory as to whether a vote to accept precludes opting out.

32.     The definition of Releasing Parties suggests that creditors who vote for the Plan are precluded from opting out of the Third-Party Releases, but the ballots indicate that creditors voting to approve the plan may submit an opt-out form.  The defined term Release Opt-Out Election further complicates whether the filing of an objection would effectuate a Third-Party Release opt out irrespective of how the party voted on the Plan.

33.     Because the Disclosure Statement fails to provide adequate information as to the above-referenced items, and in some instances inconsistent disclosures are provided, it should not be approved by the Court.

## II.    The Plan Is Not Confirmable Because It Includes Non-Consensual Third-Party Releases

34.     If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied. *See In re Quigley Co*., 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) (citing *In re Beyond.com Corp.,* 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs*., 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)). Here, the Plan is not confirmable because it includes non-consensual third-party releases.

35.     The Supreme Court held in *Harrington v. Purdue Pharma L.P.* that bankruptcy courts cannot involuntarily alter relationships between non-debtors by imposing nonconsensual releases of, or injunctions barring, claims between them. 603 U.S. 204, 209, 227 (2024). The Court did not prohibit chapter 11 plans from memorializing consensual third-party releases, and it did not "express a view on what qualifies as a consensual release." *Id.* at 226.

13

36.     A consensual third-party release is a separate agreement between non-debtors governed by nonbankruptcy law. As the Supreme Court recognized in *Purdue*, a release is a type of settlement agreement. *Purdue*, 603 U.S. at 223 (explaining that what the Sacklers sought was not "a traditional release" because "settlements are, by definition, consensual") (cleaned up).  A bankruptcy court can acknowledge the parties' agreement to a third-party release, but the authority for a consensual release is the agreement itself, not the Bankruptcy Code.  If a claim has been extinguished by virtue of the agreement of the parties, then the court is not using the forcible authority of the Bankruptcy Code or the bankruptcy court to extinguish the property right.

37.     Here, there is no existing release agreement between non-debtors. The Debtors instead seek to confirm a plan that would use the power of the court to impose a third-party release on claimants without their affirmative and voluntary consent. Such a confirmation order would impermissibly alter the relations between non-debtors because a valid release does not exist under nonbankruptcy law.

### A.      State Contract Law Applies

38.     "[T]he basic federal rule in bankruptcy is that state law governs the substance of claims." *Travelers Cas. & Sur. Co. of America v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (cleaned up); *accord Butner v. United States*, 440 U.S. 48 (1979). Thus, courts apply state law when the question is whether a debtor has entered a valid settlement agreement. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law.").

14

39.    The rule is no different for third-party releases. They are separate agreements between non-debtors governed by state law. Unlike a bankruptcy discharge, which "is an involuntary release by operation of law," "[i]n the case of voluntary releases, the nondebtor is released from a debt, not by virtue of 11 U.S.C. § 1141(b), but because the *creditor agrees to do so*." *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 503, 507 (Bankr. D.N.J. 1997) (emphasis in original); *see also Continental Airlines Corp. v. Air Line Pilots Assn., Int'l (In re Continental Airlines Corp.)*, 907 F.2d 1500, 1508 (5th Cir. 1990) (holding that for settlement provisions "unrelated to substantive provisions of the Bankruptcy Code," "the settlement itself is the source of the bankruptcy court's authority"). Thus, "the Bankruptcy Code has not altered the contractual obligations of third parties, the parties themselves have so agreed." *Arrowmill*, 211 B.R. at 507.

40.    Because the Bankruptcy Code does not authorize the imposition of an involuntary release, *Purdue*, 603 U.S. at 209, 227, the release must be consensual under non-bankruptcy law. There is no Bankruptcy Code provision that preempts otherwise applicable state contract law governing releases between non-debtors. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)); *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) ("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state."). Section 105(a), for example, "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 603 U.S. at 216 n.2 (quotation marks omitted). But the Code does not confer any authority to impose a release of claims between non-debtors that would not be valid under state law. The Bankruptcy Code does not define a "consensual release." *See* 11 U.S.C. § 101.

15

"There is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism" for third-party releases in chapter 11 plans. *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015). And no Code provision authorizes bankruptcy courts to deem a non-debtor to have consented to release claims against other non-debtors where such consent would not exist as a matter of state law.

41.     Some courts have held that federal rather than state law applies to determine whether a third-party release is consensual.[7] But because there is no applicable Code provision, whether a non-debtor has consented to release another non-debtor is not, as one court concluded, a "matter of federal bankruptcy law." *In re Spirit Airlines, Inc.*, 689 B.R. 689, 716-19 (Bankr. S.D.N.Y. 2025).; *see also In re Robertshaw US Holding Corp.*, 662 B.R. 300, 323 (Bankr. S.D. Tex. 2024) (relying on caselaw in the district to support the idea that federal law governs third-party releases, rather than any provision of the Bankruptcy Code). Absent express authority in the Code, federal courts cannot simply make up their own rules for when parties have given up property rights by releasing claims. Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Indeed, nearly a hundred years ago, the Supreme Court rejected the notion that federal courts can displace state law as "an unconstitutional assumption of powers by the Courts of the United States which no lapse of time or respectable array of opinion should make us hesitate to correct." *Erie*, 304 U.S. at 79 (cleaned up); *accord Rodriquez v. FDIC*, 589 U.S. 132, 133 (2020)

---

[7]  One court recently found that the releases are not consensual under either State or Federal law, and therefore it is not necessary to decide whether federal or state law controls. *In re Gol Linhas Aereas Inteligentes S.A.*, __ B.R. __, 2025 WL 3456675, *5 (S.D.N.Y. Dec. 1, 2025), *appeal filed In re Gol Linhas Aereas Inteligentes S.A.*, Case No. 26-49 (2d Cir. Jan. 9, 2026).  Another court reached the conclusion that state law did not apply.  *See In re The Container Store Group, Inc.*, Case No. H-25-618, Slip Op. at p. 17-18 (S.D. Tex. Feb. 12, 2026).

(holding state law applies to determine allocation of federal tax refund resulting from consolidated tax return). Courts thus may not invent their own rule for when parties may be "deemed" to have given up property rights by releasing claims.

42.     Accordingly, state-law contract principles govern whether a third-party release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.,* 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, 665 B.R. 704, 720 (Bankr. D. Del. 2024) (recognizing that "some sort of affirmative expression of consent that would be sufficient as a matter of contract law" is required); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *Arrowmill*, 211 B.R. at 506, 507 (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). Because "'nothing in the bankruptcy code contemplates (much less authorizes it)' . . . any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp*., 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (quoting *Purdue*, 603 U.S. at 223).  And "any such consensual agreement would be governed by state law." *Id.*

43.     Even if federal law applied, however, it would not lead to a different result. That is because "federal contract law is largely indistinguishable from general contract principles under state common law." *Young v. BP Expl. & Prod., Inc. (In re Deepwater Horizon)*, 786 F.3d 344,

354 (5th Cir 2015) (cleaned up); *see also Deville v. United States*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) ("The federal law that governs whether a contract exists 'uses the core principles of the common law of contracts that are in force in most states.' . . . These core principles can be derived from the Restatements.") (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003)).

### B. Under State Law, Silence Is Not Acceptance

44.     The Debtors bear the burden to prove that their plan is confirmable. *In re American Cap. Equip., LLC*, 688 F.3d 145, 155 (3d Cir. 2012). Under Delaware law, like in other states, an agreement to release claims—like any other contract—requires a manifestation of assent to that agreement. *See, e.g.*, *In re Hertz Corp.*, 120 F.4th 1181, 1192 (3d Cir. 2024) ("Contract law does not bind parties to promises they did not make."); *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018) ("Under Delaware law, overt manifestation of assent . . . controls the formation of a contract.") (cleaned up); RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."); *see also In re Gol Linhas*, 2025 WL 3456675, at *5 ("Looking to the Restatement (Second) of Contracts for guidance, the New York Court of Appeals has 'repeatedly' held that 'a binding contract requires an objective manifestation of mutual assent, through words or conduct, to the essential terms of the agreement.'").

45.     Thus, "[o]rdinarily[,] an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.); *see also Reichert v. Rapid Investments, Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe conditions so as to turn silence into acceptance."); *Jacques v. Solomon & Solomon P.C.*, 886 F. Supp. 2d 429, 433 n.3 (D. Del. 2012) ("Merely sending an unsolicited offer does not impose

upon the party receiving it any duty to speak or deprive the party of its privilege of remaining silent

without accepting."); *Elfar v. Wilmington Trust, N.A.*, No. 20-0273, 2020 WL 7074609, at *2 n.3

(E.D. Cal. Dec. 3, 2020) ("The court is aware of no jurisdiction whose contract law construes

silence as acceptance of an offer, as the general rule."), *adopted by* 2020 WL 1700778, at *1 (E.D.

Cal. Feb. 11, 2021).

46.     There are only very limited exceptions to the "general rule of contracts . . . that

silence cannot manifest consent." *Patterson*, 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell

Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in

response to an offer . . . does not constitute acceptance of the offer"). "[T]he exceptional cases

where silence is acceptance fall into two main classes: those where the offeree silently takes

offered benefits, and those where one party relies on the other party's manifestation of intention

that silence may operate as acceptance. Even in those cases the contract may be unenforceable

under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

47.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited

offer does not impair the offeree's freedom of action or inaction or impose on him any duty to

speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. And "[t]he mere fact that an offeror

states that silence will constitute acceptance does not deprive the offeree of his privilege to remain

silent without accepting." *Id.* § 69, cmt. c; *see also Patterson*, 636 B.R. at 686 (explaining how

contract law does not support deeming consent based upon a failure to opt out); *Jacques*, 886 F.

Supp. 2d at 433 n.3.

**C.      Merely Voting for a Plan Does Not Provide the Required Affirmative Consent**

48.     Under the proposed Plan, the non-debtor releases would bind all parties who vote to accept it. Because the Plan would impose non-debtor releases on these parties based on their silence, the releases are not consensual under state law and thus cannot be approved under *Purdue*.

49.     Debtors mistakenly equate a vote for the Plan, which is governed by the Bankruptcy Code's provisions for adjusting relations between a debtor and its creditors, with acceptance of proposed third-party releases, which are contracts governed by state law dealing with relations between non-debtor parties. Those are distinct legal constructs involving distinct parties: the Plan disposes of a creditor's claims against the debtor, while a third-party release disposes of a non-debtor's right to sue other non-debtors. There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. "[A] creditor should not expect that [its] rights [against non-debtors] are even subject to being given away through the debtor's bankruptcy." *Smallhold,* 665 B.R. at 721.

50.     Debtors' conflation of voting for the Plan with acceptance of the third-party release violates black-letter contract law, which requires a manifestation of intent to be bound by the third-party release. *See supra* §§ II.A &B. Voting to accept a plan does not manifest that intent. A chapter 11 plan allocates how the bankruptcy estate will pay claims and interests against the debtor. *See* 11 U.S.C. § 1123. If the plan is confirmed, only claims and interests against the debtor are discharged. 11 U.S.C. § 524(e). And it is "[b]ecause discharge affects a creditor's rights, [that] the Code generally requires a debtor to vie for the creditor's vote first." *Keystone Gas Gathering, L.L.C. v. Ad Hoc Comm. (In re Ultra Petroleum Corp.),* 943 F.3d 758, 763 (5th Cir. 2019). The right to vote on a plan depends solely on how the plan treats claims and interests against the debtor. *See* 11 U.S.C. §§ 1124, 1126, 502, 501, 101(10); *Ultra Petroleum Corp.,* 943 F.3d at 763; 7

COLLIER ON BANKRUPTCY ¶ 1126.02 (16th 2025). Claims and interests that are not impaired by the plan are deemed accept it. *See* 11 U.S.C. §§ 1124, 1126; *Ultra Petroleum Corp.,* 943 F.3d at 763. Because the purpose of a chapter 11 plan is to determine how claims and interests against the debtor will be treated, voting to accept a chapter 11 plan does not manifest an intent to be bound by the third-party release. *See In re Congoleum Corp*., 362 B.R. 167, 194 (Bankr. D.N.J. 2007); *In re Arrowmill Dev. Corp*., 211 B.R. 497, 507 (Bankr. D.N.J. 1997*); In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).

51.     Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Arrowmill,* 211 B.R. at 507 (quotation marks omitted); *accord Congoleum Corp.,* 362 B.R. at 194 ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *Digital Impact, Inc*., 223 B.R. at 14. Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill,* 211 B.R. at 507. The "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id*. (citation and alterations omitted).

52.     In addition to the lack of consent under state law, imposing a third-party release on everyone who votes to accept the plan may discourage creditors from voting. This would distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims against the debtor. *Smallhold,* 665 B.R. 716. In addition, the proposed Ballots in these cases do not warn a creditor that a vote in favor of the Plan equals consent to the third-party releases but implies that such creditors may still nevertheless opt out.

**D.      Failing to Opt Out Does Not Provide the Required Affirmative Consent**

53.      The Plan imposes a third-party release on all creditors and equity holders who do not timely return the opt-out form or object to the Plan.  In other words, the Debtors purport to impose an otherwise non-existent duty to speak on claimants regarding the offer to release non-debtors, and their silence—the failure to opt out—is "deemed" consent. But under black-letter law that silence is not acceptance of the offer to release non-debtors.  *See, e.g., Gol Linhas,* 2025 WL 3456675, at * 5 (under federal law, consent cannot be conferred by silence absent rare exceptions not applicable to third-party releases in a plan); *Patterson,* 636 B.R. at 688 ("Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent.").

54.      A case from the Ninth Circuit illustrates the point.  In *Norcia v. Samsung Telecom. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017), and the Fifth Circuit in *Imperial Ind. Supply Co. v. Thomas*, 825 F. App'x 204, 207 (5th Cir. 2020), the court held that a failure to opt out did not constitute consent to an arbitration agreement.  A consumer bought a Samsung phone and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. The phone came with a Samsung warranty brochure that contained an arbitration provision but gave purchasers the ability to opt out of it without affecting the warranty coverage. *Id*. The customer did not opt out. *Id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

55.      The Ninth Circuit in *Norcia* held that the customer's failure to opt out did not constitute consent to arbitrate. The court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." *Norcia*, 845 F.3d at 1284

(quotation marks omitted). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted).

56.     The Ninth Circuit held that none of the exceptions to this rule applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

57.     Here, too, the Debtors' creditors have neither signed an agreement to release the non-debtor releasees nor otherwise acted in any other manner suggesting that their silence manifests an intention to accept an offer to release the non-debtors.

### *i.  Not voting and not opting out is not consent to release non-debtors.*

58.     Third-party releases cannot be imposed on those who do not vote and do not opt out. *See Smallhold,* 665 B.R. at 709; *SunEdison*, 576 B.R. at 458–61; *Chassix*, 533 B.R. at 81–82; *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011). This applies to (i) creditors in voting classes who do not vote and (ii) claimants/creditors in non-voting classes who receive an opt-out notice. There is no basis to infer the consent of those who do not vote and are taking no action with respect to the plan.

59.     Even where there are conspicuous warnings that a party will be bound if they remain silent, that is not sufficient to recast a party's silence as consent to a third-party release. *SunEdison*, 576 B.R. at 458–61. Creditors have no legal duty to vote on a plan, much less to respond to an offer to release non-debtors included in a plan solicitation. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *Gol Linhas*, 2025 WL 3456675, at * 6 ("[I]t is undisputed that the creditors had no duty to respond to the opt-out opportunity and courts do not enter default judgment when parties have no duty to respond."); *SunEdison,* 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that would allow a court to infer consent to third-party releases from silence). Consent thus cannot be inferred from their silence because "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." Restatement (Second) of Contracts § 69 cmt. c (1981). Nor can it "impose on him any duty to speak." *Id.* § 69 cmt. a.

60.     Further, "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred." *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). Consent thus cannot be inferred here because parties who are solicited but do not vote may have failed to vote for reasons other than an intention to assent to the releases. *SunEdison*, 576 B.R. at 461. This is especially true for those whose votes are not solicited at all—but who are instead sent a notice informing them they cannot vote but must opt out or object the Plan.

61.     "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point." *Chassix*, 533 B.R. at 81. "It is reasonable to require creditors to pay

attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties—which belong to the creditor and not the bankruptcy estate—a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." *Smallhold*, 665 B.R. at 721; *see also id.* at 719-20 (discussing *Chassix*). "A party's receipt of a notice imposing an artificial opt-out requirement, the recipient's *possible* understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent. *Emerge Energy Services, LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (emphasis in original). "[B]asic contract principles" require affirmative assent, not inferences drawn from inaction that in fact may reflect only "[c]arelessness, inattentiveness, or mistake." *Id.*

62.     Simply put, an "opt out mechanism is not sufficient to support the third-party releases . . . particularly with respect to parties who do not return a ballot (or are not entitled to vote in the first place)." *In re Washington Mut., Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011); *see also Chassix*, 533 B.R. at 81–82.

63.     Even more obviously, those who vote to reject the plan are not consenting to third-party releases by failing to mark an opt-out box.  Not only is there no "mutual agreement" as to the plan, much less the third-party release, the creditor has expressly stated its rejection of the plan. As the court in *In re Chassix Holdings, Inc.*, reasoned: "[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

64.     One bankruptcy court has found that, in at least some circumstances, a failure to

opt out constitutes consent when a claimant votes—either to accept or reject a plan—but not if

they do not vote. *See Smallhold,* 665 B.R. at 723. The *Smallhold* court incorrectly reasoned that

because the act of voting on a debtor's plan is an "affirmative step" taken after notice of the third-

party release, failing to opt out binds the voter to the release. *Id*. But while voting is an "affirmative

step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may

operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt.

a (1981) (emphasis added). That is because "[t]he mere receipt of an unsolicited offer does not

impair the offeree's freedom of action or inaction," *id.*—in these cases, the federal right to vote on

a chapter 11 plan. 11 U.S.C. § 1126(a). Nor does it "impose on him any duty to speak,"

RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a, such as by checking an opt out box.[8] Thus,

consent to release *third-party* claims (which are governed by *nonbankruptcy* law) cannot properly

be inferred from a party's failure to check an opt-out box on a ballot to vote on the proposed

treatment of claims against the *debtor* (governed by *bankruptcy* law).

### iii.     *The Proposed Notices Are Insufficient.*

65.     The Disclosure Statement cannot be approved for solicitation because there was

insufficient notice of the third-party releases. Imputing state-law consent to a non-debtor release

assumes that the creditor understands that the failure to opt out will have this dramatic impact,

---

[8] The *Spirit* court concluded that "creditors entitled to vote who returned a ballot but did not check the opt-out box on that ballot also clearly manifested their consent to the Third-Party Releases." *Spirit Airlines,* 668 B.R. at 719-20.  That is wrong because an unsolicited offer of a third-party release cannot impose a duty to speak or impair the freedom to vote on a plan.  Further, the *Spirit* court erred in assuming that the failure to check an opt-out box on a ballot necessarily shows that a creditor "affirmatively chose" not to check the box.  *Id*. at 720.  "When the circumstances are equally consistent with either of two facts, neither fact may be inferred."  *See In re Couture Hotel Corp.*, 554 B.R. 369, 383 n.80 (Bankr. N.D. Tex. 2016). And a failure to check an opt-out box is equally consistent with inadvertence or lack of understanding.

which would require both that the creditor sees the non-debtor release provision and that the creditor understands its terms. But that assumption has no evidentiary support.

66.     There is no acceptance of an offer when there is insufficient notice of the alleged contractual terms. *See Norcia*, 845 F.3d at 1285. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id*. (quotation marks omitted); *see also Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017) (reaffirming that a person cannot be presumed to have agreed to contractual provisions unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement")**]**. Hence, failing to opt out does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at 194.

67.     Here, the proposed notices bury the releases, do not include any meaningful discussion of their terms, includes the releases written in dense legalese, are written so vaguely that parties cannot determine who is being released, and include warnings that creditors are giving up something of value when the Plan does not so provide. Furthermore, the Disclosure Statement simply copies the releases and contains no significant discussion of the parties being released, the claims being released or the consideration provided in exchange for the releases.

### iv.     Opt Outs Cannot Be Imposed Based on a Procedural Default Theory.

68.     Applicable state contract law cannot be disregarded on a procedural default theory, applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just

as they would forfeit their right to object to a debtor's plan if they failed timely to do so.[9] *See, e.g.,*

*In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592, at \*5-\*6 (Bankr. D.

Del. Mar. 27, 2023), *abrogated by Smallhold, Inc.*, 665 B.R. at 716; *In re Mallinckrodt PLC*, 639

B.R. 837, 879-80 (Bankr. D. Del. 2022); *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19

(Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010),

*rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts reasoned that so long as

the creditors received notice of a proposed non-debtor release and were informed of the

consequences if they did not opt out or object to that release, there is no unfairness or deprivation

of due process from binding them to the release. *Cf. Smallhold*, 665 B.R. at 708 (describing this

reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party

release to be entered by default").

69.     A fuller explanation of this theory was articulated prior to the *Purdue* ruling in *In

re Mallinckrodt PLC*, 639 B.R. 837, 879-80 (Bankr. D. Del. 2022). The *Mallinckrodt* court stated

that "the notion that an individual or entity is in some instances deemed to consent to something

by their failure to act is one that is utilized throughout the judicial system." *Id*. "When a party to a

lawsuit is served with a complaint or a motion, they need to file an answer or otherwise respond,

or a judgment is automatically entered against them." *Id*. at 879. The court reasoned that "[t]here

is no reason why this principle should not be applied in the same manner to properly noticed

releases within a plan of reorganization." *Id*.

70.     This is wrong.  First, when a party in litigation is bound to a result based on a failure

to timely respond, it is not because the defaulting party has *consented* to an adverse ruling.  Rather,

---

[9]  Although the court in *Spirit* disclaimed relying on a default theory, *Spirit Airlines,* 2025 WL 737068, at \*17, it based its holding on the same rationale: that a party may be deemed to consent based on notice and a failure to respond, *id.* at \*9-\*10, \*12-\*13.

"failure to make timely assertion of [a] right before a tribunal having jurisdiction to determine it" results in *forfeiture* of the right. *United States v. Olano*, 507 U.S. 725, 731 (1993). Forfeiture, unlike waiver, is not an intentional relinquishment of a known right. *Id*. at 733; *cf. Smallhold*, 665 B.R. at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default."). Forfeiture principles thus do not show consent.

71.     Second, there is no basis to hold that parties have forfeited claims against non-debtor third parties based on their silence in response to a debtor's chapter 11 plan. No one has submitted the released claims for adjudication by the bankruptcy court. *See Olano*, 507 U.S. at 731; *Gol Linhas*, 2025 WL 3456675, at * 6 (rejecting arguments that: (i) creditors who have consented to the bankruptcy court's jurisdiction also consent to the approval of releases; (ii) class action opt-out procedures applied to the third-party releases before it; and (iii) that consent may be imputed from the failure to opt out).

72.     And under *Purdue,* imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 603 U.S. at 215-227 & n.1; *see also Smallhold*, 2665 B.R. at 709 ("After Purdue Pharma, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold,* 665 B.R. at 719.

73.     The Supreme Court's *Purdue* decision rejected a fundamental premise of the procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold,* 665 B.R. at 708-09; *see also id.* at 708 ("The possibility that a plan might be

confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id.* at 717-18. As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id.* at 709; *see also id.* at 718 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way. It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

74.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff" in contested litigation. *Id.* at 709; *see also id.* at 722 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so."); *see also Thomson v. Wooster,* 114 U.S. 104, 113 (1885) (holding a decree pro confesso may only be entered if it "is proper to be decreed"); *Surtain v. Hamlin Terrace Found.,* 789 F.3d 1239, 1245 (11th Cir. 2015) ("Entry of default judgment is only warranted when there is a sufficient basis in the pleadings for the judgment entered.") (cleaned up).

75.     "[After *Purdue*], that is no longer the case in the context of a third-party release." *Smallhold,* 665 B.R. at 722. A third-party release is not "an ordinary plan provision that can

properly be entered by 'default' in the absence of an objection." *Id.* "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. Because imposition of a nonconsensual non-debtor release is not relief available through a debtor's chapter 11 plan, it is not "appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id.* at 719-20.

76.     Because *Purdue* establishes that a nonconsensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id.* at 709. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out' as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release.[10] Rather, an "affirmative expression of consent that would be sufficient as a matter of contract law" is required. *Id.* at 720 (emphasis added).

77.     For the reasons set forth above, the Combined Plan cannot be approved for purposes of solicitation.

---

[10]  For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory. *See id.* at 716 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

## **RESERVATION OF RIGHTS**

78.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves the rights

to, *inter alia*, (i) amend or supplement this Objection or (ii) conduct discovery.

## **CONCLUSION**

**WHEREFORE,** the U.S. Trustee respectfully requests that this Court issue an order

denying the Motion and granting such other relief as this Court deems just.


Dated: February 16, 2026                          Respectfully submitted,
      Wilmington, Delaware

                                                        **ANDREW R. VARA**
                                                         **UNITED STATES TRUSTEE,**
                                                         **REGIONS 3 and 9**

By: *Timothy J. Fox, Jr.*
Timothy J. Fox, Jr. (# 6737)
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 King Street, Suite 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491 (Phone)
timothy.fox@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on February 16, 2026, I caused to be served a copy of the *United States Trustee's Objection to Debtors' Motion for Entry of Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates, Deadlines, and Procedures, and (VI) Granting Related Relief* by electronic service on the registered parties via the Court's CM/ECF system.


/s/ *Timothy J. Fox*